NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
BRITTNEY M. HARRIS (Cal. Bar No. 294650)
CHELSEA NORELL (Cal. Bar No. 280831)
Assistant United States Attorneys
International Narcotics, Money Laundering,
and Racketeering Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0488 / 2624
    Facsimile: (213) 894-0141
    E-mail:   Brittney.Harris@usdoj.gov
             Chelsea.Norell@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-00595-CAS |
|---|---|
|       Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S OPPOSITION TO GOVERNMENT'S REQUEST FOR DETENTION |
|         v. | |
| EDWARD BUCK, | |
|       Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brittney M. Harris and Chelsea Norell, hereby files its Opposition to Defendant's Opposition to Government's Request for Detention, filed on August 24, 2020.

///

///

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 25, 2020   Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division


   /s/ Brittney M. Harris
BRITTNEY M. HARRIS
CHELSEA NORELL
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                        PAGE

TABLE OF AUTHORITIES.............................................. ii

MEMORANDUM OF POINTS AND AUTHORITIES.............................. 1

I.    INTRODUCTION............................................... 1

II.   PROCEDURAL BACKGROUND...................................... 2

      A.    Offense Conduct, Indictment, and Superseding
            Indictment.......................................... 2

      B.    Detention Proceedings............................... 5

      C.    Defendant's Bail Reconsideration Application........ 5

      D.    BOP's Response to the COVID-19 Outbreak............. 6

      E.    Procedures in Place at MDC.......................... 8

      F.    Current Infection Rate at MDC....................... 9

III.  ARGUMENT.................................................. 9

      A.    Defendant's "Opposition" Should Be Construed as an
            Application for Bail Reconsideration as That is the
            Only Mechanism Through Which He Can Seek His Requested
            Relief.............................................. 9

      B.    Legal Standards for Bail Reconsideration Applications... 10

      C.    Defendant's Generalized Claim Regarding His Health
            Risk in Light of the COVID-19 Pandemic Does Not Meet
            the Materiality Requirement under Section 3142(f) or
            the Compelling Reason Requirement under Section
            3142(i)............................................. 13

      D.    Even if the Court Considers Defendant's Application,
            His Proposal Does Not Overcome the Rebuttable
            Presumption in Favor of Detention and the Government
            has Met its Burden in Showing that Defendant is a
            Flight Risk and a Danger to the Community............... 18

IV.   CONCLUSION................................................ 22

i

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                 <u>PAGE(S)</u>

Cases:

<u>United States v. Cazares</u>,

  2020 WL 1955730 (N.D. Cal. April 23, 2020) ....................... 16

<u>United States v. Dillon</u>,

  938 F.2d 1412 (1st Cir. 1991) ................................... 20

<u>United States v. Diaz-Barrios,</u>

  18-CR-354-DSF-MAA-9 (April 6, 2020)............................11

<u>United States v. Hir</u>,

  517 F.3d 1081 (9th Cir. 2008) ................................... 19

<u>United States v. Holloway</u>,

  781 F.2d 124 (8th Cir. 1986) .................................... 10

<u>United States v. Koenig</u>,

  912 F.2d 1190 (9th Cir. 1990) ................................... 10

<u>United States v. Martin</u>,

  2020 WL 1274857 (D. MD March 17, 2020) ..................... 14, 21

<u>United States v. McGill</u>,

  604 F.2d 1252 (9th Cir. 1979) ................................... 10

<u>United States v. Motamedi</u>,

  767 F.2d 1403 (9th Cir. 1985) ................................... 19

<u>United States v. Pimental,</u>

  19-CR-378-DMG-KK (April 3, 2020)................................11

<u>United States v. Ryan</u>,

  2020 WL 1861662 (C.D. Cal. April 14, 2020) .............. 13, 14, 15

<u>United States v. Terrone</u>,

  2020 WL 1844793 (D. Nev. April 10, 2020) ................ 11, 12, 16

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

Statutes:

18 U.S.C. § 3142.............................................. 10

18 U.S.C. § 3142(e)............................................ 1

18 U.S.C. § 3142(e)(1)........................................ 18

18 U.S.C. § 3142(e)(3)(A)................................. 16, 19

18 U.S.C. § 3142(f)....................................... 10, 11

18 U.S.C. § 3142(f)(2)(B)................................. 10, 11

18 U.S.C. § 3142(i).......................................passim

21 U.S.C. § 841(a)(1).......................................... 2

OTHER AUTHORITIES:

Center for Disease Control, CDC Updates: People with Certain Medical Conditions (updated August 14, 2020) <u>available at</u> https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html............... 13, 14

