NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
CHELSEA NORELL (Cal. Bar No. 280831)
LINDSAY BAILEY (Cal Bar. No. 285047)
Assistant United States Attorneys
Violent and Organized Crime/International
Narcotics, Money Laundering, and Racketeering
Sections
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2624/6875
     Facsimile: (213) 894-0141
     E-mail:   chelsea.norell@usdoj.gov
               Lindsay.bailey@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-595(A)-CAS |
|---|---|
| Plaintiff, | MOTION IN LIMINE TO ADMIT WITNESS TESTIMONY AS DIRECT EVIDENCE AND PURSUANT TO FEDERAL RULE OF EVIDENCE 404(B) |
| v. | |
| EDWARD BUCK, | PUBLIC VERSION WITH REDACTIONS |
| Defendant. | Hearing Date: January 11, 2021<br>Hearing Time: 1:30 p.m.<br>Location:   Courtroom of the<br>          Hon. Christina A.<br>          Snyder |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Chelsea Norell and Lindsay M. Bailey, hereby files its Motion in Limine to Admit Witness Testimony as Direct Evidence and Pursuant to Federal Rule of Evidence 404(b).

1     This Motion is based upon the attached memorandum of points and

2  authorities, the files and records in this case, and such further

3  evidence and argument as the Court may permit.

4  Dated: November 20, 2020          Respectfully submitted,

5                                    NICOLA T. HANNA
                                     United States Attorney
6
                                     BRANDON D. FOX
7                                    Assistant United States Attorney
                                     Chief, Criminal Division
8

9                                    _____/s/_____
10                                   CHELSEA NORELL
                                     Assistant United States Attorney
11
                                     Attorneys for Plaintiff
12                                   UNITED STATES OF AMERICA

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . .1

II.   STATEMENT OF FACTS.........................................1

      A.   The FSI...............................................1

           1.   The Introductory Allegations.....................2

      B.   The Testimony at Issue................................3

III.  ARGUMENT..................................................8

      A.   The Testimony Is Admissible as Direct Evidence of the
           Charges...............................................8

      B.   The Testimony Is Also Admissible Pursuant to Rule
           404(b) as Evidence of Buck's Motive, Knowledge,
           Intent, and Common Plan or Scheme.......................10

           1.   Evidence of Buck's Contemporaneous, Uncharged
                Drugs Distributions Tend to Establish Buck's
                Intent and a Common Plan or Scheme..................11

           2.   Buck's Contemporaneous Uncharged Drug
                Distributions Tend to Show His Requisite
                Knowledge for the Crimes Charged...................15

           3.   Buck's Contemporaneous Uncharged Drug
                Distributions Tend to Show His Motive for the
                Crimes Charged.....................................16

      C.   The Probative Value of This Testimony Is Not
           Substantially Outweighed by the Danger of Unfair
           Prejudice.............................................17

IV.   CONCLUSION.................................................20

**TABLE OF AUTHORITIES**

**Cases**                                                              **Page(s)**

United States v. Brown, 2:17-CR-00047(A)-CAS,
  2018 WL 739268 (C.D. Cal. Feb. 5, 2018) ............. 11, 15, 15-16

United States v. Berckmann,
  971 F.3d 999 (9th Cir. 2020) ................................. 10

United States v. Bradshaw,
  690 F.2d 704 (9th Cir. 1982) ............................. 16, 17

United States v. Espinoza,
  578 F.2d 224 (9th Cir. 1978) ................................. 15

United States v. Hankey,
  203 F.3d 1160 (9th Cir. 2000) ................................ 18

United States v. Izatt,
  2012 WL 1635005 (9th Cir. May 10, 2012) ........... 12-13, 13, 14

United States v. Kot,
  583 F. App'x 716 (9th Cir. 2014) ........................ 12, 14

United States v. Lague,
  971 F.3d 1032 (9th Cir. 2020) .......................... 12, 13

United States v. Livoti,
  196 F.3d 322 (2d Cir. 1999) ................................. 19

United States v. Maravilla,
  907 F.2d 216 (1st Cir. 1999) ................................ 15

United States v. Potter,
  616 F.2d 384 (9th Cir. 1979) ................................ 16

United States v. Ramirez-Robles,
  386 F.3d 1234 (9th Cir. 2004) ...................... 12, 13, 15

United States v. Ramos, No. CR 13-403-CAS,
  2014 WL 8817652 (C.D. Cal. Sept. 17, 2014) ................. 12

United States v. Romero,
  282 F.3d 683 (9th Cir. 2002) ................................ 11

