CHRISTOPHER DARDEN, Bar No. 094959
DARDEN LAW GROUP, APC
11500 W. Olympic Boulevard
Suite 400
Los Angeles, California 90064
Telephone: (310) 654-3369
Facsimile: (310) 568-18
Email: Christopherdardenlaw@gmail.com

LUDLOW B. CREARY II (Bar No. 193793)
The Law Offices of Ludlow B. Creary II
555 W. 5th Street, Floor 35
Los Angeles, California 90013
Telephone: (323) 305-4849
Facsimile: (323) 430-8788
Email: Lbc2@LbcLawexperts.com

Attorneys for Defendant
Edward Buck

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>v.<br><br>EDWARD BUCK,<br><br>                 Defendant. | Case No. 2:19-cr-00595-CAS-1<br><br>MOTION IN LIMINE #7: DEFENDANT EDWARD BUCK'S MOTION TO EXCLUDE DNA RESULTS: [FRE 702] |

Defendant, by and through his attorney of record, Christopher A. Darden, hereby moves this Honorable Court to exclude the DNA results and related statistical probabilities based on an analysis of items located and seized on January 7, 2019. The statistical method used by the government's agents is inadmissible under Federal Rule of Evidence section 702.

//

//

1

This motion is based upon the attached Memorandum of Points and Authorities, declaration of counsel, all files and records in this case, and any further evidence as may be adduced at the hearing on this motion.

### 1. INTRODUCTION

On January 7th, 2019, Los Angeles County Sheriff's Deputy R. Rose responded to the above referenced location regarding a "see the woman" call. When he arrived two women greeted him. The women told Deputy Rose that there was a suspicious package directly under the window to unit #17. They were unable to provide any information as to when the package was left or who left it. Deputy Rose contacted the Fire Department to bring a ladder and retrieve the package. Engine #8 arrived with a latter.

Once the package was retrieved, Deputy Rose took possession of it, transported it to the West Hollywood Station, and gave it to Deputy Oganyan. According to the Sheriff's Department the package contained syringes and glass pipes that appeared to have burn marks at the bottom.

The glass pipes and syringes were subjected to DNA analysis. A copy of the DNA analysis report is marked "Attachment A" and included herewith. In measuring the statistical probabilities associated with the DNA analysis the Sheriff's Department Scientific Services Bureau used a controversial and unsound scientific method commonly referred to as STRmix.

### II. STATEMENT OF FACTS

#### A. SUMMARY OF DNA ANALYSIS

Modern DNA testing focuses on specific places, called "loci," of the human genome containing "Short Tandem Repeats, or STRs, which are genetic markers that contain short repeated sequences of DNA base pairs." The number of times that a particular sequence repeats itself at a locus varies from person to person, such that STR "represent a good source to differentiate individuals.

Here, the materials provided by the government to defense counsel to the defense indicate that they were able to type and provide a profile of DNA contained on a pipe and a syringe

### B. USE OF STATISTICAL SOFTWARE PROGRAMS TO ATTRIBUTE MEANING TO THE RESULTS OF DNA TESTING

The government used STRMix to determine the statistical probability that Dean or Buck may have been the likely source of DNA. STRMix is a software program that generates a statistical estimate called a likelihood ratio ("LR") to communicate the laboratory's "assessment of how strongly forensic evidence can be tied to a suspect." The LR "considers the probability of obtaining the evidence profile(s) given two competing propositions, usually aligned with the prosecution's case. To generate an LR in a case, the individual laboratory chooses two hypotheses. The first hypothesis is characterized as a prosecution fact – in this case, that the defendant's DNA or the DNA of Mr. Dean are present on the pipe or syringes. In essence, an LR represents the likelihood of whether a particular person's DNA is present in a mixture, as compared to a random person's DNA, based on standard reference databases.

STRMix uses the information from the electropherogram to calculate the probability of the profile given all possible genotype combinations. The program assigns a relative weight to the probability of the [electropherogram] given each possible genotype combination at a locus, and the weights across all combinations at that locus are normalized so that they sum to one. However, several factors entered into the STRMix program are under the control of the operator or the individual laboratory, and thus are variable.

For instance, although "[t]he true number of contributors to a profile is always unknown," the individual analyst determines the number of contributors to a DNA profile.

In addition to the number of contributors, the STRMix program relies upon other terms set by the individual laboratory, such as analytical thresholds, stutter ratios, drop-in rates, and

3

saturation levels. Furthermore, the amount of DNA tested can have a dramatic impact on the quantity and quality of the STR results obtained, and the significance of the likelihood ratios are negatively impacted as the input DNA amount decreases and the extent of allelic and locus drop-out increases. In other words, not all profiles are suitable for STRMix application and the [p]rofiles exhibiting significant levels of allelic and/or locus drop-out of one or more of the contributors may not be suitable for analysis using STRMix. Because STRMix requires use of a numeric value for the allele, if an allele cannot be accurately assigned, the entire locus is removed from the STRMix table and analysis.

