NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
CHELSEA NORELL (Cal. Bar No. 280831)
LINDSAY M. BAILEY (Cal. Bar No. 285047)
Assistant United States Attorneys
Violent and Organized Crime/International
Narcotics, Money Laundering, and Racketeering
Sections
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2624/6875
    Facsimile: (213) 894-0141
    E-mail:   chelsea.norell@usdoj.gov
              lindsay.bailey@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-595-CAS |
|---|---|
| Plaintiff, | OPPOSITION TO DEFENDANT'S MOTION IN LIMINE #7 TO EXCLUDE DNA RESULTS |
| v. | |
| EDWARD BUCK, | Hearing Date: January 11, 2021 |
| Defendant. | Hearing Time: 1:30 p.m.<br>Location: Courtroom of the Hon. Christina A. Snyder |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Chelsea Norell and Lindsay M. Bailey, hereby files its Opposition to Defendant's Motion in Limine #7 to Exclude DNA Results.

///

///

///

This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: December 7, 2020         Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

           /s/
CHELSEA NORELL
LINDSAY M. BAILEY
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                PAGE

TABLE OF AUTHORITIES................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.     INTRODUCTION....................................................1

II.    FACTUAL BASIS...................................................1

III.   LEGAL STANDARD..................................................3

IV.    ARGUMENT........................................................5

     A.     The Court Should Not Consider the NIST Article as It
            Has Been Sharply Criticized by the Scientific
            Community......................................................5

     B.     The Court Should Admit the DNA Expert Testimony as It
            Complies with Rule 702 and Daubert.............................8

V.     CONCLUSION.....................................................11

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

**Cases**

Bullcoming v. New Mexico,
  564 U.S. 647 (2011)............................................... 10

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
  509 U.S. 579 (1993)............................................. 3, 4

Dist. Attorney's Office for Third Judicial Dist. v. Osborne,
  557 U.S. 52 (2009)................................................. 9

Estate of Barabin v. AstenJohnson, Inc.,
  740 F.3d 457 (9th Cir. 2014).................................... 3, 4

Harvey v. Horan,
  285 F.3d 298 (4th Cir. 2002)................................... 9, 10

Kumho Tire Co., Ltd. v. Carmichael,
  526 U.S. 137 (1999)................................................ 4

Leflore County, Mississippi,
  80 F.3d 1074 (5th Cir. 1996)....................................... 5

United States v. Hankey,
  203 F.3d 1160 (9th Cir. 2000)............................. 5, 6, 7, 8

United States v. Hicks,
  389 F.3d 514 (5th Cir. 2004)....................................... 3

United States v. Pritchard,
  993 F Supp. 2d 1203 (C.D. Cal. 2014).......................... 5, 10

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

The Court should deny defendant's seventh motion in limine, filed on November 20, 2020, to exclude the DNA results (the "Motion"). Defendant's Motion is premised on a single, deeply flawed article regarding the general use of likelihood ratios by experts, which on its own does not provide any lawful basis for excluding the government's anticipated evidence regarding DNA. Rather, the anticipated testimony is supported by peer reviewed and scientifically accepted testing methods and should therefore be admitted.

**II. FACTUAL BASIS**

On January 7, 2019, investigators with the Los Angeles Sheriff's Department ("LASD") responded to defendant's apartment at 1234 North Laurel Avenue, Unit 17, in West Hollywood, California, following the apparent overdose of Timothy Dean. Following the conclusion of the initial investigation, Deputy Raymond Rose responded to the same location on the same day after an individual called and stated that she had observed a suspicious package outside the window to apartment 17. Upon arrival, Deputy Rose saw the package on a ledge underneath two windows of apartment 17 on the east side of the building, and the window directly above the package was slightly ajar. Upon retrieval, Deputy Rose determined that the package contained a white plastic bag, which itself contained a small box with unknown items inside. Investigators later determined that the box contained several glass cylindrical pipes, all with bulbous ends, numerous hypodermic needles, and two clear empty plastic baggies that contained a crystalline substance resembling methamphetamine.

