UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**           'O'

| Case No. | 2:19-CR-00595-CAS-1 | Date | March 24, 2021 |
|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | |
| Interpreter | N/A | | |

| Catherine Jeang | Not Present | Chelsea Norell, Not Present<br>Lindsay Bailey, Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| EDWARD BUCK | NOT | X | | CHRISTOPHER DARDEN | NOT | | X |
| | | | | LUDLOW CREARY | NOT | | X |

**Proceedings:**  (IN CHAMBERS) - DEFENDANT'S MOTION TO SUPPRESS (Dkt. 52, filed on November 20, 2020)

Defendant has filed a declaration in support of his motion to suppress, satisfying L.Cr.R. 12-1.1. See dkt. 108-1, Declaration of Edward Buck ("Buck Decl.").

## I.  INTRODUCTION

Defendant is charged with six counts of distribution of methamphetamine, 21 U.S.C. §§ 841(a)(1), (b)(1)(C); one count of maintaining a drug-involved premises, 21 U.S.C. § 856(a)(1); and two counts of coercion or enticement to commit prostitution, 18 U.S.C. § 2422(a). See dkt. 32, First Superseding Indictment ("FSI").

On November 20, 2020, defendant filed the instant motion to suppress evidence. Dkt. 52 ("Mot."). The government opposed the motion on December 7, 2020. Dkt. 72 ("Opp."). Defendant did not file a reply. The Court held an evidentiary hearing on March 2, 2021.

Having carefully considered the parties' arguments and submissions, the Court finds and concludes as follows.

## II.  BACKGROUND

The counts against defendant arise from defendant's alleged solicitation of men to consume drugs, which defendant provided, and to perform sexual acts at defendant's apartment. FSI ¶ 1.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**  'O'

Defendant is alleged to have held these so-called "party and play" sessions from at least January 2011, to September 17, 2019.  Id.  Defendant solicited his victims, some of whom were homeless, using social media platforms and a "recruiter" who solicited victims on defendant's behalf.  Id. ¶ 2.  During these sessions, defendant allegedly distributed drugs, including methamphetamine, pressured victims into using drugs, and at times injected his victims with methamphetamine himself, with and without their consent.  Id. ¶¶ 2–3.  On at least two occasions, defendant distributed lethal quantities of methamphetamine, resulting in his victims' deaths.  Id.

**A. Death of Gemmel Moore**

At 6:51 p.m. on July 27, 2017, defendant called 911 to report that "a guest" in his apartment, Gemmel Moore, was "unresponsive."  Opp. at 1–2; dkt. 72, Declaration of Chelsea Norell ("Norell Decl.") ¶ 2.  Defendant provided his address and gate code.  Opp. at 2.  Los Angeles Sheriff's Department ("LASD") deputies Barraza and Urvann responded to the call, arriving at defendant's apartment at approximately 6:54 p.m.  Dkt. 72-3, Declaration of Grehtel Barraza ("Barraza Decl.") ¶ 3.  Deputy Barraza reports that, upon arriving, she found a deputy from an assisting unit performing chest compressions on Moore, who was lying naked on a mattress in defendant's living room.  Id.  About a minute later, Los Angeles Fire Department Paramedics arrived, moved Moore onto the floor, and continued to perform CPR.  Id. ¶ 4.  They were unable to resuscitate Moore, who was pronounced dead at 7:22 p.m.  Id.  The paramedics did not observe any injuries to Moore's body; they were unable to determine a cause of death, but did not deem his death suspicious.  Id.

While the paramedics were performing CPR, Deputies Barraza and Urvan spoke to defendant.  Id. ¶ 5.  According to Barraza, defendant stated that Moore was a friend visiting from Texas.  Id.  Defendant stated that he saw Moore inject an unknown amount of methamphetamine in the bathroom several hours earlier.  Id.  Defendant averred that he did not know where Moore had disposed of the syringe, and did not know if Moore had taken any other narcotics.  Id.

