TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
CHELSEA NORELL (Cal. Bar No. 280831)
LINDSAY BAILEY (Cal. Bar No. 285047)
Assistant United States Attorneys
Violent and Organized Crime/International
Narcotics, Money Laundering, and Racketeering
Sections
    1300/1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2624/6875
    Facsimile: (213) 894-0141
    E-mail:   chelsea.norell@usdoj.gov
              lindsay.bailey@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-595(a)-CAS |
|---|---|
| Plaintiff, | TRIAL MEMORANDUM |
| v. | Trial Date: July 13, 2021 |
| EDWARD BUCK, | Location: Courtroom of the Hon. Christina A. Snyder |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Chelsea Norell and Lindsay Bailey, hereby files its Trial Memorandum.

    This Trial Memorandum is based upon the attached memorandum of

//

//

1    points and authorities, the files and records in this case, and such

2    further evidence and argument as the Court may permit.

3     Dated: July 2, 2021              Respectfully submitted,

4                                      TRACY L. WILKISON
                                       Acting United States Attorney
5
                                       SCOTT M. GARRINGER
6                                      Assistant United States Attorney
                                       Chief, Criminal Division
7

8                                            /s/
                                       _____
                                       CHELSEA NORELL
9                                      LINDSAY BAILEY
                                       Assistant United States Attorney
10

11                                     Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Table of Contents

TRIAL MEMORANDUM.................................................1

I.   STATUS OF THE CASE..........................................1

     A.    Procedural Background.................................1

     B.    Pending Stipulations.................................1

II.  ELEMENTS OF THE OFFENSE.....................................2

     A.    Distribution of Methamphetamine......................2

     B.    Maintaining a Drug Premises..........................2

     C.    Enticement to Travel for Purposes of Prostitution....3

III. THE GOVERNMENT'S CASE.......................................4

     A.    Statement of Facts...................................4

     B.    Witnesses in the Government's Case-in-Chief..........6

IV.  LEGAL AND EVIDENTIARY ISSUES...............................18

     A.    Victim Witness Testimony............................18

     B.    Case Agents.........................................20

     C.    Digital Device Evidence.............................20

           1.    Authentication and Identification.............21

           2.    Transcripts for English language recordings...24

     D.    Chain of Custody of Physical Evidence...............24

     E.    Business Records....................................25

     F.    Summary Charts and Lay Testimony Regarding Digital
           Evidence............................................26

     G.    Expert Testimony and Related Evidence...............27

     H.    Truth Testimony Provision of Diversion Agreement....28

     I.    Grand Jury Testimony................................29

     J.    Defendant's Statements..............................30

     K.    Cross-Examination of Defendant......................30

     L.    Use of Exhibits During Opening Statement............31

M.    Reciprocal Discovery.....................................31

N.    Affirmative Defenses....................................32

O.    Character and Impeachment Evidence......................32

P.    Jury Nullification......................................33

V.    CONCLUSION.................................................34

**Table of Authorities**

CASES                                                                      PAGE

Exum v. General Elec. Co.,
   819 F.2d 1158 (D.C. Cir. 1987) .................................... 28

Michelson v. United States,
   335 U.S. 469 (1948) ............................................... 33

Reyes v. United States,
   383 F.2d 734 (9th Cir. 1967) ..................................... 25

Taylor v. Illinois,
   484 U.S. 400 (1988) .............................................. 32

United States v. Anekwu,
   695 F.3d 967 (9th Cir. 2012) ..................................... 27

United States v. Beckman,
   298 F.3d 788 (9th Cir. 2002) ..................................... 20

United States v. Black,
   767 F.2d 1334 (9th Cir. 1985) .................................... 22

United States v. Boulware,
   470 F.3d 931 (9th Cir. 2006) ..................................... 27

United States v. Champion Int'l Corp.,
   557 F.2d 1270 (9th Cir. 1977) ............................... 29, 30

United States v. Chen,
   754 F.2d 817 (9th Cir. 1985) ..................................... 24

United States v. Chu Kong Yin,
   935 F.2d 990 ..................................................... 22

United States v. DeGeorge,
   380 F.3d 1203 (9th Cir. 2004) .................................... 19

United States v. Fernandez,
   839 F.2d 639 (9th Cir. 1988) ..................................... 30

United States v. Fleischman,
   684 F.2d 1329 (9th Cir. 1982) .................................... 28

United States v. Freeman,
   498 F.3d 893 (9th Cir. 2007) ..................................... 24

United States v. Gagliardi,
  506 F.3d 140 (2d Cir. 2007) ...................................... 23

United States v. Harrington,
  923 F.2d 1371 (9th Cir. 1991) ................................... 25

United States v. Matta-Ballesteros,
  71 F.3d 754 (9th Cir. 1995) .................................... 25

United States v. McCollom,
  664 F.2d 56 (5th Cir. 1981) .................................... 33

United States v. Miranda-Uriarte,
  649 F.2d 1345 (9th Cir. 1981) ................................... 31

United States v. Monroe,
  943 F.2d 1007 (9th Cir. 1991) ................................... 29

United States v. Morgan,
  555 F.2d 238 (9th Cir. 1977) ................................... 30

United States v. Powell,
  955 F.2d 1206 (9th Cir. 1992) ................................... 33

United States v. Shetler,
  665 F.3d 1150 (9th Cir. 2011) ........................... 2, 3, 19

United States v. Siddiqui,
  235 F.3d 1318 (11th Cir. 2000) .................................. 22

United States v. Smith,
  918 F.2d 1501 (11th Cir. 1990) .................................. 22

United States v. Vizcarra- Martinez,
  66 F.3d 1006 (9th Cir. 1995) ................................... 20

United States v. Wood,
  943 F.2d 1048 (9th Cir. 1991) ................................... 27

Zal v. Steppe,
  968 F.2d 924 (9th Cir. 1992) ................................... 34

STATUTES

18 U.S.C. § 2422(a) ................................................. 1
21 U.S.C. § 841(b)(1)(C) ............................................ 2
21 U.S.C. § 856(a)(1) ............................................... 1
21 U.S.C. §§ 841(a)(1) .............................................. 1
California Penal Code Section 647(b) ................................ 3

RULES

Fed. R. Crim. P. 16(d)(2)..........................................32
Fed. R. Evid. 405(a)..............................................33
Fed. R. Evid. 701.................................................24
Fed. R. Evid. 702.................................................28
Fed. R. Evid. 704.................................................28
Fed. R. Evid. 801(c)..............................................30
Fed. R. Evid. 801(d)(1)(B)........................................30
Fed. R. Evid. 801(d)(2)(A)........................................30
Fed. R. Evid. 803(6)(D)...........................................26
Fed. R. Evid. 901(b)..............................................23
Fed. R. Evid. 902(11).............................................26
Fed. R. Evid. 1002................................................23
Fed. R. Crim. P. 16(a)(1)(G)......................................27
Fed. R. Evid. 611(a)..............................................27
Fed. R. Evid. 401.................................................34

OTHER AUTHORITIES

32 McCormick On Evid. § 215.......................................23

**TRIAL MEMORANDUM**

**I.    STATUS OF THE CASE**

    **A.    Procedural Background**

    Defendant Edward Buck ("Buck") is charged in a nine-count first superseding indictment with distribution of methamphetamine resulting in death, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Counts 1 and 2); distribution of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Counts 2 through 6); maintaining a drug premises, in violation of 21 U.S.C. § 856(a)(1) (Count 7); and enticement to travel for purposes of prostitution, in violation of 18 U.S.C. § 2422(a) (Counts 8 and 9).

