TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
CHELSEA NORELL (Cal. Bar No. 280831)
LINDSAY M. BAILEY (Cal. Bar No. 285047)
Assistant United States Attorney
Violent & Organized Crimes; and International Narcotics, Money
Laundering, & Racketeering Sections
      1100 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-2216/6875
      Facsimile: (213) 894-0141
      E-mail:   chelsea.norell@usdoj.gov
                lindsay.bailey@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                 UNITED STATES DISTRICT COURT

             FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-595-CAS |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR ACQUITTAL |
| v. | |
| EDWARD BUCK, | |
| Defendant. | |

      Plaintiff United States of America, by and through its counsel
of record, the Acting United States Attorney for the Central District
of California and Assistant United States Attorneys Chelsea Norell
and Lindsay M. Bailey, hereby files its Opposition to defendant
EDWARD BUCK's Motion for Judgment of Acquittal (Dkt. 178).

//

//

//

//

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 10, 2021

Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

CHELSEA NORELL
LINDSAY M. BAILEY
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION....................................................1

II.   RELEVANT BACKGROUND.............................................1

      A.    Procedural History........................................1

      B.    Summary of Relevant Trial Evidence........................2

            1.    Liam Sacks, Josh Tedla, and Nusret Arnautovic........2

            2.    Carlos Sinclair......................................2

            3.    Jermaine Gagnon......................................4

            4.    Thomas Cody Hoffman..................................5

            5.    Dane Brown, Dr. Amar Shah, and Caroline
                  Weatherhead (September 4, 2019)......................6

            6.    Arthur Stokes, Anthony Everett, Daniel Lyons, and
                  Corey Peters.........................................8

            7.    Paul Cardella and Vaughn Gates.......................9

            8.    Grehtel Barraza, Cole Alnes, Joseph Cronin,
                  Matthew Quon, LaTisha Nixon, and John Carlin........10

            9.    Donald Schulze and Romy Haas........................11

            10.   Oscar Palacios, Cole Alnes, Brenda Shafer,
                  Jennifer DeStefano, Raymond Rose, Steve Kline,
                  Mark Lavigne, and Jim Nieman........................12

            11.   Courtney Castellino, Danielle Van Cleve, Dr.
                  Kevin Young, Dr. Matthew Miller, and Dr. Shaun
                  Carstairs...........................................13

III.  LEGAL STANDARD................................................14

IV.   ARGUMENT......................................................15

      A.    A Reasonable Jury Could Find that Defendant
            Distributed Methamphetamine..............................15

      B.    A Reasonable Jury Could Find that Gemmel Moore and
            Timothy Dean's Deaths Resulted from Defendant's
            Distribution of Methamphetamine..........................18

      C.    A Reasonable Jury Could Find that Defendant Maintained

a Drug-Involved Premises.................................21

D.    A Reasonable Jury Could Find that Defendant Induced
      Gemmel Moore and Jermaine Gagnon to Travel Interstate
      for Purposes of Prostitution............................22

V.    CONCLUSION....................................................25

ii

1

<u>**TABLE OF AUTHORITIES**</u>

2

**Cases**                                                                    **Page(s)**

3

<u>Burrage v. United States</u>,
4
    571 U.S. 204 (2014) ............................................. 20

5

<u>Jackson v. Virginia</u>,
6
    443 U.S. 307 (1979) ............................................. 15

<u>State v. Frazier</u>,
7
    98 S.W.2d 707 (1936) ................................... 20, 21, 22

8

<u>United States v. Corona-Verbera</u>,
9
    509 F.3d 1105 (9th Cir. 2007) ................................... 14

10

<u>United States v. Hinton</u>,
    222 F.3d 664 (9th Cir. 2000) ................................... 14
11

12

<u>United States v. Lombera-Valdovinas</u>,
    429 F.3d 927 (9th Cir. 2005) ................................... 14
13

<u>United States v. Rashkovski</u>,
14
    301 F.3d 1133 (9th Cir. 2002) .............................. 23, 24

15

<u>United States v. Rocha</u>,
    598 F.3d 1144 (9th Cir. 2010) .................................. 15
16

<u>United States v. Shetler</u>,
17
    665 F.3d 1150 (9th Cir. 2011) .............................. 22, 23

18

<u>United States v. Terry</u>,
19
    911 F.2d 272 (9th Cir. 1990) ................................... 15

20

**Statutes**

21

18 U.S.C. § 2422(a) ................................................. 2
22
21 U.S.C. § 856(a)(1) ............................................... 2
21 U.S.C. § 841(a)(1) ............................................... 2
23
California Penal Code Section 674(b) ........................... 24, 25

24

**Rules**

25

Federal Rule of Criminal Procedure 29 ...................... 2, 16, 21

26

27

28

iii

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3

After being found guilty following a two-week jury trial of all
nine counts of the First Superseding Indictment ("FSI"), defendant
EDWARD BUCK now seeks a judgment of acquittal pursuant to Federal
Rule of Criminal Procedure 29.  (Dkt. 178 (Defendant's Motion for
Judgment of Acquittal), "Motion" or "Mot.")  In doing so, defendant
turns the Rule 29 standard on its head by examining the evidence in
the light most favorable to *him* rather than to the government.  When
the evidence is viewed under the correct standard, a rational trier
of fact could have found – and, in fact, did find – the essential
elements of all crimes were met beyond a reasonable doubt.  The
jury's carefully considered verdicts should therefore stand.

**II.   RELEVANT BACKGROUND**

**A.    Procedural History**

The FSI charged defendant with nine counts, including
Distribution of Methamphetamine with Death Resulting, in violation of
21 U.S.C. §§ 841(a)(1), (b)(1)(C) (counts one and two); Distribution
of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C)
(counts three, four, five, and six); Maintaining a Drug Involved
Premises, in violation of 21 U.S.C. § 856(a)(1) (count seven); and
Inducement of Interstate Travel for Purposes of Prostitution, in
violation of 18 U.S.C. § 2422(a) (counts eight and nine).  (Dkt. 32.)

