Mark J. Werksman, Esq. (State Bar No. 120767)
Elizabeth S. Little, Esq. (State Bar No. 307944)
**WERKSMAN JACKSON & QUINN LLP**
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
Telephone: (213) 688-0460
Facsimile: (213) 624-1942
Email: mwerksman@werksmanjackson.com

Attorneys for Defendant
EDWARD BUCK

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> EDWARD BUCK, <br><br> Defendant. | CASE NO. 19-CR-00595-CAS <br><br> **DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT** <br><br> Date: April 4, 2022 <br> Time: 2:30 p.m. <br> Courtroom: 8D <br><br> Hon. Christina A. Snyder |

**TO THE HONORABLE CHRISTINA A. SNYDER, UNITED STATES DISTRICT COURT JUDGE, ASSISTANT UNITED STATES ATTORNEY CHELSEA NORELL, AND UNITED STATES PROBATION OFFICER CRISTINA TORRES:**

Defendant Edward Buck, by and through his counsel of record, Werksman Jackson & Quinn LLP, hereby files Defendant's Objections to the Presentence Investigation Report ("PSR").

1

# I.
# OBJECTIONS TO THE PSR

Defendant Edward Buck received a copy of the PSR prepared in connection with this case on February 28, 2022. (Doc. 220.) As explained below, Mr. Buck objects to (1) the inclusion of a two-level adjustment for maintaining a premises for the purpose of manufacturing or distributing a controlled substance; (2) the two-level vulnerable victim adjustments under U.S.S.G. 2D1.1(e) and 3A1.1(b)(1); (3) the two-level enhancement for obstruction of justice; and (4) the imposition of a $1,000,000 fine.

### A.  MR. BUCK DID NOT MAINTAIN A PREMISES FOR THE PURPOSE OF MANUFACTURING OR DISTRIBUTING A CONTROLLED SUBSTANCE

In the PSR, Probation includes a two-level specific offense characteristic for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance" under U.S.S.G. § 2D1.1(b)(12). Probation applied this specific offense characteristic with respect to Count Group 1: Distribution of Controlled Substances Resulting in Death (Moore) (PSR at ¶51); Count Group 2: Distribution of Methamphetamine (PSR at ¶61); and Count 2: Distribution of Controlled Substances Resulting in Death (Dean) (PSR at ¶70). As explained below, the application of this specific offense characteristic was error.

As explained in the commentary section to U.S.S.G. § 2D1.1(b)(12), a two-level increase "applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12), Cmt. 17. In order for this specific offense characteristic to apply, manufacturing or distributing a controlled substance "must be one of the defendant's **primary or principal** uses for the premises, rather than one of the defendant's incidental or collateral uses for the

premises." Ibid. "In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." Ibid.

Here, the primary purpose of Mr. Buck's rent-controlled apartment, where he lived for nearly 30 years dating back to the 1990s, was to serve as his residence—and those residential purposes incident to life (i.e., a place to sleep, eat, socialize, etc.) (See PSR at ¶ 106.) While the government presented evidence that certain individuals came over to his residence and consumed methamphetamine during discrete "party and play" sessions between January 2011 and September 2019, the purpose of the residence was not for the distribution of methamphetamine, but rather to serve as his home. Unquestionably, the purported distribution of methamphetamine to other individuals was at most an incidental and collateral use of Mr. Buck's apartment, which occurred during a discrete time period and was relegated to short "party and play" sessions. That is not the type of conduct encompassed by U.S.S.G. § 2D1.1(b)(12). This specific offense characteristic is meant to penalize individuals who maintain a premises for the primary purpose of manufacturing and/or selling drugs—not to penalize an addict who happens to possess and (at most) share drugs with other addicts on discrete occasions in his personal living space.

As Mr. Buck's apartment manager of twenty years (who resided in the unit directly across from Mr. Buck), testified at trial (1) he never observed drugs; (2) Mr. Buck kept his apartment clean; (3) he never heard any unusual noises; and (4) Mr. Buck was a good tenant. (3 RT 37-40.) Accordingly, Mr. Buck's rent-controlled apartment was, without a doubt, used primarily for its residential purposes than for any illegal purpose (namely, the distribution of

methamphetamine). As such, Mr. Buck objects to the inclusion of this specific offense characteristic.

### B. THE VICTIM-RELATED ADJUSTMENT UNDER 2D1.1(E) AND 3A1.1(b)(1) IS INAPPLICABLE HERE

In the PSR, Probation applies a two-level victim-related adjustment pursuant to U.S.S.G. §§ 2D1.1(e) and 3A1.1(b)(1) alleging that Mr. Buck committed, or attempted to commit, a sexual offense against another individual by distributing, with or without the individual's knowledge, a controlled substance and the defendant knew or should have known the victim of the offense was a vulnerable victim. (PSR at ¶¶ 52-53, 62-63.) Probation applied this vulnerable victim adjustment to Count Group 1: Distribution of Controlled Substances Resulting in Death (Moore) (PSR at ¶¶ 52-53); Count Group 2: Distribution of Methamphetamine; and Count 2: Distribution of Controlled Substances Resulting in Death (Dean). (PSR at ¶¶ 62-63.)

