TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
CHELSEA NORELL (Cal. Bar No. 280831)
LINDSAY M. BAILEY (Cal. Bar No. 285047)
Assistant United States Attorneys
Violent and Organized Crime Section; General Crimes Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2624/6875
    Facsimile: (213) 894-0141
    Email:    chelsea.norell@usdoj.gov
              lindsay.bailey@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-595-CAS |
|---|---|
|      Plaintiff, | GOVERNMENT'S SENTENCING POSITION; DECLARATION OF CHELSEA NORELL AND EXHIBITS A-P; UNDER SEAL RESTITUTION DECLARATION AND EXHIBITS FILED CONCURRENTLY HEREWITH |
|         v. | |
| EDWARD BUCK, | |
|      Defendant. | Hearing Date: April 4, 2022 Hearing Time: 2:30 pm Location: Courtroom of the Hon. Cristina A. Snyder |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Chelsea Norell and Lindsay Bailey, hereby files its Sentencing Position.

This Sentencing Position is based upon the attached memorandum of points and authorities, the Declaration of Chelsea Norell with Exhibits A through P (the Victim Impact Statements), the sealing application and under seal restitution documents, the files and

records in this case, the Presentence Investigation Report, the sentencing recommendation letter, and such further evidence and argument as the Court may permit.

The government reserves the right to file any supplemental sentencing position, restitution records, or proposed restitution order that may be necessary.


Dated: March 21, 2022                Respectfully submitted,

                                     TRACY L. WILKISON
                                     United States Attorney

                                     SCOTT M. GARRINGER
                                     Assistant United States Attorney
                                     Chief, Criminal Division


                                     _____/s/_____
                                     CHELSEA NORELL
                                     Assistant United States Attorney

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

## Table of Contents

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.................................................1

II.   BUCK ENGAGED IN A LETHAL PATTERN WITH TOTAL DISREGARD FOR
      THE VALUE OF HUMAN LIFE.....................................2

III.  GUIDELINE CALCULATIONS.....................................10

      A.    The PSR Guidelines Calculation.......................10

            1.    Count Group 1 Calculation......................10

            2.    Count Group 2 Calculation......................14

            3.    Count 2 Calculation............................15

            4.    Total Offense Level............................18

      B.    Government's Guideline Calculation...................18

IV.   THE 3553(A) FACTORS SUPPORT A LIFE SENTENCE................21

      A.    The Seriousness of the Offenses Warrant a Life
            Sentence.............................................21

      B.    Buck's Pattern and Remorselessness Counsels a Life
            Sentence Because It Is the Only Way to Protect the
            Community and Sufficiently Deter Others..............24

V.    RESTITUTION................................................25

VI.   FINE ......................................................26

VII.  CONCLUSION.................................................28

**Table of Authorities**

**Federal Cases**

United States v. Bedford,
  446 F.3d 1320 (10th Cir. 2006) ............................... 17

United States v. Greenough,
  669 F.3d 567 (5th Cir. 2012) ................................ 19

United States v. Haggard,
  41 F.3d 1320 (9th Cir. 1994) ................................ 28

United States v. Lato,
  934 F.2d 1080 (9th Cir. 1991) ............................... 17

United States v. Lawler,
  818 F.3d 281 (7th Cir. 2016) ................................ 19

United States v. Mancuso,
  718 F.3d 780 (9th Cir. 2013) ................................ 11

United States v. McDonald,
  804 F.3d 497 (1st Cir. 2015) ................................ 17

United States v. Mcintosh,
  236 F.3d 968 (8th Cir. 2001) ................................ 19

United States v. Pressler,
  256 F.3d 144 (3d. Cir. 2001) ................................ 19

United States v. Rebmann,
  321 F.3d 540 (6th Cir. 2003) ................................ 19

United States v. Rodriguez,
  279 F.3d 947 (11th Cir. 2002) ............................... 19

United States v. Shetler,
  665 F.3d 1150 (9th Cir. 2011) ............................... 12

United States v. Spadafore,
  791 Fed. App'x 677 (9th Cir. 2020) .......................... 12

United States v. Unger,
  484 F. App'x 78 (8th Cir. 2012) ............................. 18

United States v. Vargem,
   747 F.3d 724 (9th Cir. 2014) ................................. 28

United States v. Washington,
   462 F.3d 1124 (9th Cir. 2006) ............................... 12

**Federal Statutes**

18 U.S.C. § 2241 ............................................ 14

18 U.S.C. § 2246 ............................................ 12

18 U.S.C. § 2422 ............................................. 1

18 U.S.C. § 3553 ........................................ passim

18 U.S.C. § 3572 ............................................ 27

18 U.S.C. § 3663 ........................................ 25, 26

18 U.S.C. § 3663A........................................ 25, 26

21 U.S.C. § 841 ........................................ passim

21 U.S.C. § 856 ...................................... 1, 11, 25

**State Statute**

Cal. Health and Safety Code § 11376.5 ...................... 18

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3       Defendant Edward Buck engaged in a deadly practice of luring

4   people – typically young, Black men, and those experiencing

5   homelessness, addiction, and/or poverty – to his West Hollywood

6   apartment to "party and play."  During these party and play sessions,

7   Buck would inject (or "slam") his victims with methamphetamine and

8   drug them with GHB and clonazepam, with and without their consent.

9   Buck's insatiable appetite for injecting people turned lethal twice.

10  On July 27, 2017, Buck killed Gemmel Moore.  On January 7, 2019, he

11  killed Timothy Dean.

12      Following a two-week trial in July 2021, a jury found Buck

13  guilty of all nine counts charged in the First Superseding

14  Indictment: distribution of methamphetamine resulting in death, in

15  violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Counts 1 and 2);

16  distribution of methamphetamine, in violation of 21 U.S.C.

17  §§ 841(a)(1), (b)(1)(C) (Counts 3 through 6); maintaining a drug

18  premises, in violation of 21 U.S.C. § 856(a)(1) (Count 7); and

19  enticement to travel for purposes of prostitution, in violation of 18

20  U.S.C. § 2422(a) (Counts 8 and 9).

21      On February 28, 2022, the United States Probation Office filed

22  its Presentence Investigation Report ("PSR"), in which it calculated

23  a total offense level of 47 (which is treated as a level 43, the

24  highest level on the Sentencing Guidelines) and determined that

25  defendant falls within Criminal History Category I, resulting in an

26  advisory Guidelines Sentence of life imprisonment.  (Dkt. 220.)  On

27  March 14, 2022, the government filed its Initial Objections and

28  Factual Clarifications to the PSR, which it incorporates by

reference. (Dkt. 223.)  Other than the Objections and a minor deviation from the PSR's Guidelines calculation noted below, the government accepts the facts and computations in the PSR.

