**Mark J. Werksman, Esq. (State Bar No. 120767)**
**Elizabeth S. Little, Esq. (State Bar No. 307944)**
**WERKSMAN JACKSON & QUINN LLP**
**888 West Sixth Street, Fourth Floor**
**Los Angeles, California 90017**
**Telephone: (213) 688-0460**
**Facsimile: (213) 624-1942**
**Email: mwerksman@werksmanjackson.com**

**Attorneys for Defendant**
EDWARD BUCK

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

THE UNITED STATES OF
AMERICA,

      Plaintiff,

      vs.

EDWARD BUCK,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO. 19-CR-00595-CAS**

**DEFENDANT'S SENTENCING MEMORANDUM**

Date:      April 4, 2022
Time:      2:30 p.m.
Courtroom:  8D

Hon. Christina A. Snyder

**TO THE HONORABLE CHRISTINA A. SNYDER, UNITED STATES DISTRICT COURT JUDGE, ASSISTANT UNITED STATES ATTORNEY CHELSEA NORELL:**

# TABLE OF CONTENTS

**PAGE(S)**

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.     STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        A.     FACTS RELATING TO MR. BUCK . . . . . . . . . . . . . . . . . . . . . . .  5

        B.     FACTS OF THE INSTANT OFFENSE . . . . . . . . . . . . . . . . . . . . .  9

III.    MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . .  9

        A.     SECTION 3553(A) FACTORS CONCERNING
               THE HISTORY AND CHARACTERISTICS OF
               THE DEFENDANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

               1.     MR. BUCK'S HISTORY AND
                      CHARACTERISTICS ARE MITIGATING . . . . . . . . . . . . 11

        B.     SECTION 3553(A) FACTORS CONCERNING
               THE NEED FOR THE SENTENCE IMPOSED . . . . . . . . . . . . . . 14

               1.     THE SERIOUSNESS OF THE OFFENSE . . . . . . . . . . . . . 14

               2.     THE NEED TO PROVIDE JUST
                      PUNISHMENT AND PROMOTE RESPECT
                      FOR THE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

               3.     THE NEED TO PROTECT THE PUBLIC. . . . . . . . . . . . .  15

        C.     THE TYPES OF SENTENCES AVAILABLE. . . . . . . . . . . . . . .  16

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

# TABLE OF AUTHORITIES

**PAGE(S)**

**U.S. SUPREME COURT CASES**

Atkins v. Virginia
    536 U.S. 304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

California v. Brown
    479 U.S. 538 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Penry v. Lynaugh
    492 U.S. 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Roper v. Simmons
    543 U.S. 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Simon v. United States
    361 F. Supp. 2d 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tapia v. United States
    564 U.S. 319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Booker
    543 U.S. 220 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10


**FEDERAL CASES**

United States v. Adelson
    441 F. Supp. 2d 506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

United States v. McBride
    434 F.3d 470 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Spigner
    416 F.3d 708 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Wilson
    350 F. Supp. 2d 910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


**FEDERAL STATUTES**

18 U.S.C. § 2422(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 16

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

18 U.S.C. § 3553(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

18 U.S.C. § 3553(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

18 U.S.C. § 3582(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

**PAGE(S)**

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
21 U.S.C. § 841(b)(1)(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
21 U.S.C. § 856(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**U.S. SENTENCING GUIDELINES**

U.S.S.G. § 2D1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
U.S.S.G. § 2D1.1(b)(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
U.S.S.G. § 2D1.1(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

**OTHER SOURCES**

Elizabeth Arias, et al., Provisional Life Expectancy Estimates for 2020
(July 2021), https://www.cdc.gov/nchs/data/vsrr/vsrr015-508.pdf . . . . . . . . . . 4
Methamphetamine: Forms and Use Patterns (Accessed March 21, 2022),
https://ndarc.med.unsw.edu.au/sites/default/files/ndarc/resources/ICE%20FORM
S%20AND%20USE.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
U.S.C.C.A.N. 3182 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
U.S.C.C.A.N. 3258 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
U.S.C.C.A.N. 3259 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Mark J. Werksman, Esq. (State Bar No. 120767)**
**Elizabeth S. Little, Esq. (State Bar No. 307944)**
**WERKSMAN JACKSON & QUINN LLP**
**888 West Sixth Street, Fourth Floor**
**Los Angeles, California 90017**
**Telephone: (213) 688-0460**
**Facsimile: (213) 624-1942**
**Email: mwerksman@werksmanjackson.com**