Center for Disease Control, CDC Updates (June 25, 2020) <u>available at</u> https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html.................................................... 15

Federal Bureau of Prisons, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), <u>available at</u> https://www.bop.gov/resources/news/20200319_covid19_update.jsp .................................................... 6, 7, 8, 9

Federal Bureau of Prisons, BOP, Pandemic Influenza Plan---Module 1: Surveillance and Infection Control (Oct. 2012), <u>available at</u> https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf...... 6, 7, 8

Federal Bureau of Prisons, BOP, Pandemic Influenza Plan---Module 3: Health Care Delivery (October 2012), <u>available at</u> https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf......... 7, 8

Federal Bureau of Prisons, BOP, Action Plan Phase V (Mar. 31, 2020), <u>available at</u> https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp .......................................................... 7

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

Federal Bureau of Prisons, BOP, COVID-19 Action Plan: Agency-Wide
Modified Operations (March 13, 2020), <u>available at</u>
https://www.bop.gov/resources/news/20200313_covid-19.jsp........... 7

Federal Bureau of Prisons, BOP, Bureau of Prisons Update on COVID-19
(Mar. 24, 2020), <u>available at</u>
https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_co
vid19_update.pdf.................................................... 7

Federal Bureau of Prisons, BOP Program Statement No. 6190.04,
Infectious Disease Management (June 3, 2014), <u>available at</u>
https://www.bop.gov/policy/progstat/6190_004.pdf................... 7

Federal Bureau of Prisons, BOP, Visitor/Volunteer/Contractor COVID-19
Screening Tool (March 2020) <u>available at</u>
https://www.bop.gov/coronavirus/docs/Visitor_Volunteer_Contractor_COV
ID-19%20Screening_v1_March_2020.pdf............................... 18

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant Edward Buck's brief substantively seeking bail reconsideration based on a claim that he is at a high risk for contracting COVID-19 due to his age (65 years old), "gum disease," and an "abnormal EKG" should be denied because defendant's conjecture ignores the Bureau of Prison's ("BOP") aggressive preparations for combatting COVID-19 and the Metropolitan Detention Center's ("MDC") low infection rate.  Given the procedures that the BOP has adopted to protect inmates' health and the fact that MDC's infection rate is a small fraction of a percent, there is no evidence that releasing defendant would promote his or anyone else's safety.

Additionally, defendant's application entirely ignores the facts justifying this Court's initial detention order.  Defendant's bail proposal of home confinement with a $400,000 signature bond does nothing to rebut the presumption in favor of detention or mitigate against the significant risk of non-appearance and danger that defendant poses to the community under 18 U.S.C. § 3142(e)-(f).  Defendant's offer of a $400,000 signature bond – not even a cash bond despite having at least $3.4 million in liquid assets – will not promote his continued appearance and, instead, provides him with the resources to flee anywhere in the world in order to avoid the very serious charges against him, including two 20-year mandatory minimum offenses.  Similarly, home confinement does nothing to protect the public because all of charges in this case, including the two overdose deaths, took place inside defendant's home.  In all, there are no conditions that will reasonably assure defendant's appearance

and protect the community, and as such, defendant should remain detained pending trial.

II.  **PROCEDURAL BACKGROUND**

    A.  **Offense Conduct, Indictment, and Superseding Indictment**

    Defendant was arrested on a federal complaint on September 19, 2019, which charged him with distributing methamphetamine resulting in Gemmel Moore's death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).  (Dkts. 1, 5.)

    The complaint detailed the circumstances surrounding Moore's death.  Specifically, it alleged that defendant purchased a flight for Moore to travel from Texas to Los Angeles, and arranged a car to pick Moore up from the airport and take him to defendant's West Hollywood home.  Id.  Hours later, Moore was found dead, naked on a makeshift mattress in defendant's living room floor with sex toys, glass pipes, dozens of syringes, and methamphetamine nearby.  (Dkt. 1.)  The autopsy determined that Moore died of a methamphetamine overdose.  Id.

    The complaint detailed the circumstances of another victim who died in defendant's home less than two years later and also from a methamphetamine overdose.  Id.  The second death victim, Timothy Dean, was found dead on a makeshift mattress in defendant's living room, naked, with sex toys on and around him, and glass pipes and syringes nearby.  Id.