United States v. Shetler,
  665 F.3d 1150 (9th Cir. 2011) ................................. 9

United States v. Skillman,
  922 F.2d 1370 (9th Cir. 1990) ........................... 17, 18

United States v. Spadafore,
  791 Fed. App'x 677 (9th Cir. Jan 28, 2020) ................... 9

United States v. Tsinnijinnie,
  91 F.3d 1285 (9th Cir. 1996) ................................ 11

United States v. Vo,
  413 F.3d 1010 (9th Cir. 2005)  ............................. 11–12

**Rules and Statutes**

Federal Rule of Evidence 404(b) ............................ passim

Federal Rule of Evidence 403 ............................ 3, 17, 18

18 U.S.C. § 3771................................................. 20

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Defendant Edward Buck is charged in a nine-count First Superseding Indictment ("FSI"), which alleges that, between January 2011 and September 2019: (1) Buck engaged in a broad pattern to "solicit[] men to consume drugs" at his apartment during "party and play sessions" (Introductory Allegations); (2) Buck distributed methamphetamine to specific individuals, including two victims who died as a result of Buck's conduct (Counts One through Six); (3) Buck maintained his apartment as a drug premises, where he distributed controlled substances (Count Seven); and (4) Buck enticed victims to travel to engage in prostitution (Counts Eight and Nine).  The government moves to admit evidence of Buck's distribution of drugs to individuals not identified in the FSI on two grounds.  First, this evidence is direct evidence of the charge in Count Seven, that Buck used his apartment as a drug premises, and of the government's theory set forth in the Introductory Allegations that these distributions occurred in the course of party and play sessions.  Second, the evidence is admissible as "other acts" under Rule 404(b) to show Buck intended to distribute drugs to the men he invited to his apartment to party and play; that he had the knowledge of how to obtain drugs, prepare injections, and administer those injections to others; that he was motivated by a desire to administer injections during his party and play sessions; and that he had a common plan or scheme of recruiting men and distributing drugs to them in the same or similar ritualistic fashion.

## II.   STATEMENT OF FACTS

### A.   The FSI

1           1.   <u>The Introductory Allegations</u>

2       The FSI alleges, and incorporates into each count, the

3  following:

4       1.   Beginning on a date unknown, but not later than January

5  2011, and continuing through on or about September 17, 2019,

6  defendant EDWARD BUCK ("BUCK") engaged in a pattern of soliciting men

7  to consume drugs that BUCK provided and to perform sexual acts at

8  [BUCK's Residence].  The practice of using drugs in conjunction with,

9  or immediately preceding, sexual activity is commonly referred to as

10  "party and play."  In these party and play sessions, BUCK distributed

11  drugs, including methamphetamine, to his victims, and in some

12  instances, injected them with drugs intravenously in a practice known

13  as "slamming."  BUCK exerted power over his victims, often targeting

14  vulnerable individuals who were destitute, homeless, and/or struggled

15  with drug addiction, in order to exploit the relative wealth and

16  power imbalance between them.

17      2.   BUCK solicited his victims in various ways.  He solicited

18  them via social media platforms, including but not limited to

19  Adam4Adam, a gay male dating and escort website.  BUCK indicated on

20  his Adam4Adam profile that he was looking for men with whom he could

21  "party and play."  He also solicited men via referrals from his prior

22  victims, and used a "recruiter" who scouted men, propositioned them

23  on BUCK's behalf, and brought them to BUCK's Residence to engage in

24  party and play for compensation.

25      3.   At BUCK's Residence, BUCK distributed and attempted to

26  distribute methamphetamine and other controlled substances to his

27  victims.  At BUCK's Residence, BUCK prepared syringes containing a

28  mixture or substance containing methamphetamine.  BUCK sometimes

                                    2

personally injected his victims, with and without their consent.

BUCK pressured victims to let him personally inject them; he also

distributed syringes filled with methamphetamine so victims could

self-inject.   In addition to injections, BUCK distributed

methamphetamine to be smoked.   BUCK pressured, coerced, and/or

incentivized his victims to consume drugs, sometimes offering a

premium payment to victims who would consume more drugs, try new

drugs, or let BUCK inject them with drugs.   In some instances, BUCK

injected his victims with larger quantities of drugs than they agreed

to receive, and in other instances, BUCK injected his victims while

they were unconscious.   BUCK refused to pay or reduced pay to victims

who would not consume drugs with him.   On at least two occasions

described in this Indictment, BUCK distributed lethal quantities of

methamphetamine to his victims, resulting in death.