### III. ARGUMENT

#### A. THE "LIKELIHOOD RATIO" SHOULD NOT BE ADMITTED AS A TOOL TO CONVEY THE RESULTS OF DNA TESTING IN THIS CASE BECAUSE IT IS SUBJECTIVE, UNRELIABLE, AND HIGHLY PREJUDICIAL

The Federal Rules of Evidence ("FRE") require a trial court judge to ensure that an expert's testimony is both reliable and relevant before it may be admitted. *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993) (evaluating plaintiffs' expert's testimony that ingestion of morning sickness pills manufactured by the defendant pharmaceutical company caused limb defects in the plaintiffs). FRE 702 grants the district court the discretionary authority to determine reliability and relevancy, given the particular facts and circumstances. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). This "gatekeeping" duty of the district court applies to all specialized knowledge, including, but not limited to technical and scientific knowledge. *Id.; see also Daubert, supra,* 509 U.S. at 589. The government must prove by a preponderance of the evidence to show scientific evidence is admissible. *Daubert, supra,* 509 U.S. at 592-93; *see also Bourjaily v. United States*, 483 U.S. 171, 174 (1987) (evidentiary admissibility determinations that hinge on preliminary factual questions must be established by the proponent of the evidence by a

preponderance of the evidence).

To testify "in the form of an opinion or otherwise," an expert witness first must be qualified based on her "knowledge, skill, experience, training, or education." FRE 702. Once qualified, for the testimony to be admitted, the rule requires:

> (a) the expert's scientific, technical, or other specialized knowledge must help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
>
> (d) the expert must have reliably applied the principles and methods to the case. FRE 702.
>
> (e)

Expert opinion must be based on actual knowledge, not subjective belief or unsupported speculation. *Daubert, supra*, 509 U.S. at 590. Although an expert may base an opinion on facts if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion," inadmissible facts or data may be disclosed to the jury "only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." FRE 703. Finally, even relevant evidence must be excluded "if its probative value is substantially outweighed" by the possibility of unfair prejudice, confusion of the issues, misleading of the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. FRE 403.

The Supreme Court in *Daubert* set forth factors for a court to evaluate in determining the admissibility of scientific or expert testimony:

> (1) whether the expert's theory or technique can, or has been, tested;
> (2) whether the theory or technique has been subjected to peer review and publication;
> (3) the known or potential rate of error of the technique or theory for a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; and
> (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert, supra*, 509 U.S. at 593-94.

However, no single factor alone is necessarily dispositive, and other factors may be relevant. *See id.* at 593; *see also Kumho Tire, supra*, 526 U.S. at 149. The Court observed that subjection to scrutiny is a component of good science, in part because it increases the likelihood that substantive flaws in methodology will be detected. *Daubert, supra*, 509 U.S. at 593-94. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and '[a] known technique that has been able to draw only minimal support within community may properly be viewed with skepticism.'" *Id.* at 594. Importantly, "[s]cientific conclusions are subject to perpetual revision," and "[t]he scientific project is advanced by broad and wide-ranging hypotheses, for those that are incorrect will eventually be shown to be so[.]" *Id.* at 597.

"[N]othing in either *Daubert* or the [FRE] requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *General Electric Company v. Joiner*, 522 U.S. 136, 146 (1997). Finally, a district court has broad discretion to ensure that evidence is presented to the jury in an effective and efficient manner. *See* FRE 611(a). A trial results in a "binding legal judgment—often of great consequence—about a particular set of events in the past." *Daubert, supra*, 509 U.S. at 597. The rules of evidence apply with equal force to questions of admissibility in criminal cases, where the consequence at stake is a wrongful conviction.

**B. THE LR GENERATED BY THE GOVERNMENT'S APPLICATION OF STRMIX DOES NOT MEET THE STANDARDS FOR ADMISSION OF SCIENTIFIC EVIDENCE SET FORTH BY THE FRE AND APPLICABLE CASE LAW BECAUSE THE UNDERLYING METHODOLOGY IS NOT SCIENTIFICALLY VALID.**

On October 12, 2017, the National Institute of Standards and Technology ("NIST"), a non-regulatory agency of the United States Department of Commerce, released a study concluding that using the likelihood ratio (LR) in courtrooms is not consistently supported by scientific reasoning. NIST Article; Lund, et. al, "Likelihood Ratio as

Weight of Forensic Evidence: A Closer Look," Journal of Research of National Institute of Standards and Technology, Vol. 122, Art. No. 27 (2017) ("NIST Study")). The authors of the study, NIST statisticians Steve Lund and Hari Iyer, warn that the justification for using LR in courtrooms is flawed because it "risks allowing personal preference to creep into expert testimony and potentially distorts evidence for a jury."