The pipes and syringes were sent to the LASD Scientific Services Bureau where they were tested for DNA by Senior Criminalist Amber Sage.[1] The results showed the various likelihoods that the DNA samples originated from either defendant or Mr. Dean, with some syringes having insufficient DNA detected for a proper analysis. (Declaration of Lindsay M. Bailey [Bailey Decl.], Ex. 1). The report further indicates, and Ms. Sage will testify at trial, that "DNA profile interpretation and the calculation of likelihood ratios was facilitated by the use of STRMix software program," and "[a]ll assumptions that are made as part of the interpretation are stated in the conclusions for each sample... [including] the assumed number of contributors and any assumed known contributor." Id. at 7. Additionally, a "likelihood ration (LR) is reported when a comparison is made between an evidentiary profile and a reference profile," and explains that the "likelihood ratio is a statistical estimate of the probability of obtaining the DNA evidence profiles given competing explanations, propositions, or hypotheses ($H_1$ versus $H_2$). The $H_1$ typically includes the person of interest (POI) while the $H_2$ typically indicates a random person unrelated to the POI." Id. Accordingly, the purpose of the likelihood ratio is to indicate the likelihood that the DNA sample came from the person of interest (in this case, defendant or Mr. Dean), rather than a random individual. Id. at 7, 8. The use of likelihood ratios in this manner is based upon the 2018 Scientific Working Group on DNA Analysis Methods (SWGDAM) publication titled "Recommendations of the SWGDAM Ad Hoc

---

[1] The government noticed Ms. Sage as an expert in an Expert Disclosure to defendant on October 22, 2020.

2

Working Group on Genotyping Results Reported as Likelihood Ratios." Id. at 8.

**III. LEGAL STANDARD**

The admissibly of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. Rule Evid. 702. Rule 702 was amended in response to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), in which the Court "charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony." This amendment "affirms that trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Id. Applying these standards, the admissibility of expert testimony is governed by the principles of Federal Rule of Evidence 104(a), under which "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." Id.; see also United States v. Hicks, 389 F.3d 514, 525 (5th Cir. 2004).

The Ninth Circuit has "interpreted Rule 702 to require that expert testimony be both relevant and reliable." Estate of Barabin

3

v. AstenJohnson, Inc., 740 F.3d 457, 463 (9th Cir. 2014) (en banc) (internal quotation marks and citation omitted). "Relevancy simply requires that the evidence logically advance a material aspect of the party's case." Id. (internal quotation marks and citation omitted). Reliability requires a determination "whether an expert's testimony has a reliable basis in the knowledge and experience of the relevant discipline." Id. (internal quotation marks and citation omitted).

Daubert counsels that courts make two inquiries: first, whether the expert's testimony is based on "scientific knowledge;" and second, whether the testimony "will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592. In assessing the first question, the court considers "whether the reasoning or methodology underlying the testimony is scientifically valid." Id. at 592-93. The court looks to several non-dispositive factors in assessing the reliability of a particular scientific theory or technique, including whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) has attained general acceptance in the pertinent scientific community. See id. at 593-94. The factors relevant to the analysis "depends upon the particular circumstances of the particular case at issue." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999).

The second inquiry "goes primarily to relevance." Daubert, 509 U.S. at 591. Relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. Id. at 593.

After Daubert, it remains the case that the "rejection of expert testimony is the exception rather than rule. Daubert did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" Fed. Rule Evid. 702, Committee Notes on 2000 Amendment (quoting United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996)); see also United States v. Pritchard, 993 F Supp. 2d 1203, 1207 (C.D. Cal. 2014) ("Expert testimony is liberally admitted under the Federal Rules."). Thus, "judges are entitled to broad discretion when discharging their gatekeeping function" and deciding "whether to admit expert testimony." United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir. 2000).

**IV. ARGUMENT**

In his motion, Defendant asks the Court to completely exclude relevant, probative DNA testimony on the basis of a single article that questions the effectiveness of likelihood ratios in conveying information from experts to lay persons during courtroom proceedings. In doing so, defendant both relies on an article that has been sharply criticized for its use of flawed logic and reasoning, and selects out-of-context quotes that misrepresent the overall assertions made in the article. Accordingly, defendant's argument has no merit, and the Court should allow for the inclusion of Ms. Sage's expert testimony.