Barraza reports that, while she was in defendant's living room, she could see into defendant's kitchen, which was conjoined with the living room.  Dkt. 103, Supplemental Declaration of Grehtel Barraza ("Supp. Barraza Decl.") ¶ 4.  Barraza reports that she saw evidence of narcotics on the kitchen table.  Id. ¶ 5.  In the living room, Barraza observed a large, red rolling tool chest approximately two feet from Moore's body.  Barraza Decl. ¶ 7.  Barraza saw Moore's personal effects on top of the tool chest, and noticed that "the first three drawers were slightly open."  Id.  Barraza reports that "[t]he second drawer was open less than an inch, and the third drawer was open a little more than that."  Id.  Barraza further attests that "[t]he drawers of the tool chest had fairly wide gaps between them," which she estimates were "between half an inch to an inch."  Id.  This testimony is consistent with evidence admitted by the government in the evidentiary hearing, namely, a photograph of the red tool chest that shows gaps between the

drawers. Dkt. 115, Exh. 1. Accordingly, due to the gaps between the drawers and the drawers' being slightly open, Barraza reports that she could see some of the contents of the first, second and third drawers in plain view. Barraza Decl. ¶ 7. In the second drawer, Barraza "saw a small plastic baggie containing a crystal-like substance resembling methamphetamine," and in the third drawer she "saw what appeared to be a bulbous-end pipe." Id. In the hearing, Barraza specified that the crystalline substance and the pipe were visible because they were at the front end of the drawers. Barraza did not collect this evidence, but rather notified the coroner investigator of its presence when he arrived. Id.

Defendant contests Barraza's account of finding the contraband in the tool chest. Defendant submitted a declaration in which he states that "[his] memory is that the drawers to the tool chest were closed when [he] was asked to leave the apartment." Buck Decl. ¶ 3. He further avers that "[t]he drawers to the tool chest were always closed, because if they were open it could tip over." Id. ¶ 4.

Coroner Investigator Joseph Cronin arrived at approximately 10:00 p.m. Barraza Decl. ¶ 8. Cronin directed Barraza to open the drawers of the tool chest so that he could photograph their contents and collect the evidence of drug use Barraza had seen. Id. Upon opening the second and third drawers, Barraza found more evidence of drug use; she found no evidence of drug use in any drawers other than the second and third. Id. From the second and third drawers of the tool chest, Cronin seized approximately 24 syringes, five glass pipes, a straw, and several baggies of narcotics and residue. Id. ¶ 10. An LASD forensic laboratory determined that the baggies contained 1.76 grams of methamphetamine. Norell Decl., Exh. 2 (LASD laboratory report). Finally, although the record is unclear, it appears Cronin also seized the evidence of narcotics found on defendant's kitchen table. Dkt. 101-1, Supplemental Declaration of Chelsea Norell, Exh. A (LASD incident report) at 5.

### B. Death of Timothy Dean

At 1:04 a.m. on the morning of January 7, 2019, defendant called 911 to report that a "friend," Timothy Dean, was "unresponsive." Opp. at 4; Norell Decl. ¶ 4. According to the police incident report, LASD Deputy Palacios arrived at defendant's apartment at the same time as did Los Angeles County Fire, Engine 8. Norell Decl., Exh. 4 ("Incident Report") at 4,165. Paramedics began CPR on Dean, who was lying on the floor in the living room, unresponsive and not breathing. Id. The paramedics pronounced Dean dead at 1:36 a.m. Id.

Palacio observed a glass pipe with brown residue and a white powder on the kitchen table. Id. at 4,166. Defendant reportedly stated that he did not see Dean use any drugs, and that defendant himself had not used any drugs.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**            'O'

Homicide Bureau Sergeant Cardella and Detective Rodriquez arrived at defendant's apartment at 3:55 a.m. After making initial observations, Cardella sought a search warrant, which Los Angeles County Superior Court Judge Margaret Bernal signed. Opp. at 5; see Norell Decl., Exh. 5 ("Search Warrant 1"). The warrant permitted a search of defendant's apartment, number 17, for, among other things, "[a]ny narcotic or narcotics paraphernalia." Search Warrant 1 at 1–2. Pursuant to the search warrant, detectives retrieved three cell phones, two hypodermic syringes, three vials containing clear liquid, and two glass pipes commonly used to smoke methamphetamine, among other things. Id. at 5.

Later that day—apparently after the investigators had concluded their investigation and left the scene—the Sheriff's Department received another call regarding defendant's apartment. Opp. at 5–6. A neighbor, who was aware of the earlier police activity at defendant's apartment, reported a suspicious package—a small box in a white plastic bag—below the window to defendant's apartment 17. Dkt. 72-4, Declaration of Raymond Rose ("Rose Decl.") ¶ 4. When Deputy Rose arrived on the scene, he located the package sitting atop a ledge along the side of the building. Id. ¶ 5. The package rested on a shallow ledge, no more than a few feet across, that appears to run above the apartment building's shared driveway. Dkt. 72-5, Rose Decl., Exh. 1 (photos of package on ledge); see Opp. at 18. The ledge has no guard rail, which suggests it is not intended to be occupied or accessed, but the record does not state to what purpose this ledge has been put or how it is accessed. The package was directly below the first-floor window, and, according to Rose, approximately 30 feet below the second-floor window, which belongs to apartment 17, defendant's apartment. Rose Decl. ¶ 5. Because the package was out of reach from the street, Rose called the Fire Department to assist in retrieving the package. Id. ¶ 6. Rose then transported the package to the Sheriff's Department, West Hollywood Station. Id.