    Defendant has pleaded not guilty to all charges and will proceed to trial on July 13, 2021 at 9:30 a.m.  The final status conference is scheduled for July 6, 2021 at 11:30 a.m.

    **B.    Pending Stipulations**

    On June 15, 2021, the government proposed eleven stipulations to defense counsel regarding foundational issues concerning Cellebrite extractions of digital devices, controlled substance testing of narcotics found in defendant apartment and in the package found abandoned outside his bathroom window, toxicology results conducted on Gemmel Moore, Timothy Dean, and Dane Brown, and surveillance footage obtained during the course of this investigation.  The government proposed these stipulations to streamline its case and avoid testimony on noncontroversial topics.  The government estimates that these stipulations would cut off its case-in-chief by approximately fourteen witnesses.

## II.   ELEMENTS OF THE OFFENSE

### A.   Distribution of Methamphetamine

The elements of distribution of methamphetamine as charged in Counts One through Six are (1) the defendant knowingly distributed methamphetamine; and (2) the defendant knew it was methamphetamine or some other federally controlled substance.  For the sentencing enhancement charged in Counts One and Two, the government must also prove that death or serious bodily injury resulted from the use of such controlled substance.  "Distributing" means delivering or transferring possession of a controlled substance to another person, with or without any financial interest in that transaction.

Ninth Circuit Model Criminal Jury Inst. No. 9.18; 21 U.S.C. § 841(b)(1)(C).

### B.   Maintaining a Drug Premises

The elements of maintaining a drug premises as charged in Count Seven are (1) defendant knowingly leased/rented/used/maintained a place, namely, 1234 North Laurel Avenue, Apartment #17, in West Hollywood, California; and (2) defendant leased/rented/used/maintained the residence for the purpose of distributing or using a controlled substance, including gamma hydroxybutyric acid (more commonly known as GHB), methamphetamine, and clonazepam.  See Ninth Circuit Model Criminal Jury Instructions, No. 9.31.  "For the purpose of distributing or using a controlled substance" means that distributing or using a controlled substance is one of the primary or principal uses to which the residence is put.  Id.  "Maintaining" a place includes facts showing that, over a period of time, defendant directed the activities of and the people in the place.  Id.; see also United States v. Shetler, 665 F.3d 1150, 1162

2

1   (9th Cir. 2011) (affirming drug premises conviction where the

2   defendant manufactured methamphetamine and hosted gathering in his

3   garage where jury could reasonably infer that defendant gave guests

4   methamphetamine to consume at these gatherings).

5       **C.   Enticement to Travel for Purposes of Prostitution**

6       The elements of enticement to travel for prostitution as charged

7   in Counts Eight and Nine are (1) defendant knowingly

8   persuaded/induced/enticed an individual (here, Gemmel Moore in Count

9   Eight and Jermaine Gagnon in Count Nine) to travel in interstate

10  commerce; and (2) the purpose of travel was to engage in sexual

11  activity for which any person could be charged with a criminal

12  offense, namely, prostitution, in violation of California Penal Code

13  Section 647(b).  Ninth Circuit Model Criminal Jury Instructions, No.

14  8.192.

15      The crime of prostitution is sexual activity for which any

16  person could be charged with a criminal offense, namely, a violation

17  of California Penal Code § 647(b).  For an individual to be found

18  guilty of the crime of prostitution, the government must prove beyond

19  a reasonable doubt that the individual willfully engaged in sexual

20  intercourse or a lewd act with someone else in exchange for money or

21  other compensation.  Judicial Council of California Criminal Jury

22  Instructions, No. 1153. A "lewd act" means touching the genitals or

23  buttocks of either the prostitute or customer with some part of the

24  other person's body for the purpose of sexual arousal or

25  gratification of either person.  Id.  Someone commits an act

26  "willfully" when he does it willingly or on purpose.  Id.

27

28

1    **III. THE GOVERNMENT'S CASE**

2        **A.    Statement of Facts**

3        The government will prove beyond a reasonable doubt that,

4    beginning on a date unknown, but not later than 2011, and continuing

5    through on or about September 17, 2019, defendant engaged in a

6    pattern of "party and play," that is, soliciting men to consume drugs

7    that defendant provided and perform sexual activities, at defendant's

8    apartment, located at 1234 North Laurel Avenue, Apartment #17, West

9    Hollywood, California 90046. In these party and play sessions,

10   defendant distributed drugs, including methamphetamine, clonazepam,

11   and GHB, to his victims, and in some instances, injected them with

12   drugs intravenously in a practice known as "slamming."  Defendant

13   exerted power and control over his victims, typically targeting

14   vulnerable individuals who were destitute, homeless, and/or struggled

15   with drug addiction, and exploited the relative wealth and power

16   imbalance between them by offering them money to use drugs and let

17   Buck inject them with drugs.

18       Defendant solicited victims in various ways, including social

19   media platforms like Adam4Adam, a gay male dating and escort website.

20   He also solicited men via referrals from his prior victims and

21   individuals he hired to do other work for him, offering a finder's

22   fee for referrals.

23       At Buck's apartment, Buck distributed and attempted to

24   distribute methamphetamine and other controlled substances to his

25   victims.  He prepared methamphetamine syringes in a ritualistic

26   fashion; some victims report that he required them to watch him do

27   it.  Buck's preference was to personally inject victims, and he

28   pressured or incentivized victims to let him do so, sometimes

1  offering large cash bonuses to coerce a victim to agree to an

2  injection or additional injections.  Other times, Buck simply

3  injected victims while they were unconscious.  Defendant also

4  prepared injections for victims to self-inject.

5      In addition to methamphetamine injections, defendant distributed

6  methamphetamine to be smoked and pressured victims to stay as high as

7  possible.  If a victim was not interested in using drugs, or used

8  less than Buck wanted him to use, defendant refused to pay the person

9  or reduced the person's pay.  Ultimately, if a victim refused to use

10  methamphetamine too many times, Buck would lose interest and would no

11  longer hire the person to party and play.

12      On two occasions – July 27, 2017 and January 7, 2019 – Buck's

13  party and play fetish turned lethal.  On those dates, Gemmel Moore

14  (Count 1) and Timothy Dean (Count 2) died of methamphetamine

15  overdoses in defendant's apartment, respectively.

16      Sadly, neither of these deaths deterred defendant from

17  continuing to distribute methamphetamine through party and play

18  sessions.  After Gemmel Moore died, defendant continued to distribute

19  methamphetamine to victims, including Carlos Sinclair (Count 3),

20  Jermaine Gagnon (Count 4), and Cody Hoffman (Count 5).  After both

21  Gemmel Moore *and* Timothy Dean died in defendant's apartment,

22  defendant distributed methamphetamine to Dane Brown (Count 6), who

23  overdosed <u>twice</u> in Buck's apartment and was lucky to survive with

24  immediate medical treatment.  Defendant distributed drugs to

25  countless others, some of whom will testify at trial and corroborate

26  the accounts of the named victims, giving a composite picture of

27  defendant's compulsion to pump drugs into others regardless of the

28  consequences.  Their testimony will also provide direct evidence that

defendant used his apartment as a drug premises, constantly distributing methamphetamine, clonazepam, and GHB to a revolving door of victims (Count 7).