On July 13, 2021, defendant proceeded to trial on this matter.
(Dkt. 153.)  On July 27, 2021, the jury returned guilty verdicts and
convicted defendant on counts one through nine of the FSI.  (Dkt.
171.)  On the special verdict forms, the jury found that Gemmel Moore

1

1  and Timothy Dean's deaths resulted from defendant's distribution of

2  methamphetamine for counts one and two, respectively.  (Id.)

3       **B.   Summary of Relevant Trial Evidence**

4       In its case-in-chief, the government called 45 witnesses and

5  introduced approximately 170 exhibits into evidence, including

6  videos, text messages, surveillance footage, photographs, drug

7  paraphernalia, business records, and methamphetamine.  (Dkt. 170

8  (Court's List of Exhibits and Witnesses).)  The evidence presented

9  during the government's case-in-chief established that defendant

10 engaged in a pattern and practice of soliciting poor, homeless, and

11 vulnerable individuals to his apartment for purposes of engaging in

12 party-and-play, that is, the practice of using methamphetamine and

13 engaging in sexual activities.  The following are non-exhaustive

14 examples of such evidence.

15      1.   Liam Sacks, Joshua Tedla, and Nusret Arnautovic

16      Defendant's neighbors, Mr. Sacks, Mr. Tedla, and the apartment

17 manager, Mr. Arnautovic, all testified that defendant had guests over

18 on an almost daily basis; that his guests were primarily African

19 American men in their 20s; and that some of these men behaved

20 erratically and appeared to be under the influence after leaving

21 defendant's apartment.  (Dkts. 153, 155.)  They also testified that,

22 following the deaths of Gemmel Moore and Timothy Dean, the number of

23 visitors to defendant's apartment slowed down, but picked up within a

24 few weeks.  (Id.; Ex. 104.3.)

25      2.   Carlos Sinclair

26      Carlos Sinclair testified that he met defendant through a

27 referral from his friend J.T., also known as Arthur Stokes.  (Dkt.

28 153; Ex. 77.2.)  The two communicated via text messages in which

2

defendant quickly asked if Mr. Sinclair would slam methamphetamine; however, Mr. Sinclair agreed only to smoke. (Id.) The two began regularly meeting to party and play at defendant's apartment, and Mr. Sinclair testified that defendant provided him with methamphetamine during each of the more than fifty times Mr. Sinclair went there. (Id.) Mr. Sinclair testified that defendant would often give him substances intend to make Mr. Sinclair go unconscious, include GHB, "maximum impact," and large amounts of alcohol, and that defendant regularly requested that Mr. Sinclair dress up in white underwear and "prance around." (Id.) Defendant would generally pay Mr. Sinclair $200 for their sessions, but defendant would pay Mr. Sinclair less or not at all if defendant was unhappy with Mr. Sinclair's performance. (Id.) Mr. Sinclair's trips to defendant's residence were supported by text messages, photographs found on defendant's digital devices, and Uber and Lyft records memorializing their meetings. (Exs. 77.1, 77.2, 77.3, 77.4, 79.41, 173.1.)

Mr. Sinclair also discussed a few specific trips that he made to defendant's apartment. First, he discussed a trip on May 15, 2018, during which defendant gave Mr. Sinclair methamphetamine and GHB, the latter of which Mr. Sinclair tried for the first time that night. (Dkt. 153.) Second, Mr. Sinclair discussed an incident on September 2, 2018, in which defendant again gave him GHB, which caused Mr. Sinclair to go unconscious; he later awoke to defendant injecting him in the arm with methamphetamine without his consent. (Id.; Exs. 77.3, 143.1.) Finally, Mr. Sinclair described defendant summoning him over to defendant's apartment to remove Jermaine Gagnon, whom Mr. Sinclair identified by photograph. (Exs. 77.4, 153.) Once again,

1  these specific instances were corroborated by text messages and Uber

2  records.  (Exs. 77.3, 77.4, 137.1, 143.1.)

3          3.  Jermaine Gagnon

4      Jermaine Gagnon testified that he met defendant on the gay male

5  dating website Adam4Adam. (Dkt. 159.)  The two sent messages to each

6  other both through the website and via text message, and defendant

7  quickly asked Mr. Gagnon if he "partied," which Mr. Gagnon understood

8  to mean using methamphetamine and engaging in sexual activities.

9  (Exs. 77.9, 77.10.)  After Mr. Gagnon responded affirmatively,

10  defendant stated that he would provide methamphetamine if Mr. Gagnon

11  came over.  (Dkt. 159.)

12      Ultimately, Mr. Gagnon had four "party and play" sessions with

13  defendant at defendant's apartment, after which he would receive $250

14  per session.  (Dkt. 159.)  Each time, defendant provided Mr. Gagnon

15  with methamphetamine to smoke or inject.  (Id.)  During a session in

16  May 2018, Mr. Gagnon photographed himself with defendant standing

17  over him after defendant drugged him with what he suspected was GHB;

18  he also filmed defendant refusing to order an Uber for him until Mr.

19  Gagnon took another injection.  (Exs. 114, 115.1.)  During that same

20  visit, Mr. Gagnon became suspicious of injections defendant prepared

21  because he saw defendant prepare Mr. Gagnon's injections using drugs

22  from a different bag from the one defendant used for himself.  (Dkt.

23  159.)  When Mr. Gagnon left defendant's apartment, he took the

24  suspicious injections with him, photographed them, and threw them

25  away.  (Id.; Ex. 114.)  Much like Mr. Sinclair, Mr. Gagnon's

26  testimony was corroborated by text messages, photographs, videos, and

27  business records from Uber and Lyft.  (Exs. 77.9, 77.10, 114, 115,

28  115.1, 137.5, 138.1.)