As the basis for the application of this two-level vulnerable victim adjustment to Count Group 1, Probation explains: "Buck distributed methamphetamine to Moore during a 'party and play' session involving sexual activity." (PSR at ¶ 54.) With respect to Count Group 2, Probation applied the enhancement because "Buck distributed methamphetamine to S.C., J.G., C.H., and D.B. during 'party and play' sessions involving sexual activity." (PSR at ¶ 62.) As to Count 2, which was not "grouped" with any other counts, Probation found that the victim was vulnerable because he "distributed methamphetamine to Dean during a 'party and play' session involving sexual activity." (PSR at ¶ 73.) As explained below, Mr. Buck objects to the application of these two-level adjustments because (1) Mr. Buck did not commit a sexual offense *by* distributing a controlled substance to these individuals; and (2) Mr. Moore, S.C., J.G., C.H.,

D.B., and Mr. Dean are not vulnerable victims within the meaning of § 3A1.1(b)(1).

### 1. MR. BUCK DID NOT COMMIT OR ATTEMPT TO COMMIT A SEXUAL OFFENSE BY DISTRIBUTING A CONTROLLED SUBSTANCE

Pursuant to U.S.S.G. § 2D1.1, this enhancement applies "If . . . the defendant committed, or attempted to commit, a sexual offense against another individual *by* distributing, with or without that individual's knowledge, a controlled substance to that individual."[1] U.S.S.G §2D1.1(e) (emphasis added). As discussed above, here, Probation applied the two-level adjustment on the basis that Mr. Buck was found to have distributed drugs to various individuals during "party and play" session involving sexual activity.

Here, however, Mr. Buck did not commit a sexual offense *by* distributing a controlled substance. Even accepting the government's version of events as true, Mr. Moore, J.G., and Timothy Dean worked as escorts and went to Mr. Buck's residence to engage in sexual activities with him regardless of whether or not methamphetamine was provided. The other individuals met Mr. Buck on an online gay dating site Adam4Adam, meant to facilitate sexual relationships between men. In other words, the defendant did not engage in sexual activities with these individuals *by* distributing controlled substances to them. Mr. Buck engaged in consensual sex with consenting adult men. Further penalizing Mr. Buck for distribution on the basis that consensual sex was involved does not justify a two-

---

[1] For purposes of this enhancement, a sexual offense is defined as a "sexual act" or "sexual contact" as set forth in 18 U.S.C. § 2246(2) and (3), which includes the "intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. U.S.S.G. § 2D1.1(e), App. Note 22(A); 18 U.S.C. § 2246(3).

level enhancement. Thus, the two-level adjustments are inappropriate here because this case does not fall within the purview of U.S.S.G. § 2D1.1(e)

### 2. MR. MOORE AND NOT A VULNERABLE VICTIM WITHIN THE MEANING OF U.S.S.G. § 3A1.1(b)(1)

Regardless, even if this court finds that Mr. Buck committed a sexual offense against another individual by distributing a controlled substance, the individuals are not "vulnerable victims" within the meaning of U.S.S.G. § 3A1.1(b)(1). As set forth in § 3A1.1(b)(1), "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." Ibid. The guidelines define "vulnerable victim" as a person who (1) is a victim of the offense of conviction and/or relevant conduct; and (2) "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b)(1), App. Note 2. As further illustrated in the application notes to that section:

> Subsection (b) applies to offenses involving an **unusually vulnerable victim** in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

U.S.S.G. § 3A1.1(b)(1), App. Note 2.

Here, adult male escorts and individuals responding to a general dating profile for "party and play" are not vulnerable victims within the meaning of U.S.S.G. § 3A1.1(b)(1). All of these individuals were consenting adults who responded to Mr. Buck on his Adam4Adam dating profile and knew his sexual

preference was to "party and play." The alleged victims were not unusually vulnerable due to their age (they were all consenting adults); they were not physically inferior or handicapped (in fact, Mr. Buck was actually physically inferior to them); and Mr. Buck did not seek them out because he believed them to be unusually vulnerable. In point of fact, these individuals consistently sought Mr. Buck out because they were escorts and/or shared the same affinity for "party and play" as Mr. Buck. As discussed in the application note above, the vulnerable victim adjustment would be inapplicable for a bank robber whose victim was a bank teller. Similarly, the vulnerable victim adjustment *for engaging in a sexual act* is inapplicable where Mr. Buck is having sex with an escort or person he met through a dating application designed to facilitate sex. Accordingly, the vulnerable victim enhancement is inapplicable here.

### C.   THE TWO-LEVEL ENHANCEMENT FOR OBSTRUCTION OF JUSTICE IS INAPPLICABLE HERE

In the PSR, Probation applies a two-level enhancement with respect to Count 2: Distribution of Controlled Substances Resulting in Death (Dean), on the basis that Mr. Buck obstructed justice within the meaning of U.S.S.G. § 3C1.1 by purportedly collecting pipes and syringes he and Timothy Dean had been using to ingest methamphetamine, placing them in a box, and throwing them out the window before medics arrived to attempt to resuscitate Mr. Dean. (PSR at ¶¶ 75-76.) As explained below, Mr. Buck objects to the application of a two-level obstruction of justice enhancement here.