As set forth below, Buck should receive the Guidelines sentence of life imprisonment.  Buck is a proven recidivist – he remained undeterred after his reckless actions resulted in a first death, a second death, and a third overdose requiring hospitalization.  Buck preyed on vulnerable victims and lacks respect for the value of human life.  Life imprisonment is the only way to ensure the community's safety from Buck's criminal conduct.  Beyond protecting the public, the seriousness of Buck's offenses necessitates a life sentence to promote respect for the law, to provide just punishment, and to afford adequate deterrence to criminal conduct of this nature.  18 U.S.C. § 3553(a)(2)(A)-(C).  The government requests that the Court impose the Guidelines sentence of life imprisonment and order Buck to pay full restitution immediately, a $400,000 fine immediately, and a $900 mandatory special assessment.

## II.  BUCK ENGAGED IN A LETHAL PATTERN WITH TOTAL DISREGARD FOR THE VALUE OF HUMAN LIFE

The evidence at trial showed Buck had a pattern of preying on vulnerable, unhoused, and drug-dependent men to feed his obsession with injecting people with methamphetamine and coercing them to smoke it beyond their limits.  (PSR ¶¶ 8-12.)  For at least nearly a decade, from 2011 through 2019, Buck lured men to his apartment to smoke and slam methamphetamine and engage in sexual activities, in exchange for money.  (PSR ¶ 8; e.g., 7/14/21 Tr. 151-152 (Everett – around 2010); 7/14/21 Tr. 61 (Sinclair – 2018); Dkt. 201 at 14-16

1 (Lyons - 2018); Dkt. 213 at 152-153 (Peters - 2019); Dkt. 215 at 122-
2 123 (Brown – 2019).)  During these "party and play" sessions, Buck
3 encouraged and coerced his victims to smoke and slam as much
4 methamphetamine as possible, sometimes offering cash bonuses to use
5 more, or threatening to withhold payment if the victim didn't use
6 "enough."  (PSR ¶¶ 9, 12; 7/14/21 Tr. 48-50 (Sinclair); 7/14/21 Tr.
7 131, 135, 137, 144-145 (Stokes); Dkt. 201 at 14-17 (Lyons).)  Because
8 Buck targeted men experiencing financial hardship, this carrot-and-
9 stick approach often led victims to consume methamphetamine far
10 beyond their limits, and led to, or exacerbated existing, drug
11 dependencies.  (PSR ¶¶ 9, 12; e.g., 7/14/21 Tr. 70-72 (Sinclair
12 testifying that he never wanted to slam, but after Buck's incessant
13 demands, he agreed to it because he "really wanted to get off the
14 streets that night . . . for fear of [his] life, and [he] needed the
15 money to also get a hotel room"), 74 (Sinclair testifying that he
16 kept going back to Buck's because he was "homeless and in need of
17 money"); 7/14/21 Tr. 74-75, Ex. 77.1 (Sinclair texting Buck that he
18 was experiencing "withdrawals" after Buck injected him with
19 methamphetamine while he was unconscious);[1] Dkt. 201 at 14-16 (Lyons
20 testifying that he let Buck inject him multiple times even though he
21 was afraid of being injected with methamphetamine, because Lyons was
22 unhoused and it gave him "a place where [he] could rest").)  And when
23 Buck couldn't coerce compliance, he simply administered drugs without
24 his victim's knowledge or consent.  (PSR ¶¶ 11-12.)  In addition to
25 methamphetamine, he surreptitiously administered central nervous
26
27
28

[1] All cites to "Ex." refer to the exhibits admitted at trial.

system depressants, like clonazepam and GHB, to incapacitate his victims.  (Id.)

At trial, a chorus of victims bravely shared their harrowing experiences with Buck, who treated them like lab rats in his twisted experiments.  Buck distributed drug cocktails, sometimes without his victim's knowledge or consent.  He rendered them unconscious, and then continued to inject – and sometimes sexually assault – them while they were incapacitated.  Both Carlos Sinclair and Dane Brown recalled times when Buck gave them such extreme quantities of drugs that they went unconscious, and when they came to, Buck was stabbing them with another injection of methamphetamine.  (7/14/21 Tr. 75-76 (Sinclair testifying that after Buck drugged him with GHB, he lost consciousness and awoke to Buck sitting on his legs injecting him with methamphetamine); Ex. 77.4 at 20 (Sinclair's text message to Buck stating, "You said if I ever was unconscious and u slamed [sic] me id get the $1000000 reward and I dont remember sayi[n]g yes to anything"); Dkt. 215 at 138 (Brown testifying that he lost consciousness from all of Buck's slams, and when he awoke, Buck had Brown's arm in his hand and was injecting him).)  Jermaine Gagnon described a time when Buck surreptitiously drugged him with GHB, and he became so drowsy that he collapsed on the couch, at which point Buck pressured him to slam methamphetamine.  (Dkt. 201 at 82-86; Tr. Ex. 114 (Gagnon's photographs of himself collapsed on Buck's couch).)  Buck gave Daniel Lyons so much methamphetamine that it made Lyons lose consciousness, and when he awoke, Buck was holding and sucking Lyons's penis.  (Dkt. 201 at 15-16.)  Sinclair testified that during some party and play sessions, Buck lit Sinclair's genitals on fire (7/14/21 Tr. 100, 106), and on one occasion when Sinclair was "barely

conscious" from the drugs Buck gave him, Buck repeatedly slapped his face, causing bruising and swelling (7/14/21 Tr. 77-78; Ex. 77.4 at 2 (Sinclair's text message to Buck regarding the bruising on his face).)  Buck administered so much methamphetamine and/or GHB to Brown that Brown lost consciousness, and while he was unconscious, Buck affixed six or seven metal rings to Brown's penis, which Brown only realized once he awoke and felt his penis go numb.  (Dkt. 215 at 149-150.)  Buck surreptitiously gave Cody Hoffman clonazepam, which caused Hoffman to fade in and out of consciousness, during which he felt Buck choking and slapping him, then caressing him.  (Dkt. 213 at 204, 208-210.)  When he awoke, Buck was approaching him with two more needles filled with methamphetamine.  (Id. at 210-211.)  On another occasion, Buck injected Hoffman with something that paralyzed his entire body, and he was able to move only his eyes.  (Id. at 224-225.)  Hoffman was in this state for hours and was able to move only after Buck revved a chainsaw at him, shooting adrenaline through his body.  (Id. at 225-226.)