**Attorneys for Defendant**
EDWARD BUCK

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>     vs.<br><br>EDWARD BUCK,<br><br>        Defendant. | **CASE NO. 19-CR-00595-CAS**<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Date:     April 4, 2022<br>Time:    2:30 p.m.<br>Courtroom: 8D<br><br>Hon. Christina A. Snyder |

**TO THE HONORABLE CHRISTINA A. SNYDER, UNITED STATES DISTRICT COURT JUDGE, ASSISTANT UNITED STATES ATTORNEY CHELSEA NORELL:**

Defendant, Edward Buck ("Mr. Buck"), by and through his counsel of record, Werksman Jackson & Quinn LLP, hereby files his Sentencing Memorandum. Mr. Buck's Memorandum is based upon the transcripts of the trial; the documents in the Court's file; the Pre-Sentence Investigation Report ("PSR"); Disclosed Recommendation Letter; Mr. Buck's Objections to the Presentence

Investigation Report (dkt. 232); the attached Memorandum of Points and Authorities; all letters and documents filed herewith; and upon any oral argument that may be presented at the sentencing hearing pursuant to Federal Rule of Criminal Procedure, Rule 32(c)(1).

Dated: March 21, 2022                 Respectfully submitted,

                                      WERKSMAN JACKSON & QUINN LLP


                                      //s//_____
                                      Mark J. Werksman
                                      Elizabeth Little
                                      Attorneys for Defendant
                                      Edward Buck

2

# I.
# INTRODUCTION

On July 30, 2021, after a nine-day trial, Mr. Buck was found guilty of two counts of Distributing a Controlled Substance Resulting in Death, in violation of 21 U.S.C. section 841(a)(1), (b)(1)(c) (Counts One and Two); four counts of Distributing a Controlled Substance, in violation of 21 U.S.C. section 841(a)(1), (b)(1)(c) (Count Three through Six); a single count of Using and Maintaining a Residence for the Purpose of Distributing and Using a Controlled Substance, in violation of 21 U.S.C. section 856(a)(1) (Count Seven); and two counts of Persuading, Inducing, or Enticing a Person to Travel in Interstate Commerce to Engage in Prostitution, in violation of 18 U.S.C. section 2422(a) (Counts Eight and Nine).

On February 28, 2022, Probation filed its PSR and Disclosed Recommendation Letter. In the PSR, Probation calculated a base offense level of 38 pursuant to U.S.S.G. § 2D1.1. (PSR ¶ 50.) Probation then recommended an additional two points for maintaining "a premises for the purpose of manufacturing or distributing a controlled substance," pursuant to U.S.S.G. § 2D1.1(b)(12). (PSR ¶ 51.) Probation then applied a further two-level "vulnerable victim" enhancement under U.S.S.G. § 2D1.1(e), as well as a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 2D1.1(e) and 3A1.1(b)(1). (PSR ¶¶ 62–64, 75.) Finally, Probation added a three-level multiple offense adjustment based on its grouping of the offenses. (PSR ¶ 80.) Thus, Probation calculated a total offense level of 47. (PSR ¶ 81.) However, pursuant to Chapter 5, Part A, this total offense level is treated as a level 43—the highest level on the Sentencing Guideline table. (PSR ¶ 84.)

On March 14, 2022, Mr. Buck filed his objections to the PSR. (dkt. 232) As set forth therein, Mr. Buck objects to (1) the inclusion of a two-level adjustment

for maintaining a premises for the purpose of manufacturing or distributing a controlled substance; (2) the two-level vulnerable victim adjustments under U.S.S.G. §§ 2D1.1(e) and 3A1.1(b)(1); (3) the two-level enhancement for obstruction of justice and (4) the imposition of a $1,000,000 fine. These enhancements—which add six levels to the total offense level calculated by Probation and bring Mr. Buck's recommended sentence under the sentencing guidelines to the maximum sentence of life imprisonment—are legally inapplicable and should be disregarded.