    Additionally, the complaint detailed the accounts of nine other living victims all of whom reported similar accounts to law enforcement.  Id.  For example, Victim 2 recounted going over to defendant's home and after falling asleep on defendant's couch, he woke up with his arm red, sore, and tied to the couch.  Id.  Victim 2

surmised that defendant injected him with drugs while he was asleep. Id.  Victim 3 in the complaint recounted that defendant solicited Victim 3 to defendant's home to "party and play," i.e., to consume drugs and engage in sex.  Id.  Victim 4 recounted that defendant would pay him several hundred dollars per hour to come to defendant's home to engage in sexual activities and consume drugs that defendant supplied.  Id.  Victim 5 recounted a time when defendant gave Victim 5 two pills that made Victim 5's legs lock up.  Id.  Victim 6 told law enforcement that defendant was known in the Plummer's Park homeless community as "Doctor Kevorkian" because he would compensate male prostitutes with drugs and money.  Id.  Victim 6 recounted that on one occasion at defendant's home, defendant injected Victim 6 with methamphetamine and placed sex toys around his penis, which caused Victim 6 to lose consciousness, and on another occasion, defendant again injected Victim 6 with methamphetamine, which caused him to lose consciousness and when he awoke, his anus was sore and bleeding. Id.  Victim 7 went to defendant's house and defendant gave him a Klonopin pill and a syringe of methamphetamine, which caused Victim 7 to pass out.  Id.  When Victim 7 awoke, defendant was approaching him with two more syringes of methamphetamine.  Id.  Victim 8 told law enforcement about an encounter he had at defendant's home where defendant gave Victim 8 a drink, which defendant claimed was vodka, but after consuming it, Victim 8 fell asleep.  Id.  When Victim 8 woke up, his underwear was pulled down, his anus was in excruciating pain, metal clips were fastened to his nipples, and defendant was injecting Victim 8 with methamphetamine.  Id.  Finally, Victim 9 recounted that he went over to defendant's home on several occasions to engage in sexual activities in exchange for money and drugs, and

3

on some of the occasions, Victim 9 would fall asleep shortly after consuming the drugs and would wake up with defendant injecting or preparing an injection for Victim 9.  Id.

On October 2, 2019, a grand jury returned a five-count indictment against defendant charging him with two counts of distributing methamphetamine resulting in two victims' deaths and three counts of distributing methamphetamine to three other victims. (Dkt. 13.)  The grand jury found that there was probable cause that defendant engaged in a pattern of soliciting men – often targeting vulnerable, destitute, homeless, and/or drug-addicted victims - to come to defendant's home to engage in "party and play" sessions, which involved distributing drugs and engaging in sexual activities. Id.  The indictment alleged that defendant solicited men through online platforms, referrals from other victims, and a recruiter.  Id. The indictment alleged that defendant pressured, coerced, and/or incentivized his victims to consume drugs, sometimes offered a premium to victims who consumed more drugs, try new drugs, or let defendant inject them with drugs. Id.  Finally, the indictment alleged that defendant sometimes injected his victims without their consent, while they were unconscious, and/or with larger quantities of drugs than his victims agreed to receive.

On August 4, 2020, the grand jury returned a first superseding indictment, which contained all of the charges in the original indictment and four additional counts.  Specifically, defendant is also charged with: (1) distributing methamphetamine to a fourth living victim; (2) enticing two victims — Gemmel Moore and one of the living victims — to travel interstate to engage in prostitution; and (3) using his home as a drug distribution premises by distributing

methamphetamine, GHB (a common date rape drug), and clonazepam (sold under the brand name Klonopin, and is a powerful sedative that is particularly dangerous when consumed with other drugs and/or alcohol).

### B.  Detention Proceedings

At defendant's initial appearance on the complaint, the government moved for detention, which the Court granted on September 26, 2020, finding that there was no condition or combination of conditions that would reasonably assure defendant's appearance or the safety of any person or the community.  (Dkt. 11.)  In doing so, the Court considered the nature and circumstances of the offense, the weight of the evidence against the defendant, defendant's history and characteristics, and the nature and seriousness of defendant's danger to the community, and found that defendant did not rebut the presumption in favor of detention by sufficient evidence.  Id.

### C.  Defendant's Bail Reconsideration Application

In a telephonic meet and confer on July 29, 2020, defendant's counsel of record informed the government of defendant's intent to file an application for reconsideration of bail.  Defense counsel relayed that defendant's application would be premised on defendant being at a high risk of contracting COVID-19 due to defendant's age (65 years old) and a "pre-existing heart condition."  Defense counsel also relayed that it would be easier to meet with defendant in order to review the discovery and prepare his defense if defendant was released.