### B.   The Testimony at Issue

The government intends to call the following percipient

witnesses to whom Buck distributed or attempted to distribute drugs:[1]

**Witness 1** ("W1") is expected to testify that between

approximately 2015 and summer 2019, W1 met with Buck numerous times

at Buck's apartment to engage in party and play in exchange for

money.   W1 was homeless when he first met Buck.   Buck approached him

on the street and brought him back to his apartment.   W1 felt

uncomfortable and quickly left.   Buck approached W1 on the street a

---

[1] This is a proffer of the current anticipated witness
testimony, based on recorded interviews and reports that have been
produced in discovery.   Some percipient witnesses have not yet been
interviewed or located, despite efforts to do so.   The government
reserves the right to call other percipient witnesses as direct
evidence of the charges or as 404(b) evidence, subject to the Rule
403 analysis.

second time, brought him back to his apartment, and gave him methamphetamine to smoke. Buck also asked W1 to wear underwear Buck provided, took sexually suggestive photographs of W1,[2] and touched his genitals. After a few hours, Buck paid W1 cash and W1 left. W1, who was suffering from methamphetamine addiction, returned the next day, and again Buck provided W1 with methamphetamine to smoke. Buck told W1 that he could make more money if he let Buck inject him with methamphetamine. W1, who was living on the street and needed money, accepted, even though he had never used methamphetamine intravenously. Buck injected him approximately five times during that visit. After the third injection, W1 passed out. When he awoke, Buck was lying on W1's stomach, touching W1's genitals.

During subsequent party and play sessions, Buck would pressure W1 to "slam," that is, allow Buck to inject him with methamphetamine. If W1 refused, Buck would pay him less money. Sometimes W1 would agree to only one injection, but Buck would then inject him more than once. According to W1, during their encounters, Buck would give W1 methamphetamine, GHB, and OxyContin.

While W1 was incarcerated in 2018, he stayed in contact with Buck on the jail telephone.



---

[2] The government expects W1 to testify that Buck instructed him to wear a black mask. Law enforcement found sexually explicit photographs of a man in a black mask on Buck's digital devices, and the tattoos visible in those photographs are consistent with W1's tattoos. A trier of fact could reasonably believe that these photographs depict W1 and corroborate his testimony.

When W1 was released from ▮▮▮▮▮▮▮▮▮ Jail, Buck sent an Uber to pick him up and bring him to Buck's apartment, as confirmed by Buck's Uber records. W1 will testify that when he arrived at Buck's apartment after leaving jail, Buck gave him methamphetamine to smoke and pills to ingest. Buck paid him cash after the encounter.

W1 will also testify that he personally saw death victims Timothy Dean and Gemmel Moore at Buck's residence on occasions before their fatal overdoses. W1 saw Timothy Dean at Buck's apartment approximately three times around December 2018. The first time, he saw Dean smoke methamphetamine that Buck provided. The second time, he saw Buck prepare syringes of methamphetamine for Buck and for Dean (W1 refused a syringe). The third time, just weeks before Dean's fatal overdose, W1 saw Buck inject Dean with a syringe.

W1 saw Gemmel Moore at Buck's residence approximately three or four months before Moore died. Moore had been in Buck's apartment before W1 arrived. When W1 arrived, Moore appeared upset and was being loud. Buck wanted him to leave, so W1 said something like, "he doesn't want to know you, doesn't want to touch you no more," suggesting that Moore and Buck had been engaged in a party and play session, which is relevant to establishing the relationship between Buck and Moore, and their pattern of conduct.

**Witness 2** ("W2") is expected to testify that he met Buck online in 2016, responding to Buck's advertisement to host a "party," which

W2 understood to involve drug use and sexual activity.  He went to Buck's apartment approximately four times, and Buck paid him cash to model underwear, engage in sexual activity, and use marijuana and alcohol that Buck provided.  On the second and third occasions, W2 believes that Buck slipped tranquilizing drugs into his alcohol because W2 passed out in the apartment, which, given his high tolerance for alcohol and marijuana, would not regularly occur from just those two substances alone.  On the fourth occasion, after W2 ingested a drink that Buck prepared, he felt paralyzed.  He could hear what was going on, but he could not move.  When he started to come to, he saw Buck injecting him with something.  His arm was bleeding, he had clamps on his nipples, his pants were down, and his anus was sore.