On October 12, 2017, the National Institute of Standards and Technology ("NIST"), a non-regulatory agency of the United States Department of Commerce, released a study concluding that using the likelihood ratio (LR) in courtrooms is not consistently supported by scientific reasoning.

NIST Article; Lund, et. al, "Likelihood Ratio as Weight of Forensic Evidence: A Closer Look," Journal of Research of National Institute of Standards and Technology, Vol. 122, Art. No. 27 (2017) ("NIST Study")). The authors of the study, NIST statisticians Steve Lund and Hari Iyer, warn that the justification for using LR in courtrooms is flawed because it "risks allowing personal preference to creep into expert testimony and potentially distorts evidence for a jury." The problem, they explain, is when jurors are told to incorporate the expert's LR into their own decision-making, because an expert's judgment often involves complicated statistical techniques that can and do generate different LRs, depending on the expert. Lund and Iyer observe that "[c]omputing an LR for anything but the simplest of problems will involve approximations[,]" explaining that:

> . . . reporting a single LR value after an examination of available forensic evidence *fails to correctly communicate* to the [decision maker] the information actually contained in the data. Personal choices strongly permeate every model.

7

Here, the methodology underlying the LR is not scientifically valid. The methodology fails, at a minimum, the second, third, and fourth prongs of *Daubert*.

First, with respect to an assessment of whether the theory or technique has been subjected to peer review and publication, the NIST report reveals that when subjected to scrutiny, the scientific community detected "substantive flaws in the methodology" of determining the LR. *Daubert, supra*, 509 U.S. at 593-94. In particular, the LR method impermissibly risks allowing personal preference to creep into expert testimony, potentially distort[ing] evidence for a jury. As Lund and Iyer noted, "[p]ersonal choices strongly permeate every model" because using LR necessarily implicates an analyst's judgment about whether to include certain data in the analysis, including the individual laboratory's analytical thresholds, drop in/out, stutter, saturation, and an analyst's assessment of the number of contributors. Thus, as the NIST experts point out, an expert's judgment, even when employing Bayesian reasoning correctly, can generate substantially different answers.

With respect to the third prong of *Daubert*, meaningful standards controlling the operation of the technique do not exist, chiefly because STRMix is a proprietary program. *Daubert, supra*, 509 U.S. at 593-94. The standards for operation of the technique are not available to operators, because while analysts are provided instructions on how to operate the commercial programs available to them, they are not expert statisticians qualified to offer testimony regarding the proprietary software's internal calculus. The defendant's inability to cross-examine a qualified STRMix software expert about the impact and basis for the program's formulas, directions, and outcomes, would violate his Sixth Amendment right to confrontation. *See Crawford v. Washington*, 541 U.S. 36, 66-67 (2004). Furthermore, analyst's testimony that she/he personally knows of the program's uses in the field and that she/he has read papers where the programs were used is inadequate to establish that the application is reliable and cannot qualify her as an expert

on STRMix software. While "[t]rained experts commonly extrapolate from existing data," in a case involving complex statistical algorithms protected by patent, "too great an analytical gap" exists between the data and the opinion proffered. *Joiner, supra*, 522 U.S. at 147.

Finally, as to the fourth prong of *Daubert*, the LR methodology is not generally accepted in the scientific community. Because of the subjective principles upon which it relies, submission of the LR here would only marginally help the trier of fact to understand the evidence, while creating an enormous possibility of unfair prejudice and confusion of the issues. FRE 403. According to the American Psychology Association, research has demonstrated that "people generally aren't very good at interpreting probabilities, and they are easily swayed by the way statistics are presented." The LR generated by the Government's application of STRMix is unreliable and should not be admitted because large gaps in the chain of custody and the lack of adherence to stringent handling procedures call into question the integrity of the material subjected to analysis, and therefore the results of all subsequent tests.

## IV. CONCLUSION

For the reasons set forth in the arguments above, the defendant respectfully requests that the Court enter an order excluding all results of DNA testing in this case because they are unreliable and unfairly prejudicial.

WHEREFORE, the defendant respectfully requests this Court grant this motion to exclude evidence.

DATED: November 20, 2020

                                DARDENLAWGROUP, APC.

                                *Christopher A. Darden*

                                By:_____
                                CHRISTOPHER A. DARDEN, ESQ.

# ATTACHMENT A

# DISCOVERY PAGE NUMBERS REDACTED

## CERTIFICATE OF SERVICE

**Case No** 2:19-cr-00595-CAS-1

**Case Name: USA v. Edward Buck**

I hereby certify that on November 20, 2020, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

MOTION IN LIMINE #7: DEFENDANT EDWARD BUCK'S MOTION TO EXCLUDE DNA RESULTS: [FRE 702]

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on November 20, 2020, at Los Angeles, California.

| K. Martin | /s/ |
|---|---|
| Declarant | K. Martin |