**A. The Court Should Not Consider the NIST Article as It Has Been Sharply Criticized by the Scientific Community**

Defendant's entire argument rests on an October 12, 2017, article from the National Institute of Standards and Technology

("NIST") entitled "Likelihood Ratio as Weight of Forensic Evidence: A Closer Look" (the "NIST Article"). Defendant cites to this article as the sole support of his proposition that the methodology underlying likelihood ratios is not scientifically valid, and therefore requests that <u>all</u> DNA evidence in this case be excluded. Defendant's argument is unpersuasive for two reasons. First, the article itself does not argue for the exclusion of all evidence using likelihood ratios, but rather suggests using an additional "lattice of assumptions" to provide context for the expert's testimony. Second, multiple publications have been critical of the NIST Article, noting that it is based entirely upon a logical fallacy that is never actually employed in practice. Accordingly, the Court should not rely on the NIST Article in exercising its gatekeeping function.

First, contrary to defendant's assertions, the NIST Article does not seek to exclude any and all expert testimony that relies on likelihood ratios. Rather, the article acknowledges that the likelihood ratio may be "a potential tool for experts in their communications to triers of fact." SP Lund & H Iyer, <u>Likelihood Ratio as Weight of Forensic Evidence: A Closer Look</u>, 122 J Res Natl Inst Stan 27 (Oct. 2017). However, they argue that likelihood ratios may be affected by personal choices made by an analyst during an assessment, and therefore seek to "emphasize that an extensive uncertainty analysis is critical for assessing when and how likelihood ratios should be used," noting that they "may still be useful as metrics for differentiating between competing claims when adequate empirical information is available to provide some meaning to the quantity offered by the expert." <u>Id.</u> They therefore propose "using an assumptions lattice and uncertainty pyramid to enable an

6

audience to evaluate whether [a likelihood ratio] characterization is well fitted for the intended purpose." Id. at 3. Most importantly, in analyzing the effectiveness of likelihood ratios and assumption lattices, the authors specifically identify DNA evidence as an area in which likelihood ratios alone may be effective, noting that "[o]ne might expect to find the least degree of uncertainty in applications of probabilistic evaluation of high-template, low-contributor DNA samples, and we recognize that the community may be well founded in its use of probability to facilitate knowledge transfer in such cases." Id. at 20. They therefore conclude that DNA analysis may be one area in which the likelihood ratio is "fit for the intended purpose" of conveying the likelihood that certain DNA samples were contributed from specific individuals. Id.

    Second, even if the article did support defendant's proposition that all expert testimony relying on likelihood ratios should be excluded, the main tenets of the article have been sharply criticized in the years since its publication. Specifically, critics note that the NIST Article relies on the assumption that experts will substitute their own likelihood ratio for someone else's, "a practice that does not exist and [for] which no one advocates." S. Gittelson, ET AL., A Response to "Likelihood Ratio as Weight of Forensic Evidence: A Closer Look" by Lund and Iyer, 288 Forensic Sci Int. Stan. e15 (2018 July). The authors then discuss the many misconceptions relied upon in the NIST Article, ultimately determining that the article "reject[s] practices that do not exist and suggest[s] an approach that is already in place." Id. at 7. They go on to note that "[likelihood ratios] have been presented in US courts for over 20 years, and with the implementation of

probabilistic genotyping software, they are becoming the most common framework for presenting the value of DNA evidence in the United States today." Id. Similarly, another commentary notes that "it was shown many years ago by I.J. Good in two brief notes in the Journal of Statistical Computation and Simulation... and in Aitken and Taroni (2004) that, with some very reasonable assumptions, the assessment of uncertainty inherent in the evaluation of evidence leads inevitably to the likelihood ratio as the only way in which this [communication of information to decision makers] can be done." C. Aitken ET AL., Commentary: Likelihood Ratio as Weight of Forensic Evidence: A Closer Look, 9 Front. Genet. 224 (2018).