Cardella then sought a second search warrant, this one to search the package. Opp. at 6; see Norell Decl., Exh. 6 ("Search Warrant 2"). This warrant was supported by the same evidence as the first search warrant, as well as the neighbor's call and Cardella's opinion that it was likely defendant had attempted to hide additional evidence of narcotics by throwing the evidence out of his window. Search Warrant 2 at 7. Judge Bernal signed the warrant. Id. at 9. Upon searching the package, detectives retrieved several hypodermic syringes and glass bulbous pipes used to ingest methamphetamine, and two clear plastic baggies with a crystalline residue resembling methamphetamine. Id. DNA testing confirmed that, among other things, there is "very strong support for the proposition that Edward Buck and Timothy Dean are co-contributors to the DNA obtained" from several pipes, Norell Decl., Exh. 7 ("DNA Examination Report") at 3, 4, 5; and "very strong support for the proposition that Timothy Dean is a contributor to the DNA obtained" from a syringe, id. at 5.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**  'O'

### III. DISCUSSION

**A. Evidence Collected During the Response to Moore's Death**

Defendant argues, without elaborating, that "Coroner Investigator Cronin's recovery of methamphetamine and other drug paraphernalia located inside Mr. Buck's apartment was the product of an unreasonable search and seizure," and that "[t]here were no exigent circumstances nor any emergency that justified this warrantless search and seizure." Mot. at 3. Also, at the evidentiary hearing, defendant argued that the evidence recovered from the tool chest should be suppressed because it was not in plain view.

The government responds that the seizure was permissible because defendant consented to the deputies' presence in his apartment and, alternatively, because the emergency of Moore's overdose permitted their entrance into the apartment, and the evidence was in plain view once inside. Opp. at 8.

1. Consent

Warrantless searches can be valid "with the voluntary consent of an individual possessing authority." Georgia v. Randolph, 547 U.S. 103, 109 (2006) (citations omitted). "In a criminal case, the government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given." Pavao v. Pagay, 307 F.3d 915, 918–19 (9th Cir. 2002) (citation omitted). To prove voluntary consent, the Government must prove a defendant gave "unequivocal and specific" consent and that it was given "freely and intelligently." United States v. Shaibu, 920 F.2d 1423, 1426 (9th Cir. 1990) (quotation omitted). The Ninth Circuit has "recognize[d] that 'every encounter has its own facts and its own dynamics,' and 'so does every consent.'" Pavao, 307 F.3d at 918–19 (quoting United States v. Morning, 64 F.3d 531, 533 (9th Cir. 1995)) (alteration omitted). "In determining whether consent was given in a particular case, [courts] must therefore consider the totality of the circumstances." Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225–26 (1973); United States v. Garcia, 997 F.2d 1273, 1281–82 (9th Cir. 1993)).

Here, the record is silent as to whether defendant gave Barraza or any other Sheriff's deputy affirmative consent to enter his apartment. Defendant, too, is silent as to whether he gave consent. Nevertheless, even if defendant did not provide officers with explicit, affirmative verbal consent to enter his apartment, the facts as adduced by the government establish that defendant at least provided implicit consent. First, defendant placed a 911 call and reported an emergency in his apartment. See Pavao, 307 F.3d at 921 (finding it "especially significant" that "the officer [] was responding to a possible 911 call for help from one of the occupants of the residence"). Defendant provided his gate code, further evidencing consent for emergency personnel to enter. When

Barraza arrived, she found another deputy already in the apartment performing CPR on Moore, indicating defendant consented to having deputies enter his apartment. Finally, defendant apparently did not object to the deputies' presence in his apartment, despite ample opportunity to do so; instead, defendant responded to the officers' questions about his relationship with Moore and the circumstances of Moore's death. See id. at 920–21 ("[T]he fact that none of the occupants in the residence objected to Officer Pagay's entry lends further credence to the conclusion that Officer Pagay had received clear and unequivocal consent to enter the home.").

Accordingly, the Court finds that defendant consented to Barraza's and other deputies' entry to his apartment.

    2. Emergency

Even if defendant had not consented, the deputies' entry was permitted pursuant to the emergency exception to the warrant requirement. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (quotation omitted). "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id. (citation omitted). For the emergency doctrine to apply, the government must show that (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the scope and manner of the search was reasonable to meet the need. U.S. v. Snipe, 515 F.3d 947, 952 (9th Cir. 2008).