Finally, defendant was not satisfied in soliciting victims only within the Los Angeles area.  Instead, he enticed individuals to travel to California from out-of-state for the purposes of engaging in prostitution through party and play sessions (Counts 8 & 9).  The evidence will show that Gemmel Moore moved to Texas to get away from Los Angeles, but at a point in July 2017, he started communicating with Buck again.  Buck enticed Moore back to California by purchasing him a plane ticket so Moore could travel to Los Angeles on July 27, 2017, to party and play with Buck (Count 8).  Just over a year later, in September 2018, defendant similarly purchased a plane ticket for Jermaine Gagnon to fly from Iowa to Los Angeles so that the two could party and play (Count 9).

**B.    Witnesses in the Government's Case-in-Chief**

The government estimates that it will call up to 51 witnesses in its case-in-chief, as identified below.  The government expects that it can cut approximately 14 witnesses, if defendant will enter trial stipulations.  The government may not call every victim witness identified in this list; however, we have attempted to identify all possible witnesses who may testify.  Witness unavailability and the government's efforts to further streamline will likely narrow this list.  While the length of defendant's cross-examinations are difficult to predict, the government expects that its case-in-chief can be completed in eight to ten days.  Should defendant offer witnesses or present evidence in his defense, the government may choose to call additional witnesses in rebuttal.

1    The government expects to call the following witnesses loosely
2 in this order, but may need to call witnesses out of order based on
3 availability or unforeseeable circumstances:

4    Liam Sacks will testify that he lived in the same apartment
5 complex as Buck and saw young primarily black men entering and
6 exiting the defendant's apartment at all hours of the day, and that
7 defendant told him that he was a social worker helping these
8 individuals.  His testimony is relevant to Count 7.

9    Carlos Sinclair will testify that Arthur Stokes referred him to
10 defendant; defendant paid him to party and play; defendant offered
11 him primarily methamphetamine and GHB; defendant frequently pressured
12 him to "slam" methamphetamine rather than smoke it; and defendant
13 would refuse to pay Sinclair if he did not perform to defendant's
14 expectations.  Although Sinclair regularly declined slamming
15 methamphetamine, defendant once injected him with methamphetamine
16 while he was unconscious and without his consent.  His testimony is
17 relevant to Counts 3 and 7.

18    Arthur Stokes will testify that Buck paid him to party and play;
19 offered him several types of drugs and told Stokes he wanted to
20 "slam" him; offered him more money if he would do methamphetamine;
21 paid for his transportation across state lines to engage in party and
22 play; and when Stokes continued to decline Buck's urges to use
23 methamphetamine, asked Stokes to refer a friend to use
24 methamphetamine with Buck, at which point Stokes referred Carlos
25 Sinclair.  Stokes's testimony (1) corroborates Carlos Sinclair (Count
26 3); and (2) demonstrates Buck's pattern of distributing drugs through
27 party and play (Counts 1 through 6) and enticing people across state
28 lines to engage in prostitution (Counts 8 and 9).

Anthony Everett will testify that Buck paid him to party and play; that Buck set forth detailed terms to arrange the party and play session (corroborating Cody Hoffman, Count 4); that Buck offered him more money to inject methamphetamine; and that he knew Gemmel Moore and knew that he worked as an escort because they did escort jobs together.  Everett's testimony (1) demonstrates that Gemmel Moore worked as an escort, which is necessary to Count 8; and (2) demonstrates Buck's pattern of distributing drugs through party and play (Counts 1 through 6).

James Conners will testify that he met Buck by responding to Buck's online advertisement to host a "party," which Conners understood to involve drug use and sexual activity.  He went to Buck's apartment approximately four times, during which Buck paid him to model underwear and use marijuana Buck provided.  On two occasions, Conners believes that Buck slipped a tranquilizer in his drink, because Conners passed out.  On the last occasion, Conners ingested a drink that made him feel paralyzed and when he started to come to, he saw Buck injecting him with something (which corroborates the accounts of Carlos Sinclair and Cody Hoffman, who had similar experiences).  This pattern evidence is relevant to Counts 1 through 6, and specifically Counts 3 and 5.

Josh Tedla will testify that he lived in the apartment next door to Buck and saw a revolving door of people going in and out of Buck's apartment, many of whom appeared to be in a stupor or under the influence.  The volume of visitors subsided after each of the overdose deaths, but quickly rose again as time passed.  Between the deaths, Tedla saw a man who appeared to be under the influence

circling the perimeter of the apartment complex screaming at Buck's apartment and demanding $30.  This testimony is relevant to Count 7.

Detective Robert Martindale will testify that he searched defendant's apartment pursuant to a warrant in September 2019 and collected evidence of defendant's drug use and distribution, including klonopin pills, plastic tubing and straws, masks (identified by some witnesses and displayed in the digital evidence), sex toys, and a flashlight with a hidden compartment (identified as drug stash location by several witnesses).  His testimony is relevant to Counts 1 through 9.

Paramedic Cole Alnes will testify that he was the "patient care" paramedic who responded to the scene of the Gemmel Moore and Timothy Dean overdoses.  During the Gemmel Moore incident, he saw a glass pipe on the kitchen table, and during the Timothy Dean incident, he saw towels covered in blood and vomit, indicating there had been an effort to clean up the scene before paramedics arrived.  This testimony is relevant to Counts 1 and 2.

Deputy Grehtel Barraza will testify that she responded to a 911 call at Buck's apartment during Gemmel Moore's overdose and saw drug evidence in plain view in partially open toolchest drawers, as well as a glass pipe on the kitchen table.  Her testimony is relevant to Count 1.

Coroner Investigator Joseph Cronin will testify that he collected Gemmel Moore's personal effects (and found no drug paraphernalia therein); found Moore's boarding pass showing he had flown to Los Angeles that day; photographed the scene; took custody of Gemmel Moore's body; and examined the contents of Gemmel Moore's

phone before releasing it to a friend of Moore's, per a written consent.  His testimony is relevant to Count 1.

Detective John Carlin will testify that he recovered Gemmel Moore's cell phones from Mr. Moore's mother, LaTisha Nixon, and booked them into evidence.  He will go through certain text messages on Gemmel Moore's cellphone that Buck and Mr. Moore exchanged just prior to Mr. Moore's flight to Los Angeles on July 27, 2017.  He may also lay the foundation for certain photographs.  His testimony is relevant to Count 1.

Detective Aaron King will testify that he completed the Cellebrite extraction for Gemmel Moore's phone.  His testimony is relevant to Count 1 and may be established through a trial stipulation.

Special Agent Alton Richards will testify that he completed the Cellebrite extraction for Dane Brown's phone.  His testimony is relevant to Counts 6 and 7 and may be established through a trial stipulation.

Sergeant Paul Cardella will testify that during this investigation, he and members of the investigative team seized approximately eight of Buck's digital devices and Buck's iCloud, which Cardella searched and discovered messages, photographs, and videos evidencing Buck's party and play sessions, including sessions with Gemmel Moore.  He will give an overview of the investigation and introduce that digital device evidence.  He will also go through text messages found on Buck's devices that evidence Buck's pattern of soliciting others for party and play.  To provide a cohesive narrative for the jury, Sergeant Cardella will testify twice – once to introduce the digital device evidence and give a "case agent"

overview of the investigation, and then in the context of the Timothy

Dean investigation, where he was the assigned homicide detective.