1    Eventually, Mr. Gagnon moved to Minnesota, but reached out to

2    defendant in the hopes that defendant would buy Mr. Gagnon a flight

3    to Florida.  (Ex. 77.10.)  Defendant agreed to purchase the flight

4    but only if Mr. Gagnon flew to California first.  (Id.)  Mr. Gagnon

5    and defendant then spoke over the phone and discussed partying and

6    playing when Mr. Gagnon came out to California.  (Dkt. 159.)

7    Defendant then purchased a flight through American Airlines, and Mr.

8    Gagnon flew to California on September 22, 2018.  (Ex. 142.)  Once he

9    arrived, defendant sent an Uber to pick Mr. Gagnon up in Culver City,

10   after which defendant provided, prepared, and administered an

11   injection of methamphetamine in Mr. Gagnon's right arm.  (Ex. 137.5.)

12   Mr. Gagnon then left defendant's apartment, and when he returned, Mr.

13   Sinclair was there to kick him out.  (Dkt. 159; Ex. 155.)

14            4.   Thomas Cody Hoffman

15        Thomas Cody Hoffman testified that he similarly met defendant on

16   Adam4Adam in 2018 while Mr. Hoffman was working as an escort.  (Dkt.

17   160.)  During their initial conversations, defendant asked Mr.

18   Hoffman if he "just admin[ed]," which Mr. Hoffman understood to mean

19   injecting methamphetamine.  (Dkt. 160; Ex. 77.7.)  The two then had a

20   phone call to discuss the details of their party and play, during

21   which defendant told Mr. Hoffman that he wanted to inject Mr. Hoffman

22   with methamphetamine in exchange for $300.  (Dkt. 160.)

23        Mr. Hoffman went to defendant's apartment on December 2 and

24   December 15, 2018.  (Id.)  Both times, defendant sent Mr. Hoffman an

25   Uber to take him to defendant's apartment, and both times, defendant

26   provided methamphetamine to smoke and inject, and insisted on

27   injecting Mr. Hoffman with methamphetamine.  (Dkt. 160; Ex. 137.4.)

28   Mr. Hoffman testified that, following the injection on December 2,

2018, he began to fade in and out of consciousness and would awake to defendant choking him, slapping him, or caressing him.  (Dkt. 160.) Once Mr. Hoffman fully woke up, defendant approached him with more injections, stating "the party's just getting started."  (Id.)  Mr. Hoffman became so uncomfortable that he texted a friend to pick him up immediately.  (Id., Ex. 112.)

After the initial session, defendant texted Mr. Hoffman on December 15, 2018, asking Mr. Hoffman to "join me in the clouds tonight," which Mr. Hoffman understood to mean coming over to defendant's apartment and using methamphetamine.  (Dkt. 160; Ex. 132.)  During that meeting, Buck again provided methamphetamine for Mr. Hoffman to smoke, and he injected Mr. Hoffman with something that caused Mr. Hoffman to become comatose and unable to move anything but his eyes.  (Dkt. 160.)  Mr. Hoffman finally awoke from this paralysis when defendant approached revving a chainsaw.  (Id.)  After, Mr. Hoffman was able to stand up, gather himself, and leave.  (Id.)  Mr. Hoffman's account is supported by screenshots of defendant's Adam4Adam profile and the messages the two men exchanged, photographs and videos Mr. Hoffman took inside defendant's apartment, text messages, Uber records, and Zelle records.  (Exs. 77.7, 112, 118, 137.4, 139.)

   5.   Dane Brown, Dr. Amar Shah, and Caroline Weatherhead
        (September 4, 2019)

Dane Brown similarly met defendant on Adam4Adam in June of 2019, where Mr. Brown used the screen name "GeekyDude81."  (Dkt. 161; Ex. 81.1.)  After chatting, the two began to meet up regularly.  (Id.) During their meetings, defendant would send Mr. Brown an Uber, and, once Mr. Brown arrived, defendant would provide, prepare, and

6

administer injections ranging from 40 to 90ccs of methamphetamine to Mr. Brown.  (Dkt. 161; Ex. 137.6.)  The two would also smoke methamphetamine provided by defendant, and sometimes Mr. Brown would use GHB provided by defendant.  (Dkt. 161.)

On July 24, 2019, defendant told Mr. Brown that he would be leaving for a while because he was worried that he would be arrested on the anniversary of Gemmel Moore's death.  (Dkt. 161; Ex. 81.1.) Mr. Brown accompanied defendant to a Motel 6 and America's Best Inn where defendant injected Mr. Brown with methamphetamine on at least six occasions.  (Dkt. 161.)  At one point, Mr. Brown passed out from excessive drug use, and when he awoke, defendant had already placed a needle in his arm.  (Id.)

During this time, Mr. Brown also informed defendant that he was going to be kicked out of his transitional housing, and defendant offered to let Mr. Brown move in.  (Id.)  Having nowhere else to go, Mr. Brown moved into defendant's apartment on July 29, 2021.  (Id.) After Mr. Brown moved in, defendant would inject Mr. Brown with methamphetamine two-to-three times every day.  (Id.)  When they would run out of methamphetamine, defendant would give Mr. Brown money and instructions to pick up more.  (Id.)

On September 4, 2019, defendant provided and injected Mr. Brown with methamphetamine three times, all back-to-back.  (Id.)  Mr. Brown began to feel terrible, with a lightness in his chest, trouble breathing, and a rapid heartbeat.  (Id.)  Defendant took Mr. Brown to an Urgent Care center, where personnel instructed him to go to the hospital.  (Id.; Exs. 124, 125.)  Defendant sent Mr. Brown to Cedars-Sinai Medical Center in an Uber where Mr. Brown was treated for methamphetamine use.  (Dkt. 161; Ex. 137.6.)  His treating physician,

Dr. Shah, ordered a toxicology screen which returned results at over 20,000 nanograms per milliliter (or 20 micrograms per milliliter) of methamphetamine in Mr. Brown's blood, the limit of what the lab could test for.  (Dkts. 160, 161.)  When he returned to defendant's apartment, Mr. Brown moved out, but returned on September 10, 2019, and defendant again injected Mr. Brown with methamphetamine.  (Dkt. 161.)  Again, Mr. Brown felt a tightness in his chest and had trouble breathing, but this time, defendant refused to help.  (Id.)  Mr. Brown therefore sat on the couch, prepared to die, until he heard his mother's voice tell him to "Get up and get help."  (Id.)  Mr. Brown therefore walked to a nearby Shell Gas station where the clerk called 911, and paramedics again took him to Cedars-Sinai Medical Center for treatment.  (Id.; Exs. 3, 4, 126, 127.)  Mr. Brown's testimony was supported by text messages, photographs, Uber records, surveillance footage, and 911 calls.