Pursuant to U.S.S.G. § 3C1.1, a two-level increase applies if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to" the defendant's offense of conviction, relevant conduct, or closely

related offense. *Id.* Obstructive conduct generally includes "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding[.]" Ibid., App. Note 4(D). However, "if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow **or throw away a controlled substance**), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it results in a material hindrance to the official investigation or prosecution of the instant offense." Ibid. (emphasis added).

Here, the government alleges that sometime between calling 911 to report that Mr. Dean had overdosed and the time law enforcement and medical personnel arrived, Mr. Buck purportedly collected pipes and syringes from his apartment, placed them in a box, and threw them out his window. (PSR at ¶¶ 75-76.) Even taking this version of events to be true (which, Mr. Buck asserts they are not), these types of actions are exactly akin to the circumstances described in the application notes wherein a defendant attempts to swallow or throw away a controlled substance contemporaneous to arrest. Here, Mr. Buck purportedly threw away drug paraphernalia knowing police were on their way to his residence in an effort to avoid an arrest. As explained above, the guidelines recognize that this type of action, alone, is insufficient to warrant an adjustment for obstruction *unless it results in a material hindrance to the official investigation or prosecution of the instant offense.*[2] In this case, Mr. Buck's actions didn't hinder the

---

[2] California's 9111 Good Samaritan overdose fatality prevention law further supports that Mr. Buck should not be penalized for getting rid of drug paraphernalia after calling the police to report that his friend had overdosed. (Cal. Health and Safety Code, § 11376.5) This law is meant to encourage people like Mr. Buck to call the police. By penalizing Mr. Buck for disposing of drug paraphernalia because he called 911 for help, the federal sentencing guidelines

government's investigation at all. Indeed, law enforcement ultimately still recovered that evidence and it was presented at trial. Accordingly, the two-level enhancement for obstruction of justice should not be applied here.

**D. DEFENDANT OBJECTIONS TO PROBATION'S RECOMMENDATION THAT MR. BUCK PAY AN IMMEDIATE $1,000,000 FINE TO THE UNITES STATES**

As set forth in Probation's Recommendation Letter dated February 22, 2022, Probation recommends that this Court order that defendant immediately pay to the United States a total fine of $1,000,000, consisting of $500,000 on each of Counts 1 and 2 of the First Superseding Indictment. (Doc. 219.) The imposition of this fine is based, in no small part, on Probation's mistaken belief that Mr. Buck has a total net worth of $2,082,447.13.[3] (PSR at ¶ 124.) Mr. Buck objects to Probation's assessment of his total net worth, which defense counsel believes is significantly inflated, and to the $1,000,000 fine Probation has recommended the Court impose in this case.

Here, Mr. Buck has been deprived of access to his accounts while in custody, and in spite of counsel's best efforts, has been unable to obtain a current balance for his accounts to date. Mr. Buck intends to supplement the instant objections with current statements establishing that Probation's assessment of his financial condition is grossly inflated. Notably, Probation's estimation of his financial condition and ability to pay is based on mutual fund balances from December 31, 2021, and May 31, 2021, respectively. Mr. Buck has a reasonable

---

send the exact wrong messages to those faced with a similar decision to make. Such an interpretation is, thus, against public interest.

[3] According to the PSR, Mr. Buck appears to have mutual funds in the amount of $3,082,447.13 and has liabilities in the amount of $1,000,000 in the form of a personal loan from his mother Margaret Buckmelter for legal expenses. (PSR ¶ 124.)

9

belief that his total net worth is significantly less than what has been calculated by probation, in no small part due to market fluctuations and outstanding tax liabilities. Probation's assessment of Mr. Buck's ability to pay, fails to account for several hundred thousand dollars, which are owed to the IRS. Additionally, Mr. Buck's previous attorney liquidated a substantial portion of Mr. Buck's funds, and by doing so, caused capital gains to accrue, which are subject to several hundred thousand dollars in state and federal taxes. Without access to his accounts, Mr. Buck has been unable to pay those tax liabilities to date, which will likely result in additional penalties. Finally, Mr. Buck's 94-year-old mother advanced $1,000,000 for legal fees in this case, which is owed to her and must be paid as soon as he is able to access his accounts. The government's imposition of a fine that exceeds Mr. Buck's net worth would have a devastating effect on his ability to pay back his mother, who is in declining health.

      Accordingly, Mr. Buck objects to the imposition of a $1,000,000 fine in this case, and probation's determination with respect to his current financial condition and ability to pay.

DATED:	March 14, 2022	Respectfully submitted,

WERKSMAN JACKSON & QUINN LLP

    /s/
Mark J. Werksman
Elizabeth S. Little
Attorneys for Defendant
Edward Buck