Buck bragged about the unspeakable things he did to his victims. For instance, text messages on Buck's phone showed that during a party and play session, while his victim was incapacitated, Buck invited third parties over to join in sexually assaulting the victim. Buck wrote to the third party, "You still up? I got a buddy over and he's real fucked up . . . . Should be cool [to] watch you come in can you grab his dick."  (Ex. 77.8 (Buck's text messages); 7/16/21 Tr. 45-51.)  Trial evidence showed that Buck then sent an Uber to pick up the third parties and bring them to Buck's apartment to carry out Buck's sexual assault fantasy.  (7/16/21 Tr. 45-51; Ex. 77.8.)  When the victim later begged for Buck to tell him what happened to him

while he was "tied up and drugged," Buck taunted, "A picture is worth a thousand words . . . I have the answer to your question and some pictures." (Ex. 77.12 (Victim: "After that G you gave me, it wasn't but 15 minutes and then I was out cold. Stuff is crazy. What happened to me or what did you do? . . . What happened when I was tied up and drugged. Honestly." . . . Buck: "A picture is worth a thousand words . . . I got the answer to your question and some pictures.")

Buck's party and play ritual was more than a fetish – it was a lethal and unchecked pattern of reckless disregard for human life that left two people dead. Gemmel Moore had a history of party and play with Buck, as evidenced by text messages, videos, and photographs extracted from Buck's devices. (See PSR ¶ 15.) In March 2017, Moore moved to Texas to be near his mother (7/14/21 Tr. 200 (Nixon)), but in July 2017, he started communicating with Buck again (PSR ¶ 13). Buck summoned him to Los Angeles, buying Moore a plane ticket and hiring a driver to pick him up from the airport. (PSR ¶ 14.) On July 27, 2017, within hours of arriving at Buck's apartment, 26-year-old Gemmel Moore died on Buck's living room floor from methamphetamine that Buck gave him. (PSR ¶¶ 14-16.) Just hours after Moore's death – and before Moore's body had even been removed from Buck's apartment – another young Black man was waiting to enter Buck's apartment. (See 7/15/21 Tr. 140-141; Ex. 104.2.) Buck was undeterred by Moore's death. After Moore died, Buck continued to coerce and induce countless men to inject and smoke methamphetamine, including Sinclair, Gagnon, and Hoffman, as well as Stokes (who Buck pressured to use methamphetamine on many occasions and discarded when he would not do so) (7/14/21 Tr. 131, 135, 137, 144-145).

Then, on January 7, 2019, Timothy Dean went to Buck's apartment, and within an hour, overdosed from methamphetamine that Buck gave him. (PSR ¶ 17.) But when Buck saw the familiar scene – a man clinging to life, naked on his living room floor, after Buck injected him with drugs – Buck didn't immediately call 911. (Id.) First, he cleaned his apartment, wiping up Dean's blood and vomit, and tossing out his window the evidence that Buck had given Dean the fatal dose of methamphetamine. (PSR ¶¶ 17-18; see Ex. 2 (on the 911 call, responding officers are heard arriving at Buck's apartment, at which point the apartment was secured; Buck had to have disposed of evidence before he called); Ex. 107 (photograph of the package Buck threw out the window); Ex. 123 (photograph of the pipes and syringes in the package, some of which contained Dean and Buck's DNA).) The lesson Buck learned from Moore's death wasn't to stop injecting people with methamphetamine; it was to not get caught. When paramedics arrived, Dean's white-bottomed feet exposed Buck's inexcusable delay in calling 911: Dean had been dead for some time. (PSR ¶ 17.) Immediately after the death, investigators attempted to get information from Buck regarding Dean's next of kin, but Buck was more interested in showing off his collection of photographs around the apartment. (7/16/21 Tr. 127-128 (Palacios).)

After the second death, Buck remained undeterred. Rather than change his ways, he spun lies to cover his tracks. For instance, he told neighbors that the stream of visibly high men emerging from his apartment were his "social work clients." (7/14/21 Tr. 115 (Sacks).) But behind Buck's closed door – the "gates of hell," as he called it (Dkt. 213 at 207 (Hoffman))– Buck continued to administer recklessly high doses of methamphetamine. Victim accounts of this were

7

corroborated by Buck's trove of home videos, where Buck's exceedingly high victims submitted to his incessant demands to smoke more, inject more, and take more drugs. (E.g., Exs. 79.33, 79.37, 79.28, 79.36, 79.40, 79.27.)

Just the month after Dean died, Buck approached Corey Peters at an ATM and lured him back to Buck's apartment. (Dkt. 213 at 152-153 (Peters).) Peters, who was unhoused, was relieved for the shelter, but could never have imagined the amount of methamphetamine Buck would pressure him to use. (Id. at 157-59, 161.) Peters eventually got clean, but relapsed months later and felt deeply depressed. (Id. 167.) He was self-destructing and wanted to "play with fire," so he returned to Buck's apartment. (Id. at 169-170.) Peters told Buck he could only take a small shot, because his tolerance had gone down in his sobriety, but Buck gave him a "full blast" that felt like a "hot shot" – a shot that is "far and beyond what you normally do" that "takes you right to the edge of consciousness." (Id. at 172-173.)

Buck then met Dane Brown in June 2019, and started sending Ubers to his transitional housing to pick him up and bring him to Buck's apartment to smoke and slam methamphetamine that Buck provided. (Dkt. 215 at 120-128; Ex. 82.3; Ex. 137.6.) Around the anniversary of Moore's death, when Buck was on the run and staying in hotels out of fear of being arrested, Buck asked Brown to stay in a hotel with him. (Dkt. 215 at 136-137; Ex. 82.3.) Over the few nights they were together, Buck injected Brown with methamphetamine six different times, each time with exceedingly high dosages. (Dkt. 215 at 137-138 ("Some of them were .8 milliliters. Some of them were .6 milliliters, and I believe like one was 1.4 which was the last one"; Brown described .8 milliliters as a "very high dosage").) The

excessive doses caused Brown to lose consciousness, and when he
awoke, Buck was holding Brown's arm trying to inject him again.  (PSR
¶ 29; Dkt. 215 at 138.)  Brown pleaded with Buck to stop, but Buck
insisted on injecting him.  (Dkt. 215 at 138-139.)  Brown, knowing
that Buck would not take "no" for an answer, begged Buck to at least
reduce the dose, fearing how his body would respond to another
massive slam.  (Id.)