As explained in the PSR, the total offense level of 43 calculated by Probation carries a recommended sentence of life under the advisory Sentencing Guidelines. In its Disclosed Recommendation Letter, Probation sets forth that a "guideline sentence of life is more than needed to achieve the goals of sentencing in this case." (Dkt. 219, p. 7.) Yet, Probation recommends that Mr. Buck receive a sentence of 25 years imprisonment—a downward "variance" from the advisory guideline sentence of life. Thus, while stating that a life sentence is unnecessary to meet the goals of sentencing, Probation recommends a term of imprisonment the functional equivalent of a life sentence for Mr. Buck, who is 68-years old and has a variety of serious medical issues. [1]

As set forth below, the 25-year sentence recommended by Probation is excessive. Indeed, there are numerous mitigating factors and circumstances that this Court should consider in sentencing Mr. Buck and these mitigating factors warrant a below-guidelines sentence. These include Mr. Buck's highly traumatic and difficult childhood and adolescence marked by a volatile marriage between his parents, his father's severe alcoholism, his father's physical abuse, and eventually,

---

[1] For reference, as of 2020, the life expectancy of an average American male is 74.5. (Elizabeth Arias, et al., *Provisional Life Expectancy Estimates for 2020* (July 2021), https://www.cdc.gov/nchs/data/vsrr/vsrr015-508.pdf.)

his father's prolonged sexual abuse of Mr. Buck for more than two years of his adolescence (from when Mr. Buck was eleven to when he was thirteen). Concurrent to this incestuous sexual abuse and following it, Mr. Buck also suffered sexual abuse at the hands of multiple clergy members at his church. Despite these horrific early life circumstances, Mr. Buck able to escape from his difficult upbringing through his hard work and talent, eventually achieving financial success through various business ventures. He then spent the better part of his life dedicated to political and charitable causes. It was not until Mr. Buck's mid-forties, when severe physical and cognitive health problems led to an eventual dependence on prescription amphetamines, which ultimately led to a dependence on methamphetamine, that caused a severe downturn in his life and eventual involvement in the instant case. Thus, the Court should impose a below-guidelines sentence to give Mr. Buck the opportunity to rehabilitate and obtain treatment for the underlying issues which led to his involvement in the instant case, and to eventually reintegrate into society rather than receiving a sentence that effectively amounts to him dying in prison.

Moreover, as detailed in Mr. Buck's Objections, Probation's suggested fine amount of $1,000,000 is excessive and unreasonable. (See Objections, dkt. 232, pp. 9–10.) Thus, the Court should instead impose a reasonable fine within Mr. Buck's ability to pay, taking into account his accurate net worth, as well as his outstanding debts and responsibilities. (Ibid.)

## II.

## STATEMENT OF FACTS

### A.    FACTS RELATING TO MR. BUCK

Mr. Buck was born on August 25, 1954, in Steubenville, Ohio to Edward and Margaret Buckmelter. (PSR ¶ 98; See Letter of Margaret Buckmelter, attached as Exhibit A.) Mr. Buck has three siblings—Larry Buckmelter, Cathleen Goodfellow, and Georgonia ("George") Beard. (Id. at ¶ 99; see Letter of George Beard, attached

5

as <u>Exhibit B</u>.) During Mr. Buck's early childhood, the family relocated from Ohio to Phoenix, Arizona, after the steel mills in Steuebenville began shutting down, and the town entered into an economic downturn. (<u>Id.</u> at ¶ 100.) In Phoenix, Mr. Buck's father found work as a sewage treatment plant operator while Mr. Buck's mother first worked as a production line worker and later, as an office administrator for Motorola. (<u>Ibid.</u>) After relocating to Phoenix, Mr. Buck attended Catholic school. Mr. Buck was raised as an avid Catholic, and the entire family attended Sunday Mass every week. (See <u>Exhibit B</u>.) Additionally, from Fourth to Eighth Grade, Mr. Buck served as an alter boy at his local Church. (<u>Ibid.</u>)

Throughout his childhood, Mr. Buck suffered horrific and repeated abuse at the hands of multiple trusted adults. Starting when Mr. Buck was just eleven years old, Mr. Buck's father began to sexually abuse him. (PSR ¶ 102.) Always occurring while Mr. Buck's mother was out of the house, the abuse was frequent and took place every couple of days. (<u>Ibid.</u>) The sexual abuse by Mr. Buck's father also spanned a lengthy period of time—continuing until Mr. Buck was thirteen years old. (<u>Ibid.</u>) Further compounding sexually abusing Mr. Buck, his father also made him believe that the abuse was Mr. Buck's fault and even ordered him to seek forgiveness from his priest in repentance for the abuse. (<u>Ibid.</u>) Due to this, it was not until Mr. Buck was in his late twenties and disclosed the abuse to a friend that he began to view what his father had done to him as sexual abuse. (<u>Ibid.</u>)