On August 24, 2020, defendant filed a brief titled "Opposition to Government's Request for Detention," which argues for release on a $400,000 signature bond with home confinement and location monitoring

1   due to the "serious risk" defendant faces being detained during the
2   COVID-19 pandemic and because he "will not be able to adequately
3   assist his attorney in preparing his defense." (Dkt. 37 at 6.)
4   Defendant's brief identifies his heightened COVID-19 risks as being
5   due to "gum disease," a single "abnormal EKG" in October 2019 –
6   departing from counsel's earlier assertion that defendant in fact had
7   a heart condition – and defendant's age. (Dkt. 37 at 4-5.)

8       **D.   BOP's Response to the COVID-19 Outbreak**

9       BOP has taken aggressive steps to protect inmates' health and to
10  resist the spread of COVID-19. "[M]aintaining safety and security of
11  BOP institutions is [the BOP's] highest priority." BOP, Updates to
12  BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), <u>available</u>
13  <u>at</u> https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

14      The BOP has never underestimated the threat of infectious
15  disease. To the contrary, the BOP has had a Pandemic Influenza Plan
16  in place since 2012. <u>Id</u>.; BOP, Pandemic Influenza Plan---Module 1:
17  Surveillance and Infection Control (Oct. 2012), <u>available at</u>
18  https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That
19  protocol is astoundingly detailed, establishing a six-phase framework
20  requiring BOP facilities to begin preparations when there is first a
21  "suspected human outbreak <u>overseas</u>." <u>Id</u>. at i (emphasis added).

22      At extremely early stages, the Pandemic Influenza Protocol
23  requires BOP facilities to ensure inmates' access to soap, to train
24  them on hand-hygiene practices, and to ensure adequate infection-
25  control supplies. <u>Id</u>. at 9. For every phase thereafter (from
26  preliminary preparation, to a response to active pandemic, to
27  recovery), it includes detailed procedures required of <u>every</u> BOP
28  facility. <u>Id</u>. at 9-11. These include policies for ensuring for

creating "social distance" and for requiring "frequent environmental cleaning of 'high-touch' surfaces." Id. at 2-3, 6.  Facilities must follow protocols on how to identify sick inmates, track their interactions, and quarantine the exposed.  Id. at 4-5.  They must also establish contingency plans to ensure that medical care is not disrupted, even when faced with an influx of sick inmates.  BOP, Pandemic Influenza Plan---Module 3: Health Care Delivery (October 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf.[1]

The BOP implemented its Pandemic Influenza Protocol in January 2020, modified as a COVID-19 Action Plan.  BOP, Action Plan Phase V (Mar. 31, 2020) ("Action Plan Phase V"), available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp In Phase 1 of that plan, the BOP began developing policies in consultation with the Centers for Disease Control.  See BOP, COVID-19 Action Plan: Agency-Wide Modified Operations (March 13, 2020) ("BOP Action Plan"), available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.

Since then, the BOP has serially escalated its response.  BOP, Bureau of Prisons Update on COVID-19 (Mar. 24, 2020), available at https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.  On March 13, the BOP moved to Phase 2 of its Action Plan, taking steps to "mitigate the spread of COVID-19" in prisons, for the protection of both inmates and staff.  See BOP Action Plan, supra.  The BOP suspended social and legal visits,

---

[1] The BOP has similar protocols for a wide range of diseases. See BOP Program Statement No. 6190.04, Infectious Disease Management (June 3, 2014), available at https://www.bop.gov/policy/progstat/6190_004.pdf.

1    curtailed inmate movement, established enhanced screening procedures
2    for inmates and staff, and curtailed staff travel.  Id.  Consistent
3    with the Pandemic Flu Protocol, facilities adopted "modified
4    operations"---including staggered meal and recreation times---to
5    promote social distancing.  Id.  Just five days later, the BOP
6    escalated to Phase 3—taking additional steps, including ensuring that
7    "all cleaning, sanitation, and medical supplies" had been inventoried
8    and were adequately stocked.  Id.

9    Phases 4 and 5 followed in late March.  Beginning March 26, the
10   BOP required all newly admitted inmates to be quarantined or isolated
11   for a minimum of 14 days "or until cleared by medical staff." See
12   Action Plan Phase V, supra.  And, as of April 1, the BOP has
13   instituted a nationwide lockdown.  Id.  For at least a two-week
14   period, "inmates in every institution will be secured in their
15   assigned cells/quarters to decrease the spread of the virus."  Id.
16   The BOP has also "significantly decreas[ed] incoming movement.  Id.

17   The gravity and severity of these measures reflect BOP's
18   commitment to fighting COVID-19 and protecting inmates.