**Witness 3** ("W3") is expected to testify that he met with Buck in approximately June and October 2018, which is corroborated by text messages extracted from Buck's cellphone.  On the first occasion, W3 went to Buck's apartment to party and play, during which Buck provided W3 with methamphetamine to smoke and underwear to model for Buck.  Buck asked W3 if he would let Buck inject him with methamphetamine for an extra $200.  W3, who had never injected methamphetamine before, agreed to take the injection.  At the end of the encounter, Buck paid W3 $450.

On the second occasion, W3 went to Buck's apartment, where they smoked methamphetamine, they drank GHB, and Buck injected W3 with methamphetamine.  Buck provided all of the drugs they consumed.  W3 again modeled underwear for Buck, and Buck paid him $600 at the end of the encounter.

W3 will also testify that Buck offered him a $100 finder's fee

6

for any men he referred for party and play.  That Buck sought out
referrals is corroborated by text messages extracted from Buck's
cellphone showing that W3 sent Buck a referral, including a physical
description of the person, and Buck approved, asking for more
information.

**Witness 4** ("W4") is expected to testify that he met Buck on a
dating app several years ago, and that Buck offered W4 money to
"party" with him.  At Buck's residence, Buck offered W4 several types
of drugs, including marijuana, methamphetamine, GHB, Viagra, and
Cialis, and told W4 that he wanted to "slam" him (inject him with
methamphetamine).  On the first occasion, W4 declined all of the
drugs except marijuana.  During that encounter, Buck had W4 dress up
in underwear and fondled his genitals.  At the end of the night, Buck
paid W4 approximately $800.

W4 met with Buck at least five more times after that, including
while W4 was living ███████████        On approximately two occasions,
Buck paid for W4 to travel to Los Angeles to party and play with
Buck, which is corroborated by text messages and a Zelle (Bank of
America) payment found on Buck's cellphone.  During these sessions,
Buck made it clear that he wanted W4 to use methamphetamine with him
and that W4 would make more money if he agreed to do it.  W4 declined
to use methamphetamine each time, and ultimately, Buck stopped
contacting him.

W4 also referred at least one person to Buck – ██████ – as
demonstrated by his text messages with Buck.  ██████████████████████
███████████████████████████████ W4 sent Buck a message
about ██████ at approximately the time ██████ first met Buck, strongly
suggesting that ██████ met Buck as part of this referral program.

7

**III. ARGUMENT**

    **A.  The Testimony Is Admissible as Direct Evidence of the Charges**

    The testimony described above is direct evidence of Count Seven, that Buck maintained a premises for the purpose of distributing and using controlled substances, as well as the Introductory Allegations that are incorporated into that Count, namely, that Buck engaged in a pattern of party and play where he distributed methamphetamine, GHB, and other drugs to men in his apartment.  This pattern is established not only by the victims identified in the FSI, but also through the testimony of W1, W2, W3, and W4, each of whom will testify that Buck offered them drugs as part of their party and play sessions at Buck's apartment.

    These witnesses will support the government's theory and allegations that Buck solicited men – through online dating, escort apps, and a referral program – to go to Buck's apartment, don underwear for him, and use drugs that Buck provided.  They will establish that Buck's preferred form of distributing drugs was "slamming" (injecting) others, as W1 and W3 will testify that Buck offered them more money to let him inject them; W4 will testify that Buck repeatedly asked him if he could inject W4 and stopped contacting W4 after he refused too many times; and W2 will testify that Buck injected him without his consent while he was semi-conscious, similar to the experience of C.S., the victim identified in Count Three, whom Buck injected while C.S. was unconscious and restrained to the couch.

    Under Rule 401, this testimony is direct evidence of Count Seven, maintaining a premises for the purpose of distributing

1   methamphetamine, GHB, and clonazepam.  This is a continuing offense

2   for which the government must prove that distribution or use of drugs

3   was "at least one of the primary or principal uses to which the

4   [residence was] put."  United States v. Shetler, 665 F.3d 1150, 1162

5   (9th Cir. 2011) (citation omitted).  A jury can "infer that a

6   defendant's drug activities were a 'primary or principal use' of the

7   property where, even if he does not profit financially from such

8   activity, there is evidence that drug activity involving consumption

9   or use by numbers of non-resident individuals occurs in the home."

10  Id. at 1163.  For example, in Shetler, the Ninth Circuit affirmed a

11  drug premises conviction where the defendant regularly manufactured

12  methamphetamine and hosted gatherings in his garage because the jury

13  could reasonably infer that methamphetamine was consumed at these

14  gatherings, and thus the evidence was "sufficient to allow the jury

15  to find that [defendant's] drug activities were not purely personal,

16  but also included supplying of drugs to persons who did not reside on

17  his property."  Id.; United States v. Spadafore, 791 Fed. App'x 677

18  (9th Cir. Jan 28, 2020) (citing Shetler in affirming a conviction for

19  maintaining a residence as a drug premises).