When viewed beyond the out-of-context quotes provided by defendant, it is clear that the NIST Article does not support defendant's argument, nor does the article itself hold up to scrutiny. Accordingly, the Court should not consider the NIST Article in determining whether the government's expert should be permitted to use likelihood ratios to explain DNA evidence.

**B.   The Court Should Admit the DNA Expert Testimony as It Complies with Rule 702 and Daubert**

Defendant makes no argument that the DNA evidence is irrelevant, nor that Ms. Sage's testimony will not sufficiently assist the trier of fact in understanding or determining a fact at issue. Rather, defendant argues only that the use of likelihood ratios is not based on scientific knowledge, specifically claiming that the reasoning and/or methodology underlying Ms. Sage's testimony is not scientifically valid. Again, defendant's only support for this argument is the NIST Article, which the Court should not consider for

8

reasons discussed above. Moreover, the Daubert factors weigh heavily in favor of admitting the testimony.

In regards to the first, second, and fourth prongs of the Daubert test, the method of DNA testing utilized in this case can be tested, has been subjected to peer review and publication, and is now generally accepted in the scientific community. The Supreme Court has acknowledged that the underlying methodology regarding the actual DNA testing using short tandem repeat technology "can, in certain circumstances, establish to a virtual certainty whether a given individual did or did not commit a particular crime." Dist. Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 80 (2009); see also Harvey v. Horan, 285 F.3d 298, 305 (4th Cir. 2002) ("There is now widespread agreement within the scientific community that [STR] technology, which requires literally cellular-size samples only, can distinguish between any two individuals on the planet, other than identical twins, the statistical probabilities of STR DNA matches ranging in the hundreds of billions, if not trillions."). Moreover, the SWGDAM working group specifically recommends reporting genotyping results as likelihood ratios combined with a verbal qualifier (e.g., limited support, moderate support, etc.) to "aid the court or other layperson in understanding evidential strength." 2018 Scientific Working Group on DNA Analysis Methods, Recommendations of the SWGGDAM Ad Hoc Working Group on Genotyping Results Reported as Likelihood Ratios, https://1ecb9588-ea6f-4feb-971a-73265dbf079c.filesusr.com/ugd/4344b0_dd5221694d1448588dcd0937738c9e46.pdf (last visited Dec. 2, 2020). Such propositions have also been supported in other, peer reviewed works. See, e.g., S. Gittelson,

*supra*. This demonstrates that both STR DNA testing and likelihood ratios have, in fact, attained general acceptance in the scientific community.

In regards to the third Daubert factor – whether the expert testimony has a known or potential rate of error and the existence and maintenance of standards controlling the techniques operation – defendant claims that no such meaningful standard for STR DNA testing exists because "STRMix is a propriety program." Mot. At 8. Defendant then claims that his inability to cross-examine a qualified STRMix software expert about "the impact and basis for the program's formulas, directions, and outcomes" violates the Confrontation Clause of the Sixth Amendment. Id. However, the STRMix software, by its very nature, is non-testimonial; that is, the software was not a statement created specifically for the purpose of accusing this defendant at trial. See Pritchard, 993 F.Supp.2d at 1213 (citing Bullcoming v. New Mexico, 564 U.S. 647, 658 (2011) (finding no Confrontation Clause problem with expert's reference to a report that "was not prepared for the primary purpose of accusing a targeted individual")). Defendant therefore has no right to personally cross examine an expert on the underlying STRMix software, nor is Ms. Sage required to be an expert specifically on STRMix. The fact that STRMix's method of DNA testing has been generally accepted by the scientific community following peer review demonstrates that it is reliable and suitable for expert testimony.[2] See, e.g., JA Bright, ET AL., Developmental validation of STRmix expert software for the

---

[2] Indeed, STRMix is generally used and accepted in state court practice as it is employed by major forensic laboratories throughout California.

interpretation of forensic DNA profiles, 23 Forensic Sci Int Genet. 226 (Jul. 2016); J.S. Buckleton, ET AL., The Probabilistic Genotyping Software STRmix: Utility and Evidence for its Validity, 64(2) J Forensic Sci. 393 (Mar. 2019).  The Daubert factors therefore favor the admission of Ms. Sage's expert testimony.

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion in limine #7 to exclude DNA evidence.