Here, both prongs are met. First, the deputies had an objectively reasonable basis for concluding there was an emergency in defendant's apartment because defendant's 911 call reported an overdose there. See Stricker v. Twp. of Cambridge, 710 F.3d 350, 360 (6th Cir. 2013) (overdose constitutes emergency for purposes of emergency exception); United States v. Huebner, 125 F. App'x 767, 768 (9th Cir. 2005) (unpublished) (911 call reporting potential overdose provided "reasonable grounds to believe there was an emergency at hand and an immediate need for their assistance"). Furthermore, the scope and manner of the search was reasonable to meet the needs of the emergency because the deputies confined their search to the room where they found Moore. The evidence they ultimately saw and seized was mere feet from Moore's body.

Accordingly, even if defendant had not consented to the deputies' entry to his apartment, their warrantless entry did not violate the Fourth Amendment because it was excused by virtue of the emergency of Moore's overdose.

3. <u>Plain View</u>

Having established that the deputies' entry to defendant's apartment was permitted by defendant's consent and the emergency doctrine, the Court turns to the manner in which the deputies seized the evidence defendant seeks to suppress. "The plain-view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." <u>Illinois v. Andreas</u>, 463 U.S. 765, 771 (1983) (citation omitted). The doctrine "is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy." <u>Id.</u>; <u>see also</u> <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home ... is not ... subject [to Fourth Amendment] protection.").

According to Barraza, once inside defendant's living room, she observed evidence of narcotics on the kitchen table, and a bulbous pipe and a baggie with white crystalline residue in the already-open drawers to the red tool chest. The tool chest was approximately two feet from Moore's body. Thus, in the permissible scope of her entry to defendant's apartment, Barraza observed evidence of criminal activity in plain view, and did not violate defendant's Fourth Amendment right to privacy by seizing this evidence. <u>See</u> <u>United States v. Jabara</u>, 618 F.2d 1319, 1324 (9th Cir. 1980) ("[S]eizure of [] package containing cocaine and [] small tray that were discovered in the open drawer of the night table was justified under the plain view doctrine."), <u>overruled on other grounds by</u> <u>United States v. Escobar De Bright</u>, 710 F.2d 1404 (9th Cir. 1983); <u>United States v. Gravier</u>, 706 F.2d 174, 177 (6th Cir. 1983) (seizure permitted by plain view doctrine where "bags [of cocaine] were visible in the partially opened drawer, and their incriminating nature was apparent"). Once Barraza and Cronin opened the drawers to seize the pipe and baggies Barraza saw in plain view, the remaining evidence in the drawers was also in plain view. Finally, this same reasoning applies to the evidence of drug use found on defendant's kitchen table.

In this case, it is contested whether the evidence in the tool chest was in plain view, or whether Barraza or another deputy would have had to open the drawers to find the evidence. As related above, Barraza contends the drawers were open slightly, but enough to see the crystalline substance and the bulbous-end pipe, which were at the front edge of the second and third drawers, respectively. In the hearing, Barraza was unequivocal on this point. Defendant disputes this and argues that Barraza's account is not credible. In the hearing, defendant offered his testimony that he recalls the drawers were closed, argued that it is implausible that the crystalline substance and the bulbous-end pipe would have been at the front of the doors such that they would have been visible through an opening as small as Barraza claims there was, and, finally, points out that Barraza failed to photograph the tool chest in the state in which she claims to have found it.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**   **'O'**

The Court finds Barraza's testimony is more credible. First, Barraza was unequivocal in her account, while defendant stated his memory was clear, but nevertheless equivocated in stating that he was "ninety-nine and forty-four one-hundredths" sure the drawers were closed. Defendant substantiated his claim by relating that he always closes the drawers due to the tool chest's tendency to tip over. But the government undermined the credibility of this account by introducing at the evidentiary hearing a video, recovered from defendant's computer, in which the tool chest can be seen with at least two drawers open substantially. Dkt. 115, Exh. 2. This video establishes that, on at least one occasion, defendant did leave the drawers open, contrary to his contention that he always, as a matter of habit, keeps them closed. Furthermore, it is undisputed that Barraza saw evidence of narcotics on the kitchen table. Under these circumstances, it is reasonable that she would have sought to look into open drawers for additional evidence. Finally, the fact that Barraza or another deputy did not photograph the tool chest as they contend they found it can be explained by the fact that, upon entering the apartment, they were not executing a search warrant but rather were responding to a medical emergency. They saw the evidence soon after entering. The fact that the deputies failed to photograph the tool chest before retrieving the evidence does not detract substantially from the credibility of Barraza's account. On balance, her account is more credible than defendant's, and the Court adopts her version of events in ruling on defendant's motion.