Cellebrite Witnesses Minh Vu, Dan Morgan, Thanh Dang, Courtney
King, and Christine Siedsma extracted data from the digital devices
seized at Buck's apartment and defendant's iCloud account.  Of these
five witnesses, at least four reside on the east coast.  It is the
government's hope and expectation that, in the interest of
efficiency, particularly during a pandemic, that defendant will
stipulate to the testimony of these witnesses.

Nusret Arnautovic will testify that he is the manager of the
apartment complex where Buck lived and he took screenshots of the
surveillance footage showing Gemmel Moore entering the apartment
complex with Buck on July 27, 2017.  He will testify that Buck had
many male visitors, ranging from 25 to 40 years old at all hours of
the day, and he continued to have such visitors after each of the
overdose deaths.  His testimony is relevant to Counts 1 and 6;
however, in an effort to streamline the case, the government has
offered to stipulate to his testimony regarding the accuracy of the
surveillance footage at the apartment complex and would forego
calling him for the remaining testimony.

Lauren Beard-Ansley will testify that he picked up Gemmel Moore
from LAX on July 27, 2017 and drove him straight to Buck's apartment.
When Mr. Beard-Ansley arrived at Buck's apartment, Gemmel Moore
entered the complex and went up to Buck's apartment.  Mr. Beard-
Ansley went into the apartment for approximately an hour.  During
that time, he did not see Gemmel Moore using drugs.  He did not give
any drugs to Gemmel Moore.  His testimony is relevant to Count 1.

Criminalist Matthew Quon will testify that he examined a solid crystalline substance seized from defendant's apartment on the evening of Gemmel Moore's death and determined that it consisted of 1.7 grams of methamphetamine.  His testimony is relevant to Count 1 and may be established through a trial stipulation that the government has proposed.

Medical Examiner Kevin Young - will testify regarding the autopsy of Gemmel Moore.  Specifically, he will testify that the immediate cause of death for Moore was methamphetamine use, and that Moore had puncture wounds in his elbow pits, including a recent puncture mark on the left side. His testimony is relevant to Count 1.

LaTisha Nixon will testify that she was Gemmel Moore's mother and that in 2016, Moore called her crying and screaming, and said that a rich and powerful man named Ed Buck held him against his will and shot him up with drugs and that his arms were red and swollen. She told him to file a police report and go to the hospital.  She will also testify that she obtained Moore's cell phones from Marcus Wilson Smith and subsequently turned them over to Det. Carlin.  Her testimony is relevant to Count 1.

Markellis Jefferson will testify that from approximately 2006 to 2011 or 2012, Buck routinely injected him with cocaine, and then in approximately 2011 or 2012, Buck started injecting Jefferson with methamphetamine, all at Buck's apartment.  Jefferson allowed Buck to do this because Buck would pay him to party and play, and Jefferson desperately needed the money.  Sometime in 2016, Buck tried to inject Jefferson while Jefferson was unconscious in Buck's apartment.  There are numerous photographs, videos, and messages on Buck's digital

1   devices that corroborate Jefferson's account, and his testimony is
2   relevant pattern evidence related to Counts 1 through 9.

3       Daniel Lyons will testify that he saw Buck inject Timothy Dean
4   with drugs in December 2018 or the beginning of January 2019, while
5   he and Dean were at Buck's apartment.  Buck also paid Lyons to party
6   and play, injected him with methamphetamine, and photographed him
7   during the party and play sessions.  Several photographs and videos
8   of Lyons were found on Buck's digital devices.  Lyons's testimony in
9   relevant to Counts 1 through 6, and Count 2 in particular.

10      Cody Hoffman will testify that Buck paid him to party and play
11  on two occasions during which Buck distributed methamphetamine; Buck
12  also distributed clonazepam to Hoffman, and on both occasions, Buck
13  surreptitiously gave Hoffman something that caused him to lose
14  consciousness.  When he awoke, Buck was preparing more injections for
15  Hoffman.  Hoffman's testimony is relevant to Count 5 and Count 7.

16      Jermaine Gagnon will testify that Buck paid him to party and
17  play on four occasions, paid for him to fly from Iowa to Los Angeles
18  to party and play, provided methamphetamine every time and insisted
19  on "slamming" Gagnon, and surreptitiously gave him what he believed
20  to be a combination of GHB and methamphetamine that made him
21  extremely weak, hot, and as though his head would explode.  Gagnon's
22  testimony is relevant to Counts 4, 7, and 9.

23      Corey Peters will testify that Buck approached him at an ATM
24  machine and invited him to party at his apartment, which Peters
25  understood to mean use methamphetamine.  Buck provided Peters with
26  methamphetamine and GHB, and insisted on keeping him as high as
27  possible.  Peters will testify that Buck had a very controlled
28  environment where guests had a station; Buck led him to believe that

1    cameras were everywhere; Peters had to ask permission to go to the

2    bathroom; and all of the "play" props were meticulously organized

3    (which corroborates other victim accounts).  Peters's testimony is

4    relevant pattern evidence as to Counts 1 through 9.

5        Gregory Grant will testify that he met with defendant on

6    approximately five occasions in late 2018.  On one occasion,

7    defendant gave him GHB which caused him to become unconscious, after

8    which defendant tied Grant up, removed his clothing, and manipulated

9    his genitalia.  Grant's testimony is relevant to Counts 3 through 7.

10       Phillip Okague will testify that defendant injected him with

11   methamphetamine on at least two occasions and was paid large amounts

12   of money for spending time with defendant.  Defendant would also have

13   him dress up in white underwear and would provide him with GHB.  His

14   testimony is relevant to Counts 3 through 7.

15       Retired CHP Officer Vaughn Gates is a drug recognition expert

16   who will testify regarding the common effects of methamphetamine,

17   GHB, and clonazepam, how these drugs are consumed, and the average

18   dosing of each.  He will also discuss the coded language used to

19   refer to these drugs and analyze messages on Buck's digital devices

20   that are consistent with drug distribution.  His testimony is

21   relevant to Counts 1 through 7.

22       Deputy Oscar Palacios will testify that he responded to

23   defendant's residence on January 7, 2019 and saw decedent victim

24   Timothy Dean lying unresponsive and face up on the living room

25   carpet.  When he arrived, defendant was performing CPR on Dean, after

26   which the Los Angeles County Fire paramedics relieved defendant and

27   began life saving measures for approximately thirty minutes.

28

1  Paramedic Ramirez ultimately pronounced Dean deceased at 0136 hours
2  on January 7, 2019.  His testimony is relevant to Count 2.

3      Coroner Investigator Brenda Shafer will testify that she
4  responded to defendant's apartment following Timothy Dean's death on
5  January 7, 2019.  Upon arrival, she saw Dean's body on the living
6  room floor surrounded by clothing, sex toys, and thick clear plastic
7  tubing that appeared to contain a white powdery substance.  She also
8  recovered a glass pipe on the dining room table and one on the stove
9  top.  She then inspected Dean's body, which was in rigor mortis.
10  Dean was wearing two pairs of white men's briefs with a ring secured
11  at the base of the penis and wrapped around the scrotum.  Her
12  testimony is relevant to Count 2.