> ### 6. Arthur Stokes, Anthony Everett, Daniel Lyons, and Corey Peters

Arthur Stokes, Anthony Everett, Daniel Lyons, and Corey Peters all visited defendant between 2014 and 2019.  (Dkts. 155, 159, 160.)  Some regularly used methamphetamine, some slammed, and some refused despite immense pressure from defendant.  (Id.)  Each of these men were working to make ends meet, were struggling with addiction, or were experiencing homeless and saw defendant as a source of much needed money, drugs, or a brief reprieve from life on the streets.  (Id.)  Their testimony similarly showed defendant's method of recruiting men on Adam4Adam, through referrals or directly off the streets; his obsession with party and play and the bizarre apparatuses he made men use to smoke methamphetamine; his habit of

1   pushing drugs on men and using his money to incentivize them to do
2   more and bigger amounts than they had previously agreed to do; and
3   defendant's practice of delivering a revolving door of men to his
4   apartment through Uber and Lyft.  (Id.)

5              7.   Paul Cardella and Vaughn Gates
6       Los Angeles Sheriff's Department ("LASD") Sergeant Paul
7   Cardella, one of the case investigators, testified about his review
8   of defendant's iCloud and certain computers and cellphones seized
9   from defendant following his arrest in September of 2019.  (Dkts.
10  156, 157.)  Specifically, Sgt. Cardella discussed the numerous videos
11  recovered from defendant's desktop computer that depicted hundreds of
12  individuals smoking or injecting methamphetamine in defendant's
13  apartment.  (Dkt. 156, 157; Exs. 77, 79, 80.)  Sgt. Cardella
14  described how these individuals all wore the same items, including
15  white underwear, gas masks, and black masks; how they would all smoke
16  methamphetamine while defendant directed them on how to do so; and
17  how defendant would often touch their genitals both while they were
18  awake and unconscious.  (Dkt. 156, 157; Exs. 77, 79, 80, 109, 110.)
19  Sgt. Cardella also reviewed text messages from defendant's cellphone
20  and iCloud in which he regularly discussed using methamphetamine with
21  others.  (Exs. 77, 82.)  Drug expert Vaughn Gates then described the
22  coded drug language used in these messages and opined that the smoke
23  depicted in the videos was consistent with methamphetamine smoke.
24  (Dkt. 161; Exs. 77, 82.)

25       Sgt. Cardella also testified regarding the numerous videos and
26  text messages specifically relating to Gemmel Moore recovered from
27  defendant's digital devices.  (Dkt. 157; Exs. 77.1-77.26, 79.1-79.2,
28  79.4-79.19.)  In these videos, Mr. Moore would either smoke

methamphetamine or discuss the fact that he was extremely high;
defendant would play with Gemmel's genitals; and defendant would
dress Gemmel up in clothes and position him for photographs.  (Ex.
79.1-79.2, 79.4-79.19.)  In one video, Mr. Moore discussed not
wanting to take another "slam" or injection of methamphetamine, after
which defendant told him that he was just there to make him "indecent
proposals," after which Mr. Moore could be heard taking another
injection of methamphetamine off screen.  (Ex. 79.9.)  In text
messages, Mr. Moore discussed the fact that defendant paid him
hundreds of dollars to inject methamphetamine, often lamenting how
poorly defendant treated him and stating that he no longer wanted to
do drugs with defendant.  (Ex. 79.2.)

        8.   <u>Grehtel Barraza, Cole Alnes, Joseph Cronin, Matthew Quon, LaTisha Nixon, and John Carlin</u>

A number of witnesses testified regarding the events of July 27,
2017, specifically regarding Gemmel Moore's travel from Texas to Los
Angeles and his subsequent death.  Mr. Moore's mother, LaTisha Nixon,
described an incident in which Mr. Moore called her crying stating
that a rich, powerful man named Ed Buck had injected him with
methamphetamine and held him against his will.  (Dkt. 153.)  She also
described how Mr. Moore moved back to Texas shortly after this
incident, and that he had no money while he was there, relying
entirely on her for support.  (<u>Id.</u>)  Det. John Carlin testified that
he reviewed text messages from Mr. Moore's phone in which Mr. Moore
sent a text to defendant on July 20, 2017, stating "I'm starting to
miss LA" followed by a video of someone being injected and a question
mark.  (Dkt. 156; Exs. 76, 76.1.)  Defendant then responded "be here
now," and bought a plane ticket for Mr. Moore to travel from Houston,

1    Texas, to Los Angeles, California.  (Dkt. 156; Exs. 76, 141.)  Mr.
2    Moore arrived on July 27, 2017, and defendant arranged to have
3    someone pick Mr. Moore up from the airport and take him directly to
4    his West Hollywood apartment.  (Dkt. 156; Ex. 76.)  Surveillance
5    footage showed Mr. Moore arriving and walking up to defendant's
6    apartment.  (Ex. 104.1.)  A few hours later, defendant then placed a
7    911 call calmly stating that he had a friend who was unresponsive.
8    (Ex. 1.)  Paramedic Cole Alnes testified that he arrived on scene and
9    attempted to revive Mr. Moore, but was unable to do so.  Mr. Moore
10   was therefore pronounced dead.  (Dkt. 156.)  Deputy Grehtel Barraza
11   responded to the scene and saw drugs and drug paraphernalia,
12   including pipes and syringes, in plain view in a red tool chest
13   located in defendant's living room, which she pointed out to coroner
14   investigator John Cronin.  (Dkt. 156; Exs. 13, 14, 15, 102.)  Chemist
15   Matthew Quon later tested the drugs and determined that they
16   contained methamphetamine.  (Dkt. 156.)