When Brown lost his housing shortly thereafter, Buck exploited
Brown's misfortune and moved him into his apartment, where he
injected Brown with methamphetamine nearly every day, often multiple
times a day.  (PSR ¶¶ 30-31; Dkt. 215 at 141-143.)  Then, on
September 4, 2019, Buck gave Brown three back-to-back methamphetamine
injections that caused Brown to overdose.  (PSR ¶ 31; Dkt. 215 at
152-153.)  Brown was hospitalized and miraculously survived, even
though he had more than five times the amount of methamphetamine in
his system that Moore and Dean had upon their deaths.  (PSR ¶ 31;
Dkt. 215 at 153-158.)  Brown moved out of Buck's apartment, but a few
days later, on September 10, 2019, he returned to do some paid work
around the apartment.  (Dkt. 215 at 160.)  Buck again injected him
with methamphetamine three times.  (Id. at 160-161; PSR ¶ 32.)  Brown
again felt himself overdose, but Buck was unwilling to help him.
(PSR ¶ 32; Dkt. 215 at 163-165.)  Brown sat on the couch, resigned to
the same fate as Moore and Dean, when he heard his deceased mother
cry out to him, "Get up, Dane" and he managed to get himself to a
nearby gas station, where paramedics took him to the hospital.  (PSR
¶ 32; Dkt. 215 at 163-165; Ex. 116.1 (surveillance footage showing
Brown's rescue from the gas station).)

1  **III.  GUIDELINE CALCULATIONS**

2      **A.  The PSR Guidelines Calculation**

3      The Probation Office computed Buck's offense level pursuant to

4  the grouping rules set forth in the Sentencing Guidelines:

5      (1) Count Group 1: Counts 1 and 8, arising out of Buck's

6  distribution to and trafficking of Gemmel Moore, which were part of a

7  single criminal episode; and

8      (2) Count Group 2: Counts 4 and 9, arising out of Buck's

9  distribution to and trafficking of Jermaine Gagnon; Counts 3, 5, and

10  6 (drug distributions); and Count 7 (maintaining a drug premises),

11  which is a specific offense characteristic of the distribution

12  counts; and

13      (3) Count 2 (drug distribution resulting in Timothy Dean's

14  death), which does not group with other counts because it does not

15  involve the same victim or harm as any other count of conviction.

16  (PSR ¶¶ 46-48.)

17          1.  <u>Count Group 1 Calculation</u>

18      The base offense level for Count Group 1 is 38 because Buck was

19  convicted of a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and in

20  the special verdict form, the jury specifically found that Moore's

21  use of the methamphetamine distributed by Buck resulted in Moore's

22  death.  Accordingly, the offense of conviction establishes that death

23  resulted from the use of the substance, and U.S.S.G. § 2D1.1(a)(2)

24  applies.

25          *a.  Drug Premises Enhancement Applies*

26      The specific offense characteristic of maintaining a premises

27  for the purpose of distributing a controlled substance, U.S.S.G.

28  § 2D1.1(b)(12), applies because the evidence established that Buck

maintained and utilized his apartment to distribute methamphetamine to a revolving door of men.  (PSR ¶ 51.)   This enhancement is supported by the conviction on Count 7 for maintaining a drug premises, and the trial evidence that Buck filmed his victims, including Moore, using methamphetamine in his apartment (Ex. 79.4-79.41); the security camera stills showing the constant influx of men visiting Buck's apartment (Ex. 104.3); Buck's neighbor's testimony describing the men who would visit Buck at all hours of the day, some of whom were clearly high when they left (7/15/21 Tr. at 9-11 (Tedla)); the victim testimony that Buck always provided methamphetamine; a biohazard container filled with discarded syringes recovered from Buck's car (Ex. 109); the drugs and drug paraphernalia recovered throughout Buck's apartment (Exs. 79, 102, 109); and the countless text messages in which Buck offered to host party and play sessions in his apartment and supply drugs (see, e.g., Exs. 77.2, 77.7, 77.11, 79.2, 82.3).

Moreover, the statutory standard for Count 7 matches the Guidelines standard.  To convict Buck under 21 U.S.C. § 856(a), the jury had to find beyond a reasonable doubt that distribution or use of drugs was a primary or principal purpose of the residence.  See United States v. Mancuso, 718 F.3d 780, 795 (9th Cir. 2013).  The jury was correctly instructed on this standard.  (Dkt. 168 p. 24 (explaining that maintaining a premises "'for the purpose of distributing or using a controlled substance' means that distributing or using a controlled substance is one of the primary or principal uses to which the residence is put.").)  That Buck also resided at the premises does not negate the jury's finding that drug distribution was a primary or principal purpose of the residence.

See United States v. Shetler, 665 F.3d 1150, 1162 (9th Cir. 2011) (affirming a drug premises conviction in the residential context where the defendant used his garage to host gatherings during which he distributed methamphetamine to "persons who did not reside on his property"); United States v. Spadafore, 791 Fed. App'x 677, 679 (9th Cir. 2020) (citing Shetler in affirming a conviction for maintaining a residence as a drug premises).  The Guidelines standard is substantively the same: "distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises."  2D1.1 App Note 17.  Given that the jury already found the fact of "primary or principal" purpose beyond a reasonable doubt, the Court should find the same fact by the lower standard.  See United States v. Washington, 462 F.3d 1124, 1142 n.11 (9th Cir. 2006) (district court does not err by applying enhancement based on same fact that jury necessarily found beyond a reasonable doubt).

### b.   Victim-Related Enhancement Applies

The victim-related enhancement also applies because Buck committed a "sexual offense" against Moore by distributing methamphetamine to Moore.  (PSR ¶¶ 52-53 (citing U.S.S.G. § 2D1.1(e), § 3A1.1(b)(1)).)  As set forth in the Application Notes, for purposes of this Section 2D1.1(e), a "sexual offense" means a "sexual act" or "sexual contact" as those terms are defined in 18 U.S.C. § 2246(2) and (3), respectively.  U.S.S.G. § 2D1.1(e), App. Note 22.  Section 2246(3) defines "sexual contact" as "intentionally touching, directly or through clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate,

harass, degrade, or arouse or gratify the sexual desire of any person." As the PSR notes, Buck distributed a fatal dose of methamphetamine to Moore during a "party and play" session, which, as the evidence at trial showed, involved sexual touching. (PSR ¶ 54.)

A preponderance of the evidence shows that Buck sexually touched his victims, including Moore, by incapacitating them with drugs. As the testimony of Brown, Hoffman, and Lyons, as well as the messages on Buck's own phone, established, Buck engaged in a pattern of intoxicating his victims and sexually assaulting them while they were unconscious. (Dkt. 215 at 149-150; Dkt. 213 at 204, 208-210; Dkt. 201 at 15-16; Exs. 77.8, 77.12 (Buck's text messages encouraging third parties to sexually assault his unconscious victim and messages with the unconscious victim after the assault); see also 7/14/21 Tr. 47 (Sinclair testifying that Buck enjoyed seeing his victims "unconscious").) Further, on at least one occasion prior to Moore's death, Buck sexually assaulted Moore while he was unconscious, as evidenced by the video Buck took of Moore asleep in Buck's apartment while Buck manipulated Moore's naked genitals. (Ex. 79.12.)