In addition to sexually abusing Mr. Buck, his father was also abusive in other ways. (PSR ¶ 101.) He was an alcoholic and would frequently engage in volatile fights with Mr. Buck's mother. (<u>Ibid.</u>) The two had a tumultuous marriage and would fight on a daily basis. (<u>Ibid.</u>) Mr. Buck's father was also physically abusive—whipping or threatening to whip one of Mr. Buck's siblings with a belt. (<u>Ibid.</u>)

As an adolescent and teenager, Mr. Buck also suffered sexual abuse at the hands of several clergy members. (<u>Id.</u> at ¶ 103.) Between the ages of twelve and

6

fifteen, Mr. Buck was sexually abused by four to six separate priests and one Monsignor. (Ibid.) Mr. Buck reported this abuse to his mother, who immediately informed the church rectory. (Ibid.) However, the Church simply relocated one of the priests involved. (Ibid.)

Around the time that Mr. Buck reported the sexual abuse he was suffering at Church to his mother, he also came out to his parents about his sexuality. (Ibid.) While his mother was supportive, Mr. Buck's father expressed a lack of interest and was dismissive. (Ibid.)

While in high school, Mr. Buck began working to earn an income by running three paper routes a day. (PSR ¶ 104.) This allowed him to save up money and to gain some independence from his parents. (Ibid.) After graduating from high school, Mr. Buck attended Phoenix College where he received an Associate Degree. (Ibid.) He attended the college on a fully scholarship and graduated with highest distinctions. (Ibid.) After college, Mr. Buck was offered a scholarship to go study in the former Yugoslavia for three months. (Ibid.) Soon after returning to Phoenix from Yugoslavia, Mr. Buck decided to return to Europe. (Ibid.) While there, Mr. Buck was discovered as a model and supported himself by modeling and acting. (Ibid.) Mr. Buck stayed in Europe for five years, traveling extensively and building a successful modeling career. (Ibid.)

When Mr. Buck finally returned to the United States, he started working at a friend's business—a company providing information services for auto insurers. (PSR ¶ 123.) Eventually, Mr. Buck purchased this business and made it highly successful. (Ibid.) He later sold the business at a large profit. (Ibid.) He owned and sold several other businesses. (Ibid.) His success and the money he earned from these ventures allowed Mr. Buck to retire from business at the age of 32. (Ibid.)

Following his retirement, Mr. Buck became heavily involved in politics and activism. (PSR ¶ 122.) Mr. Buck became a nationally known figure in the late 1980s when he led the successful effort to impeach Arizona Governor Evan

Mecham in opposition to what he viewed as Mecham's regressive and racist policies. (Ibid.)

In 1991, Mr. Buck relocated to West Hollywood, in Los Angeles. (Id. at ¶ 104.) During his time in California, Mr. Buck maintained the same three-bedroom, two-bathroom, rent-controlled apartment in West Hollywood for nearly 30 years. (Id. at ¶ 122.) Mr. Buck continued his involvement in politics and activism while in California. In 2007, Mr. Buck unsuccessfully ran for West Hollywood City Council. Mr. Buck also supported various charitable causes and was a major donor to LGBTQ and animal welfare organizations. (Ibid.) Indeed, Mr. Buck was instrumental to the city of West Hollywood banning the sale of fur apparel in 2011. (See Exhibit B.)

In addition to his involvement in politics, activism, and philanthropy, the attached character letters also attest to his love and generosity towards friends, family members, and animals. As John and Donna Westemeyer write, Mr. Buck funded a trip for them to come to visit Mr. Buck in California and has maintained a decades long friendship with Donna—his fourth-grade teacher. (See Letters of John and Donna Westemeyer, attached as Exhibit C.) Mr. Westemeyer also described Mr. Buck's love of animals, writing: "Ed had an amazing talent that I witnessed of training rescue dogs." (Ibid.) Mr. Buck often "took in dogs that had been abused. His tone was calm; never any hitting. He took pride in this work and found new owners who would adopt the dog." (Ibid.)