19        **E.   Procedures in Place at MDC**

20   The MDC has executed these and additional policies to
21   aggressively protect inmates' health.  As this Court knows, among
22   other things, every single inmate entering the facility is
23   quarantined for a period of 14 days following arrival.  They are not
24   placed into general population until they have cleared this
25   quarantine.  In addition, new inmates are screened prior to being
26   accepted into custody.

27
28

1      **F.    Current Infection Rate at MDC**

2          Although the BOP has not been immune from the pandemic, it has

3   "thus far been fortunate in that [its] rate of COVID-19 infection is

4   remarkably low."  Statement from BOP Director, <u>supra</u>.

5          Based on data reported as of August 25, 2020, MDC currently has

6   a total of three active COVID-19 cases: one inmate who has tested

7   positive for COVID-19 and two staff members who have tested

8   positive.[2]  There have been no reported COVID-19 related deaths at

9   MDC.  With regard to the inmate population alone, this represents an

10  infection rate of 0.1%, as there are currently 562 inmates housed at

11  MDC.[3]

12  **III. ARGUMENT**

13         Defendant's bail reconsideration application should be denied

14  because he has not presented any material or compelling reason

15  justifying release, and the significant flight risk and danger to the

16  community that defendant poses, coupled with the presumption in favor

17  of detention, warrants detention in this case.

18         **A.    Defendant's "Opposition" Should Be Construed as an
                   Application for Bail Reconsideration as That is the Only**
19                 **Mechanism Through Which He Can Seek His Requested Relief**

20         On August 24, 2020, defendant filed a brief entitled

21  "Defendant's Opposition to Government's Request for Detention."

22  (Dkt. 37).  Defendant's brief should be construed as an application

23  for bail reconsideration because defendant was already ordered to be

24  detained on September 26, 2020, and the newly-filed first superseding

25

26  ───────────────

27         [2] Information is updated daily and is available at
    https://www.bop.gov/coronavirus/index.jsp.

28         [3] Information is available at
    https://www.bop.gov/locations/institutions/los/.

indictment in-and-of-itself does not give defendant a second chance to seek release.

Under 18 U.S.C. § 3142(f), initial detention hearings are held upon the defendant's first appearance in federal court and at no other time.  This is commonly known as the "first appearance rule." United States v. Holloway, 781 F.2d 124, 125 (8th Cir. 1986); see also United States v. Koenig, 912 F.2d 1190, 1192 (9th Cir. 1990). Filing a superseding indictment has no effect on this rule.  See United States v. McGill, 604 F.2d 1252, 1255(9th Cir. 1979) (stating that there is no requirement in the Bail Reform Act that the court hold detention hearings "each time a defendant is arraigned on a superseding indictment").

Defendant's brief suggests that this Court will hold another detention hearing at his arraignment on the first superseding indictment, which plainly runs contrary to law.  Defendant has already been ordered to be detained and his only mechanism to challenge that order is through filing an application for bail reconsideration.  Thus, the Court should construe defendant's brief as such.

**B.    Legal Standards for Bail Reconsideration Applications**

As a preliminary matter, defendant bears the burden of establishing the legal mechanism under which he is moving the Court for release.  District courts across the country have generally heard bail review applications grounded in COVID-19 concerns under two different subdivisions in 18 U.S.C. § 3142 depending on the type of release the defendant seeks: reopening the detention hearing and seeking release pursuant to 18 U.S.C. § 3142(f)(2)(B), and seeking temporary release pursuant to 18 U.S.C. § 3142(i).  Although

10

defendant fails to state under which provision his application is grounded, it fails under both.

Pursuant to 18 U.S.C. § 3142(f)(2)(B), when a defendant has already been ordered to be detained — as was the case here when Chief Magistrate Judge Walsh ordered defendant detained on September 26, 2019 — the detention hearing may be reopened only if the court "finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2)(B).

Defendant bears the burden of demonstrating that there is new information that will have a "material bearing" on the issue of bail. 18 U.S.C. § 3142(f)(2)(B). A hearing is not automatic, and defendant must set forth sufficient facts to show that he is entitled to a hearing. E.g., United States v. Diaz-Barrios, 18-CR-354-DSF-MAA-9 (April 6, 2020 at Dkt. No. 725) (finding matter suitable for resolution without a hearing despite defendant's claim of "changed circumstances, specifically the COVID-19 pandemic"); United States v. Pimentel, 19-CR-378-DMG-KK (April 3, 2020 at Dkt. No. 127) (finding matter suitable for resolution without a hearing despite defendant's claims that he suffers from hypertension and cardiac issues and is at "increased risk of contracting COVID-19").