20      Here, to show that Buck's drug use was not "purely personal,"

21  but instead involved "supplying [] drugs to persons who did not

22  reside on his property," the government must call witnesses who will

23  show that Buck was constantly distributing drugs out of his

24  apartment.  Witnesses such as W1, W3, W4, and W2 will establish,

25  firsthand, that Buck distributed the drugs charged in the FSI.  They

26  also will show the frequency with which Buck distributed drugs, which

27  is essential to showing that drug distribution was a "primary or

28  principal" use of the apartment.  Thus, their testimony is direct

1  evidence of the charges.

2      Explaining the pattern of behavior alleged in the FSI – Buck

3  distributing drugs in party and play sessions, pressuring and/or

4  incentivizing individuals to consume drugs and to allow Buck to

5  inject them, or putting them in a state where they could not refuse –

6  is central to the government's theory of the case, and specifically

7  Count Seven, to show Buck used his residence as a hub to distribute

8  drugs during party and play sessions.  This evidence is also highly

9  relevant in refuting the defense that the individuals who used drugs

10  at Buck's apartment brought the drugs themselves and did them without

11  Buck's knowledge or encouragement.[3]

12      **B.   The Testimony Is Also Admissible Pursuant to Rule 404(b) as**
           **Evidence of Buck's Motive, Knowledge, Intent, and Common**
13         **Plan or Scheme**

14      Evidence of Buck's distribution to individuals not identified in

15  the FSI also is admissible under Rule 404(b) as to the other counts

16  to show Buck's intent, knowledge, common plan/scheme, and motive in

17  distributing drugs.

18      Rule 404(b) permits evidence of a defendant's crimes, wrongs or

19  bad acts to prove "motive, opportunity, intent, preparation, plan,

20  knowledge, identity, or absence of mistake or accident."  Fed. R.

21  Evid. 404(b).  "Rule 404(b) is one of inclusion, and evidence of

22  prior acts that bears on other relevant issues apart from character

23  traits is admissible."  United States v. Berckmann, 971 F.3d 999,

24  1002 (9th Cir. 2020 (internal quotations, brackets, and citation

25  omitted).

26      Evidence is admissible under Rule 404(b) if it (1) tends to

27

28      [3] Buck previewed this defense in his statements to the police,
as well as counsel's arguments at the bail review hearing.

prove a material point; (2) is not too remote in time; (3) is sufficient to support a finding that defendant committed the other act; and (4) if admitted to prove intent or knowledge, is similar to the offense charged. <u>United States v. Romero,</u> 282 F.3d 683, 688 (9th Cir. 2002); <u>United States v. Tsinnijinnie</u>, 91 F.3d 1285, 1288-89 (9th Cir. 1996). The third prong has a "low threshold" that can be satisfied by witness testimony, the credibility of which is "left to the jury." <u>Romero</u>, 282 F.3d at 688. Applying this test, this Court admitted "other acts" evidence in <u>United States v. Brown</u>, No. 2:17-CR-00047(A)-CAS, 2018 WL 739268, at *8 (C.D. Cal. Feb. 5, 2018). In <u>Brown</u>, where the defendant was charged with cocaine distribution and use of a stolen identity to transport cocaine across the country, the government sought to admit evidence that the defendant previously used a different false identity to further other drug-trafficking activities. <u>Id.</u> This Court admitted evidence of the prior use of a different false identity because (1) it tended to prove the material fact of knowledge; (2) it occurred around the time of the alleged crimes; (3) it supported a finding that the defendant committed the crimes charged; and (4) the prior act was sufficiently similar to the conduct at issue. <u>Id.</u>

   1. <u>Evidence of Buck's Contemporaneous, Uncharged Drugs Distributions Tend to Establish Buck's Intent and a Common Plan or Scheme</u>

  The Ninth Circuit has "consistently held that evidence of a defendant's prior possession or sale of narcotics is relevant under Rule 404(b) to issues of intent, knowledge, motive, opportunity, and absence of mistake or accident in prosecutions for possession of, importation of, and intent to distribute narcotics." <u>United States v. Vo</u>, 413 F.3d 1010, 1018 (9th Cir. 2005) (holding that a 13-year-

11

old prior drug trafficking conviction was admissible under Rule 404(b) to show that the defendant "was familiar with distribution of illegal drugs and that his actions were not caused by accident or a mistake"); United States v. Ramirez-Robles, 386 F.3d 1234, 1245 (9th Cir. 2004) (finding testimony regarding the defendant's past, ongoing sale of methamphetamine admissible because it showed that he had both the knowledge necessary and intent to distribute methamphetamine); United States v. Ramos, No. CR 13-403-CAS, 2014 WL 8817652, at *10 (C.D. Cal. Sept. 17, 2014), aff'd, 717 F. App'x 693 (9th Cir. 2017) (holding that the defendant's prior statement that he was distributing "glass" (common code for methamphetamine) was admissible under Rule 404(b) because the statement showed the defendant's knowledge, which was material to the offense charged).