Therefore, the Court **DENIES** defendant's motion to suppress to the extent it seeks the suppression of the evidence seized from the tool chest or defendant's kitchen table.

### B. Evidence Collected During the Response to Dean's Death

Defendant argues, without elaborating, that "[t]he area under the outside window to apartment 17, where the box was located, is part of the curtilage connected to apartment 17, and as such is subject to 4th Amendment protection." Mot. at 4.

The government responds that seizure of the package found on the ledge was permissible because defendant had abandoned the package, because it was in a common area, and because detectives obtained a warrant prior to searching it. Opp. at 13.

1. Abandonment

"[W]arrantless searches or seizures of abandoned property do not violate the fourth amendment." United States v. Nordling, 804 F.2d 1466, 1469 (9th Cir. 1986) (citation omitted). "The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned." United States v. Wilson, 472 F.2d 901, 902 (9th Cir. 1972) (citing Katz, 389 U.S. at 351). The inquiry, therefore, "should focus on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy

in the property at the time of the search or seizure." Nordling, 804 F.2d at 1469 (citations omitted). "This determination is to be made in light of the totality of circumstances, and two important factors are denial of ownership and physical relinquishment of the property." Id.

Here, defendant abandoned the package when he left it unattended on the ledge a story below his window, and thus forfeited his Fourth Amendment right in the package. See Jabara, 618 F.2d at 1323, 1324–25 (holding "[t]he seizure of [a] shopping bag" containing narcotics, found "in a driveway outside the apartment, four stories beneath the apartment's kitchen window," "was justified on the theory of abandonment"); United States v. Mamani-Vidal, No. 3:15-CR-00044-8-JO, 2017 WL 627430, at *3 (D. Or. Feb. 15, 2017) (bag abandoned where defendant "left the bag unattended in plain view without an identification tag to show an ownership interest … where any passerby would have access to it"). Defendant relinquished physical control of the package when he left it outside on the ledge approximately 30 feet below his apartment. Further, the ledge was a common space onto which another apartment's window opened, and which ran above a shared driveway. The ledge was visible to passersby, as demonstrated by the neighbor's noticing the package. Although Rose required a ladder to reach the bag, it was nonetheless exposed to the public, and therefore abandoned for purposes of the Fourth Amendment. See United States v. Jackson, 448 F.2d 963, 971 (9th Cir. 1971) ("What a person knowingly exposes to the public is not a subject of Fourth Amendment protection.").

Accordingly, defendant abandoned the package when he left it unattended on the shared ledge a floor below his window, and Rose's seizure of the package did not violate defendant's Fourth Amendment rights.

   2. Curtilage

Furthermore, the ledge is not within the curtilage of defendant's apartment. "[T]he Fourth Amendment protects the curtilage of a house and [] the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." United States v. Dunn, 480 U.S. 294, 300 (1987) (citation omitted). "[T]he central component of this inquiry [is] whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." Id. (quotation omitted). Courts consider four factors when determining whether an area is within the curtilage of a home: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." Id. (citations omitted).

Here, it cannot reasonably be said that a shared ledge a floor below defendant's window, to which defendant does not enjoy access and which is visible to passersby, "harbors the intimate

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**     **'O'**

activity associated with the sanctity of [defendant's] home and the privacies of life." <u>Dunn</u>, 480 U.S. at 300. Applying the <u>Dunn</u> factors confirms this conclusion. First, although the ledge protrudes from the side of the building, it is approximately 30 feet below defendant's apartment, so the proximity does not weigh in favor of finding the ledge is curtilage. Second, the area is not included in the enclosure surrounding the home because there is no fence or other barrier around the ledge and the ledge is accessible from the driveway. Third, although the record does not contain evidence of the nature of the uses to which the ledge is put, it appears to be put to no uses by defendant or anyone else. Finally, defendant has taken no steps to protect the ledge from observation by passersby. Accordingly, the ledge is not curtilage, and defendant does not enjoy a Fourth Amendment interest there.

Moreover, even if the ledge were curtilage, the fact remains that the deputies obtained a search warrant prior to searching the package.

The Court therefore **DENIES** defendant's motion to suppress the evidence contained in the package on the ledge.

### IV. CONCLUSION

In accordance with the foregoing, the Court **DENIES** defendant's motion to suppress evidence.

IT IS SO ORDERED.

                                                                                                             00  :  00
Initials of Deputy Clerk      CMJ