13      Jennifer DeStefano will testify that on January 7, 2019, she saw
14  an abandoned package on a ledge outside Buck's bathroom window, and
15  reported it to police.  Her testimony is relevant to Counts 2 and 7.

16      Deputy Raymond Rose will testify that he retrieved the package
17  that DeStefano reported to police, photographed the location where he
18  found it, and gave the evidence to Sergeant Cardella.  His testimony
19  is relevant to Count 2.

20      Deputy James Potts will lay the foundation for surveillance
21  footage that he recovered from 1234 N. Lauren Avenue and from a Shell
22  gas station on Santa Monica Boulevard.  Absent a stipulation, his
23  testimony will be relevant to Counts 2 and 6.

24      Sergeant Paul Cardella will testify about the evidence recovered
25  pursuant to a search warrant after Timothy Dean's death, the evidence
26  found in the package Deputy Rose recovered, and the surveillance
27  footage showing Timothy Dean entering Buck's apartment.  This portion
28  of his testimony is relevant to Count 2.

Senior Criminalist Amber Sage will testify that she ran DNA tests on the pipes and syringes recovered from outside of defendant's apartment on January 7, 2019.  She will testify that the DNA on various pipes and syringes support the conclusion that either defendant, Timothy Dean, or both defendant and Timothy Dean contributed DNA to the particular item.  Her testimony is relevant to Count 2.

Criminalist Steven Kline will testify that he tested the syringes found in the package outside Buck's window and many tested positive for methamphetamine.  This testimony is relevant to Count 2.

Criminalist Mark LaVigne will testify that he tested the pipes found outside Buck's window following the Timothy Dean overdose death, which tested positive for methamphetamine, and the suspected klonopin found in Buck's apartment during the September 2019 search, which tested positive for clonazepam.  This testimony is relevant to Counts 1 through 7 and may be established through a stipulation.

Donald Schulze will testify that he sold methamphetamine to Buck on at least 20 occasions between May 2018 and January 2019, including on January 5, 2019, the day before Timothy Dean went to Buck's apartment and died the next morning.  Schulze will testify that he typically dropped off the methamphetamine to Buck outside Buck's apartment.

Crime Analyst Romy Haas is a cell-site expert who analyzed data from Schulze's cellphone for the dates on which Schulze will testify he met with Buck.  Haas will testify that, on many of these occasions, cell-site data suggests that Schulze's phone was in the vicinity of cell towers near Buck's apartment.

1    <u>Dr. Matthew Miller</u> will testify that he performed the autopsy of

2    Timothy Dean.  He will testify regarding scar tissue in the elbow

3    pit, as well as a small amount of subcutaneous hemorrhage and

4    subcutaneous scar tissue on the right side.  The subcutaneous

5    hemorrhage contained foreign debris consistent with recent drug use.

6    Dr. Miller will also opine that the cause of death is methamphetamine

7    and ethanol toxicity, with coronary artery atherosclerosis as a

8    contributing condition. His testimony is relevant to Count 2.

9    <u>Senior Criminalist Danielle Van Cleve</u> will testify that she

10   performed the toxicology screens for Gemmel Moore and Timothy Dean.

11   For Gemmel Moore, the results showed 3.9 ug/mL methamphetamine in the

12   femoral blood and 0.13 ug/mL amphetamine and 4.4 ug/mL

13   methamphetamine in the heart blood.  For Timothy Dean, the results

14   showed 0.003 ug/mL amphetamine and 1.6 ug/mL methamphetamine in the

15   femoral blood; and 0.06 ug/mL amphetamine and 4.3 ug/mL

16   methamphetamine in the heart blood.  Her testimony is relevant to

17   Counts 1 and 2, and the government has offered to stipulate to her

18   testimony.

19   <u>Senior Criminalist Courtney Castallino</u> will testify that she

20   performed the toxicology screens for Timothy Dean.  For Timothy Dean,

21   the results showed a blood alcohol content of between 0.112 and

22   0.146%; 0.003 ug/mL amphetamine and 1.6 ug/mL methamphetamine in the

23   femoral blood.  Her testimony is relevant to Count 2, and the

24   government has offered to stipulate to her testimony.

25   <u>Dane Brown</u> will testify that he met defendant through the dating

26   website Adam4Adam in late 2019.  Defendant would regularly send

27   rideshare services to pick Brown up and take Brown to his apartment

28   where they would inject large amounts of methamphetamine.  Brown will

testify that defendant constantly pressured him to inject more methamphetamine each time they met and would often pressure him to inject twice in a single session.  Brown will testify that defendant regularly provided GHB.  Eventually, Brown moved in with defendant, after which he overdosed following methamphetamine injections on September 4, 2019 and September 11, 2019.  His testimony is relevant to Counts 6 and 7.

Dr. Amar Shah will testify that he treated Dane Brown following his overdose on September 4, 2019.  He will discuss Brown's condition and his ultimate diagnosis that Brown had overdosed on methamphetamine.  His testimony is relevant to Count 6.

Caroline Whitehead will testify that she was a toxicologist with Quest Diagnostic and ran the toxicology screen ordered by Dr. Shah on September 4, 2019.  The results showed 5,500 ng/mL amphetamine and >20,000 ng/mL methamphetamine in Brown's urine.  Her testimony is relevant to Count 6, and the government has offered to stipulate to her testimony.

## IV.   LEGAL AND EVIDENTIARY ISSUES

### A.   Victim Witness Testimony

On March 24, 2012, this Court ruled that evidence of Buck's distributions of drugs to individuals other than those identified in the FSI is admissible "pursuant to 404(b) because it demonstrates that defendant intended and had the capacity to distribute drugs to participants in party and play sessions."  (Dkt. 123 at 14.)  The Court also held that these facts could be introduced as direct evidence that defendant was operating a drug premises as charged in Count 7.  (Id.)  The Court therefore held that this evidence is admissible subject to an appropriate limiting instruction, which the

government included in the jury instructions it proposed to defense counsel.

Separate, but relatedly, each of the victims identified in the FSI had multiple party and play sessions with Buck; however, the FSI charges only one count of distribution per named victim. Evidence of distributions to the *same* victim is direct evidence of the charged distribution to that victim, not subject to the Rule 404(b) analysis, because those surrounding distributions are inextricably intertwined with the charged distribution. That is, those surrounding distributions are necessary to tell a coherent and complete story of how the victims met Buck, how they formed a party and play arrangement where Buck offered compensation to ingest drugs, and how Buck gradually (or consistently) applied pressure to "get higher" or let Buck inject them. United States v. DeGeorge, 380 F.3d 1203, 1220 (9th Cir. 2004) (evidence necessary to tell a coherent and comprehensive story is inextricably intertwined to the charged conduct and thus is not subject to Rule 404(b) analysis).

Additionally, text messages, Uber/Lyft records, and photographs from other party and play sessions with the same victim corroborate the charged instance of distribution. A jury cannot make its decision in a void – without knowledge of the frequency and commonalities of the distributions, the ongoing nature of the relationship, and the evidence corroborating the victim's account of the ongoing conduct. See United States v. Vizcarra- Martinez, 66 F.3d 1006, 1012-13 (9th Cir. 1995); United States v. Beckman, 298 F.3d 788 (9th Cir. 2002) (testimony that defendant worked as a drug courier for the government's cooperating witness and smuggled marijuana across the border for that person on five or six prior

occasions was inextricably intertwined with the distribution charge because it was necessary to provide a comprehensive story about the crime and to establish the defendant's relationship with the cooperating witness).