17         9.   Donald Schulze and Romy Haas

18        Donald Schulze testified that he regularly supplied defendant
19   with methamphetamine beginning in May 2018.  (Dkt. 160.)  Initially,
20   Mr. Schulze sold defendant seven grams of methamphetamine at a time
21   for $100.  (Id.)  Around September 2018, defendant doubled his usual
22   order to fourteen grams for $200.  (Id.)  Mr. Schulze also testified
23   that he sold fourteen grams of methamphetamine to defendant on the
24   evening on January 5, 2019.  (Id.)  Mr. Schulze's sales to defendant
25   were supported by text messages and cell-site analysis provided by
26   LASD Analyst Romy Haas.  (Dkt. 160; Exs. 77.14, 148.)

27

28

1

        10.   Oscar Palacios, Cole Alnes, Brenda Shafer, Jennifer

2

DeStefano, Raymond Rose, Steve Kline, Mark Lavigne, and Jim
Nieman

3    A number of witnesses testified regarding the events of January

4  7, 2019.  Specifically, Sgt. Cardella introduced surveillance footage

5  showing Timothy Dean arriving to defendant's residence just after

6  midnight, walking normally, and entering defendant's opened apartment

7  door.  (Dkt. 159; Ex. 117.1.)  Less than an hour later, defendant

8  made a 911 call in which he stated that Mr. Dean had "done some drugs

9  that were too much for him" and specifying that it was

10  "methamphetamine," after which defendant could be heard performing

11  CPR for approximately five minutes until the paramedics arrived.

12  (Ex. 2.)  Once again, paramedic Cole Alnes responded to the call and

13  noticed several dirty paper towels covered in vomit and blood pushed

14  into a corner.  (Dkt. 156.)  LASD Deputy Oscar Palacios also arrived

15  on scene and saw that Mr. Dean's feet were white at the bottom,

16  which, in his experience, indicated that Mr. Dean had been dead for

17  some time.  (Dkt. 159; Ex. 105.)  After paramedics attempted

18  lifesaving measures for approximately twenty minutes, Mr. Dean was

19  declared dead.  (Dkt. 156.)  Coroner Investigator Brenda Shafer then

20  arrived on scene and photographed several pipes, syringes, and white

21  underwear located throughout defendant's apartment.  (Dkt. 159; Ex.

22  122.)  A few hours after clearing the scene, one of defendant's

23  neighbors, Jennifer DeStefano, noticed a package on a ledge just

24  under defendant's window.  (Dkt. 159.)  LASD Deputy Raymond Rose

25  responded to the scene and recovered a plastic bag containing a box,

26  which in turn was full of multiple pipes and syringes.  (Id.)  Crime

27  Analysts Steve Kline and Mark Lavigne tested the pipes and syringes

28  and determined that some of them contained methamphetamine.  (Dkt.

1  160.)  DNA expert Jim Nieman then testified that various pipes and

2  syringes contained either the DNA of Mr. Dean, defendant, or both

3  men.  (Dkt. 161.)

4          11.  Courtney Castellino, Danielle Van Cleve, Dr. Kevin
               Young, Dr. Matthew Miller, and Dr. Shaun Carstairs
5

6       Finally, the government presented testimony of witnesses from

7  the Los Angeles County Office of the Medical Examiner – Coroner.

8  Criminalist Danielle Van Cleve testified regarding the levels of

9  methamphetamine in both Gemmel Moore and Timothy Dean's systems at

10 the time of death, while criminalist Courtney Castellino testified

11 regarding the blood alcohol content of Timothy Dean.  (Dkts. 156,

12 157.)  Specifically, they testified that Gemmel Moore had 3.9 ug/mL

13 methamphetamine in his femoral blood and 4.4 ug/mL methamphetamine in

14 his heart blood; Timothy Dean had 1.6 ug/mL methamphetamine in his

15 femoral blood and 4.2 ug/mL methamphetamine in his heart blood, and

16 Mr. Dean's blood alcohol content was 0.128% in the femoral blood,

17 0.112% in the heart blood, and 0.146% in the vitreous.  (Id.)  Dr.

18 Kevin Young then testified that the cause of Gemmel Moore's death was

19 methamphetamine use.  (Dkt. 157.)  His opinion was based on the

20 extremely high levels of methamphetamine in Mr. Moore's blood and on

21 the lack of any other apparent possible causes of death.  (Id.)  Dr.

22 Matthew Miller similarly testified that the cause of Timothy Dean's

23 death was mixed methamphetamine and alcohol toxicity with coronary

24 artery atherosclerosis as a contributing factor.  (Dkt. 159.)  Dr.

25 Miller based his opinion on the high levels of methamphetamine found

26 in Mr. Dean's blood stream and the significant blockage of his

27 arteries but noted that the alcohol alone was likely insufficient to

28 cause death.  (Id.)

13

1    Finally, Dr. Shaun Carstairs, a forensic toxicologist, provided
2    but-for causation.  (Dkt. 160.)  Dr. Carstairs testified that
3    pulmonary edema is commonly found following methamphetamine overdoses
4    and that the amount of methamphetamine in both Gemmel Moore and
5    Timothy Dean's bloodstreams was within or above the range known to
6    cause death.  (Id.)  Additionally, Dr. Carstairs testified that he
7    knows of no causal link between either HIV/AIDS and pulmonary edema,
8    and therefore opined that, but for the methamphetamine in Mr. Moore's
9    system on July 27, 2017, Mr. Moore would not have died.  (Id.)
10   Similarly, Dr. Carstairs noted no blockage that would otherwise
11   indicate that Timothy Dean suffered from a heart attack caused by his
12   coronary atherosclerosis and noted that Mr. Dean's blood alcohol
13   content was well below the fatal amount.  (Id.)  Conversely, the
14   amount of methamphetamine in Mr. Dean's system at the time of his
15   death was extremely high.  (Id.)  Dr. Carstairs therefore testified
16   that, but for the methamphetamine in Mr. Dean's system on January 7,
17   2019, he would not have died.  (Id.)