Buck argues that this enhancement is inapplicable because his victims were escorts, and thus they would have engaged in sexual activities regardless of Buck drugging them. (Dkt. 232 at 5.) But consent to some sexual touching did not give Buck blanket permission to touch his victims whenever he wanted, however he wanted. And no profession – "escort" or otherwise – sanctions sexual assault on people who are unconscious or unable to decline participation.

The fact that Moore was found naked, with a ring around his penis, after Buck distributed a lethal dose of methamphetamine to him indicates that it is more likely than not Buck engaged in sexual

contact with Moore by administering drugs to him.  This evidence supports the vulnerable victim enhancement.

Thus, the total offense level for Count Group 1 is **42**.  (PSR ¶ 57.)

2.  Count Group 2 Calculation

The Probation Offense calculates the base offense level for Count Group 2 to be 38, based on the evidence that Buck distributed methamphetamine to victims, which resulted in serious bodily injury. (PSR ¶¶ 58-60.)  "Serious bodily injury" is injury involving extreme physical pain or protracted impairment of a function of a bodily member, organ, or mental faculty.  (PSR ¶ 59 (citing U.S.S.G. § 1B1.1, App. Note M).)  It also includes criminal sexual abuse under 18 U.S.C. § 2241 or § 2242, the latter of which defines "sexual abuse" as engaging in a sexual act with another person if that person is (a) incapable of apprising the nature of the conduct; or (b) physically incapable of declining participation in, or communicating unwillingness to engage in that sexual act.  (PSR ¶ 59.)  As noted in the PSR, Buck inflicted both serious bodily injury and sexual abuse upon Hoffman when he surreptitiously gave Hoffman a controlled substance that caused him to lose control over his body for several hours during a "party and play" session.  (PSR ¶ 60.)[2]

a.  *Drug Premises Enhancement Applies*

The specific offense characteristic of maintaining a premises for the purpose of distributing a controlled substance (U.S.S.G. § 2D1.1(b)(12)) applies because the evidence established that Buck

---

[2] While the government agrees with the Probation Office's analysis regarding the base offense level for this group, as noted below, the government urges the Court to adopt a different, lower base offense level predicated on the drug quantity table.

14

1   maintained and utilized his apartment to distribute methamphetamine

2   to Sinclair, Gagnon, Hoffman, and Brown, among many others.  (PSR

3   ¶ 61.)  As described above, that was a primary or principal purpose

4   of the apartment.

5                   *b.   Victim-Related Enhancement Applies*

6        The victim-related adjustment applies because Buck distributed

7   methamphetamine to each of these victims during "party and play"

8   sessions and used methamphetamine to facilitate sexual contact with

9   his victims by impairing their ability to decline participation in

10  sexual activities.  (See PSR ¶¶ 62-64.)  For example, in the case of

11  Brown, Buck distributed massive quantities of methamphetamine and/or

12  GHB, then attached six or seven metal rings to his penis once Brown

13  was unconscious.  (Dkt. 215 at 149-150.)  Accordingly, the victim-

14  related enhancement applies.

15       Thus, the PSR calculates the total offense level for this group

16  as **42.**  (PSR ¶ 67.)

17            3.   Count 2 Calculation

18       The base offense level for Count 2 is 38 because Buck was

19  convicted of a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and in

20  the special verdict form, the jury specifically found that Dean's

21  use of the methamphetamine distributed by Buck resulted in Dean's

22  death.  (PSR ¶¶ 68-69.)  Accordingly, the offense of conviction

23  establishes that death resulted from the use of the substance, and

24  U.S.S.G. § 2D1.1(a)(2) applies.

25                   *a.   Drug Premises Enhancement Applies*

26       The specific offense characteristic of maintaining a premises

27  for the purpose of distributing a controlled substance (U.S.S.G.

28  § 2D1.1(b)(12)) applies because the evidence established that Buck

maintained and utilized his apartment to distribute methamphetamine to a revolving door of men, including Timothy Dean.  (PSR ¶ 70.)  It is further supported by the conviction on Count 7 for maintaining a drug premises, and the evidence described above.

### b.   Victim-Related Enhancement Applies

The victim-related adjustment also applies because Buck distributed methamphetamine to Dean during a party and play session. (PSR ¶ 73.)  As described above, Buck administered drugs to lower his victim's inhibitions and ability to resist Buck's sexual advances. (See also 7/14/21 Tr. 47-48 (Sinclair testifying that Buck liked to see his victims so intoxicated that they "couldn't stand" so Buck "would be able to do whatever he liked as far as touch and everything and that sort").)  The evidence suggests that he did as much with Dean, as Dean was found naked with his penis double-looped in a sex ring (Ex. 122), a position that caused edema to the penis, according to the Autopsy Report, and something Buck was likely able to do only because Dean was under the influence of the methamphetamine Buck distributed.  Indeed, Buck applied similar rings to Brown while he was unconscious, and Moore was found with a ring on his penis when he fatally overdosed.  Thus, it is more likely than not that the drugs Buck administered facilitated his sexual touching of Dean, and the enhancement should apply.

### c.   Obstruction of Justice Enhancement Applies

Finally, an obstruction of justice enhancement applies for Buck's willful attempt to destroy evidence by throwing out his window the drug paraphernalia he used to distribute drugs to Dean.  (PSR ¶¶ 75-76; see U.S.S.G. § 3C1.1 App. Note 4(D) (an obstruction of justice enhancement is warranted when defendant destroys or conceals

evidence that is material to an official investigation or attempts to
do so).)  Specifically, on January 7, 2019, after Dean overdosed and
before Buck called 911 to seek life-saving measures for Dean, Buck
gathered up the pipes and syringes he and Dean had been using to
smoke and inject methamphetamine, put them in a box, in a bag, and
threw them out his window.  (PSR ¶¶ 42, 75-76; see Exs. 2, 107, 123.)
See United States v. Lato, 934 F.2d 1080, 1082 (9th Cir. 1991)
(collecting cases applying obstruction of justice enhancement where
defendants threw evidence out of windows).  Buck did this
intentionally so officers would not find evidence of Dean's death in
Buck's apartment, and to support Buck's lie to officers that he and
Dean had not been using drugs together.  (PSR ¶¶ 42, 75-76.)  Thus,
because Buck attempted to destroy or conceal evidence that was
material to the Dean death investigation, an obstruction enhancement
is warranted.  (PSR ¶¶ 42, 75-76.)