At the same time that Mr. Buck maintained a successful public persona in politics and activism, he also dealt with a lifetime of mental, emotional, physical,[2] and substance abuse issues. Since the late 1970s, Mr. Buck has experienced painful

---

[2] As set forth in the PSR, Mr. Buck suffers from hearing loss, requiring the use of hearing aids in both ears. He has glaucoma and requires glasses. Mr. Buck has also been diagnosed with heart arrhythmia while in custody. (PSR ¶ 108.)

headaches, periods of sudden sleep, and difficulty concentrating. (PSR ¶ 110.) Mr. Buck was later diagnosed with narcolepsy and cognitive disfunction. (Ibid.) Mr. Buck also dealt with depression and sought therapy for his mental health and cognitive issues consistently for fifteen years. (Id. at ¶ 111.)

While Mr. Buck experimented with various drugs over the course of his early life, this did not become a dependency or addiction until Mr. Buck was in his 40s. At age 46, Mr. Buck began consuming Dexedrine—an amphetamine prescribed to Mr. Buck to treat his narcolepsy. (Id. at ¶ 118.) This eventually grew into a dependency on amphetamines and eventually led to Mr. Buck beginning to smoke and occasionally inject methamphetamine daily. (Id. at ¶ 119.) Prior to his arrest, Mr. Buck was consuming approximately 0.5 grams of methamphetamine a day.[3] (Ibid.) Yet, Mr. Buck did not participate in drug treatment or consider himself addicted to drugs. (Id. at ¶ 120.) Rather, Mr. Buck believed that he could stop using drugs whenever he pleased, and this gave him a false sense of control over his addiction. (Ibid.)

## B.   FACTS OF THE INSTANT OFFENSE

For purposes of sentencing, Mr. Buck relies on the facts from trial, while maintaining his objections to the PSR, as set forth in the "Objections to the Presentence Investigation Report" filed on February 28, 2022. (See dkt. 232.)

### III.
### MEMORANDUM OF POINTS AND AUTHORITIES

Title 18 U.S.C. § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing.

---

[3] For reference, a "typical dose of methamphetamine is a 'point' (0.1 grams) . . . which is taken once or twice over the course of an evening or a day." (*Methamphetamine: Forms and Use Patterns* (Accessed March 21, 2022), https://ndarc.med.unsw.edu.au/sites/default/files/ndarc/resources/ICE%20FORMS%20AND%20USE.pdf.)

Under the § 3553, factors considered to make this determination include: 1) the nature and the circumstances of the offense and the history and characteristics of the defendant; 2) the purposes of sentencing; 3) the kind of sentences available, 4) the United States Sentencing Guideline calculation; 5) pertinent policy statements; 6) the need to avoid unwarranted sentence disparities; and 7) the need to provide restitution. 18 U.S.C. § 3553(a). In considering § 3553(a) factors, a court may consider formerly discouraged factors or facts that would not have met pre-Booker standards for departures. See United States v. McBride, 434 F.3d 470, 476 (6th Cir. 2006) ("Now, because the Guidelines are no longer mandatory and the district court need only consider them along with its analysis of the section 3553(a) factors . . . many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court–with greater latitude–under section 3553(a)."); see also United States v. Booker, 543 U.S. 220, 301 (2005) (Stevens, J., dissenting) ("[T]here can be no 'departure' from a mere suggestion.").

As set forth below, Mr. Buck's history and characteristics are mitigating and should be considered to impose a below-guideline sentence.

A.   **SECTION 3553(A) FACTORS CONCERNING THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

One of the primary 18 U.S.C. § 3553(a) factors to consider is the nature and circumstances of the offense and the history and characteristics of the defendant. As one court noted, "Surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006).

As set forth below, Mr. Buck's history and characteristics are mitigating. In particular, this Court should consider Mr. Buck's well-established history of philanthropy, activism, and dedicated service to important causes such as animal rights and AIDs activism. The Court should also give weight to the horrific early

10

childhood abuse Mr. Buck suffered at the hands of his father and multiple trusted religious figures. This persistent abuse has a direct correlation to the conduct alleged in this case. The far-reaching effects of this prolonged sexual abuse—spanning throughout Mr. Buck's most formative years, his early adolescence and into his teen years—cannot be overstated. Indeed, the damage from this prolonged sexual abuse was only compounded by Mr. Buck internalizing his father's message that he, himself, was to blame for the appalling sexual abuse he experienced throughout his childhood. As a result, Mr. Buck began engaging in increasingly risky and self-destructive behavior as he grew older and his physical, mental, and emotional condition worsened. Indeed, by the time he was in his mid-forties, Mr. Buck had developed a severe addiction to methamphetamine, initially brought on by dependence on prescription medication necessary to treat serious medical and cognitive issues. Thus, there are a multitude of mitigating factors which, under Supreme Court precedent, are directly relevant to this Court's task of imposing appropriate punishment which is no greater than the minimum necessary to meet the goals of sentencing. These factors militate towards imposition of a below-guidelines sentence.