If the court re-opens the detention hearing under 18 U.S.C. § 3142(f), it "may consider the defendant's physical ailments as a mitigating factor regarding the danger the defendant poses to society." United States v. Terrone, 2020 WL 1844793, *3 (D. Nev. April 10, 2020) (internal citation omitted). However, "[r]elease for

a presumptively dangerous defendant is appropriate only when the defendant produces evidence of an <u>extraordinary, life-threatening medical condition</u> the jail or prison facility cannot treat and further shows the safety of the community may be reasonably assured through the conditions of release." <u>Id</u>. at *4 (emphasis added).

Pursuant to 18 U.S.C. § 3142(i), a defendant can be "temporarily released" if the release is "necessary for the preparation of the person's defense or for another compelling reason." "Defendant bears the burden of establishing circumstances warranting temporary release under § 3142(i)." <u>Terrone</u>, 2020 WL 1844793 at *4. In determining whether release is necessary to prepare a defense, courts consider the following: "(1) time and opportunity the defendant has to prepare for the trial and to participate in his defense; (2) the complexity of the case and volume of information; and (3) expense and inconvenience associated with preparing while incarcerated." <u>Id</u>.

If release is due to a medical condition and grounded in the "another compelling reason" category, defendant bears the burden of establishing that his purported medical condition justifies release. 18 U.S.C. § 3142(i). "Courts typically grant relief under § 3142(i) only sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries" and the jail cannot adequately manage such medical care. <u>Id</u>. (collecting cases). With respect to COVID-19 concerns, courts consider "(1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase

COVID-19 risks to others." United States v. Ryan, 2020 WL 1861662, *2 (C.D. Cal. April 14, 2020) (citation omitted). Finally, even if there is an appropriate "compelling reason," Section 3142(i) requires that the defendant be released to the custody of a United States marshal or "another appropriate person." 18 U.S.C. § 3142(i). The "third party custodian, unlike a mere surety, agrees to assume supervision of the defendant and to report any violation of a release condition to the court...must reasonably assure the court that the defendant will appear as required and will not pose a danger to the safety of any other person or the community...[and] risk[s] not just monetary loss but criminal prosecution should the defendant flee or otherwise violate the conditions of his release." Ryan, 2020 WL 1861662 at *2 (internal quotations omitted).

   C.   **Defendant's Generalized Claim Regarding His Health Risk in Light of the COVID-19 Pandemic Does Not Meet the Materiality Requirement under Section 3142(f) or the Compelling Reason Requirement under Section 3142(i)**

   Defendant's conclusory argument for release due to COVID-19 concerns given his age, "gum disease," and a single "abnormal EKG" in October 2019 in no way meets the strictures of release under Section 3142(f) or (i).

   First, defendant has failed to establish that his purported "gum disease" in any way negatively affects his risk of contracting or the severity of a COVID-19 illness. Indeed, gum diseases are not on the Centers for Disease Control's list of diseases that are known to increase a person's risk of a severe COVID-19 illness. See CDC Updates: People with Certain Medical Conditions (updated August 14, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Similarly,

13

gum diseases are not on the Centers for Disease Control's list of diseases that "might" cause an "increased risk" for a severe illness from COVID-19. Id. In all, defendant's gum disease should have no bearing on whether he should be released.

Second, defendant has failed to establish that his single "abnormal EKG" in October 2019 is due to a diagnosed heart condition, and even if it is, he has failed to identify the diagnosed heart condition.[4] Moreover, defendant has not established that MDC is or will be unable to adequately treat such a condition and has failed to establish that MDC's protective measures regarding the COVID-19 pandemic are so insufficient that they necessitate defendant's release. BOP's extensive protective measures coupled with the fact that MDC currently has only three active COVID-19 cases shows that the facility is aggressively protecting inmates against the disease. See e.g., United States v. Martin, 2020 WL 1274857, *4 (D. MD March 17, 2020) (stating that while defendant's asthma, high blood pressure, and diabetes makes him at a higher risk for COVID-19, it was "insufficient to rebut the proffer by the Government that the correctional and medical staff at [defendant's jail] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus").

Furthermore, while current medical knowledge has shown that certain medically-diagnosed "serious heart conditions" are correlated with more severe cases of COVID-19, defendant — assuming he even has

---

[4] Indeed, defendant's Exhibit 2 confirms the lack of a diagnosed heart condition, as it states that the EKG showed a "non-specific" abnormal t-wave, that defendant was asymptomatic, and that further testing was needed (a stress echo) for a diagnosis. (Dkt. 37-2 at 10.)