Similarly, evidence of uncharged conduct showing that the current charges share a common plan or scheme is admissible under Rule 404(b). See United States v. Lague, 971 F.3d 1032, 1037-38 (9th Cir. 2020); United States v. Kot, 583 F. App'x 716, 719 (9th Cir. 2014) (holding in a fraud case that court correctly admitted testimony regarding other, uncharged property transactions that helped establish the defendant "had previously devised and executed the same scheme with her friends and relatives," because it tended to provide motive, intent, plan and knowledge, and refuted the defendant's claim of innocence and mistake); see also United States v. Izatt, 2012 WL 1635005, *2 (9th Cir. May 10, 2012) (holding that district court correctly admitted evidence that the defendant previously stored drugs in a purple Crown Royal bag where the drugs in the present case were found in the same type of bag, because it was relevant to show a "common plan or scheme"). For example, in

Lague, an opioid diversion case, the government charged the defendant with distributing opioids through illegitimate prescriptions. Lague, 971 F.3d at 1035. At trial, the government presented evidence of the defendant's office-wide prescriptions to show that the charged prescriptions were part of a broader practice of prescribing medications outside the legitimate practice of medicine. Id. at 1036. The Court admitted this evidence under Rule 404(b) because the uncharged prescriptions "supported a reasonable inference that the underlying prescriptions" were also without medical justification, and were "therefore probative of [defendant's] unlawful intent, undermining his defense at trial that the charged prescriptions amounted to 'a few bad judgments.'" Id. at 1040.

Here, the evidence that Buck repeatedly distributed drugs to men he invited to his apartment – before and contemporaneous with the charged distributions in this case – is admissible because it tends to show his intent to distribute drugs. Ramirez-Robles, 386 F.3d at 1245; Lague, 971 F.3d at 1037-38. Just as the 404(b) evidence in Lague showed that the charged conduct was part of a widespread plan to distribute drugs, here, evidence of Buck's practice of engaging in "party and play" demonstrates his overall intent to distribute drugs and inject methamphetamine into those victims who entered his residence. Further, as in Lague where the 404(b) evidence was admitted to refute any argument that the defendant wrote the prescriptions as a mistake or due to a lapse in judgment, the victim testimony described above tends to refute Buck's argument that any individual who used drugs in his apartment brought their own or otherwise used them without Buck's knowledge.

Additionally, the striking similarities across the witnesses'

13

testimony – explaining how Buck solicited men to come to his apartment, asked them to model underwear, and then encouraged, incentivized, and/or pressured them to take drugs, often by first asking the witness to smoke methamphetamine, then asking them to "slam" it – further evidences Buck's intent and establishes a common plan or scheme.  See Kot, 583 F. App'x at 719; Izatt, 2012 WL 1635005 at *2.  Evidence of this scheme is relevant to the charges because the experiences of W1, W2, W3, and W4 closely track the experiences of the victims identified in Counts Three through Six of the FSI. For instance, the victims identified in the FSI will testify that Buck gave them drugs in the course of party and play sessions, including methamphetamine and drugs that tranquilized them (akin to the experiences of W1 and W2).  They will testify that Buck asked them to don underwear during the sessions (akin to W1, W2, W3, and W4).  They will explain that Buck encouraged, pressured, and incentivized them to slam, often injecting them with more than they agreed to receive (akin to W1 and W3).  And they will testify that Buck asked them to refer other men to him to keep a steady supply of people with whom Buck could party and play (akin to W4 and W1). Further, this scheme is consistent with the evidence of the death victims (Counts One and Two).  For example, both Gemmel Moore and Timothy Dean were found nearly naked on Buck's apartment floor; Timothy Dean was in two pairs of white underwear, which is consistent with Buck's request that his party and play guest don underwear for him.  Both Timothy Dean and Gemmel Moore also had lethal amounts of methamphetamine in their systems and had fresh injection sites in their elbow pits.  Thus, the jury could reasonably infer that the fatal and nonfatal distributions of methamphetamine charged in Counts

14

One through Six were part of Buck's common plan or scheme to distribute drugs, and not a matter of individuals taking drugs they brought with them to Buck's apartment, as Buck claims.