Finally, this evidence is also direct evidence of Count 7 (drug premises), as the frequency of the visits tend to show that Buck was using and maintaining his apartment to distribute drugs.

**B.    Case Agents**

LASD Sergeant Paul Cardella and Detective Quilmes Rodriguez are the primary case investigators.  Sergeant Cardella will testify as the case agent.  Detective Rodriguez is not expected to testify in the government's case-in-chief.  The government respectfully requests that they both be permitted to remain in the courtroom throughout trial and that one of them sit at counsel table.

**C.    Digital Device Evidence**

The government expects to admit photographs, videos, and text message conversations seized from defendant's digital devices and iCloud.  The photographs and video seized from defendant's digital devices show Buck and various individuals (identified and unidentified) engaged in party and play sessions and thus corroborate victim testimony and establish Buck's pattern of distributing drugs through party and play.  Similarly, the text message conversations between Buck and various individuals (identified and unidentified) show how Buck solicited men to party and play as well as his practice of sending cars to transport them to Buck's residence where Buck would distribute drugs including methamphetamine, clonazepam, and GHB.  Some of this evidence, including photographs, videos, and text messages with named victims, is direct evidence of the charges and is

inextricably intertwined with those charges.  Other digital evidence, also including photographs, videos, and text messages, with other victims is essential evidence of Buck's pattern of party and play, corroborates the named victims' testimony, and refutes Buck's anticipated defense that his guests brought or used their own drugs in his apartment without his knowledge, approval, or participation. While the latter category is also direct evidence of Count 7, in an abundance of caution, the government gave Rule 404(b) notice of this evidence on November 13, 2020.[1]

### 1.  Authentication and Identification

The photographs and videos from Buck's digital devices will be identified and authenticated (1) by a testifying victim depicted in the photograph or video or who is otherwise familiar with the depiction; or (2) by case investigator Paul Cardella who will identify the photograph or video as one he observed on defendant's digital devices in the course of this investigation.  Similarly, text messages from Buck's digital devices will be identified and authenticated by (1) a testifying victim who personally exchanged the messages with Buck; or (2) case investigator Paul Cardella who will testify that the messages are from an extraction of defendant's digital devices.

Federal Rule of Evidence 901(a) provides that "[t]he requirement

---

[1] Specifically, the government gave notice that it intends to introduce "photographs, videos, and messages seized from defendant's digital devices that evidence defendant recruiting men for party and play; communicating regarding narcotics use in coded language; offering compensation to party and play; and depicting individuals appearing to be engaged in party and play, including images and videos of apparent drug use."

of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Under Rule 901(a), evidence should be admitted, despite any challenge, once the government makes a prima facie showing of authenticity or identification so "that a reasonable juror could find in favor or authenticity or identification . . . [because] the probative force of the evidence offered is, ultimately, an issue for the jury." United States v. Chu Kong Yin, 935 F.2d 990, 996 (9th Cir. 1991) (citations and internal quotation marks omitted); see also United States v. Black, 767 F.2d 1334, 1342 (9th Cir. 1985).

Like other evidence, electronic data, including data seized from digital devices, can be authenticated in a variety of ways, including by an investigator with knowledge of the investigation or by someone with firsthand knowledge of the content or circumstances captured in the data.  See United States v. Smith, 918 F.2d 1501, 1510 (11th Cir. 1990) ("[t]he government may authenticate a document solely through the use of circumstantial evidence, including the document's own distinctive characteristics and the circumstances surrounding its discovery"); United States v. Siddiqui, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (emails sufficiently authenticated by content and context by examining what was said in the messages as well as nicknames used within the messages).  For example, a witness can authenticate text messages that he personally exchanged with the defendant.  See Fed. R. Evid. 901(b) (a party may authenticate evidence through "[t]estimony [of a witness with knowledge] that a matter is what it is claimed to be").  Similarly, a witness can authenticate a photograph or video that depicts the witness or something with which

1    he is familiar, regardless of his knowledge of the particular

2    circumstances under which the photograph or video was taken.  32

3    McCormick On Evid. § 215 (7th ed.) ("The witness who lays the

4    authentication foundation need not be the photographer, nor need the

5    witness know anything of the time, conditions, or mechanisms of the

6    taking of the picture."); see also Fed. R. Evid. 1002 advisory

7    committee's note.  "The bar for authentication of evidence is not

8    particularly high."  See generally United States v. Gagliardi, 506

9    F.3d 140, 151 (2d Cir. 2007) (citation omitted).

10       Here, as stated above, the government expects to present some

11   digital device evidence directly through victims who will

12   authenticate the evidence as a text conversation they had with

13   defendant, or a photograph or video depicting the victim in

14   defendant's apartment.  To the extent there are lingering questions

15   regarding authenticity, the evidence can be conditionally admitted,

16   subject to a case investigator or Cellebrite technician (or

17   stipulation) establishing that the data was seized from defendant's

18   digital devices.

19       The government also expects to admit and discuss a portion of

20   this evidence through Sergeant Paul Cardella, who will give an

21   overview of the investigation and admit a sample of digital device

22   evidence showing defendant's distributions of drugs in his apartment

23   during apparent party and play sessions, including sessions with

24   Gemmel Moore prior to Gemmel Moore's overdose death.  For digital

25   device evidence not discussed by victim witnesses, the government may

26   seek to elicit lay testimony from Sergeant Cardella regarding the

27   meaning of certain extracted messages, based on his knowledge of the

28   investigation.  Lay opinion testimony is admissible if it is (1)

1  "rationally based on the perception of the witness," (2) "helpful to

2  a clear understanding of the witness's testimony or the determination

3  of a fact in issue[,]" and (3) "not based on scientific, technical,

4  or other specialized knowledge within the scope of Rule 702." Fed. R.

5  Evid. 701. See also United States v. Freeman, 498 F.3d 893, 904-05

6  (9th Cir. 2007) (upholding, as proper lay testimony, detective's

7  testimony interpreting ambiguous statements where his "understanding

8  of ambiguous phrases was based on his direct perception of several

9  hours of intercepted conversations. . . and other facts he learned

10  during the investigation" and his testimony "proved helpful to the

11  jury in determining what [defendants] were communicating during the

12  recorded telephone calls").

13          2.   Transcripts for English language recordings

14      For videos recovered from Buck's digital devices where there is

15  audible conversation relevant to the charges or necessary to

16  understand the evidence, the recording will be synced with a

17  transcript.  The recordings and corresponding transcripts have been

18  produced to defendant.  The statements captured by the recordings are

19  all in English.[2]

20      **D.  Chain of Custody of Physical Evidence**

21      To be admitted, real evidence (i.e., a physical exhibit) must be

22  in substantially the same condition as when the crime was committed.

23  The court may admit the evidence if there is "a reasonable

24  probability the article has not been changed in important respects."

25  United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991).

26

27      [2] For recorded conversations in the English language, the
recording itself is the evidence, and a transcript of the recording
28  may be provided as an aid in following the conversation. United
States v. Chen, 754 F.2d 817, 824 (9th Cir. 1985).

1    In establishing chain of custody, the government is not required

2    to call all persons who have come into contact with the evidence.