## III. LEGAL STANDARD

19   Under Federal Rule of Criminal Procedure 29, a court must
20   "review the evidence presented against defendant in the light most
21   favorable to the government to determine whether any rational trier
22   of fact could have found the essential elements of the crime beyond
23   a reasonable doubt."  See United States v. Lombera-Valdovinas, 429
24   F.3d 927, 920 (9th Cir. 2005); United States v. Hinton, 222 F.3d
25   664, 669 (9th Cir. 2000).  Any "[c]onflicting evidence is to be
26   resolved in favor of the jury verdict."  See United States v.
27   Corona-Verbera, 509 F.3d 1105, 1117 (9th Cir. 2007) (quotations
28   omitted).  This is because it is "the responsibility of the trier of

1   fact fairly to resolve conflicts in the testimony, to weigh the
2   evidence, and to draw reasonable inferences from basic facts to
3   ultimate facts." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

4   "The hurdle to overturn a jury's conviction based on a
5   sufficiency of the evidence challenge is high." United States v.
6   Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010) (explaining that the test
7   to be applied for a Rule 29 motion for acquittal is the same as for
8   a sufficiency challenge). "The test is whether the evidence and all
9   reasonable inferences which may be drawn from it, when viewed in the
10  light most favorable to the government, sustain the verdict."
11  United States v. Terry, 911 F.2d 272, 278 (9th Cir. 1990).

12  **IV.  ARGUMENT**

13      **A.  A Reasonable Jury Could Find that Defendant Distributed
        Methamphetamine**
14

15      As set forth in the Court's jury instructions, the following are
16  the elements for Distribution of Methamphetamine as alleged in counts
17  one, two, three, four, five, and six of the FSI:

18      (1) Defendant knowingly distributed methamphetamine; and

19      (2) Defendant knew it was methamphetamine or some other
            federally controlled substance.
20

21  (Dkt. 168 at 21.)

22      In a single paragraph, defendant claims that the government
23  "failed to offer evidence" supporting these charges while
24  simultaneously acknowledging that there was witness testimony,
25  videos, photographs, and text messages regarding defendant's
26  distribution. (Mot. at 3.) When considered together and viewed in
27  the light most favorable to the government, it is clear that there is

28

                                    15

more than sufficient evidence to allow a rational trier of fact to conclude that defendant distributed methamphetamine.

First, named victims Carlos Sinclair, Jermaine Gagnon, Thomas Cody Hoffman, and Dane Brown all testified that defendant distributed methamphetamine to them on May 15, 2018 (count three), September 22, 2018 (count four), December 2, 2018 (count five), and September 4, 2019 (count six), respectively.  The Court also instructed the jury that they could decide what sworn testimony to believe, and that the "weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify."  (Dkt. 168 at 8-9.) Accordingly, if the jury found these witnesses credible (as a rational jury could and did in this case), they could find defendant guilty of counts three, four, five, and six based <u>solely</u> on their testimony.

Regardless, the government presented additional evidence corroborating the victims' testimony.  First, other witnesses, including Daniel Lyons and Corey Peters, testified that defendant, and only defendant, ever supplied the methamphetamine they used during their party and play sessions.  Additionally, the government introduced business records from Uber/Lyft, photographs, text messages, and videos which showed that each of the named victims was in defendant's apartment on the dates in question; that defendant regularly sought out people to engage in party and play; and that defendant regularly used methamphetamine.  The government also presented evidence from Donald Schulze, who testified that he regularly provided methamphetamine to defendant from May 2018 to January 2019, and that defendant started doubling his orders – purchasing fourteen grams at a time - because defendant was

16

1    purchasing methamphetamine so frequently.  Clearly, when considering

2    the evidence collectively, a reasonable juror could infer that

3    defendant was providing methamphetamine to the named victims during

4    their party and play sessions.

5        There was also sufficient evidence to establish that defendant

6    distributed methamphetamine to Gemmel Moore and Timothy Dean.

7    Regarding Gemmel Moore, videos recovered from defendant's computer

8    showed that Mr. Moore regularly used methamphetamine in defendant's

9    apartment, and text messages established that defendant paid Mr.

10   Moore to "slam" (inject) methamphetamine on multiple occasions,

11   something Mr. Moore otherwise did not want to do.  Mr. Moore also

12   called his mother screaming after defendant injected him with

13   methamphetamine against his will.  Next, Mr. Moore traveled from

14   Texas to California just to meet with defendant so they could slam –

15   something he would not have needed to do if he had access or means to

16   obtain methamphetamine in Texas.  When Mr. Moore traveled to

17   California on July 27, 2017, he had no money and went through airport

18   security before defendant's driver picked up Mr. Moore and brought

19   him to defendant's apartment, making it extremely unlikely that Mr.

20   Moore brought methamphetamine to defendant's apartment himself.

21   Finally, after Mr. Moore died in defendant's apartment, defendant had

22   methamphetamine in his toolchest, while Mr. Moore had no drugs or

23   drug paraphernalia on his person or property.  This evidence all

24   establishes that defendant provided the methamphetamine Mr. Moore

25   used on July 27, 2017, particularly when all inferences are viewed in

26   the government's favor.