Buck objects to this enhancement, relying on the caveat to Note
4(D) that obstructive conduct that occurs "contemporaneously with
arrest" is insufficient to warrant an enhancement unless it results
in a material hindrance to the investigation (Dkt. 232 at 8);
however, that caveat is inapplicable because the conduct (in January
2019) was not contemporaneous with Buck's arrest, which wasn't until
September 2019.  The caveat is designed for "'conduct admitting a
spontaneous or visceral or reflexive response occurring at the point
arrest becomes imminent.'"  United States v. Bedford, 446 F.3d 1320,
1325 (10th Cir. 2006) (quoting United States v. Lamere, 980 F.2d 506,
515 n.6 (8th Cir. 1992)).  The facts here come nowhere close to
satisfying that standard.  A gap of mere hours defeats a showing that
conduct occurred contemporaneously with arrest.  See, e.g., United

States v. McDonald, 804 F.3d 497, 505 (1st Cir. 2015); United States

v. Unger, 484 F. App'x 78, 83 (8th Cir. 2012).  A gap of eight months

obviously does too.

Buck's reliance on the "Good Samaritan" law, Cal. Health and

Safety Code § 11376.5 (Dkt. 232 at 8 n.2), also rings hollow.  That

law provides that it is not a crime to possess drugs for personal use

if that person, "in good faith, seeks medical assistance for another

person experiencing a drug-related overdose."  The law does not

sanction destruction of evidence.  Moreover, Buck did precisely the

opposite of what the "Good Samaritan" law intends to accomplish: He

wasted precious minutes disposing of his drug paraphernalia to avoid

incrimination before seeking life saving measures for Dean.  His

efforts to destroy evidence material to the death investigation are

sufficient to support the enhancement.

Thus, the total offense level for Count 2 is **44**.

### 4.  Total Offense Level

The Probation Office calculates the three groups/counts as three

units (offense levels 42, 42, and 44), leading to an addition of

three offense levels to the highest offense level of 44, resulting in

a total offense level of **47**.  (PSR ¶¶ 78-81 (citing U.S.S.G.

§ 3D1.4).)  Because this offense level is one of the "rare instances"

in which the total offense level exceeds 43 (the maximum under the

Guidelines), the offense level is treated as a level 43.  (PSR ¶ 84

(citing Chapter 5, Part A (cmt. n.2)).)

### B.  Government's Guideline Calculation

The government largely agrees with the Probation Office's

calculation of Buck's total offense level and believes that the

calculation is supported by the law and facts of the case.  In an

18

abundance of caution, however, for Count Group 2, the government urges the Court to adopt an offense level of 16 based on U.S.S.G. § 2D1.1(a)(5) (the quantity table), rather than U.S.S.G. § 2D1.1(a)(2).  The relevant part of subsection (a)(2) instructs that the base offense level is 38 when a defendant is convicted under 21 U.S.C. § 841(b)(1)(C) and the "offense of conviction establishes that death or serious bodily injury resulted from the use of the substance."  While trial testimony established that victims in Counts 3-6 experienced serious bodily injury, including sexual abuse, as a result of Buck's distributions (see also PSR ¶ 59), arguably the "offense of conviction" on its face does not establish that injury because the jury was not asked to find that those distributions resulted in such injury.  Whether the Court can look at the underlying facts to evaluate the "offense of conviction" is an open question in the Ninth Circuit, and is the subject of a circuit split.[3]  In light of this uncertainty, and because the total offense level will not be affected by resolution of this issue, the government urges the Court to calculate the offense level for this group based on the drug quantity table.

---

[3] Compare United States v. Lawler, 818 F.3d 281 (7th Cir. 2016) (enhanced base offense level not triggered by judicial finding at sentencing); United States v. Rebmann, 321 F.3d 540, 543-44 (6th Cir. 2003) (same); United States v. Pressler, 256 F.3d 144, 157 n.7 (3d. Cir. 2001) (same, in dicta); United States v. Greenough, 669 F.3d 567 (5th Cir. 2012) (same), with United States v. Rodriguez, 279 F.3d 947, 950 (11th Cir. 2002) (enhanced offense level applied after court made findings by a preponderance and sentence did not exceed statutory maximum for lesser offense); United States v. Mcintosh, 236 F.3d 968, 975-76 (8th Cir. 2001) (same), abrogated by Burrage v. United States, 134 S. Ct. 881 (2014) (defendant cannot be liable under the penalty enhancement provision of § 841(b)(1)(C) unless use of a drug is the but-for cause of the death or injury).

1      Here, because the exact quantity of methamphetamine Buck

2  distributed to the victims in Counts 3-6 is unknown, the Court should

3  default to the lowest possible amount of methamphetamine in the drug

4  quantity table: "less than 5 grams of methamphetamine, or less than

5  500 milligrams of methamphetamine (actual)."  U.S.S.G.

6  § 2D1.1(c)(14).  This results in a base offense level of 12.  <u>Id.</u>

7  For the reasons set forth above, there is a two-level enhancement for

8  maintaining a drug premises (U.S.S.G. § 2D1.1(b)(12)), and a two-

9  level vulnerable victim enhancement (U.S.S.G. § 2D1.1(e)), resulting

10  in a total offense level of 16.  Because 16 is more than nine levels

11  lower than 44 and 42, respectively, the Count Group 2 does not

12  increase the applicable offense level.  U.S.S.G. § 3D1.4(c).

13  However, it does "provide a reason for sentencing at the higher end

14  of the sentencing range for the applicable offense level."  <u>Id.</u>

15      For ease of reference, the government's calculation is as

16  follows:

17  <u>Count Group 1:</u>

18      Base offense level: 38     U.S.S.G. § 2D1.1(a)(2)

19      Drug Premises:    +2     U.S.S.G. § 2D1.1(b)(12)

20      Vulnerable Victim: +2     U.S.S.G. §§ 2D1.1(e), 3A1.1(b)(1)

21      Group Total:     **42**

22  <u>Count Group 2:</u>

23      Base offense level: 12     U.S.S.G. § 2D1.1(c)(14)

24      Drug Premises:    +2     U.S.S.G. § 2D1.1(b)(12)

25      Vulnerable Victim: +2     U.S.S.G. §§ 2D1.1(e), 3A1.1(b)(1)

26      Group Total:     **16**

27  <u>Count 2:</u>

28      Base offense level: 38     U.S.S.G. § 2D1.1(a)(2)

| | | |
|---|---|---|
| Drug Premises: | +2 | U.S.S.G. § 2D1.1(b)(12) |
| Vulnerable Victim: | +2 | U.S.S.G. §§ 2D1.1(e), 3A1.1(b)(1) |
| Obstruction: | +2 | U.S.S.G. § 3C1.1 |
| Group Total: | **44** | |

Multiple Count Adjustment:

    44 + 42 = 2 units: +2     U.S.S.G. § 3D1.4(a)

**Total Offense Level: 46**

With an offense level 46 (which is treated as 43, the highest level in the Guidelines), and a Criminal History Category I, Buck's Guidelines sentence is life imprisonment.