### 1.   MR. BUCK'S HISTORY AND CHARACTERISTICS ARE MITIGATING

The United States Supreme Court has instructed that "'evidence about [a] defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" Penry v. Lynaugh, 492 U.S. 302, 319 (1989), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002), quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Conner, J., concurring). The Court has also noted that a defendant's "Immaturity at the time of the offense conduct," whether attributable to age or a mental disability "is not an

11

inconsequential consideration." <u>Gall</u>, 552 U.S. at 58 (quoting <u>Roper v. Simmons</u>, 543 U.S. 551, 569 (2005)). Certainly, therefore, courts have taken into consideration and treated as a significantly mitigating factor a defendant's history of substance abuse and mental health issues, especially in cases involving controlled substances.

Here, Mr. Buck's history and characteristics are highly mitigating. In addition to being born into a volatile and dysfunctional household, there were undiagnosed mental health and substance abuse issues prevalent on his father's side of the family. Mr. Buck's father was also an alcoholic who depended on alcohol daily and was verbally and physically abusive towards his family. Shockingly, when Mr. Buck was just eleven years old, his father began sexually abusing him. This abuse was not occasional or intermittent. It occurred nearly every other day for the better part of two years. To further compound the damage from this abuse, Mr. Buck was explicitly told by his father that the abuse was his own fault and that he should repent for it in church. Yet, rather than finding any kind of solace, guidance, or relief in church, Mr. Buck only suffered further abuse by trusted clergy members who further sexually abused him between the ages of twelve and fifteen.

Despite these unimaginably difficult circumstances, Mr. Buck was able to graduate from high school, attend college, and begin a successful modeling and acting career. From there, he was able to gain financial success through various business ventures. However, while Mr. Buck had earned enough money by the age of 32 to "retire" from business, this did not stop him from wanting to contribute positively to his community. Indeed, he spent much of the rest of his life contributing to important political and charitable causes. His work in the field of animal rights activism, LGBTQ causes, and AIDs advocacy is well noted. At the same time, he was also highly generous and conscientious in his interpersonal

12

relationships—financially providing for his family members and friends. (See attached Character Letters, Exhibits A–C.)

Yet, in his mid-forties, Mr. Buck was prescribed amphetamines to deal with severe chronic physical and cognitive issues. This began decades of dependence on first prescription amphetamines and then, oral and intravenous methamphetamine. This severe narcotic addiction, for which Mr. Buck never sought professional help, was a major factor in his eventual involvement in the instant offense.

Thus, Mr. Buck's history and characteristics are highly mitigating because they help to explain and contextualize his later self-destructive and risky behaviors. Indeed, Mr. Buck's history and characteristics show an individual subjected to unusually horrific amounts of early childhood trauma, and persistent abuse, compounded by physical, mental health, and substance abuse issues. This history is notable, therefore, because it shows that despite facing inconceivable amounts of abuse and pain from a very early age and from some of the most trusted adults around him, Mr. Buck made a conscious effort to escape from that abusive environment and to contribute positively to society. Indeed, for years, he worked to contribute to important causes through his philanthropic work and activism. However, Mr. Buck's undiagnosed and untreated mental health and substance abuse issues eventually caused him to spiral into highly risky and self-destructive patterns of behavior.

Notably, since his arrest, Mr. Buck has been highly forthcoming about his mental, physical, and substance abuse issues and has expressed an unqualified desire to obtain help and rehabilitation for these issues. Thus, there is no reason to believe that these issues cannot be redressed and solved with appropriate rehabilitative care and treatment. Thus, the Court should consider imposing an appropriate custodial sentence that allows Mr. Buck to obtain the mental health and substance abuse counseling he needs and allows him to eventually reintegrate into society. In this case, the sentence recommended by Probation would be unduly

punitive as it would amount to the functional equivalent of a life sentence for a man of Mr. Buck's age. Thus, the Court should impose a custodial sentence below the guideline recommendation.