14

one of CDC's listed "serious heart conditions" — faces these risks
regardless if he is incarcerated or not.  See CDC Updates (June 25,
2020) available at https://www.cdc.gov/media/releases/2020/p0625-
update-expands-covid-19.html (explaining that only "serious heart
conditions, such as heart failure, coronary artery disease, or
cardiomyopathies" put one at an increased risk for a severe COVID-19
case).  The same is true for defendant's COVID-19 concerns with
respect to his age: he faces an increased risk regardless if he is
incarcerated or not.  Given that all three counties in the Central
District of California are currently experiencing a surge in COVID-19
cases, defendant has not shown how he would be any better off in
protecting himself from COVID-19 if he were released.  See e.g.,
Ryan, 2020 WL 1861662 at *2 (finding that despite defendant being at
a higher COVID-19 risk due to having asthma, defendant's COVID-19
exposure was a "risk as prevalent outside prison as it is inside"
and, as such, holding that there were no materially changed
circumstances justifying release under Section 3142(f).)  Indeed,
defendant's brief concedes that he would not practice quarantining
even if released, as his bail proposal seeks permission to have
visitors in his home including "family" and "close friends."  (Dkt.
37 at 7.)  In fact, releasing defendant without requiring him to make
any specific showing as to a diagnosed medical condition recognized
by the CDC as leading to a severe COVID-19 illness and without
requiring defendant to show that he would receive inadequate medical
care at MDC would endorse the mass release of pre-trial detainees
into the community, thereby, jeopardizing, rather than promoting,
public health and safety.

Even if the court re-opens the detention hearing, defendant's overall medical condition does not result in automatic release. Rather, defendant's overall condition is just one fact that the court can consider when assessing defendant's danger to the community.  See Terrone, 2020 WL 1844793 at *4.  As detailed in section D below, defendant is presumptively dangerous under 18 U.S.C. § 3142(e)(3)(A) and the seriousness and weight of the charges against him, including two victims dying in his home, still heavily weighs against release.

Moreover, defendant's bail proposal does nothing to mitigate the danger that he poses to the community and the victims in this case. Home confinement with location monitoring does not provide Pretrial Services with any information as to what defendant would be doing inside of his home or who he would be communicating with each day, and it allows defendant to be in the very place where he is alleged to have committed the serious crimes charged in the superseding indictment, i.e., within the confines of his home.  See United States v. Cazares, 2020 WL 1955730, *3-5 (N.D. Cal. April 23, 2020) (finding that defendant's danger to the community, including charges of attempted murder, a history of substance abuse, and a pattern of similar criminal conduct did not warrant release despite COVID-19 concerns).

Similarly, defendant has failed to establish that his overall medical condition in light of the COVID-19 pandemic is a "compelling reason" justifying release under 18 U.S.C. § 3142(i).  Defendant has not identified any specific heart condition, provided proof that this condition has been medically diagnosed, brought forward any evidence that MDC is not equipped to manage medical care for this purported issue, proposed a release plan that is tailored to mitigate COVID-19

risks, or shown how his release would not increase COVID-19 risks to others.  Additionally, to the extent defendant is moving the Court under 18 U.S.C. § 3142(i), he has not identified a third party custodian who is both willing and able to assume the responsibilities of supervising defendant 24 hours a day.  To the extent that defendant nominates his mother (who lives in Arizona) to act as his custodian, there is no evidence that she is able to take on such a significant responsibility, as defendant's mother is elderly and defendant has not established that she could in any manner adequately supervise him or that she is willing to do so.  And, if defendant were to live with her in Arizona, it would place her at a greater risk of COVID-19.

Finally, defendant's conclusory argument that the COVID-19 pandemic has placed unidentified "restrictions" on his attorney-client communications such that he will not be able to adequately assist his attorney in preparing his defense lacks all merit.  (Dkt. 37 at 6.)  First, the trial in this case is set for January 2021 giving defendant over a year from his initial arrest to prepare for trial in this case.  Specifically, defendant had approximately six months to prepare his defense prior to the pandemic's onset, five months to prepare from the pandemic's onset until now, and he still has five more months to prepare for the January trial.  Moreover, the bulk of the discovery was provided to defense in November 2019 and January 2020 and there is nothing inherently complicated about the discovery or the charged offenses, as this is not a wiretap or large-scale RICO case.  And, second, while the MDC – along with all BOP institutions - has imposed certain restrictions on in-person meetings, such as the visitor confirming that he/she has not been

knowingly exposed to the COVID-19 illness within 14 days of the meeting and confirming that he/she does not a fever, cough, or shortness of breath at the time to the meeting, defendant has failed to establish how these basic restrictions have had and will continue to have such a severe negative impact on his ability to communicate with his attorney necessitating release.  BOP, Visitor/Volunteer/Contractor COVID-19 Screening Tool (March 2020) available at https://www.bop.gov/coronavirus/docs/Visitor_Volunteer_Contractor_COVID-19%20Screening_v1_March_2020.pdf.  Even with the basic restrictions on in-person meetings, defendant is still freely able to communicate with his attorney over the telephone, through e-mail, and the mail.  The Court should deny defendant's reconsideration application on these grounds because of defendant's complete failure to state with any specificity as to how the MDC's basic restrictions have in any way impacted him.  Holding otherwise would essentially endorse the release of every pre-trial inmate, as all defense attorneys (and all visitors in general) are subject to these basic screening measures.