Moreover, Buck's prior acts of enticement, namely, paying for W4 to travel ██████████ to Los Angeles to engage in party and play sessions, is relevant to Buck's intent in transporting Gemmel Moore and J.G. across state lines, as alleged in the enticement counts (Counts Eight and Nine).  This evidence is relevant and admissible under Rule 404(b) because it (1) tends to prove the material fact of Buck's knowledge and intent; (2) is contemporaneous with the charges; (3) is corroborated by text messages and a Zelle payment showing that Buck sent money to W4's brother; and (4) is similar to the enticements for party and play that occurred in this case.  <u>Brown</u>, 2:17-CR-00047(A)-CAS, 2018 WL 739268, at *8.

> 2.  <u>Buck's Contemporaneous Uncharged Drug Distributions Tend to Show His Requisite Knowledge for the Crimes Charged</u>

Prior acts showing the defendant had the requisite knowledge to carry out the crimes charged are admissible to demonstrate that knowledge.  <u>Ramirez-Robles</u>, 386 F.3d at 1245; <u>United States v. Espinoza</u>, 578 F.2d 224, 228 (9th Cir. 1978) (In an alien smuggling case, trial court properly admitted a prior similar act of alien smuggling that took place 11 days before the offenses charged to show knowledge and intent); <u>United States v. Maravilla</u>, 907 F.2d 216, 222 (1st Cir. 1999) (evidence of a customer officer "surreptitiously whisking" a person through customs on previous occasion admissible to "show that he had the ability to have done the same with the victim" in the instant case); <u>Brown</u>, No. 2:17-CR-00047(A)-CAS, 2018 WL 739268, at *8.

Here, Buck's repeated distribution of GHB and methamphetamine to W1 and W3 establishes Buck's requisite knowledge of how to obtain these drugs, how to prepare them for ingestion or injection, and how to inject another person with drugs.  It also refutes Buck's claim that he did not know his guests were using drugs in his apartment.  Thus, they are also relevant and admissible under the knowledge prong of Rule 404(b).

### 3. Buck's Contemporaneous Uncharged Drug Distributions Tend to Show His Motive for the Crimes Charged

Evidence of Buck's motive for distributing drugs, including sexual conduct, is also admissible under Rule 404(b).  In United States v. Potter, 616 F.2d 384 (9th Cir. 1979), where a doctor was charged with distributing Quaaludes without a legitimate medical purpose, the court properly admitted testimony that the doctor engaged in sexual activities with his patients while writing prescriptions, because the jury "could properly infer that the granting of sexual favors provided at least some incentive for his actions."  Id. at 387.  The government did not need to prove that the issuance of prescriptions was contingent upon the granting of sexual favors; "[i]t was sufficient that the sexual favors provided an inducement" to write the prescriptions.  Id. at 388.  Similarly, in a kidnapping case, the court properly admitted evidence that the defendant distributed drugs to his victim and sexually exploited him before and after taking him across state lines because it was "relevant to show [defendant's] dominion over" the boy, the defendant's motive for kidnapping him, and it refuted the defendant's claim that the boy consented to the travel.  United States v. Bradshaw, 690 F.2d 704, 709 (9th Cir. 1982).  The Court observed that

1    motive evidence "presents a picture, the whole of which indicates
2    guilt." Id.

3         The testimony is relevant and admissible to establish Buck's
4    motive in distributing drugs, specifically, that he distributed them
5    as part of the party and play sessions he hosted at his apartment and
6    derived gratification from injecting others with methamphetamine.
7    Explaining Buck's motive for distributing drugs – particularly in
8    this nontraditional drug case, akin to Potter, where Buck did not
9    receive monetary compensation in return – is necessary to explain
10   Buck's actions, to understand the evidence and the government' theory
11   of the case, and to present a complete picture of the conduct at
12   issue.  Here, the evidence that Buck's distributions were part of
13   these party and play sessions and that Buck enjoyed injecting others
14   with methamphetamine allows the jury to reasonably infer Buck's
15   motivations for distributing drugs.

16        In short, this testimony is admissible under Rule 404(b) because
17   (1) it tends to prove the material points of Buck's intent,
18   knowledge, common scheme, and motive; (2) the distributions to these
19   individuals occurred contemporaneous with the charged conduct; (3)
20   the evidence is sufficient to support a finding that Buck committed
21   the other acts, including corroboration through text messages
22   extracted from Buck's cellphone, Uber records, and Zelle payments;
23   and (4) the other acts are similar to the offenses charged.