3    Reyes v. United States, 383 F.2d 734 (9th Cir. 1967).  Alleged

4    defects in the chain of custody go to the weight of the evidence

5    rather than to its admissibility.  United States v. Matta-

6    Ballesteros, 71 F.3d 754, 769 (9th Cir. 1995), amended on denial of

7    reh'g and reh'g en banc, 98 F.3d 1100 (9th Cir. 1996).  In the

8    absence of evidence of tampering, there is a presumption that public

9    officers have properly discharged their official duties.  Harrington,

10   923 F.2d at 1374.

11   In this case, the government's physical evidence includes drugs,

12   and party and play paraphernalia found in defendant's apartment

13   during the Gemmel Moore overdose death, the Timothy Dean overdose

14   death, and the September 2019 arrest and search warrant.  The

15   government will also offer into evidence photographs of defendant's

16   apartment and the items seized from it.  Additionally, the government

17   will offer into evidence a Cellebrite download of victim Gemmel

18   Moore's phone.  The phone was originally seized by Coroner

19   Investigator Cronin, and the Property Unit released it to a

20   custodian, a friend of Gemmel Moore's.  Mr. Moore's mother, LaTisha

21   Nixon, then provided the phone to Det. John Carlin, who downloaded

22   its contents.

23   **E.   Business Records**

24   At trial, the government anticipates offering several sets of

25   business records into evidence, including 911 calls,[3] Uber/Lyft

---

[3] Specifically, the government will introduce the 911 calls (1)
defendant made after Gemmel Moore's overdose and Timothy Dean's
overdose; and (2) a gas station attendant made after Dane Brown's
overdose.  The government has prepared transcripts of video

*(footnote cont'd on next page)*

records, phone records, bank records, and flight records.  Such records of "regularly conducted activity" fall within an exception to the rule against hearsay and are admissible either through "the testimony of the custodian or another qualified witness" or "by a certification that complies with Rule 902(11)."  Fed. R. Evid. 803(6)(D).  In this case, the government has chosen the latter option with respect to certain records, and has provided copies of those records in discovery to defense counsel along with certifications by appropriately qualified custodians of records, thereby affording opposing counsel "a fair opportunity to challenge them."  Fed. R. Evid. 902(11).  To date, no defendant has raised any objection to the admission of any of these business records.

> **F.  Summary Charts and Lay Testimony Regarding Digital Evidence**

The government plans to introduce summary charts regarding (1) the digital devices searched and seized in this case; (2) Gemmel Moore's visits to defendant's apartment, as established by digital device evidence; (3) Donald Schulze's distributions of methamphetamine to defendant, as established by text messages, historical cell-site analysis, and witness testimony; and (4) Carlos Sinclair's visits to defendant's apartment, as established by digital device evidence, Uber/Lyft records, and witness testimony, as established by digital device evidence, Uber/Lyft records, and witness testimony.  These charts will aid the jury is understanding this important, but voluminous evidence.

The Ninth Circuit has long endorsed the use of summary charts as a "testimonial aid" for the jury.  <u>United States v. Wood</u>, 943 F.2d

recordings where the conversation on the recording is relevant. For other records, where the images are the relevant portion of the recording, there will be no corresponding transcript.

1  1048, 1053-54 (9th Cir. 1991).  It has also acknowledged that there
2  is no "bright-line rule against admission of summary charts as
3  evidence." United States v. Anekwu, 695 F.3d 967, 981-82 (9th Cir.
4  2012).  Rather, it is within a "district court's discretion" under
5  Federal Rule of Evidence 611(a) to determine whether such exhibits
6  can be admitted.  Id. at 982 (citing United States v. Boulware, 470
7  F.3d 931, 936 (9th Cir. 2006)).

8      **G.   Expert Testimony and Related Evidence**

9      The government has notified defendant pursuant to Federal Rule
10  of Criminal Procedure 16(a)(1)(G), that it intends to call as expert
11  witnesses (1) a forensic biologist to testify about DNA evidence
12  found on the syringes and pipes found below Buck's bathroom window
13  after Timothy Dean's overdose death; (2) a forensic toxicologist who
14  will opine of the causes of Gemmel Moore and Timothy Dean's deaths;
15  (3) the medical examiners who performed autopsies on Gemmel Moore and
16  Timothy Dean; (4) a cell-site expert who analyzed the location of
17  Donald Schulze's cellphone during his meetings with Buck to
18  distribute drugs; (5) a law enforcement drug expert who will opine
19  regarding the effects of certain controlled substances and the coded
20  language used to refer to drugs and drug use; (6) criminalists who
21  tested the controlled substances recovered from Buck's apartment and
22  in the drug residue in the pipes and syringes found in the package
23  outside Buck's apartment; and (7) toxicologists who tested the levels
24  of various drugs in the decedent victims' blood and the named
25  victim's urine.

26      A qualified expert witness may provide opinion testimony on the
27  issue in question if specialized knowledge will assist the trier of
28  fact in understanding the evidence or determining a fact in issue.

See Fed. R. Evid. 702.  To be admissible, expert testimony must satisfy only two basic requirements: (1) the testimony must be helpful to the trier of fact; and (2) the witness must be qualified to deliver the testimony based on his knowledge, skill, experience, training, or education.  Exum v. General Elec. Co., 819 F.2d 1158, 1163 (D.C. Cir. 1987); 4 Weinstein & Berger, WEINSTEIN'S FEDERAL EVIDENCE, § 702.06[2], at 702-06 (2d ed. 1997) ("WEINSTEIN").  An expert may provide opinion testimony even if it embraces an ultimate issue to be decided by the trier of fact.  See Fed. R. Evid. 704; United States v. Fleischman, 684 F.2d 1329, 1335 (9th Cir. 1982). Each of the government's witnesses meets the requirements of Rule 702.

On November 20, 2020, defendant challenged the testimony of DNA expert Amber Sage.  Following a hearing on March 1, 2021, the Court ruled that Ms. Sage's testimony was "not only relevant, but admissible pursuant to Daubert."  (Dkt. 123 at 25-26.)  Defendant has not otherwise challenged any of the remaining experts' qualifications or the helpfulness of the testimony.

### H.   Truth Testimony Provision of Diversion Agreement

The government may not vouch for the credibility of its witnesses by presenting the jury with personal assurances of the witness's veracity.  However, a reference to the "truthful testimony" provisions of a witness's diversion agreement with the government does not constitute vouching if it is made in response to an attack on the witness's credibility because of his plea bargain.  United States v. Monroe, 943 F.2d 1007, 1013 (9th Cir. 1991).  To introduce such a "truthful testimony" provision of a diversion agreement, the government need not wait until re-direct examination, after the

witness's credibility has been attacked on cross-examination.

Instead, where in opening statement the defendant attacks the

witness's credibility because of the witness's diversion agreement,

the government may introduce the "truthful testimony" provisions in

direct examination of the witness. Id. at 1014 (because government

introduced "truthful testimony" aspects of a cooperator's plea

agreement only after defendant had attacked cooperator's credibility

in opening statement, government did not vouch for cooperator).

### I.   Grand Jury Testimony

The government intends to call Lauren Beard-Ansley at trial, who

also testified before the grand jury.[4]  Mr. Beard-Ansley is a friend

of defendant and we expect that he may become evasive or recalcitrant

on the stand.