27       Regarding Timothy Dean, the government also presented sufficient

28   evidence that defendant supplied the methamphetamine on January 7,

2019.  First, Mr. Schulze testified, and historic cell-site records demonstrated, that Mr. Schulze provided defendant with fourteen grams of methamphetamine on July 5, 2019, less than 36 hours before Mr. Dean died.  Once again, following Mr. Dean's death, defendant had pipes and syringes located inside his apartment while Mr. Dean had neither drugs nor drug paraphernalia on his person or property.  Most importantly, however, following Mr. Dean's overdose, Deputy Rose seized a box outside defendant's window that contained pipes and syringes that tested positive for both methamphetamine and Mr. Dean's DNA.  The mere fact that defendant attempted to hide evidence of Mr. Dean's drug use in defendant's apartment demonstrates his consciousness of guilt, further establishing that defendant distributed methamphetamine to Mr. Dean on January 7, 2019.

Ultimately, when taken together and viewed in the light most favorable to the government, there is more than sufficient evidence to allow a reasonable jury to rationally conclude that defendant distributed methamphetamine to Gemmel Moore on July 27, 2017; Timothy Dean on January 9, 2019; Carlos Sinclair on May 15, 2018; Jermaine Gagnon on September 22, 2018; Cody Hoffman on December 2, 2018; and Dane Brown on September 4, 2019.  Defendant's Motion as to Counts One through Six must therefore fail.

**B.   A Reasonable Jury Could Find that Gemmel Moore and Timothy Dean's Deaths Resulted from Defendant's Distribution of Methamphetamine**

As set forth in the Court's jury instructions for counts one and two, defendant's distribution of methamphetamine "resulted in" death if it was the "cause in fact of his death.  That is, the government must prove beyond a reasonable doubt that, but for [the individual's] use of the distributed methamphetamine, he would not have died."  The

1    jury instructions further state that a distribution "resulted in"

2    death if the individual's "use of methamphetamine combined with other

3    factors (including underlying disease) to produce death, and death

4    would not have occurred without the incremental effect of the

5    methamphetamine."  (Dkt. 168 at 22-23.)

6        Defendant argues, in essence, that a rational jury was required

7    to believe the testimony of his expert, Dr. Marvin Pietruszka, over

8    the government's expert, Dr. Shaun Carstairs, and the testimony of

9    the coroners – Dr. Kevin Young and Dr. Matthew Miller.[1]  His argument

10   would also require the jury to believe that Gemmel Moore was

11   suffering from AIDS and that Timothy Dean was an alcoholic,

12   propositions for which there was absolutely no supporting evidence

13   presented at trial.  Defendant's argument would also require the jury

14   to conclude that, because Mr. Dean <u>may</u> have injected himself, he

15   therefore <u>must</u> have supplied his own methamphetamine.  Not only is

16   this a logical leap not supported by the evidence, but it is an

17   inference that would have to be drawn in defendant's favor, not the

18   government's.  Unfortunately for defendant, this is not the standard

19   on a Rule 29 motion for acquittal.

20       First, the jury was well within its right to disregard the

21   testimony of Dr. Pietruszka in favor of the government's experts.  In

22   his direct testimony, Dr. Pietruszka made a number of inferences that

23   were not supported by the evidence presented and claimed that

24

25       [1] Defendant contends that Dr. Miller testified that "ethanol and
     heart disease could have killed Mr. Dean without methamphetamine."
26   (Mot. At 3.)  Not so.  While Dr. Miller did state that a hypothetical
     person could die from ethanol and arterial atherosclerosis, he did
27   <u>not</u> state that those factors alone could have killed Timothy Dean.
     Rather, he testified that Timothy Dean had a significantly high level
28   of methamphetamine in his system, and there was a "zero percent
     chance" that methamphetamine had no role in Timothy Dean's death.

1 | pulmonary edema, a common occurrence in overdose deaths, actually
2 | caused the deaths of both Gemmel Moore and Timothy Dean.  Moreover,
3 | on cross-examination, it was revealed that Dr. Pietruszka previously
4 | gave testimony akin to that of the government's experts – including
5 | that 0.09 ug/mL is a high concentration of methamphetamine known to
6 | cause death – that directly contradicted his testimony in this case.
7 | A reasonable jury could therefore completely disregard Dr.
8 | Pietruszka's testimony as that of a hired gun, willing to testify
9 | regarding anything if paid enough money.

10 | Moreover, when viewed under the correct standard, the government
11 | presented more than sufficient evidence to establish that defendant's
12 | distribution of methamphetamine resulted in the deaths of Gemmel
13 | Moore and Timothy Dean.  Distribution "results in" death if, but for
14 | the distribution of methamphetamine, neither Gemmel Moore nor Timothy
15 | Dean would have died.  Burrage v. United States, 571 U.S. 204, 218-19
16 | (2014) ("[A] defendant cannot be liable under the penalty enhancement
17 | provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for
18 | cause of the death or injury.")  But-for causation can occur even if
19 | there is polysubstance use or underlying disease as long as "without
20 | the incremental effect of the [methamphetamine], he would have
21 | lived."  Id. at 211 (citing State v. Frazier, 98 S.W.2d 707, 712–713
22 | (1936)).

23 | Regarding Gemmel Moore, the government presented evidence that
24 | Mr. Moore had no possible underlying causes of death other than
25 | methamphetamine.  At age 26, he was relatively healthy aside from a
26 | possible HIV diagnosis, but he had no other signs of an infectious
27 | disease that would have led to his death on July 27.  Moreover, the
28 | levels of methamphetamine in his system were extremely high, well

1   over twice the amount known to cause death.  For these reasons, a

2   reasonable juror could find that the methamphetamine distributed by

3   defendant resulted in Gemmel Moore's death.