**IV. THE 3553(A) FACTORS SUPPORT A LIFE SENTENCE**

Buck's total offense level, which exceeds the highest level in the Guidelines, advises the Court to impose a life sentence. There is no reason to depart from the Guidelines here. As the Court saw at trial, and as recapped above, Buck does not value human life beyond his own. He used human beings as playthings, destroying their lives merely to appease his own sexual gratifications. He has killed two people and nearly a third, torn apart families, created and amplified debilitating addictions among the most vulnerable populations, and has done it all without an ounce of remorse. Edward Buck should never be released from prison.

**A. The Seriousness of the Offenses Warrant a Life Sentence**

The circumstances of Buck's drug distributions are among the most aggravating facts one can imagine. Buck not only distributed recklessly and excessively high doses of drugs, he also sought out victims who were unhoused (Sinclair, Peters, Lyons) or had unstable housing (Brown), who struggled with addiction (Sinclair, Peters, Lyons), and who made a living as sex workers (Hoffman, Gagnon,

Everett, Stokes) – people Buck banked on no one believing.  He

targeted young Black men, injecting them beyond their limits while

degrading them with racial slurs and violence. (7/14/21 Tr. 171

(Anthony Everett testifying that Buck told him, "bring that [n*****]

dick over here" during a party and play session; 7/14/21 Tr. 80

(Sinclair testifying Buck told him, "I don't need another dead

[n*****] on my couch"); Proposed (but not admitted) Ex. 79.22 (a

video from Buck's computer in which he refers to Black men as

"n******").)  And as detailed above, Buck sexually assaulted his

victims and injected them with drugs while they were unconscious.

    The seriousness of Buck's crimes is also aptly summed up by the

destruction he leaves in his wake.  In his own words, Dane Brown is

"scarred for life."  (Norell Decl., Ex. E (Brown Victim Impact

Statement ("VIS")).)  He experiences severe depression and lives in

fear that people are "watching [his] every move."  (Id.)  It's "hard

to walk out the door of my own home now."  (Id.)  Brown wakes "in

sweats repeating the same scenario of the last moments with Ed in

[his] head."  (Id.)  For Jermaine Gagnon, Buck's "forcible

inject[ions]" of methamphetamine and GHB had a "profound and

traumatizing effect," including making him "more dependent on meth."

(Norell Decl., Ex. F (Gagnon VIS).)  Gagnon's "previously controlled

schizophrenia symptoms have resurfaced since the incident with Mr.

Buck," and his paranoia has "paralyzed [him] to the point where [he

has] trouble leaving [his] apartment," which has led to his isolation

and strained relationships with his family.  (Id.)  Cody Hoffman's

experience with Buck "really made [him] not trust anybody"; he sits

inside alone, depressed and hating himself.  (Norell Decl., Ex. G

(Hoffman VIS).)  "What makes me saddest [is] the fact that I have not been able [to] complete my school because of the stress."  (Id.)

Buck's crimes have also wrecked the families of his victims. Joann Campbell, who described her brother Timothy Dean as "loved, caring, funny," and someone who "loved life," remembers the joy of celebrating birthdays with her brother and how he could always make her laugh.  (Norell Decl., Ex. C (Campbell, VIS).)  Now she is haunted by the image of "the Coroner taking my brother['s] long body down the stairs in that black body bag from Ed Buck['s] house."  (Id.)  "Some days I feel I'm going insane thinking about all the good times I shared with my brother over the years and now those memories just seem a mere fog now that he is gone from me too soon."  (Id.)  Joyce Jackson, also Timothy Dean's sister, wrote that her heart feels "heavy and broken," and that her family has to "deal with an empty void" with her brother taken from her.  (Norell Decl., Ex. D (Jackson, VIS).)

Gemmel Moore's mother, LaTisha Nixon, has experienced similarly wrenching pain.  "This has torn our family to shreds."  (Norell Decl., Ex. A (Nixon, VIS-1).)  "My baby Gemmel," she wrote, "showed me how to love and that I was worth loving."  (Norell Decl., Ex. B (Nixon, VIS).)  She remembers her son's joy for life, recounting a time at church when Moore told the whole congregation that "he wanted to be pastor, fireman, and a police officer and ramble[d] on and on," and Ms. Nixon laughed thinking about the busy future he had ahead of him.  (Id.)  Moore was only 26 years old when Buck stamped out that future.  "All I have now is memories of him and his ashes."  (Id.) Ms. Nixon is haunted by how her son died:

I was a certified nursing assistant for over twenty years I can't tell you how many times I held a person's hand and prayed with them and said beautiful things to them as they crossed over.  All I can think about is how my son died naked on a mattress with no love around him.  No one to hold his hand or tell him good things.

(Id.)

The only sentence that adequately reflects the seriousness of the offense is life imprisonment.

**B.   Buck's Pattern and Remorselessness Counsels a Life Sentence Because It Is the Only Way to Protect the Community and Sufficiently Deter Others**

On July 27, 2017, 26-year-old Gemmel Moore died in Buck's apartment from the methamphetamine that Buck gave him.  For any person capable of empathy, this would be a life-altering tragedy, but Buck's pattern remained unaltered.  After the death, he wrote in a text message, "I have eight more days to go with this Jamall more [sic] sheriff investigating me bullshit.  On the 28th of this month we will know what's going to happen and the muzzle comes off and I can speak."  (Ex. 79.1.)  Tragically, he sent that message to Timothy Dean, who later met the same fate as Moore, dying in Buck's apartment from the methamphetamine Buck gave him.  Buck was still undeterred, injecting anyone he could recruit for his party and play sessions.  Even when Buck knew he was under investigation, that scrutiny didn't stop him from slamming Dane Brown and Corey Peters with massive shots of methamphetamine.  Buck's lack of remorse is aptly captured in one image: As he was hiding out in a hotel, evading arrest for Gemmel Moore's death, he was injecting Dane Brown, another young Black man, with back-to-back slams of methamphetamine.  Even Brown's two near-death overdoses did not deter Buck.  Buck continued to call Hoffman

1  to party and play until the day Buck was arrested.  (Norell Decl.,

2  Ex. G (Hoffman, VIS).)

3       The evidence before the Court shows that if Buck were ever

4  released, he would feed his compulsion to inject others until the day

5  he died.  To protect the community from his horrendous crimes, Buck

6  must never be released from prison.  A life sentence also serves as a

7  powerful deterrent to any would-be Bucks who think they can victimize

8  vulnerable populations with impunity.