## B.   SECTION 3553(A) FACTORS CONCERNING THE NEED FOR THE SENTENCE IMPOSED

The next factors under § 3553(a) concern the need for a particular sentence. The mandatory principle of § 3553 is a limiting one, the sentence must be "*sufficient, but not greater than necessary,*"[4] to satisfy the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2) (emphasis added).

Courts across the country have recognized that they must honor this parsimonious provision. See, e.g., Carty, 520 F.3d at 991; United States v. Spigner, 416 F.3d 708, 711 (8th Cir. 2005).

### 1.   THE SERIOUSNESS OF THE OFFENSE

The instant case undoubtedly involves incredibly serious charges and the sentence imposed should unquestionably be proportionate to the seriousness of this crime. However, as noted by Probation in the PSR and Disclosed Recommendation Letter, a life-sentence is not necessary or proportionate to the conduct at issue. Yet, Probation recommends a sentence of 25 years which, at Mr. Buck's age of 68 years is the functional equivalent of a life sentence. This sentence is excessively punitive

---

[4] The Adelson court noted "necessary" is the "operative word." Adelson, 441 F. Supp. 2d at 515.

and unnecessary to meet the goals of sentencing. Instead, the Court should impose a below-guidelines sentence that would allow for Mr. Buck's rehabilitation and treatment, as well as his eventual re-integration into society; and would be much preferable to relegating him to death in prison.

### 2. THE NEED TO PROVIDE JUST PUNISHMENT AND PROMOTE RESPECT FOR THE LAW

18 U.S.C. § 3553(a) mandates that the court consider the need for the sentence imposed to provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). In determining whether a punishment is "just," a number of factors need to be considered. A "just" punishment is punishment that "fits the crime." Simon v. United States, 361 F. Supp. 2d 35, 43 (E.D.N.Y. 2005). The punishment should not be unreasonably harsh under all of the circumstances of the case. See United States v. Wilson, 350 F. Supp. 2d 910 (D. Utah 2005) (citing S. Rep. No. 98-225, at 75-76 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3258–59.)

As discussed above, Mr. Buck has been entirely forthcoming about the many underlying mental, physical, and substance abuse issues which led to his involvement in the instant offense. Thus, Mr. Buck has demonstrated his commitment to rehabilitation by taking concrete steps to address the underlying issues that led to his participation in the instant offense. Accordingly, there is no need for a custodial sentence as high as the one recommended by Probation, which would amount to the functional equivalent of a life sentence. Instead, the Court should impose a lower custodial sentence with a focus on rehabilitation and treatment for these underlying issues.

### 3. THE NEED TO PROTECT THE PUBLIC

Another factor to consider in determining the need for the sentence imposed is whether or to what extent society needs to be protected from the defendant. Further, in determining whether the length of the sentence is adequate to protect the public from further crimes of the defendant, it is also relevant to

15

determine a defendant's likelihood of recidivism.

Here, Mr. Buck is already an elderly man in ill health. Thus, even a lower-end custodial sentence, with a focus on rehabilitation, will ensure that any concern about public safety is adequately alleviated. However, to the extent that any concerns remain, the Court may also impose a lengthier term of supervised release with appropriate conditions to further mitigate any concerns.

## C. THE TYPES OF SENTENCES AVAILABLE

Another factor to consider under 18 U.S.C. § 3553 is the kinds of sentences that are available. 18 U.S.C. § 3582(a) provides that, "the court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in § 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). 18 U.S.C; see also Tapia v. United States, 564 U.S. 319, 332 (2011) (holding that Section 3582 "precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation"). § 3553(a) also requires consideration of the "kinds of sentences available." 18 U.S.C. § 3553(a)(3). Thus, under § 3582, this Court should consider what term of imprisonment is appropriate in the instant case to meet the goals of sentencing. Here, the court should impose a below-guidelines term of imprisonment that promotes Mr. Buck's rehabilitation with the goal of eventually reintegrating him back into society, rather than what amounts to a life sentence.

## IV.
## CONCLUSION

For the foregoing reasons, Mr. Buck respectfully requests that the Court

/ / /

/ / /

consider whether a lower sentence meets the purposes of § 3553(a) based on the unique circumstances of this case.

Dated: March 21, 2022                    Respectfully submitted,

                                         WERKSMAN JACKSON & QUINN LLP


                                         //s//_____
                                         Mark J. Werksman
                                         Elizabeth Little
                                         Attorneys for Defendant
                                         Edward Buck

17