**D.    Even if the Court Considers Defendant's Application, His Proposal Does Not Overcome the Rebuttable Presumption in Favor of Detention and the Government has Met its Burden in Showing that Defendant is a Flight Risk and a Danger to the Community**

Even if the Court considers defendant's motion on the merits, defendant's bail proposal does nothing to overcome the presumption in favor of detention or mitigate defendant's significant risk of non-appearance and danger to the community.

A defendant must be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of

the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is thus appropriate where a defendant is either a danger to the community or a flight risk. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985).

In cases where a charged offense carries a maximum term of imprisonment of ten years of more under the Controlled Substances Act, there is a presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(A). The onus is then on defendant to proffer evidence sufficient to rebut the presumption. United States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008). If defendant proffers such evidence, the court then considers four factors in determining whether pretrial detention is warranted: "(1) the nature and circumstances of the offense charged...(2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release." Id. Throughout the court's consideration, however, "[t]he presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in [18 U.S.C.] § 3142(g)." Id.

Here, defendant is charged with nine offenses, seven of which carry the presumption that no combination of conditions will reasonably assure defendant's appearance and the community's safety pursuant to 18 U.S.C. § 3142(e)(3)(A). Defendant's effort to rebut the presumption, in part, by offering to post a $400,000 signature bond woefully fails to reasonably assure his continued appearances in this case. Defendant's significant wealth[5] coupled with the nature and strength of the charges, including two 20-year mandatory minimum offenses, provides defendant with both the resources and motivation to flee the district in order to evade facing the serious charges against him. Given that defendant has millions of dollars in liquid assets yet is only proposing a signature bond (and of an amount that is a fraction of his overall wealth), squarely confirms that his bond proposal is only a veneer that he will remain in this district. See e.g., United States v. Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991) (despite defendant's strong ties to the community, minimal criminal history, and sureties willing to post secured bonds up to $200,000, the court found that defendant still posed a flight risk because the $200,000 was an amount that could have been "absorbed" by the drug organization).

In addition to defendant being a significant flight risk, defendant also poses a serious danger to the community, which is in no way mitigated by his offer to submit to home detention with location monitoring. Every single charge in the nine-count superseding indictment is alleged to have taken place inside of

---

[5] At the federal search warrant executed the day prior to his initial appearance in this case, law enforcement found bank statements totaling over $3.4 million in checking and investment accounts.

defendant's home.  As the criminal complaint detailed, both victims who died from methamphetamine overdoses were found naked and dead on defendant's living room floor.  Defendant is also charged with distributing methamphetamine to four other victims at his house, enticing two victims to come to his home to engage in prostitution, and using his home as a drug distribution hub for over eight years. Moreover, the criminal complaint details accounts of nine victims all of whom reported horrific, yet strikingly similar, encounters with defendant inside of his home.  All of these victims reported consuming drugs inside of defendant's home and some reported being drugged without their knowledge or consent and/or becoming unconscious inside of defendant's home and waking up with sore and/or bleeding private parts.  Moreover, defendant's ability to recruit future victims through online platforms, other victims' referrals, and a recruiter, as alleged in the first superseding indictment, is not mitigated at all by home confinement with location monitoring, as he would still be able to access the internet, telephone, and meet with future victims or potential co-conspirators.  See e.g., Martin, 2020 WL 1274857 at *4 ("While location monitoring that [defendant] proposes may offer useful information about where he is, it provided little useful information about what he is doing, and the ready accessibility of smart phones and digital communication devices would make it all too easy for him to resume his involvement (directly or through confederates) in the distribution of controlled substances without detection.").  Indeed, defendant's proposal includes being able to visit with unidentified "close friends." (Dkt. 37 at 7.) Finally, because there are several living victims in this case, they are at increased danger if defendant is released.  The only way to

reasonably assure the community's and the victims' safety in this case is to detain defendant pending trial.

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion for bail reconsideration, and order that defendant be detained.