24        **C.   The Probative Value of This Testimony Is Not Substantially
              Outweighed by the Danger of Unfair Prejudice Under Rule 403**
25

26        Once relevance is established, "the critical question is whether
27   the probative value of relevant evidence [is] substantially
28   outweighed by the danger of unfair prejudice."  United States v.

                                    17

1   _Skillman_, 922 F.2d 1370, 1374 (9th Cir. 1990).  Rule 403 "favors

2   admissibility" and exclusion of evidence under Rule 403 is an

3   "extraordinary remedy to be used sparingly."  United States v.

4   Hankey, 203 F.3d 1160, 1172 (9th Cir. 2000).  Rule 404(b) evidence

5   "is not rendered inadmissible because it is of a highly prejudicial

6   nature . . . The best evidence often is."  United States v. Parker,

7   549 F.2d 1217, 1222 (9th Cir. 1977) (citation omitted).  Indeed,

8   "relevant evidence is inherently prejudicial, but it is only unfair

9   prejudice, substantially outweighing probative value, which permits

10  exclusion of relevant matter under Rule 403."  Id.  Only evidence

11  that "has an undue tendency to suggest decision on an improper basis,

12  commonly, though not necessarily, an emotional one" is considered

13  "unfairly" prejudicial.  Skillman, 922 F.2d at 1374.

14      Here, the testimony establishing additional drug distributions

15  at Buck's apartment is highly relevant, and to the extent that it

16  results in any unfair prejudice, that prejudice does not

17  substantially outweigh the probative value.  First, as discussed

18  above, this evidence is direct evidence of Count Seven and is central

19  to the charge.  Therefore admitting it does not result in any unfair

20  prejudice.  See Potter, 616 F.2d at 387 (emotionally charged evidence

21  that the defendant was receiving sexual favors in his doctor's office

22  survived the Rule 403 analysis because it tended to prove an element

23  of the charge, namely, that the defendant was prescribing drugs for

24  sexual favors rather than a legitimate medical purpose).

25      Second, this evidence is highly probative of Buck's intent,

26  knowledge, scheme, and motive.  This is particularly important in a

27  case where two of the victims died as a result of Buck's

28  distributions and therefore cannot explain to the jury what happened.

18

Further, because Buck generally did not receive money in exchange for drugs, motive evidence is central to understanding <u>why</u> Buck distributed drugs, which the jury can infer from his common scheme of distributing drugs as part of his party and play sessions.

Third, this testimony will not inflame the jury or introduce unfair prejudice because it is similar in subject matter to the testimony the jury will hear from the living victims identified in the FSI. <u>United States v. Livoti</u>, 196 F.3d 322, 326 (2d Cir. 1999) (generally "[e]vidence will not be excluded as unduly prejudicial when it is not more inflammatory than the charged crime"). Indeed, the evidence in this case is far less prejudicial that the highly inflammatory evidence in <u>Bradshaw</u> that the defendant drugged and sexually exploited a child both before and after kidnapping him. Nevertheless, in <u>Bradshaw</u>, the evidence was admissible under Rule 403 analysis because it showed the defendant's "dominion" over the boy, the defendant's motive in kidnapping the boy, and it negated the defendant's defense that the boy consented to the trip. <u>Bradshaw</u>, 690 F.2d at 708-09. Here, Buck's pattern of drug distribution and sexual exploitation of adults is also admissible under Rule 403 because it shows Buck's motive in distributing drugs and negates Buck's contention that his guests brought their own drugs to use in his apartment.

Fourth, this evidence is not cumulative, not likely to waste the jury's time, and not likely to confuse the issues. The evidence is not cumulative because each witness will recount a different instance of distribution, which are collectively required to establish that Buck used his apartment as a drug distribution premises (as alleged in Count Seven), to establish a pattern of distribution that

evidences Buck's motive, intent, and common scheme, and to corroborate the testimony of victims identified in the FSI who received drugs from Buck through the same common scheme and whose credibility will undoubtedly be attacked by Buck.  This testimony can and will be presented efficiently, mindful of the jury's time and the victims' rights.  <u>See</u> 18 U.S.C. § 3771 (noting that victims' rights include the "right to be treated with fairness and respect for the victim's dignity").  Finally, for the reasons discussed above, this testimony will elucidate, not confuse, the issues in this case.

**IV.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court grant the Government's motion.