Sworn grand jury testimony can be used not only to impeach

allies of the defendant but also to refresh recollection, and may be

admitted as substantive evidence if the witness testifies

inconsistently or claims to have no recollection of the earlier

statement.  United States v. Champion Int'l Corp., 557 F.2d 1270,

1274 (9th Cir. 1977) ("Prior inconsistent testimony of a witness

before a grand jury is admissible as substantive evidence if the same

witness testifies at trial.") (citing Fed. R. Evid. 801(d)(1)(A));

United States v. Morgan, 555 F.2d 238, 242 (9th Cir. 1977) (grand

jury testimony properly admitted where witness at trial was

"indefinite and uncertain" or "indefinite and evasive" on topics

covered in his grand jury testimony).  Portions of the prior

testimony can be read even if the grand jury testimony was "elicited

---

[4] His grand jury testimony has been disclosed under the
Protective Order, pursuant to the Court's order.

by means of leading questions." Champion Int'l Corp., 557 F.2d at
1274.

Sworn grand jury testimony of a witness testifying at trial can
also be admitted if it is consistent with the witness's trial
testimony and is offered "to rebut an express or implied charge that
the declarant recently fabricated it or acted from a recent improper
influence or motive in so testifying" or "to rehabilitate the
declarant's credibility as a witness when attacked on another
ground." Fed. R. Evid. 801(d)(1)(B).

### J.   Defendant's Statements

Defendant's statements are admissible only if offered against
him -- otherwise, they fall within the scope of the rule against
hearsay. Fed. R. Evid. 801(d)(2)(A); United States v. Fernandez, 839
F.2d 639, 640 (9th Cir. 1988). The hearsay rule prohibits a
defendant from obtaining the benefit of testifying without subjecting
himself to cross-examination by placing his self-serving prior
statements before the jury through other witnesses. Fed. R. Evid.
801(c); Fernandez, 839 F.2d at 640.

### K.   Cross-Examination of Defendant

A defendant who testifies at trial may be cross-examined as to
all matters reasonably related to the issues he or she puts in
dispute during direct examination. "A defendant has no right to
avoid cross-examination on matters which call into question his claim
of innocence." United States v. Miranda-Uriarte, 649 F.2d 1345,
1353-54 (9th Cir. 1981). The government is not required to provide
notice of matters about which it may seek to cross-examine defense
witnesses, including defendant, should they testify.

1

      **L.**   **Use of Exhibits During Opening Statement**

2      Exhibits may be used by the government in the opening statement,

3   and so long as the opening statement "avoids references to matters

4   that cannot be proved or would be inadmissible, there can be no

5   error, much less prejudicial error." United States v. De Peri, 77826

6   F.2d 963, 979 (3d Cir. 1985); see also United States v. Rubino, 43127

7   F.2d 284, 290 (6th Cir. 1970).

8      The government intends to identify the photographs that it will

9   use in its opening statement to the defense prior to trial.

10      **M.**   **Reciprocal Discovery**

11      The government has, on numerous occasions, requested reciprocal

12   discovery and expert disclosures from the defense.  To date, defense

13   counsel has not produced any reciprocal discovery.  On November 20,

14   2020, they disclosed three experts: (1) Mark Scott Taylor – DNA

15   analysis; (2) Marvin Pietruszka – Forensic Toxicology; and (3)

16   Christopher Mark Milroy – Forensic Pathology.  On November 24, 2020,

17   the government informed defense counsel that merely identifying three

18   persons and their respective fields was insufficient notice under

19   Rule 16(b)(1)(C) and requested a written summary of any testimony

20   that defendant intended to use under Rules 702, 703, or 705.

21   Defendants disclosure did not apprise the government of the proposed

22   experts' opinions, the bases for their opinions, or their

23   qualifications.  The government has renewed its request for Rule 16

24   disclosures at least twice since November 2020.

25      At the June 1, 2021 status conference, defense counsel stated

26   that he would no longer call Mr. Taylor or Mr. Milroy.  On June 14,

27   2021, defendant provided sufficient notice of Dr. Pietruszka and his

28   anticipated testimony.  However, the government has not received any

1   disclosures regarding any additional expert witnesses.  At the June
2   22, 2021 hearing and the June 28, 2021 status conference, defense
3   counsel indicated that he is ready to proceed to trial on July 13,
4   2021.

5       To the extent defendant attempts to introduce or use documents
6   at trial that have not been previously produced, or to use
7   undisclosed experts, the government reserves the right to seek to
8   preclude their use.  See Fed. R. Crim. P. 16(d)(2) ("[T]he court may
9   . . . prohibit the party from introducing evidence not disclosed.");
10  see also Taylor v. Illinois, 484 U.S. 400, 415 (1988) (defendant's
11  failure to comply with, or object to, government's discovery requests
12  before trial justified exclusion of unproduced evidence).

13      **N.   Affirmative Defenses**

14      Defendant has not given notice of an intent to rely on any
15  defense of mental incapacity, duress, entrapment, or alibi.
16  Therefore, to the extent defendant may attempt to rely on any such
17  defense, the government reserves the right to object and to seek to
18  have defendant precluded from asserting such a defense.

19      **O.   Character and Impeachment Evidence**

20      The Supreme Court has recognized that character evidence --
21  particularly cumulative character evidence -- has weak probative
22  value and great potential to confuse the issues and prejudice the
23  jury.  See Michelson v. United States, 335 U.S. 469, 480, 486 (1948).
24  The Court has thus given trial courts wide discretion to limit the
25  presentation of character evidence.  Id.

26      In addition, the form of the proffered evidence must be proper.
27  Federal Rule of Evidence 405(a) sets forth the sole methods for which
28  character evidence may be introduced.  It specifically states that,

where evidence of a character trait is admissible, proof may be made in two ways: (1) by testimony as to reputation and (2) by testimony as to opinion.  Thus, a defendant may not introduce specific instances of his or her good conduct through the testimony of others.  See Michelson, 335 U.S. at 477.  On cross-examination of a defendant's character witness, however, the government may inquire into specific instances of a defendant's past conduct relevant to the character trait at issue.  See Fed. R. Evid. 405(a).  In particular, a defendant's character witnesses may be cross-examined about their knowledge of the defendant's past crimes, wrongful acts, and arrests.  See Michelson, 335 U.S. at 481.  The only prerequisite is that there must be a good faith basis that the incidents inquired about are relevant to the character trait at issue.  See United States v. McCollom, 664 F.2d 56, 58 (5th Cir. 1981).

## P.    Jury Nullification

To the extent any defendant attempts to raise improper defenses, the Court should exclude any evidence or argument relating to any possible jury nullification defense.  Zal v. Steppe, 968 F.2d 924, 930 (9th Cir. 1992) (Trott, J., concurring) ("[N]either a defendant nor his attorney has a right to present to a jury evidence that is irrelevant to a legal defense to, or an element of, the crime charged.  Verdicts must be based on the law and the evidence, not on jury nullification as urged by either litigant.").

In particular, the defendant in this case should not be permitted to introduce evidence concerning his philanthropic causes, donations, the financial dependency of family members, having ailing family members, or having a difficult upbringing, since none is relevant to any material issue and its nonexistent or minimal

probative value is substantially outweighed by the risk of unfair prejudice and confusion of the issues.  <u>See</u> Fed. R. Evid. 401, 403.

**V.    CONCLUSION**

The government respectfully requests permission to file supplemental trial memoranda if necessary.