4          Similarly, Dr. Carstairs testified that, although Timothy Dean

5   had significant atherosclerosis, there was no indication that the

6   atherosclerosis actually caused his death; Mr. Dean did not have any

7   blockage of his arteries that would indicate that he suffered from a

8   heart attack, nor any other signs that he suffered from a stroke or

9   pulmonary embolism.  Additionally, the amount of methamphetamine in

10  his system was also well within the high-end of the range known to

11  cause death, while the amounts of alcohol in his system were non-

12  fatal.  Based on this evidence, a rational jury could reasonably

13  conclude that defendant's distribution of methamphetamine to Mr. Dean

14  on January 7, 2019, resulted in his death.  Accordingly, defendant's

15  Motion as to counts one and two must fail.

16      **C.   A Reasonable Jury Could Find that Defendant Maintained a
        Drug-Involved Premises**

17

18      As set forth in the Court's jury instructions, the following are

19  the elements for count seven, maintaining a drug-involved premises:

20      (1) Defendant knowingly maintained a place, namely, 1234
        North Laurel Avenue, Apartment #17, in West Hollywood,
21      California; and

22      (2) Defendant maintained that place for the purpose of
        distributing or using a controlled substance, such as gamma
23      hydroxybutyric acid ("GHB"), methamphetamine, and/or
        clonazepam.
24

25  (Dkt. 168 at 24.)  "For the purpose of distributing or using

26  controlled substances" means that "distributing or using a controlled

27  substance is one of the primary or principal uses to which the

28  residence is put."  (Id.)  "Maintaining" a place means that "over a

period of time, the defendant directed the activities of and the people in the place." (Id.)

Defendant argues that he cannot be convicted of count seven because he used the apartment as his primary residence. (Mot. at 3-4.) Not so. As set forth in the jury instructions, distributing or using a controlled substance need not be the only use to which the residence is put, just one of the primary or principal uses. (Dkt. 168 at 24; see also United States v. Shetler, 665 F.3d 1150, 1162 (9th Cir. 2011).) The mere fact that defendant used his apartment as a residence does not discount the fact that he regularly invited visitors and guests into his apartment for party and play sessions, all of which included distributing and using methamphetamine, gamma hydroxybutyrate, and clonazepam. Numerous witnesses testified that defendant distributed these drugs out of his apartment, and the thousands of videos on defendant's desktop computer show how regularly he engaged in drug distribution and use. When combined with the testimony of defendant's neighbors that he had visitors over to his apartment daily, if not multiple times a day, a reasonable juror could easily find that defendant maintained his apartment for the purpose of distributing and using controlled substances. Accordingly, defendant's challenge to count seven is completely without merit.

**D. A Reasonable Jury Could Find that Defendant Induced Gemmel Moore and Jermaine Gagnon to Travel Interstate for Purposes of Prostitution**

Finally, as set forth in the Court's jury instructions, the following are the elements for counts eight and nine, Inducement of Interstate Travel for Purposes of Prostitution:

(1) Defendant knowingly persuaded, induced, and enticed an individual to travel in interstate commerce; and

(2)  The purpose of the interstate travel was to engage in sexual activity for which any person could be charged with a criminal offense, that is, prostitution, in violation of California Penal Code Section 674(b).

(Dkt. 168 at 25-26.)

Additionally, prostitution as defined in California Penal Code Section 674(b) means that "the individual willfully engaged in sexual intercourse or a lewd act with someone else in exchange for money or other compensation."  (Id. at 27.)  A "lewd act" means "touching the genitals or buttocks of either the prostitute or customer with some part of the other person's body for the purpose of sexual arousal or gratification of either person."  (Id.)

Defendant argues that a rational jury could not convict him of counts eight and nine because both Gemmel Moore and Jermaine Gagnon wanted to travel to California.  (Mot. at 4-5.)  However, their desire to travel does not preclude the finding that defendant also persuaded, induced, enticed, or coerced them to do so.  United States v. Rashkovski, 301 F.3d 1133, 1136-37 (9th Cir. 2002).  Indeed, defendant can be convicted of this crime as long as he "convinced or influenced [them] to actually undergo the journey, or made the possibility more appealing."  Id. (further holding that criminal liability is based on defendant's intent, not the victim's intent.)

Here, defendant convinced Gemmel Moore and Jermaine Gagnon to actually undergo the journey to California by purchasing each of them a plane ticket that they otherwise could not afford.  Moreover, Mr. Gagnon never expressed a desire to come to California and traveled

1  only because defendant required him to do so before he would purchase
2  Mr. Gagnon a flight to Florida.

3      Defendant also argues that he cannot be convicted on counts
4  eight and nine because there is no evidence that either Gemmel Moore
5  or Jermaine Gagnon actually engaged in sex upon arrival.  Defendant's
6  argument is not persuasive for a number of reasons.  First, under
7  California law, prostitution does not require sex, but rather only a
8  "lewd act," which includes touching of the genitals.  Second, nothing
9  in the jury instructions requires the victims to engage sex or a lewd
10 act upon arrival.  Rather, the sole affirmative act required is for
11 defendant to persuade, induce, or entice interstate travel.  While
12 the purpose of the travel must be for prostitution, there is no
13 requirement that prostitution actually occur.  Rashkovski, 301 F.3d
14 at 1137.  Accordingly, defendant can be found guilty as long as he
15 induced or enticed interstate travel with the intent of engaging in
16 prostitution upon the victim's arrival.

17     The government presented sufficient evidence at trial to
18 establish that defendant purchased plane tickets for Gemmel Moore and
19 Jermaine Gagnon so that they could party and play – that is, engaging
20 in sexual activity in exchange for drugs and, usually, money.
21 Defendant regularly filmed himself engaged in sexual acts with Gemmel
22 Moore, including touching Mr. Moore's genitals while Mr. Moore was
23 under the influence of methamphetamine and other drugs, and the two
24 regularly discussed their party and play sessions.  Similarly, Mr.
25 Gagnon testified that he engaged in party and play with defendant,
26 which primarily involved oral sex, and that they specifically
27 discussed party and play when discussing Mr. Gagnon's trip to
28 California.  Finally, Mr. Gagnon's testimony is corroborated by the

testimony of other victims and the videos on defendant's computer which show that defendant regularly paid to engage in sexual acts during party and play sessions.  Mr. Gagnon's testimony is therefore heavily corroborated, despite defendant's claims, and there is sufficient evidence for a rational jury to find defendant guilty of counts eight and nine.

**V.    CONCLUSION**

For the foregoing reasons, and based upon all the evidence presented at trial, defendant's motion for acquittal should be denied.