9  **V.   RESTITUTION**

10      As noted in the PSR, the Mandatory Victim Restitution Act of

11  1996, 18 U.S.C. § 3663A, applies in this case (PSR ¶ 33), and

12  requires the Court to order Buck to make restitution to any victim

13  (or victim's estate, for a deceased victim), for losses resulting

14  from Buck's violation of 21 U.S.C. § 856, maintaining a premises for

15  purposes of distributing methamphetamine.[4]  For purposes of the

16  restitution statutes, a "victim" is a person "directly and

17  proximately harmed as a result" of the offense.  18 U.S.C.

18  § 3663A(a)(2); 18 U.S.C. § 3663(a)(2).  In the case of a victim who

19  is deceased, "the legal guardian of the victim or representative of

20  the victim's estate, another family member, or any other person

21  appointed as suitable by the court, may assume the victim's rights."

22  18 U.S.C. § 3663A(a)(2); 18 U.S.C. § 3663(a)(2).

23      In the case of an offense resulting in bodily injury to a

24  victim, the restitution order includes (1) the cost of necessary

25  medical and related professional services and devices relating to

26

27      [4] The Discretionary Victim Restitution Act, 18 U.S.C. § 3663(a),
    which covers Controlled Substance Act offenses under Title 21,
28  including 21 U.S.C. § 841, provides additional, discretionary grounds
    for ordering restitution in this case.

physical, psychiatric, and psychological care; (2) the cost of necessary physical and occupational therapy and rehabilitation; (3) reimbursement of income lost by the victim as a result of the offense; (4) reimbursement for funeral and related services, in the event of the victim's death; and (5) reimbursement for lost income and necessary childcare, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at the proceedings related to the offense.  18 U.S.C. § 3663A(b)(2)-(4); 18 U.S.C. § 3663(b).

Buck should be ordered to pay restitution as set forth in the under seal filing.  The estimated amount of restitution is $51,562.19, subject to adjustment and verification at the time of sentencing.  Restitution should be paid immediately.[5]

## VI.  FINE

The government concurs with the Probation Office that a substantial fine is warranted in this case and should be paid immediately.  (PSR ¶¶ 133-134; Dkt. 219.)

The Guidelines state that, "the court <u>shall</u> impose a fine in all cases, except where the defendant establishes that [he] is unable to pay and is not likely to become able to pay."  U.S.S.G. § 5E1.2(a) (emphasis added).  In determining the fine, the court "shall consider" the following, among other things: "the need for the combined sentence to reflect the seriousness of the offense . . . to promote respect for the law, to provide just punishment, and to afford adequate deterrence"; "any evidence presented as to the

---

[5] Buck should be ordered to pay restitution and the fine immediately, as he has immediate ability to pay.  (PSR ¶ 134.) Any money paid by Buck "shall first be applied to satisfy the order of restitution."  U.S.S.G. § 5E1.1(d).

defendant's ability to pay the fine (including the ability to pay over a period of time) in light of [his] earning capacity and financial resources"; and "the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed." U.S.S.G. §§ 5E1.2(d); see also 18 U.S.C. § 3572(a). As the Guidelines make clear, "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanction imposed, is punitive." U.S.S.G. § 5E1.2(d).

Here, the Guidelines range for the fine is $50,000 to $8,000,000. (U.S.S.G. §§ 5E1.2(c)(3), (c)(4) [$2,000,000 (Count 1) + $2,000,000 (Count 2) + $1,000,000 (for each of Counts 3-6) = $8,000,000].)

The Probation Office's recommendation of a $1,000,000 fine is justified by the facts of this case. Buck used his money and privilege to exploit the wealth and power imbalances between himself and his victims, who were unhoused, destitute, and/or struggling with addiction. He spent thousands of dollars on drugs and party and play sessions that destroyed lives and bred insidious addictions. He even used his money to fund Gemmel Moore's travel to Los Angeles where he met his death. Buck's money was a tool in his toolbox, just like his syringes and pipes, and he should not be able to enjoy it in prison.

Moreover, Buck has the assets to support a $1,000,000 fine. The Probation Office determined that he has a positive net worth of more than $2,000,000. (PSR ¶ 133.) At the time of his arrest, in just the bank statements investigators found around his apartment, they discovered accounts totaling $3,477,335.35 in assets. (PSR ¶ 127.) Buck objects to the recommended fine but offers nothing more than his retained counsel's speculation regarding his inability to pay. (Dkt.

232 at 9-10.)  This is insufficient to meet Buck's burden of showing an inability to pay.  U.S.S.G. § 5E1.2(a); see also United States v. Vargem, 747 F.3d 724, 732-33 (9th Cir. 2014) (defendant bears the burden "to show inability to pay by a preponderance of evidence," and district court did not err in imposing fine notwithstanding defendant's claim that "criminal proceedings had resulted in substantial financial losses, and that his imprisonment deprived him of the ability to provide a financial statement").  Buck has also "made no showing of future inability to pay," United States v. Haggard, 41 F.3d 1320, 1329 (9th Cir. 1994), and his assertion that he obtained $1,000,000 from his elderly mother for legal fees (Dkt. 232 at 10) suggests that he has access to, and may stand to inherit, substantial family resources.

While a $1,000,000 fine is entirely appropriate, the government is mindful that some victims in this case have pending wrongful death lawsuits against Buck.  (PSR ¶ 129.)  In the interest of those victims and their potential recoveries, the government recommends a fine of $200,000 on Count One and $200,000 on Count Two, for a total fine of $400,000.  Such a fine is sufficiently punitive, in combination with the lifetime custodial sentence, and in light of the circumstances of the case.

**VII. CONCLUSION**

Buck thought his victims' lives didn't matter and that he could act with impunity.  He was wrong about both.  His depraved conduct warrants the most severe sentence of life imprisonment.

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence: life imprisonment on Counts One and Two, 20 years each on Counts Three through Seven, and

10 years each on Counts Eight and Nine; a mandatory special assessment of $900; restitution, as determined at the time of sentencing; and a fine of $400,000.