**Michael P. Denea (AZ 014768)**
*Pro Hac Vice*
Attorney for Movant
Michael P. Denea, PLC
P.O. Box 1095
Avondale, Arizona 85323
Telephone: 602-794-4480
Facsimile: 602-794-4481
Email: mpd@mpdlawfirm.net

**Irwin Mark Bledstein (CA Bar No. 47482)**
Designated Resident California Counsel
Bledstein and Koppekin, LLP
15915 Ventura Boulevard, Suite 203
Encino, California 91436
Telephone: 818-995-0801
Facsimile: 818-981-6098
Email: imblaw@imblaw.la

Michael P. Denea, PLC
PO Box 1095
Avondale, Arizona 85323
602 794-4480

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>Respondent,<br><br>v.<br><br>Edward Buck,<br><br>Defendant/Movant. | CV No. 2:26-cv-496<br><br>CR No. 2:19-cr-00595-CAS-1<br><br>**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY (Attorney Verified)** |

Defendant/Movant, Edward Buck, through undersigned counsel, and pursuant to 28 U.S.C. § 2255, hereby submits this motion to vacate, set aside or correct sentence by a person in federal custody. This motion is filed pursuant to 28 U.S.C. § 2255, the Rules Governing Section 2255 Proceedings, and applicable Local Rules of the Central District of California, including Local Rule 83-16 and

1

Local Rule 83-16.2.

**MOTION**

Mr. Buck seeks relief from federal criminal convictions as follows:

1.  **Name and location of the court that entered judgment of conviction being challenged**:

United States District Court, Central District of California (Western Division - Los Angeles).

2.  **Date of judgment of conviction**:

April 14, 2022.

3.  **Length of sentence**:

Three hundred sixty (360) months. This term consists of 360 months on each of Counts 1 and 2, to be served concurrently to one another, and 240 months on each of Counts 3 through 9, to be served concurrently to one another, and concurrently to Counts 1 and 2.

**Sentencing Judge**:

Judge Christina A. Snyder.

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

2

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

4.    **Nature of offense(s) involved (all counts) for which convictions were**

**sustained**:

Count 1:    Distribution of Controlled Substances Resulting in Death (Gemmel Moore), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

Count 2:    Distribution of Controlled Substances Resulting in Death (Timothy Dean), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

Count 3:    Distribution of Controlled Substances (C.S.), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

Count 4:    Distribution of Controlled Substances (J.G.), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

Count 5:    Distribution of Controlled Substances (C.H.), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

Count 6:    Distribution of Controlled Substances (D.B.), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

Count 7:    Maintaining Drug-Involved Premises, in violation of 21 U.S.C. § 856(a)(1).

Count 8:    Enticement to Travel in Interstate Commerce for Prostitution (Gemmel Moore), in violation of 18 U.S.C. § 2422(a).

Count 9:    Enticement to Travel in Interstate Commerce for Prostitution (J.G.), in violation of 18 U.S.C. § 2422(a).

5.    **Plea entered to charges**?

Not Guilty.

6.    **Kind of Trial**?

Jury Trial.

7.    **Did Petitioner testify at trial**?

No.

8.    **Did Petitioner appeal from the judgment of conviction**?

Yes.  (Doc. 260, Notice of Appeal.)

9.    **If Petitioner did appeal, answer the following**:

(a)    **Name of court**:

United States Court of Appeals for the Ninth Circuit.

(b)    **Result**:

Convictions and sentences affirmed.

(c)    **Date of Decision**

October 21, 2024 (Doc. 321, Memorandum of USCA).

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

10.  **Other than a direct appeal from the judgment of conviction and sentence, has Movant previously filed any petitions, application or motions with respect to the judgment in any federal court**?

No.

11.  **If Movant answer to question number 10 was "yes" give the following information**:

Not applicable.

12.  **State concisely every ground on which Movant claims they are being held unlawfully**:

A.   **Ground One**: The prosecution must prove all of the elements included in the definition of the charged offense to meet its burden under the Due Process Clause. They failed to do so here, as the Distribution of Controlled Substances Resulting in Death instruction they provided was structurally defective and violated Mr. Buck's Fifth and Sixth Amendment rights to have the penalty enhancement proved beyond a reasonable doubt. The prosecution's addition of a non-statutory element, "incremental effect," nullified the "drug use resulted in death" causation element.

*Legal Background and Factual Basis*

In *Burrage v. United States*, 571 U.S. 204 (2014), the Supreme Court explained that the "death results" element increased the minimum and maximum sentences and is an element that must be submitted to the jury and found beyond a reasonable doubt. 571 U.S. at 210. Distribution of Controlled Substances Resulting in Death has two principal elements: (i) knowing or intentional distribution of a controlled substance, § 841(a)(1) and (ii) death caused by

5

("resulting from") the use of that drug, § 841(b)(1)(C). *Id*. The Supreme Court concluded that the phrase "results from" imposes a requirement of but-for causation. *Id*. at 214. The Supreme Court expressly rejected the prosecution's proposed interpretation of a "results from" causation element that would allow for a "contributing factor" determination. *Id*. at 214-16. The Supreme Court reasoned that Congress had enacted a "results from" element and had not seen fit to also enact a "contributing to" element although it could have:

> We decline to adopt the Government's permissive interpretation of § 841(b)(1). The language Congress enacted requires death to "result from" use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed. Congress could have written § 841(b)(1)(C) to impose a mandatory minimum when the underlying crime "contributes to" death or serious bodily injury, or adopted a modified causation test tailored to cases involving concurrent causes, as five States have done.

571 U.S. at 216. The Supreme Court also rejected the prosecution's argument that the ordinary meaning of "results from" would "unduly limi[t] criminal responsibility":

> We hold that, at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury.

6

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

571 U.S. at 219. The Supreme Court would later disapprove of expansive interpretation of statutory elements in *McDonnell v. United States*, 579 U.S. 550, (2016), where it concluded that the prosecution's expansive interpretation of 'official act' raises constitutional concerns.

During the trial management conference convened on June 28, 2021, the prosecution noted that the Ninth Circuit's model jury instructions did not contain a model instruction for distribution of methamphetamine:

> There is no Ninth Circuit Model instruction for distribution of methamphetamine with death resulting, that latter part. So I think that that will probably be the only instruction that's -- that the government is proposing that will not be through the Ninth Circuit Model.

(Doc. 194 at 7, R.T. 06/28/2021, at 7.)[1]

---

[1] In 2021, the Model Criminal Jury Instructions for the Ninth Circuit provided guidance with regards to the resulting in death enhancement in its comments but had not crafted a suggested jury instruction for resulting in death allegations. That has since been addressed. At the time of Mr. Buck's prosecution, the suggested instruction provided as follows:

> Several of the penalty sections for a violation of 21 U.S.C. §§ 841(a)(1), 846, 859, 860 and/or 861(a)(1) increase the sentence "if death or serious bodily injury results from the use of such [controlled] substance[s]." 21 U.S.C. §§ 841(b)(1)(A)-(C). Although the government must prove that death or serious bodily injury resulted from the use of the controlled substance for this enhancement to apply, the government need not prove that the death was a foreseeable result of the distribution of the controlled substance. *Houston*, 406 F.3d at 1125 ("Cause-in-fact is required by the 'results'

Days later, the prosecution tendered a causation instruction that incorporated the "contributing factor" causation element the Supreme Court had expressly rejected 8 years earlier:

> Whether the distributed methamphetamine "resulted in" death means that Gemmel Moore's use of that methamphetamine was the cause in fact of his death. That is, the government must prove beyond a reasonable doubt that but for Gemmel Moore's use of the distributed methamphetamine, he would not have died. Accordingly, if Gemmel Moore's use of methamphetamine combined with other factors (including underlying disease) to produce death, *and death would not have occurred without the incremental effect of the methamphetamine*, his use of methamphetamine "resulted in" his death.

(Doc. 145, at 53, Proposed Jury Instructions (emphasis added); see also Doc. 145 at 55, Proposed Jury Instruction for Timothy Dean.)    During    the    jury instructions conference, discussions were had about the instruction but none pertained to inclusion of a phrase that modified the but-for causation element. (Doc. 217 at 127-36, R.T. 07/23/2021, at 127-36, Trial Transcript Day 8.)

The final jury instructions contained a clause that instructed the jury on a lesser standard than the required "but-for" proof of causation:

> language, but proximate cause, at least insofar as it requires that the death have been foreseeable, is not a required element.").

*See*, *Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit*, Prepared by the Ninth Circuit Jury Instructions Committee (2010 Edition) (Updated June 2021).

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

8

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

> Whether the distributed methamphetamine "resulted in" death means that Gemmel Moore's use of that methamphetamine was the cause in fact of his death. That is, the government must prove beyond a reasonable doubt that but for Gemmel Moore's use of the distributed methamphetamine, he would not have died. Accordingly, if Gemmel Moore's use of methamphetamine combined with other factors (including underlying disease) to produce death, *and death would not have occurred without the incremental effect of the methamphetamine*, his use of methamphetamine "resulted in" his death.

(Doc. 168 at 20, Final Instruction No. 20 (emphasis added); see also Doc. 168 at 21, Final Instruction No. 21 (Timothy Dean); Doc. 217 at 151-52, R.T. 7/23/2021.)

The corresponding verdict form did not track the jury instruction and directed the jury to return a guilty verdict if they found distribution of methamphetamine *resulted* in death:

> 2.  We, the Jury, having found defendant EDWARD BUCK guilty of Count One, further unanimously find that Gemmel Moore's use of the methamphetamine distributed by defendant EDWARD BUCK resulted in Gemmel Moore's death:
>
> ____YES
> ____NO

(Doc. 171 at 3, Special Verdict Form for Gemmel Moore.)

> 2.  We, the Jury, having found defendant EDWARD BUCK guilty of Count Two, further unanimously find that Timothy Dean's use of the methamphetamine distributed by defendant

EDWARD BUCK resulted in Timothy Dean's death:

_____YES
_____NO

(Doc. 171 at 4, Special Verdict Form for Timothy Dean.)

The jury instruction constituted structural error, not subject to review for harmlessness, because it conveyed the prosecution was not required to prove every element of the charge. *Burrage* required the prosecution to prove actual (or but-for) causation and legal (or proximate) causation, however.

The closing arguments of the prosecution further compounded the error. During the prosecutor's closing arguments, she represented the prosecution could meet its burden of proof by establishing incremental effect of methamphetamine use:

> The Court has just instructed you what it means when someone's death results in a -- or when distribution results in someone's death. First, it results in death when the distribution of methamphetamine is the cause in fact of that person's death. That is, but for that individual's use of methamphetamine, they would not have died. And this can be true even if the individual suffers from some underlying disease as long as the incremental effect of the methamphetamine on that disease caused the individual's death. So let's start by discussing the evidence for Count 1, the distribution to Gemmel Moore, resulting in his death.
>
> …
>
> So because defendant's distribution of methamphetamine to Gemmel Moore resulted in Gemmel's death on July 27th, 2017, you can find defendant guilty.

10

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

(Doc. 217 at 164, 170, R.T. 07/23/2021, Trial Transcript Day 8.) In regards to Timothy Dean, the prosecution expressly stated they did not have the burden of proving that methamphetamine was the only cause of death:

> Now, the Government does not need to show that meth was the only cause of death. It just has to have the incremental effect of causing his death. It has to be the straw that broke the camel's back. And you know it's the straw that broke the camel's back, because you know that methamphetamine is terrible for a bad heart. It increases the heart rate. It makes the -- the ventricles swell. It makes it -- it enlarges the heart, all of the things that they saw in Dean are consistent with methamphetamine use. So the red herrings that Defense counsel threw out like having an enlarged heart and pointing to coronary heart disease are not reasonable doubt.

(Doc. 217 at 247-48, R.T. 07/23/2021.)

The structural error analysis is further informed by the differences between the verdict form and the corresponding jury instruction. The differences raise an alternative elements issue as the guilty verdict could have been premised on a theory of "death would not have occurred without the incremental effect of the methamphetamine" or "use of the methamphetamine distributed by the defendant resulted in death." This created a genuine possibility of jury confusion or conclusion that Mr. Buck could be held criminally liable for the underlying substantive offense under alternative means—depriving him of juror unanimity. Without a unanimous but-for causation determination, the enhanced sentence

imposed is unconstitutional, as only a jury may find facts that increase a maximum penalty.

In a supplement to the Rule 29 motion for acquittal, sentencing counsel contended the prosecution failed to present evidence proving each and every element of the charges. (Doc. 221 at 2-8, Defense Supplemental Memorandum…for Judgment of Acquittal.) The trial court ruled the prosecution had introduced substantial evidence adequate to allow the jury to rationally conclude that distribution of methamphetamine resulted in the death of the decedents. (Doc. 249 at 6-8, Criminal Minute Entry.)

**B.    Ground Two**: Trial counsel was ignorant on a point of law fundamental to contesting the penalty enhancement of Distribution of Controlled Substances Resulting in Death. Their failure to perform basic research on that point constituted ineffective assistance of counsel that deprived Mr. Buck of Fifth and Sixth Amendment trial rights to have the penalty enhancement proven beyond a reasonable doubt.

The factual basis is set forth under Ground 1 above. Eight years before Mr. Buck was charged with Distribution of Controlled Substances Resulting in Death, the Supreme Court had strongly rejected an interpretation of the "results from" causation element that would allow for a "contributing factor" determination. The prosecution referred to *Burrage* in its proposed instructions and noted it was controlling. (Doc. 144 at 53-54.) Yet trial counsel failed to lodge objections to a proposed jury instruction containing a non-statutory clause that modified the but-

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

12

for causation element. During the jury instructions conference, trial counsel touched on the inadequacy of the jury instruction but their legal analysis was not fully formulated revealing trial counsel had not reviewed the statute, model jury instructions or controlling legal authority. Trial counsel failed to grasp that the clause "*and death would not have occurred without the incremental effect of the methamphetamine*," nullified the but-for causation element and allowed the jury to convict using a "contributing to" analysis:

> I'm just going to say that "resulted in" I realize -- well, first off, "resulted" -- the instruction has been created by the Government. This is not a Ninth Circuit instruction. This is their customized instruction that is based on case law. So "resulted in" there's -- is not a standardized instruction for causation. The -- the problem with "resulted in" is that the jury -- the jurors could conceivably interpret that to mean, well, you know -- you know, one of the outcomes of -- you know, it was an outcome of the whole thing -- of the whole event, you know, whatever drugs that he took or whatever was in their system, and as long as that was the outcome, then whatever amount of meth or whatever role it played was enough because the result was death. It doesn't -- it doesn't really speak to the fact that number one it has to have caused it. It has to be the but-for cause, meaning, you know, because of the methamphetamine, he's dead; not because of anything else.

(Doc. 217 at 128-29, R.T. 07/23/2021.) Nor did trial counsel compare the jury instructions with the verdict forms and object to their differences. Trial counsel referred to the *Burrage* causation standard for the first time in the Rule 29 motion for acquittal filed on August 3, 2021—long after the prosecution had tendered its

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA  85323
602 794-4480

proposed jury instructions on July 7, 2021, and the jury rendered its verdict on July 27, 2021. (Doc. 178 at 2; Doc. 145; Doc. 171.)

**C.    Ground Three**: The First Superseding Indictment infringed on Mr. Buck's Sixth Amendment right to present a complete defense.

***Factual Basis***

Mr. Buck was initially charged with two counts of distribution of controlled substances resulting in death and three counts of distribution of controlled substances to sexual partners. (Doc. 13, Indictment.) On August 4, 2020, a First Superseding Indictment charged Mr. Buck with distributing controlled substances to *another* sexual partner, maintaining drug-involved premises, and two counts of enticement to travel in interstate commerce for prostitution. (Doc. 32, First Superseding Indictment.) The prosecution against Mr. Buck proceeded to a jury trial 11 months later on July 13, 2021. (Doc. 153, Minute Entry.)

The drug den and enticement counts infringed on Mr. Buck's right to a fair trial. The new charges allowed the prosecution to introduce other act evidence as direct evidence of a criminal offense thereby circumventing Rule 404's prohibition on the introduction of character evidence of the accused.

The disparity in the amount of evidence underlying the joined offenses also infringed on the right to a fair determination of guilt or innocence. The new charges obfuscated Mr. Buck's defense to the initial charges and he could not meaningfully contest that death did not result from chemically-induced

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

14

suppression of the respiratory system leading to asphyxiation. The distribution resulting in death charges required proof of "but-for" causation and proximate cause. In a separate trial on the Maintaining a Drug-Related Premises charge, Mr. Buck would have had a meaningful opportunity to present an incidental use defense to the charge. Conviction on that charge required proof that the *primary or principal purpose* for maintaining his home was to manufacture, distribute or use controlled substances. In a separate trial on the Enticement to Travel in Interstate Commerce for Prostitution charge, Mr. Buck would likewise have had a meaningful opportunity to defend the charges by contesting that his sexual partners had not engaged in criminal sexual conduct. The First Superseding Indictment allowed the prosecution to introduce character evidence under the guise of completing the story and to introduce other act evidence the jury was then instructed could be used for myriad purposes, all in violation of the Sixth Amendment right to a fair trial.

    **D.**     **Ground Four**: Misjoinder of offenses resulted in prejudice that denied Mr. Buck his Fifth Amendment right to procedural due process and his Sixth Amendment right to present a complete defense.

***Procedural Rule and Factual Basis***

Joinder of offenses, promulgated under Rule 8(a), of the Federal Rules of Criminal Procedure provides as follows:

15

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Relief from prejudicial joinder, promulgated under Rule 14 of the Federal Rules of Criminal Procedure, provides that the trial court may order separate trials of counts or provide any other relief that justice requires if the joinder of offenses "appears to prejudice a defendant or the government." Rule 12(b)(3)(D) provides that severance of charges or defendants under Rule 14 must be raised by pretrial motions.

Mr. Buck was first indicted on October 2, 2019. (Doc. 13, Indictment.) On May 26, 2020, the Court ordered the parties to file all trial motions by November 20, 2020. (Doc. 29, Court Order.) On August 4, 2020, the prosecution secured a superseding indictment adding an additional four charges and bringing the total number of charges against Mr. Buck to 9 counts. (Doc. 32, First Superseding Indictment.) Mr. Buck was initially charged with Distribution of Controlled Substances Resulting in Death and Distribution of Controlled Substances. (Doc. 13.) The new indictment added a charge of Distribution of Controlled Substances to a different sexual partner, as well as charges of Maintaining Drug-Involved Premises and Enticement to Travel in Interstate Commerce for Prostitution. (Doc. 32.)

On November 20, 2020, trial counsel filed 10 pretrial motions on behalf of Mr. Buck. (Docs. 51-60, Defense Pretrial Motions.) Trial counsel did not file a motion for severance. Joint motions to continue trial were filed on May 26, 2020, January 12, 2021, and March 24, 2021. (Docs. 28, 95, 122, Stipulation to Continue Trial Date.) A 9-day jury trial commenced on July 13, 2021. (Doc. 153, Minute Entry Order.) As recounted by the prosecution, it presented the testimony of 45 witnesses and introduced approximately 170 exhibits into evidence, including "videos, text messages, surveillance footage, photographs, drug paraphernalia, business records, and methamphetamine." (Doc. 181 at 7, Opposition to Defendant's Motion for Acquittal citing to Doc. 170, List of Exhibits and Witnesses; see also Doc. 151, Prosecution Witness List.) In a section titled "Summary of Trial Evidence" the prosecution grouped the evidence in had presented in different categories and outlined that the offenses occurred at different times, involved different victims, different witnesses, and different evidence. (Doc. 181 at 7-19.) Yet the jury was instructed they could consider evidence of distribution of drugs to individuals not identified in the indictment as evidence of: (1) state of mind, (2) knowledge, (3) intent, (4) motive, (5) opportunity, (6) preparation, (7) plan, (8) habit, and (9) absence of accident or mistake. (Doc. 168 at 14, Final Jury Instruction 12.)

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

During the prosecution's rebuttal argument, it capitalized on the joinder of offenses pointing out that Mr. Buck could not present a defense to the first six charges:

> So even if every single person went there willingly and knowingly and only took the drugs that they agreed to take, Mr. Buck is guilty of Counts 1 through 6. Now, unable to challenge the elements of this offense, Mr. Buck wants you to believe that he is on trial for the private and personal choices of grown men.
>
> …
>
> Next, you have the drug premises charge. And the same evidence of distribution also shows you the evidence that he was using his premises to distribute drugs.\
>
> …
>
> Now, the last -- the last indicia of reliability of testimony is the reasonableness of the testimony in light of the other evidence. And here, you heard a lot of evidence that was shocking, but it was also corroborated. It was also supported. You heard the specifics of Buck's pattern laid out numerous times. You saw the drugs, the drug paraphernalia, the party and play paraphernalia after Gemmel Moore's death, after Timothy Dean's death and when Buck was arrested in September of 2019. You saw it in his apartment each time, and you saw it through Buck's own eyes through the videos that he kept of his victims, ordering them to smoke more methamphetamine on camera.

(Doc. 217 at 236-44; R.T. 07/23/2021.) The jury convicted Mr. Buck on all the charges submitted to it.

Mr. Buck's Sixth Amendment trial rights were violated as the right to request severance of offenses was not invoked on his behalf nor could he present a complete defense. Prejudicial joinder relieved the prosecution of the burden to

prove guilt beyond a reasonable doubt as required by the Fifth Amendment. It also deprived Mr. Buck of the right to a fair determination of the guilt or innocence of each offense under the Sixth Amendment. Joinder further prejudiced Mr. Buck as it impaired his ability to present different defenses to the charges.

**E.**   **Ground Five**: Trial counsel provided ineffective assistance by failing to seek a severance of offenses pretrial or raise misjoinder objections during trial. These failures violated Mr. Buck's trial rights under the Fifth and Sixth Amendments.

### *Factual Basis*

The factual basis is set forth under Grounds 3 and 4 above. Mr. Buck was indicted on additional charges, 11 months after he was indicted on charges of Distribution of Controlled Substances Resulting in Death and Distribution of Controlled Substances. (Docs. 13 and 32.) Under the Federal Rules of Criminal Procedure the new charges could be contested as offenses not of the same or similar character, based on the same act or transaction, or connected with or constitute parts of a common scheme or plan—particularly as it pertained to the allegations that Mr. Buck operated a drug den out of his apartment. Requests for severance may also lie if the joinder of offenses "appears to prejudice a defendant or the government," given the prosecution's theory of the case. (See Doc. 50, Motion in Limine to admit 404(b) Evidence; Doc. 181, Opposition to Defendant's Motion for Acquittal.) However, Rule 12(b)(3)(D) provides that claims of prejudicial joinder must be raised by pretrial motions. Not only did trial counsel

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

not file a motion requesting severance by the November 20, 2020, deadline set by this Court (Doc. 29, Court Order), trial counsel did not raise misjoinder objections to the evidence during trial, although misjoinder objections may be raised at any time.

  **F.**  **Ground Six**: The introductory allegations the prosecution incorporated into each count of the Indictments affected Mr. Buck's Fifth Amendment right to procedural due process and his Sixth Amendment right to a present a complete defense.

*Procedural Rule and Factual Basis*

  Rule 7(c)(1) of the Federal Rules of Criminal Procedure provides that a criminal indictment must provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Rule 12(b)(3)(B) provides that a motion alleging a defect in an indictment that can be determined on the face of the indictment must be filed prior to trial.

  The first three pages of the First Superseding Indictment is a narrative recitation of uncharged allegations the prosecution categorized as introductory. (Doc. 32 at 1-3.) The prosecution expressly reincorporated the allegations into each of the nine counts of the First Superseding Indictment. (Id.)

  In conjunction with the other act evidence and extrinsic evidence the prosecution presented to the jury, the speaking indictment affected Mr. Buck's substantial rights to due process and a fair trial. The uncharged allegations go beyond the requirement of a plain, concise statement of essential facts and

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

comprised a "speaking indictment," as it consisted of a running narrative of the prosecution's version of the facts of the case, contained prejudicial allegations not related to the elements of the charges submitted to the jury, assigned propensity motives for Mr. Buck's actions, and sparked inflammatory media coverage. (Exhibit 2, Media Aggregator Files.)

    **G.**    **Ground Seven**: Evidence proffered to "complete the story" and as "other act evidence" further infringed on Mr. Buck's ability to defend the charges, amounted to propensity character evidence, introduced irrelevant and prejudicial evidence into the proceedings that had the potential to confuse the jury, and rendered the trial fundamentally unfair under the Sixth Amendment.

***Procedural Rule and Factual Basis***

Rule 403 of the Federal Rules of Evidence, titled "Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons" provides that the trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Rule 404 provides that character evidence of the accused is not admissible as a matter of course and prohibited if introduced "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

The prosecution filed a motion to admit other act evidence that was opposed by the defense. (Doc. 50, Motion in Limine; Doc. 56, Motion to Preclude.) The

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

trial court ruled the other act evidence was admissible because it demonstrated intent and capacity to distribute drugs to participants in party and play sessions. (Doc. 123 at 14, Criminal Minutes (Redacted).) The trial court also concluded the probative value of the evidence was high as it established facts central to the prosecution's allegations that Mr. Buck distributed methamphetamine and maintained drug-involved premises. (Id.)

In the prosecution's July 2, 2021, trial memo, it signaled that it intended to introduce evidence to complete the story and as other act evidence:

> Separate, but relatedly, each of the victims identified in the FSI had multiple party and play sessions with Buck; however, the FSI charges only one count of distribution per named victim. Evidence of distributions to the same victim is direct evidence of the charged distribution to that victim, not subject to the Rule 404(b) analysis, because those surrounding distributions are *inextricably intertwined* with the charged distribution. That is, those surrounding distributions are necessary to *tell a coherent and complete story* of how the victims met Buck, how they formed a party and play arrangement where Buck offered compensation to ingest drugs, and how Buck gradually (or consistently) applied pressure to "get higher" or let Buck inject them.

(Doc. 143 at 26, Trial Memorandum) (italics added). As set forth in Ground 6 above, the prosecution used its closing argument to summarize the voluminous evidence it had presented and portrayed it as *intrinsic* evidence to the crime charged. (Doc. 217, at 161-98, R.T. 07/23/2021.) The "party and play" evidence figured prominently in the prosecution's summation:

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

> Now, throughout this trial you have seen numerous examples of defendant distributing methamphetamine during his party and play sessions.

(Doc. 217 at 161.)

> Now, you heard testimony from just a small sample of some of defendant's victims in this case, including, Carlos Sinclair, Jermaine Gagnon, Cody Hoffman and Dane Brown…

(Doc. 217 at 161.)

> You saw video after video after video of people using drugs in defendant's apartment. And you heard Sergeant Cardella tell you that the videos that you saw were just a small portion of what was on defendant's computer, approximately 40 videos in a sea of thousands.

(Doc. 217 at 192.)

Evidence of acts or events that are not part of the crime itself, or not essential to the context of the crime, are subject to the evidentiary bar in Rule 404(b)(1), as they were not "inextricably intertwined" with the charged offenses. Moreover, evidence that had the potential to arouse the passion of the jurors constituted unfairly prejudicial evidence without probative value.

As set forth under Ground 3 above, the distribution resulting in death charges required proof of "but-for" causation and proximate cause. In a separate trial on the Maintaining a Drug-Related Premises charge, Mr. Buck would have had a meaningful opportunity to present an incidental use defense to the charge. Conviction on that charge required proof that the *primary or principal purpose*

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

23

for maintaining his home was to manufacture, distribute or use controlled substances. In a separate trial on the Enticement to Travel in Interstate Commerce for Prostitution charge, Mr. Buck would likewise have a had a meaningful opportunity to defend the charges by contesting that his sexual partners had not engaged in criminal sexual conduct.

> **H.** **Ground Eight**: The other act evidence jury instruction further deprived Mr. Buck of constitutional rights in violation of the Fifth and the Sixth Amendments, as the instruction consisted of the infamous laundry list of permitted uses of other act evidence: proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

***Procedural Rule and Factual Basis***

Joinder of offenses, promulgated under Rule 8(a), of the Federal Rules of Criminal Procedure provides that offenses may be joined for trial if they are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

The prosecution introduced "other act evidence" as well as "completing the story" evidence during trial. The jury was instructed that the evidence could be considered for a host of purposes other than those specified in Rule 8(a):

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

COURT'S INSTRUCTION NO. 12

You have heard testimony that the defendant distributed drugs to other individuals not identified in the indictment. This evidence was admitted to establish the charge described in Count Seven of the indictment, that is, that the defendant knowingly leased, rented, used, and maintained his residence for the purpose of distributing controlled substances.

You may also consider this evidence for the limited purpose of its bearing, if any, on whether the defendant:

(1) had the state of mind, knowledge, or intent necessary to commit the other crimes charged in the indictment;

(2) had a motive or the opportunity to commit the other crimes charged in the indictment;

(3) was preparing or planning to commit the other crimes charged in the indictment;

(4) acted with a method of operation as evidenced by a unique pattern; or

(5) did not commit the other crimes for which the defendant is on trial by accident or mistake.

Do not consider this evidence for any other purpose.

Of course, it is for you to determine whether you believe this evidence and, if you do believe it, whether you accept it for the purposes offered. You may give it such weight as you feel it deserves, but only for the limited purposes that I described to you.

The defendant is not on trial for committing these other acts. You may not consider the evidence of these other acts as a substitute for proof that the defendant committed the crimes charged. You may not consider this evidence

> as proof that the defendant has a bad character or any propensity to commit crimes. Specifically, you may not use this evidence to conclude that because the defendant may have committed the other acts, he must also have committed the acts charged in the indictment.
>
> Remember that the defendant is on trial here only for the charges listed in the indictment, not for these other acts. Do not return a guilty verdict unless the government proves the crimes charged in the indictment beyond a reasonable doubt.

(Doc. 168 at 14-15.)[2] The prosecution used its closing argument to summarize the voluminous evidence it had presented, and the "party and play" evidence figured prominently in its summation:

> Now, throughout this trial you have seen numerous examples of defendant distributing methamphetamine during his party and play sessions.

(Doc. 217, at 161, R.T. 07/23/2021.)

> Now, you heard testimony from just a small sample of some of defendant's victims in this case, including, Carlos Sinclair, Jermaine Gagnon, Cody Hoffman and Dane Brown…

(Doc. 217 at 161.)

> You saw video after video after video of people using drugs in defendant's apartment. And you heard Sergeant Cardella tell you that the videos that you saw were just a

---

[2] At the time the trial court ruled that other act evidence would be admitted it had directed the attorneys to confer and propose a limiting instruction. (Doc. 123, at 15, Redacted Criminal Minutes.) Only the prosecution submitted proposed instructions.

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

26

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

small portion of what was on defendant's computer, approximately 40 videos in a sea of thousands.

(Doc. 217 at 192.) The defense lodged an objection to the prosecution categorization of other victims that was not resolved during closing arguments. (Id. at 198-201.) While claiming it was not judging Mr. Buck's lifestyle, the prosecution doubled down on its theory of disposition towards criminality during rebuttal argument:

> Let's start with what this case is not about.... it is not a lifestyle on trial. It is not an attack on a subculture of the gay community, and it is certainly not about the Government making Mr. Buck look like a racist. Those are all things to distract you from the evidence in this case, *what the evidence shows you is an unbroken pattern of a man preying on homeless addicted and vulnerable men to feed his own obsession with injecting them with methamphetamine and making -- watching them smoke it beyond their limits -- a pattern that ended in the death of two people. That's why we're in federal court.*

(Doc. 217 at 235) (emphasis added). The prosecution ended closing arguments by pointing to all the other act evidence it had presented to establish guilt:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the charges are true. It's not proof beyond all doubt. It is not proof beyond a speculative doubt. It is the standard used in courtrooms every single day. When you deliberate, I ask you to consider the evidence that leaves you firmly convinced of Buck's pattern of distribution. *The firsthand accounts from victims who testified that he always provided the drugs, the testimony that was supported by record after record, photos, text messages, things from Buck's own computers and phones. Think about how the victims' testimony was*

27

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

*corroborated by the things that Mr. Buck had in his apartment that you would only know about if you were there, partying and playing with him. The gas masks, the tool chest, all the drugs and even the flashlight with the false bottom. Consider the messages that you saw, where Buck straight offers people drugs, offers them money to come over and use those drugs.* Whether they wanted it or not, is besides the point. The question before you is, did he give them that methamphetamine? And when you consider all of the evidence in this case, the only reasonable conclusion is that the charges are true and that the evidence supports guilty verdicts on all counts. Thank you.

(Doc. 217 at 252-53) (emphasis added). Motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident were not necessary elements of any of the offenses Mr. Buck was charged with having committed.

I. **Ground Nine**: Trial counsel provided ineffective assistance when they failed to request that the other act evidence instruction be limited to the purpose set forth in the rule permitting joinder of offenses.

***Factual Basis***

The factual basis is set forth under Grounds 6, 7, and 8 above. Rule 8(a) of the Federal Rules of Criminal Procedure provides that offenses may be joined for trial if the offenses are of the same or similar character, or are based on the same act or transaction, or relate to or constitute parts of a common scheme or plan. Pursuant to Rule 105 of the Federal Rules of Evidence, the court—on timely request—*must* restrict the evidence to its proper scope and instruct the jury

accordingly. The Manual of Model Criminal Jury Instructions for the Ninth Circuit similarly provides that juries must be instructed that other act evidence is to be received for a limited purpose.

At the time the trial court ruled that other act evidence would be admitted it directed the attorneys to confer and propose a limiting instruction. (Doc. 123, at 15.) No modification was made to the laundry list other-act-evidence instruction the prosecution presented to the Court. The jury was instructed that other act evidence could be used as evidence of (1) state of mind, (2) knowledge, (3) intent, (4) motive, (5) opportunity, (6) preparation, (7) plan, (8) habit, and (9) absence of accident or mistake. (Doc. 168 at 14-15.) Mr. Buck was prejudiced as other act evidence was not restricted to its proper scope.

**J.** **Ground Ten**: Trial counsel failed to represent Mr. Buck competently when they failed to request a theory of defense instruction although the attorneys contested the but-for causation evidence during cross-examination, through its defense witness, closing arguments, and Rule 29 litigation, thereby violating his Sixth Amendment rights to a fair trial.

***Factual Basis***

As set forth in Ground 1 above, the Supreme Court held in 2018 that the offense of Distribution of Controlled Substances Resulting in Death imposes a requirement of *but-for* causation. *Burrage*, 571 U.S. at 214. In addition, defendants are entitled to theory-of-defense instructions provided that it is supported by law and has some foundation in the evidence.

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

29

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

During trial, the defense attorneys contested the but-for causation element during cross-examination of prosecution witnesses,[3] its sole defense witness, Forensic Pathologist Marvin Pietruszka, M.D.,[4] its closing arguments,[5] and Rule 29 litigation.[6] In fact, trial counsel orally supported his request for acquittal by expressly arguing the prosecution had not established causation on the distribution resulting in death counts. (Doc. 217 at 56, R.T. 07/23/2021, Trial Transcript Day 8.)

---

[3] See Trial Transcript Day 2, Doc. 244 at 195, 217-21, cross-examination of Tisha Nixon, mother of Gemmel Moore; Trial Transcript Day 3, Doc. 245 at 46, 53-54, cross-examination of Criminalist Courtney Castellino, Los Angeles County Medical Examiner Coroner Office; Doc. 245 at 118, 127-133, cross-examination of Firefighter/Paramedic Cole Thomas Alnes, Los Angeles County Fire Department; Doc. 245 at 154, 165-67, Coroner Investigator Joseph Danton Cronin, Los Angeles County Medical Examiner Coroner Office; Trial Transcript Day 4, Doc. 246 at 67, 74-76, Criminalist Matthew Andrew Quon, Los Angeles County Sheriff Crime Laboratory; Doc. 246 at 77, 84-87, Senior Criminalist Danielle Van Cleve, Los Angeles County Medical Examiner Coroner Office; Doc. 246 at 88, 96-108, Deputy Medical Examiner Kevin Young, M.D., Los Angeles County Medical Examiner Coroner Office (Gemmel Moore autopsy); Trial Transcript Day 5, Doc. 201 at 136, 144-49, Coroner Investigator Brenda Schafer, Los Angeles County Medical Examiner Coroner Office; Doc. 201 at 150, 165-77, 182-86, Deputy Medical Examiner Matthew Miller, M.D. Los Angeles County Medical Examiner Coroner Office (Timothy Dean autopsy); Trial Transcript Day 6, Doc. 213 at 253, 277-95, 297-98, Medical Toxicologist David Shawn Carstairs, M.D.; Trial Transcript Day 7, Doc. 215, 57, 99-114, National Highway Traffic Association-Trained Drug Recognition Expert Instructor Vaughn Gates, California Highway Patrol (Retired).

[4] See Trial Transcript Day 8, Doc. 217 at 68-92.

[5] See Trial Transcript Day 8, Doc. 217 at 202-34.

[6] See Trial Transcript Day 8, Doc. 217 at 56-60; Doc. 178, Motion for Judgment of Acquittal.

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

Yet no request for a theory of defense instruction was lodged during the jury instructions conference. (Doc. 217 at 127-36.) Trial counsel's failure to request a theory of the case instruction affected Mr. Buck's rights to present a complete defense and his substantial rights to a fair trial. The prejudicial impact of failing to instruct the jury that Mr. Buck had a right to present a defense was compounded by the avalanche of evidence the prosecution presented as other act evidence and intrinsic evidence. Mr. Buck's rights were further eroded by the failure to tell the jury that the prosecution had a *but-for* causation burden and could not rely on a "contributing factor" analysis to establish that distribution of controlled substances resulted in the deaths of Gemmel Moore and Timothy Dean.

**K.** **Ground Eleven**: Trial counsel failed to represent Mr. Buck competently when they failed to file a Rule 33 motion for new trial within designated time limits thereby depriving Mr. Buck of procedural due process under the Fifth Amendment.

***Procedural Rule and Factual Basis***

Rule 29 of the Federal Rules of Criminal Procedure provides that a defendant may motion for judgment of acquittal before the matter is submitted to the jury or after the jury verdict. Pursuant to Rule 33, motions for new trial must be filed within 14 days after the verdict or finding of guilty.

Trial counsel orally moved for a judgment of acquittal after the prosecution rested and renewed it after the jury rendered its verdict on July 27, 2021. (Doc. 217 at 56-64, 260, R.T. 07/23/2021; Doc. 288 at 27, R.T. 07/27/2021.) Trial

counsel filed written supplements to the motions for acquittal but did not submit a request for new trial. (Doc. 178, Motion for Judgment of Acquittal, filed 08/03/2021; Doc. 221, Supplemental Memorandum…for Judgment of Acquittal, filed March 10, 2022) The 14-day window to file the motion for new trial expired on August 10, 2021. In ruling on the motion for acquittal, the trial court noted a motion to set aside the verdict had not been filed, although raised in oral argument. (Doc. 249 at 2 n. 1 Criminal Minute Entry; see also, Doc. 294, R.T. 04/04/2022.)

A reversal based on the weight of the evidence can occur only after the prosecution has presented sufficient evidence to support conviction and has persuaded the jury to convict. Had trial counsel filed a motion for new trial, the trial court would have had to consider whether the convictions should be vacated in the interest of justice because the prosecution had not met its burden of proving the penalty enhancement beyond a reasonable doubt.

**L.**    **Ground Twelve**: Trial counsel failed to request a change of venue despite years of extensive and inflammatory publicity that denied Mr. Buck due process under the Fifth Amendment and the Sixth Amendment right to a fair trial by a panel of impartial jurors.

***Factual Basis***

On July 27, 2017, Gemmel Moore died in Mr. Buck's apartment located at 1234 North Laurel Avenue, in West Hollywood, California. On January 7, 2019, one year and five months later, Timothy Dean died in Mr. Buck's apartment. The federal government first indicted Mr. Buck on charges of Distribution of

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

Controlled Substances Resulting in Death on October 2, 2019. The matter proceeded to a jury trial on July 13, 2021, in the United States District Court, For The Central District Of California—approximately 45 minutes from Mr. Buck's home. On July 27, 2021, the jury rendered its verdict finding Mr. Buck guilty of the nine counts submitted to it.

In the interim, media scrutiny fueled by activists' organizations exploded and reached a global audience. A report commissioned during collateral review proceedings collected approximately 725 sensationalized news reports about the case. (Exhibit 2, Media Aggregator Files.) Trial counsel did not move for a change of venue and jury selection took place on July 13, 2021. (Doc. 153, R.T. 07/13/2021, Jury Selection Transcript, Trial Day 1.) Although directed by the Court to confer regarding voir dire questions (Doc. 139, Criminal Minute Entry), all proposed trial procedures were submitted by the prosecution. The voir dire on pretrial publicity was limited to the following questions:

> II. PRIOR KNOWLEDGE OF DEFENDANT/THIS INVESTIGATION
> 8.    Have you heard of Edward Buck? If so, what have you heard about him?
> 9.    Have you heard or read about the investigation into the deaths of Gemmel Moore and Timothy Dean? What have you heard or read?
> 10.   Have you developed opinions about the investigation or Edward Buck?
> 11.   Could you set aside any opinions you have about Edward Buck or the investigation and consider

only the evidence presented in this trial in rendering a fair and impartial verdict?

(Doc. 144 at 4, Proposed Voir Dire.)

> **M.    Ground Thirteen**: Trial counsel failed to conduct pretrial investigation thereby depriving Mr. Buck of the right to effective counsel under the Sixth Amendment.

### *Factual Basis*

Trial counsel failed to conduct pretrial investigation and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

(1)    Trial counsel did not consult with mental health experts regarding (a) the documented history of sexual abuse by parent and clergy,[7] (b) the documented history of excessive drug use and psychiatric depressive disorder diagnosis,[8] and (3) near-universal categorization of Mr. Buck's behavior as "ritualistic" and "fetishist."[9] The failure to investigate Mr. Buck's social history, mental and

---

[7] Doc. 37-2 at 7, Abuse history documented in Medical Records Exhibit to Defense Opposition to Detention Request; Doc. 250 at 20 ¶¶ 105-107, Presentence Investigation Report.

[8] Doc. 250 at 20-23 ¶¶ 113-24.

[9] Doc. 50 at 6, Prosecution Motion in Limine to Admit Witness Testimony as Direct Evidence:

> Second, the evidence is admissible as "other acts" under Rule 404(b) to show Buck intended to distribute drugs to the men he invited to his apartment to party and play; that he had the knowledge of how to

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

34

emotional health prejudiced the outcome of his trial. Mr. Buck's competency was not examined, his defense to the knowing and intentional element on the distribution charge was not developed, and his social and mental health history was not presented as mitigating evidence during the sentencing phase.

(2)     Trial counsel filed a motion to suppress pertaining to the seizure of a red toolbox that was wholly deficient. (Doc. 52, Defense Motion to Suppress.)

---

> obtain drugs , prepare injections , and administer those injections to others; that he was motivated by a desire to administer injections during his party and play sessions ; and that he had a common plan or scheme of recruiting men and distributing drugs to them in the same or similar *ritualistic fashion*.

(Italics added.); Doc. 54 at 4-5, Defense Motion in Limine #3 to Preclude Evidence, opposing admission of testimony from Gemmel Moore's grandmother and reference to Mr. Buck's "fetish" for black men; Doc. 74 at 6, Prosecution Opposition to Motion in Limine to Preclude Other Acts (Doc. 56), asserting other acts evidence a common scheme or plan of recruiting men and distributing drugs in a ritualistic fashion; Doc. 78 at 7-8, Prosecution Opposition to Motion in Limine to Preclude Other Acts (Doc. 57), asserting that the use of racially insensitive remarks was probative of Mr. Buck's attitudes towards African American men and the manner in which he fetishized these men; Doc. 143 at 11, Prosecution Trial Memorandum Statement of Facts:

> At Buck's apartment, Buck distributed and attempted to distribute methamphetamine and other controlled substances to his victims. He prepared methamphetamine syringes in a *ritualistic fashion*.

(Italics added.); Doc. 221 at 2, Defense Supplemental Motion for Acquittal, noting the extremely prejudicial and irrelevant character evidence presented that included graphic images and videos of his fetishes. As sentencing counsel recounts the disturbing nature of the evidence presented was such that the court cautioned the prosecution that the evidence had the potential to impact the jurors psychologically. Id.; see also Doc. 246 at 40-41, R.T. 07/16/2021, Trial Transcript Day 4; Doc. 170, Prosecution Exhibit List.

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

However, the defense's statement of facts laid bare their unfamiliarity with the evidence integral to their challenge to the seizure of evidence. The prosecution's response conclusively refuted the defense's theory of preclusion in its response. (Doc. 72 at 18, Opposition to Defendant's Motion to Suppress Evidence; Doc. 72-3 at 80-83, Barraza Declaration, executed 12/04/2020; Doc. 103, Barraza Second Declaration, executed 01/31/2021.) The testimony adduced at the suppression hearing further established trial counsel's unfamiliarity with the specifications, dimensions, features, capacity and functionality of the wheeled 6-drawer tool chest they were contesting. (Doc. 289 at 27-48, R.T. 03/02/2021.) The court denied the motion to suppress ruling the plain view exception to search warrant requirement was applicable. (Doc. 124 at 2, Criminal Minute Entry.) Trial counsel's failure to investigate prejudiced the outcome of the suppression hearing. Had trial counsel reviewed the disclosure and the physical dimensions of the wheeled toolbox, he would have established that the contents of the wheeled toolbox were not in plain view. (See generally, Exhibit 1 at 45-52, Direct Appeal Opening Brief at 45-52.)

(3)    The prosecution gave notice that it would present the testimony of experts in the fields of forensic biology, forensic toxicology, clinical toxicology, cell-site analyst, drug recognition analysis, and criminalists. (See Doc. 143 at 14-25, DOJ Trial Memorandum.) Trial counsel failed to consult with experts with

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

36

capacity to scrutinize toxicology reports and expert witness testimony where the disclosure supported a conclusion that other factors—such as the presence of other drugs or underlying medical issues—contributed to the death of the decedents. At a minimum, efficient representation would have mandated requesting a *Daubert*/*Frye* hearing to assess the prosecution's proffered experts scientific, technical, or specialized knowledge in regard to their opinions on "but-for" causation and proximate cause.

The prosecution alluded to these failures in its trial memo where it pointed out the defense had only challenged the testimony of the DNA expert and had not otherwise challenged any of the remaining experts' qualifications or the helpfulness of their proposed testimonies. (Doc. 143 at 35.) The prosecution also noted the defense had nominally disclosed three expert witnesses but had only provided sufficient disclosure with regards to one defense expert and had withdrawn the others. (Id. at 38.)

During trial, the defense's cross-examination of prosecution witnesses was halting and imprecise.[10] The defense could not examine prosecution experts on

---

[10] See Trial Transcript Day 2, Doc. 244 at 195, 217-21, cross-examination of Tisha Nixon, mother of Gemmel Moore; Trial Transcript Day 3, Doc. 245 at 46, 53-54, cross-examination of Criminalist Courtney Castellino, Los Angeles County Medical Examiner Coroner Office; Doc. 245 at 118, 127-133, cross-examination of Firefighter/Paramedic Cole Thomas Alnes, Los Angeles County Fire Department; Doc. 245 at 154, 165-67, Coroner Investigator Joseph Danton

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

37

the differences between but-for causation, underlying causes of death, and factors contributing to death. Nor could the defense engage prosecution experts on matters related to scientific studies on methamphetamine toxicity. The defense expert in toxicology was discredited during cross-examination. (Doc. 217 at 92-122, R.T. 07/23/2021.) During closing arguments, the defense could not expressly point out that the prosecution had not established but-for causation or proximate cause.

The failure to consult with experts in various fields prejudiced the outcome of the trial. The prosecution relied on an "incremental effect" causation standard that would have been readily apparent to trial counsel as an incorrect burden of proof had the defense team consulted with experts and conducted minimal research. Further, trial counsel failed to recognize that the evidence the

Cronin, Los Angeles County Medical Examiner Coroner Office; Trial Transcript Day 4, Doc. 246 at 67, 74-76, Criminalist Matthew Andrew Quon, Los Angeles County Sheriff Crime Laboratory; Doc. 246 at 77, 84-87, Senior Criminalist Danielle Van Cleve, Los Angeles County Medical Examiner Coroner Office; Doc. 246 at 88, 96-108, Deputy Medical Examiner Kevin Young, M.D., Los Angeles County Medical Examiner Coroner Office (Gemmel Moore autopsy); Trial Transcript Day 5, Doc. 201 at 136, 144-49, Coroner Investigator Brenda Schafer, Los Angeles County Medical Examiner Coroner Office; Doc. 201 at 150, 165-77, 182-86, Deputy Medical Examiner Matthew Miller, M.D. Los Angeles County Medical Examiner Coroner Office (Timothy Dean autopsy); Trial Transcript Day 6, Doc. 213 at 253, 277-95, 297-98, Medical Toxicologist David Shawn Carstairs, M.D.; Trial Transcript Day 7, Doc. 215, 57, 99-114, National Highway Traffic Association-Trained Drug Recognition Expert Instructor Vaughn Gates, California Highway Patrol (Retired).

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

38

prosecution presented did not meet the but-for causation standard. Trial counsel also failed to recognize that the but-for causation jury instruction was structurally defective, and the verdict forms created a genuine possibility of jury confusion depriving Mr. Buck of juror unanimity.

13. **If any of the grounds listed in Section 12 above were not previously presented, state briefly what grounds were not presented, and give reasons for not presenting them**:

A. **Ground One**: The prosecution did not prove all of the elements of Distribution of Controlled Substances Resulting in Death as the jury instruction it provided was structurally defective and violated Mr. Buck's Fifth and Sixth Amendment rights to have the penalty enhancement proved beyond a reasonable doubt.

Mr. Buck raised this ground for relief in direct appeal proceedings, and it was dismissed by the Ninth Circuit on sufficiency of the evidence grounds. (Exhibit 1 at 59-64, Direct Appeal Opening Brief at 59-64; Doc. 321 at 3-4, Memorandum Decision.) Trial counsel did not lodge a contemporaneous objection during trial. The sentencing court rejected a post-conviction motion for acquittal contesting whether the conviction was sustained in accordance with procedural due process. (Doc. 221 at 2-8; Doc. 249 at 6-8; see also Doc. 178, (Initial) Motion for Judgment of Acquittal.)

The prosecution's failure to establish every element of the offense is properly before this Court on collateral review because the claim for relief involves a procedural due process constitutional claim that directly calls into

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

question whether the prosecution proved the penalty enhancement beyond a reasonable doubt. Such a claim is timely and properly raised in a motion to vacate, set aside or correct sentence. In addition, the historical facts of the failure to prove an essential element claim underpin Mr. Buck's ineffective assistance of trial counsel claim (Ground 2), as he has a substantive constitutional right to have had the prosecution prove the penalty enhancement beyond a reasonable doubt.

    **B.**    **Ground Two**: Trial counsel was ignorant on a point of law fundamental to contesting Distribution of Controlled Substances Resulting in Death.

This ground for relief has not been raised in prior proceedings. Claims of ineffective assistance of counsel are generally raised in collateral proceedings.

    **C.**    **Ground Three**: The First Superseding Indictment infringed on Mr. Buck's Sixth Amendment right to a present a complete defense.

Trial counsel did not contest misjoinder of offenses as set forth under Ground 4 below and this claim could not be litigated in direct appeal proceedings under Rule 52 of the Federal Rules of Criminal Procedure. Nonetheless, on direct appeal Mr. Buck contested the improper admission of other uncharged acts. (Exhibit 1 at 52-57, Direct Appeal Opening Brief at 52-57.) The Ninth Circuit ruled that the trial court had not abused its discretion. (Doc. 321 at 4-5, Memorandum Decision.) Mr. Buck had also contested impermissible prosecutorial arguments alluding to representative sample of alleged victims. (Exhibit 1 at 57-59, Direct Appeal Opening Brief at 57-59.)

The prejudicial amendment claim is properly before this Court on collateral review because its historical facts underpin the ineffective assistance of trial counsel claim Mr. Buck raises in Ground 5, as he has substantive constitutional rights to a fair determination of guilt or innocence on the primary offenses and to have the penalty enhancement proved beyond a reasonable doubt. The addition of drug den and enticement charges infringed on Mr. Buck's Sixth Amendment rights to present a complete defense.

    **D.**    **Ground Four**: Misjoinder of offenses resulted in prejudice that denied Mr. Buck his Fifth Amendment right to procedural due process and his Sixth Amendment right to present a complete defense.

Trial counsel did not lodge a contemporaneous objection during trial proceedings and misjoinder of offenses could not be litigated in direct appeal proceedings under Rule 52. Nonetheless, on direct appeal Mr. Buck contested the improper admission of other uncharged acts. (Exhibit 1 at 52-57, Direct Appeal Opening Brief at 52-57.) The Ninth Circuit ruled that the trial court had not abused its discretion. (Doc. 321 at 4-5, Memorandum Decision.) The Ninth Circuit also found that each conviction was supported by sufficient evidence. (Doc. 321 at 3-4.)

The claim is properly before this Court on collateral review because the historical facts of the misjoinder claim underpin the ineffective assistance of trial counsel claim Mr. Buck raises in Ground 5, as he has substantive constitutional

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

rights to a fair determination of guilt or innocence on each offense and to have the penalty enhancement proved beyond a reasonable doubt. Misjoinder of offenses resulted in prejudice so great it denied Mr. Buck his Fifth Amendment right to procedural due process and his Sixth Amendment right to present a complete defense.

  **E.**  **Ground Five**: Trial counsel provided ineffective assistance by failing to seek a severance of offenses pretrial or raise misjoinder objections during trial. These failures violated Mr. Buck's trial rights under the Fifth and Sixth Amendments.

Ground Five has not been raised in prior proceedings. Claims of ineffective assistance of counsel are generally raised in collateral proceedings.

  **F.**  **Ground Six**: The introductory allegations the prosecution incorporated into each count of the Indictment affected Mr. Buck's Fifth Amendment right to procedural due process and his Sixth Amendment right to a present a complete defense.

Trial counsel did not lodge a contemporaneous objection during trial proceedings, and a speaking indictment claim could not be litigated in direct appeal proceedings under Rule 52. Nonetheless, on direct appeal Mr. Buck contested the improper admission of other uncharged acts. (Exhibit 1 at 52-57, Direct Appeal Opening Brief at 52-57.) The Ninth Circuit ruled that the trial court had not abused its discretion. (Doc. 321 at 4-5, Memorandum Decision.) The Ninth Circuit also found that each conviction was supported by sufficient evidence. (Doc. 321 at 3-4.)

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

The prejudicial uncharged allegations claim is properly before this Court on collateral review because the historical facts underpin the ineffective assistance of trial counsel claim Mr. Buck raises in Grounds 9 and 10, as he has substantive constitutional rights to exclude unfairly prejudicial evidence, a fair determination of guilt or innocence on each offense and to have the penalty enhancement proved beyond a reasonable doubt. The speaking indictment resulted in prejudice so great it denied Mr. Buck his Fifth Amendment right to procedural due process and his Sixth Amendment right to present a complete defense.

G.     **Ground Seven**: Evidence proffered to "complete the story" and as "other act evidence" further infringed on Mr. Buck's ability to defend the charges and rendered the trial fundamentally unfair under the Sixth Amendment.

Trial counsel filed a motion to preclude other act evidence that was denied by the trial court. The ruling of the trial court was litigated in direct appeal proceedings. (Exhibit 1 at 52-57, Direct Appeal Opening Brief at 52-57.)

This claim of evidentiary error is properly before this Court on collateral review as the historical facts of this claim underpin the ineffective assistance of counsel claim Mr. Buck raises in Ground 9. Mr. Buck has substantive constitutional rights to exclude unfairly prejudicial evidence, a fair determination of guilt or innocence on the primary offenses and to have the penalty enhancement proved beyond a reasonable doubt.

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

**H.      Ground Eight**: The other act evidence jury instruction further deprived Mr. Buck of constitutional rights in violation of the Fifth and the Sixth Amendments.

The improper admission of other act evidence was litigated in direct appeal proceedings as violations of the Federal Rules of Evidence. (Exhibit 1 at 52-57, Direct Appeal Opening Brief at 52-57.) The Ninth Circuit ruled the trial court did not abuse its discretion by admitting evidence of other uncharged acts. (Doc. 321 at 4-5, Memorandum Decision) Trial counsel did not request that the instructions limit other act evidence to its proper scope and instructional error could not be litigated in direct appeal proceedings under Rule 52.

This instructional error claim is properly before this Court on collateral review because the historical facts of this claim underpin the ineffective assistance of trial counsel claim Mr. Buck raises in Grounds 9 and 10. Mr. Buck has substantive constitutional rights to exclude unfairly prejudicial evidence, present a complete defense, a fair determination of guilt or innocence on the primary offenses, and to have the penalty enhancement proved beyond a reasonable doubt. The other act evidence instruction exceeded the scope of Rule 8 permitting joinder of offenses.

I.    **Ground Nine**: Trial counsel provided ineffective assistance when they failed to request that the other act evidence instruction be limited to the purpose set forth in the rule permitting joinder of offenses.

Ground Nine has not been raised in prior proceedings. Claims of ineffective assistance of counsel are generally raised in collateral proceedings.

J.    **Ground Ten**: Trial counsel failed to represent Mr. Buck competently when they failed to request a theory of defense instruction thereby violating his Sixth Amendment rights to a fair trial.

Ground Ten has not been raised in prior proceedings. Claims of ineffective assistance of counsel are generally raised in collateral proceedings.

K.    **Ground Eleven**: Trial counsel failed to represent Mr. Buck competently when they failed to file a Rule 33 motion for new trial within designated time limits thereby depriving Mr. Buck of procedural due process under the Fifth Amendment.

Ground Eleven has not been raised in prior proceedings. Claims of ineffective assistance of counsel are generally raised in collateral proceedings.

L.    **Ground Twelve**: Trial counsel failed to request a change of venue despite years of extensive and inflammatory publicity that denied Mr. Buck due process under the Fifth Amendment and the Sixth Amendment right to a fair trial by a panel of impartial jurors.

Ground Twelve has not been raised in prior proceedings. Claims of ineffective assistance of counsel are generally raised in collateral proceedings.

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

**M.** **Ground Thirteen**: Trial counsel failed to conduct pretrial investigation thereby depriving Mr. Buck of the right to effective counsel under the Sixth Amendment.

Ground Thirteen has not been raised in prior proceedings. Claims of ineffective assistance of counsel are generally raised in collateral proceedings.

14. **Does Movant have any petition or appeal now pending in any court as to the judgment being challenged**?

No.

15. **Give the name and address, if known, of each attorney who represented Movant in the following stages of the judgment challenged herein**:

(a) **Preliminary hearing**:

Claire M. Simonich

Social Justice Legal Foundation, 523 West 6th Street Suite 450, Los Angeles, CA 90014.

(b) **Arraignment and plea**:

Claire M. Simonich

Social Justice Legal Foundation, 523 West 6th Street Suite 450, Los Angeles, CA 90014.

(c) **Trial**:

Christopher A. Darden

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

46

Solution Law, APC, 16580 Harbor Blvd, Ste K, Fountain Valley, CA 92708-1385.

Ludlow Barrington Creary, II

The Law Offices of Ludlow B. Creary II, 555 West 5th Street, 35th Floor, Los Angeles, CA 90013.

(d)     **Sentencing**:

Mark Werksman

Werksman Jackson and Quinn LLP, 888 West Sixth Street Suite 400, Los Angeles, CA 90017.

Elizabeth Stewart Little

Werksman Jackson and Quinn LLP, 888 West Sixth Street Suite 400, Los Angeles, CA 90017.

(e)     **Appeal**:

Michael P. Denea

Michael P. Denea, PLC, PO Box 1095, Avondale, AZ 85323.

Kevin R. Myer

Michael P. Denea, PLC, PO Box 1095, Avondale, AZ 85323.

Irwin Bledstein

Bledstein and Koppekin, LLP, 15915 Ventura Boulevard Suite 203, Encino, CA 91436.

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

47

(f)    **Post-conviction Proceeding**:

Michael P. Denea.

Michael P. Denea, PLC, PO Box 1095, Avondale, AZ 85323.

Irwin Bledstein

Bledstein and Koppekin, LLP, 15915 Ventura Boulevard Suite 203, Encino, CA 91436.

(g)    **Appeal from any adverse ruling in a post-conviction proceeding**:

Not applicable.

16.    **Was Movant sentenced on more than one count of an indictment, or on more than one indictment, in the same court at approximately the same time**?

Yes.

17.    **Does Movant have any future sentence to serve after completing the sentence imposed by the judgment being challenged**?

No.

**18.    Compliance with Rule 2(c)(5) of the Rules Governing Section 2254 And 2255 Cases in the United States District Courts**:

Habeas Corpus Rule (2)(c)(5) provides that the petition be signed under penalty of perjury by the Movant or by a person authorized to sign it for the movant under 28 U.S.C. § 2242.  Undersigned counsel is authorized to sign the petition on the behalf of Movant Buck.

48

**19.** **Compliance with LRCiv. 83-16.2, Verification by Other Than Person in Custody**:

See Verification (L.R. 83-16.2) below.

**20.** **28 U.S.C. § 2255(f) Timeliness Calculations**:

Mr. Buck's motion is timely.

The statute imposes a 1-year limitation period that begins to run from the date on which the judgment of conviction becomes final. 28 U.S.C. § 2255(f)(1). In *Clay v. United States*, 537 U.S. 522 (2003), the Supreme Court concluded "direct appeal finality" includes the time a defendant convicted in federal court could have filed a petition for certiorari in its court. 537 U.S. at 525.

The Ninth Circuit affirmed Mr. Buck's convictions and sentences on October 21, 2024. (Doc. 321, Memorandum of USCA.) Mr. Buck did not petition the Supreme Court for review. Accordingly, the judgment became final upon expiration of the time for filing a petition for writ of certiorari, and this motion is filed well within one year of finality under 28 U.S.C. § 2255(f)(1).

WHEREFORE, movant prays that this Court grant him all relief to which he may be entitled in this proceeding.

MICHAEL P. DENEA, PLC
PO BOX 1095
AVONDALE, ARIZONA 85323
602 794-4480

RESPECTFULLY SUBMITTED on January 16, 2026.


MICHAEL P. DENEA, PLC


*/s/Michael P. Denea*
Michael P. Denea (AZ 014768)
PO Box 1095
Avondale, Arizona 85323
*Attorney for Movant Edward Buck*
*Pro Hac Vice*

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

## **VERIFICATION (L.R. 83-16.2)**

Pursuant to L.R. 83-16.2, undersigned counsel verifies this Motion on behalf of Movant because Movant is in federal custody and is unable to timely review and execute this Motion under penalty of perjury before the filing deadline. This verification is made based on counsel's personal knowledge and counsel's review of the official court record in United States v. Buck, Case No. 2:19-cr-00595-CAS-1, including the pleadings, minute orders, transcripts, and exhibits referenced herein, as well as counsel's communications with Movant and other members of Movant's defense team. To the extent any factual allegation is made on information and belief, the source of that information and belief is identified as the official court record and/or the communications described above. Counsel declares under penalty of perjury that the foregoing is true and correct to the best of counsel's knowledge, information, and belief. Movant will submit an executed verification promptly upon obtaining access to the final filing.

Executed on January 16, 2026, at Phoenix, Arizona.

MICHAEL P. DENEA, PLC

/s/Michael P. Denea
Michael P. Denea (AZ 014768)
PO Box 1095
Avondale, Arizona 85323
*Attorney for Movant Edward Buck*
*Pro Hac Vice*

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

51

**PROOF OF SERVICE**
**(C.D. Cal. – CM/ECF)**

I am employed in the County of Maricopa, State of Arizona. I am over the age of 18 and not a party to this action. My business address is P.O. Box 1095, Avondale, Arizona 85323.

On January 15, 2026, I served the foregoing document entitled MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY (ATTORNEY VERIFIED), including all attachments and exhibits, as follows:

I caused the foregoing document to be filed electronically with the United States District Court for the Central District of California using the CM/ECF system. Participants in the case who are registered CM/ECF users were served by the CM/ECF system via Notice of Electronic Filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 16, 2026, at Phoenix, Arizona.

/s/Eddie Khnanisho
Eddie Khnanisho
PO Box 1095
Avondale, Arizona 85323
Paralegal for Michael P. Denea, PLC

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

52

**Michael P. Denea (AZ 014768)**
*Pro Hac Vice*
Attorney for Movant
Michael P. Denea, PLC
P.O. Box 1095
Avondale, Arizona 85323
Telephone: 602-794-4480
Facsimile: 602-794-4481
Email: mpd@mpdlawfirm.net

**Irwin Mark Bledstein (CA Bar No. 47482)**
Designated Resident California Counsel
Bledstein and Koppekin, LLP
15915 Ventura Boulevard, Suite 203
Encino, California 91436
Telephone: 818-995-0801
Facsimile: 818-981-6098
Email: imblaw@imblaw.la

MICHAEL P. DENEA, PLC
PO Box 1095
AVONDALE, ARIZONA 85323
602 794-4480

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| United States of America, | CV No. 2:26-cv-496 |
|---|---|
| Respondent, | CR No. 2:19-cr-00595-CAS-1 |
| v. | |
| Edward Buck, | **EXHIBITS ACCOMPANYING 28 U.S.C. § 2255 MOTION VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY** |
| Defendant/Movant. | |

**Index**

**Exhibit Number and Title**                                                          **Bates Number**

(1)   Direct Appeal Opening Brief..............................................................002-087

(2)    Media Aggregator Files ...................................................................087-099

1

Case No. 22-50091
22-50136

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

UNITED STATES

-v.-

EDWARD BUCK,

*Defendant-Appellee*

---

Appeal from the United States District Court
Central District of California
No. 2:19-CR-00595-CAS-1

---

## OPENING BRIEF

---

Michael P. Denea
Kevin R. Myer
MICHAEL P. DENEA, PLC
3200 N. Central Avenue, Suite 1500
Phoenix, Arizona 85012
Telephone: 602-794-4480
Facsimile: 602-794-4481
Email: docket@mpdlawfirm.net

*Counsel for Defendant-Appellant Edward Buck*

# CONTENTS

INTRODUCTION ................................................................................... 16

JURISDICTION ..................................................................................... 17

ISSUES.................................................................................................... 18

    1.    The 2017 warrantless search of Mr. Buck's apartment
        discovered drugs and paraphernalia, which are central to
        all these charges. Did that search violate the Fourth
        Amendment? ............................................................................ 18

    2.    The district court prevented Mr. Buck from confronting
        Detective Barraza regarding her "plain view" discovery
        during that search. Did that restriction violate the Sixth
        Amendment? ............................................................................ 18

    3.    The district court admitted witness testimony describing
        other party-and-play sessions with Mr. Buck, often with
        lurid details. Did this "other act" evidence violate either
        Rule 404(b) or 403(b) or both? ............................................... 18

    4.    The Government claimed – without evidence, as the court
        acknowledged – that the alleged victims in this case were
        only a "sample" of the victims of Mr. Buck's crimes. Was
        Jury Instruction 13 enough to cure this prejudicial error?....... 18

    5.    The district court denied Mr. Buck's Rule 29 motion for
        acquittal. Was there sufficient evidence to justify criminal
        liability: ................................................................................... 18

a.    for being the cause of Mr. Moore and Mr. Dean deaths?.......................................................................... 18

b.    of maintain his primary residence as a "drug house"; and............................................................................. 18

c.    for inducing Mr. Moore and Mr. Gagnon into interstate prostitution?.................................................. 18

6.    The court allowed multiple "other act" witnesses to testify about lurid sexual details, unsubstantiated (and uncharged) claims of violence, and unsubstantiated claim of racial animus by Mr. Buck, all of which were vastly more unfairly prejudicial than probative. Does the cumulative effect of these errors require a new trial?.............. 18

7.    The court sentenced 67-year-old Mr. Buck to 30 years imprisonment, despite overwhelming evidence supporting mitigation. Was this sentence excessive? ................................ 19

8.    The court imposed a fine of $200,000 on Mr. Buck, expecting that he would be imprisoned for the next 30 years. Was this fine excessive? ................................................ 19

**PROCEDURE** .............................................................................................. 19

**I.    The charges** ......................................................................................... 19

**II.    The pre-trial rulings**.............................................................. 20

**III.    The trial**............................................................................................. 21

**IV.    Motion for acquittal** ............................................................. 22

FACTS ................................................................................................ 22

I.    The facts leading to the charges............................................ 22

A.    The death of Gemmell Moore................................... 22

1.    The discovery of Mr. Moore's body ................ 22

2.    Mr.    Moore's    pre-existing    health
conditions and lifestyle .................................... 23

a.    Testimony of Mr. Moore's mother
Latisha Nixon.......................................... 23

b.    Testimony of pathologist Dr. Kevin
Young........................................................ 23

c.    Testimony of toxicologist Dr. Shawn
Carstairs................................................... 24

d.    Testimony of defense forensic
pathologist Dr. Marvin Pietruszka........ 25

B.    The death of Timothy Dean ...................................... 26

1.    The discovery of Timothy Dean's body........... 26

2.    Mr. Dean's pre-existing health conditions
and lifestyle....................................................... 26

a.    Testimony of pathologist Dr.
Matthew Miller........................................ 26

b.    Testimony of toxicologist Dr. Shawn
Carstairs................................................... 27

c.    Testimony of defense forensic
pathologist Dr. Marvin Pietruszka........ 27

C.    The other persons named in the indictment.............. 28

1.    Carlos Sinclair .................................................. 28

    **2.**     **Jermaine Gagnon**.............................................. 28

    **3.**     **Cody Hoffman**................................................ 30

    **4.**     **Dane Brown**.................................................. 30

**III.**   **The motion to suppress**.......................................... 31

    **A.**    **The 2017 search of Mr. Buck's apartment**................ 31

    **B.**    **The 2019 search outside Mr. Buck's apartment.**....... 32

**IV.**   **The denial of confrontation of Detective Barraza**............... 33

**V.**    **The motions in limine**............................................ 35

    **A.**    **The "other act" evidence admitted over
objection**.................................................... 35

    **B.**    **The motion to preclude the racial epithets**............... 36

**VI.**   **The Government's closing argument**.............................. 37

**VII.**  **Rule 29 motion**.................................................. 39

**VII.**  **Post-conviction**................................................. 40

    **A.**    **Sentence** ................................................... 40

    **B.**    **Restitution and fine**....................................... 41

**SUMMARY** .................................................................. 42

**ARGUMENT**................................................................. 43

I.    The trial court violated Mr. Buck's Fourth Amendment rights by admitting the evidence of the illicit drugs in the toolbox in Mr. Buck's apartment. ......... 43

    A.    Review ................................................................. 44

    B.    The circumstances of the case do not permit the Government to justify the 2017 warrantless search by either the emergency or exigent circumstances exception to the warrant requirement of the Fourth Amendment. ................... 45

        1.    Emergency ........................................... 45

        2.    The exigent-circumstances exception does not apply, because the first responders did not have either probable cause to search or a reasonable worry that the evidence would be destroyed. ........................................... 47

        3.    Plain view........................................... 48

II.   The trial court violated Mr. Buck's Sixth Amendment rights by preventing Mr. Buck from confronting the officer who found the illicit drugs in the toolbox in Mr. Buck's apartment. ................................................... 49

    A.    Review ................................................................. 49

    B.    The district court should have allowed Mr. Buck to question Detective Barraza's credibility regarding the search. ...................................... 49

III.  The trial court violated Federal Rule of Evidence 404(b) by admitting improper evidence of other bad acts. ............................................................... 52

A.      Review ................................................................. 52

B.      Standard ............................................................... 53

C.      The "other act" evidence of additional party-and-play participants, the alleged threats of violence, and the alleged racial statements were unnecessary, duplicative, and prejudicial. ................ 54

D.      The "racial animus" evidence of was unnecessary, duplicative, and prejudicial. ................ 56

IV.      The trial court violated Mr. Buck's due-process rights by permitting improper argument by the Government. ................................................................. 57

A.      Review ................................................................. 57

B.      Impermissibly suggesting Mr. Buck had more victims created an impermissible urge for the jury to "act" by convicting Mr. Buck, thereby depriving him of a fair trial. ........................................ 57

V.      The trial court violated Mr. Buck's due-process rights by affirming his conviction without sufficient evidence of causation. ........................................................... 59

A.      Review ................................................................. 59

B.      The Government failed to prove that methamphetamine-overdose is the "but-for cause" of either Mr. Moore's or Mr. Dean's death. ................................................................... 59

1.      Gemmel Moore ................................................. 60

2.      Timothy Dean .................................................... 62

7

C.     The Government has failed to prove that Mr. Buck rented, leased or maintained his apartment for the purposes of using or distributing methamphetamine. ...................................................... 64

D.     The Government has failed to prove that Mr. Buck persuaded, induced and enticed Gemmel Moore or Jermaine Gagnon ........................................ 65

  1.     Gemmel Moore ................................................. 68

  2.     Jermaine Gagnon ............................................. 70

VI.   The trial court's cumulative errors constitute reversible error and entitle Mr. Buck to a new trial. ......... 70

A.     Review ................................................................. 70

B.     The "other act" evidence, the allegation of deviant sexual behavior, the allegation of racial epithets, and the suggestion of other victims in the Government's closing cumulatively constitute reversible error. .......................................... 71

VII.  The district court's sentence of 360 months/30 years was substantially unreasonable because it was unduly harsh under the circumstances, and therefore, constitutes an error in judgment. ........................................ 73

A.     Review ................................................................. 73

B.     The district court's sentence of three-hundred sixty months (360) / thirty (30) years was unnecessary to accomplish the purposes of 18 U.S.C. § 3553(a). .......................................... 73

1.      A sentence of 360 months/30 years was not
        necessary to punish the nature of this
        offense. ............................................................ 74

2.      A sentence of 360 months / 30 years was
        not necessary to protect the public. ................ 75

C.      The district court should have mitigated Mr.
        Buck's sentence. ........................................................ 76

VIII. The fine imposed was excessive and arbitrary,
      violating Mr. Buck's Eight Amendment rights.................... 79

A.      Review ...................................................................... 79

B.      Given Mr. Buck's effective life sentence and
        inability to ever earn more money, the amount of
        the fine imposed is excessive ........................................ 79

C.      The fine should more closely reflect the nature of
        the case. ...................................................................... 81

CONCLUSION ................................................................................ 82

COMPLIANCE................................................................................ 83

SERVICE......................................................................................... 84

# AUTHORITIES

## Cases

*Alexander v. United States*,
  509 U.S. 544 (1993) ................................................................. 82

*Atkins v. Virginia*,
  536 U.S. 304 (2002) ................................................................. 78

*Burrage v. United States*,
  571 U.S. 204 (2014) ............................................................. 61, 62

*California v. Brown*,
  479 U.S. 538, 545 (1987) ......................................................... 78

*Darden v. Wainwright*,
  477 U.S. 168 (1986) ................................................................. 60

*Deck v. Jenkins*,
  814 F.3d 954 (9th Cir.2016) ..................................................... 60

*Ford v. Peery*,
  999 F.3d 1214 (9th Cir.2021) ................................................... 60

*Gall v. United States*,
  552 U.S. 38 (2007) ................................................................... 76

*Godinez v. Paramo*,
  2021 WL 7543605 (C.D.Cal. Sept.22,2021) ............................ 17

*Hopkins v. Bonvicino*,
  573 F.3d 752, 763 (9th Cir. 2009) ....................................... 47, 48

*Horton v. California*,
  496 U.S. 128 (1990) ................................................................. 50

*Mancuso v. Olivarez*,
  292 F.3d 939 (9th Cir.2002) ..................................................... 73

*Payton v. New York,*
   445 U.S. 573 (1980) ................................................................ 47

*Penry v. Lynaugh,*
   492 U.S. 302 (1989) ................................................................ 78

*People v. Yeoman,*
   31 Cal.4th 93, 149 (2003)................................................... 61, 74

*Pimentel v. City of Los Angeles,*
   974 F.3d 917 (9th Cir.2020)................................................... 84

*Sec. & Exch. Comm'n v. Murphy,*
   50 F.4th 832 (9th Cir.2022)................................................... 84

*Simon v. United States,*
   361 F.Supp.2d 35 (E.D.N.Y. 2005)........................................ 76

*Thomas v Gipson,*
   2023 WL 5334425 (E.D. Cal. Aug. 18, 2023) ........................ 60

*United States v. Adelson,*
   441 F.Supp.2d 506 (S.D.N.Y. 2006)................................. 77, 78

*United States v. Alarcon-Simi,*
   300 F.3d 1172 (9th Cir.2002)................................................ 61

*United States v. Bailey,*
   696 F.3d 794 (9th Cir.2012)................................................. 55

*United States v. Bajakajian,*
   524 U.S. 321 (1998) ............................................................... 82

*United States v. Berry,*
   627 F.2d 193 (9th Cir. 1980)................................................. 73

*United States v. Brown,*
   327 F.3d 867 (9th Cir.2003)................................................. 59

*United States v. Carpenter,*
   923 F.3d 1172 (9th Cir. 2019)......................................... 54, 55

*United States v. Cervantes,*
  219 F.3d 882 (9th Cir.2000) ..................................................................... 47

*United States v. Cruz-Mendez,*
  811 F.3d 1172 (9th Cir. 2016) .................................................................. 75

*United States v. Ducasse,*
  2019 WL 5058583 (D. Alaska Oct. 7, 2019) ............................................ 62

*United States v. Fernandez,*
  388 F.3d 1199 (9th Cir. 2004) .................................................................. 73

*United States v. Frederick,*
  78 F.3d 1370 (9th Cir.1996) ..................................................................... 73

*United States v. Gomez,*
  165 F.3d 650 (8th Cir.1999) ..................................................................... 61

*United States v. Halamek,*
  5 F.4th 1081 (9th Cir. 2021) ..................................................................... 75

*United States v. Harris,*
  999 F.3d 1233 (9th Cir. 2021) .................................................................. 75

*United States v. Henry,*
  1 F.4th 1315 (11th Cir.2021), cert. den., 142 S. Ct. 814 (2022) ............... 76

*United States v. Hernandez-Miranda,*
   601 F.2d 1104, 1108 (9th Cir.1979) ......................................................... 55

*United States v. Hill,*
  953 F.2d 452 (9th Cir. 1991) .................................................................... 54

*United States v. Holiday,*
  998 F.3d 888 (9th Cir.2021) ..................................................................... 55

*United States v. Houston,*
  406 F.3d 1121 (9th Cir.2005) ................................................................... 62

*United States v. Hudson,*
  100 F.3d 1409 (9th Cir.1996) ................................................................... 46

*United States v. Huguez-Ibarra*,
  954 F.2d 546 (9th Cir.1992)......................................................... 46

*United States v. Iwai*,
  930 F.3d 1141 (9th Cir.2019)....................................................... 46

*United States v. Jahner*,
  72 F.App'x 665 (9th Cir.2003)..................................................... 74

*United States v. Johnson*,
  256 F.3d 895 (9th Cir.2001)......................................................... 49

*United States v. Larson*,
  495 F.3d 1094 (9th Cir.2007)................................................. 51, 52

*United States v. Lavalle*,
   751 F.2d 1266 (D.C. Cir. 1985) ................................................. 55

*United States v. Mackby*,
   261 F.3d 821 (9th Cir.2001)....................................................... 82

*United States v. Martinez*,
  406 F.3d 1160 (9th Cir.2005)....................................................... 47

*United States v. Martinez-Lopez*,
  864 F.3d 1034 (9th Cir. 2017) (en banc)..................................... 75

*United States v. McConney*,
  728 F.2d 1195 (9th Cir.1984)....................................................... 49

*United States v. Mikhel*,
  889 F.3d 1003 (9th Cir. 2018)..................................................... 52

*United States v. Necoechea*,
   986 F.2d 1273 (9th Cir. 1993).................................................... 73

*United States v. Orlando*,
  553 F.3d 1235 (9th Cir.2009)....................................................... 81

*United States v. Rashkovski*,
  301 F.3d 1133 (9th Cir.2002)............................................. 41, 68, 69, 71

*United States v. Shelton*,
  628 F.2d 54 (D.C. Cir.180) ................................................................. 55, 56

*United States v. Shetler*,
  665 F.3d 1150 (9th Cir.2011)..................................................... 41, 66, 67

*United States v. Shouse*,
  755 F.3d 1104 (9th Cir.2014)................................................................. 77

*United States v. Sims*,
  617 F.2d 1371 (9th Cir.1980)................................................................. 55

*United States v. Singh*,
  995 F.3d 1069 (9th Cir.2021), cert. den., 142 S. Ct. 1422 (2022)...... 51, 52

*United States v. Skillman*,
  922 F.2d 1370 (9th Cir.1990)........................................................... 38, 59

*United States v. Snipe*,
  515 F.3d 947 (9th Cir.2008)................................................................... 47

*United States v. Stafford*,
  416 F.3d 1068 (9th Cir.2005)........................................................... 48, 50

*United States v. Tam*,
  240 F.3d 797 (9th Cir.2001)................................................................... 59

*United States v. Tucker*,
  641 F.3d 1110 (9th Cir.2011)................................................................. 59

*United States v. Washington*,
  490 F.3d 765 (9th Cir.2007)................................................................... 46

*United States v. Williams*,
  291 F.3d 1180 (9th Cir. 2002)................................................................ 68

*United States v. Wilson*,
  350 F. Supp. 2d 910 (D. Utah 2005)...................................................... 76

*United States v. Wilson*,
  865 F.2d 215 (9th Cir.1989)................................................................... 46

*United States v. Zitalpopoca,*
  495 Fed.Appx. 833 (9th Cir.2012) .................................................. 69, 70, 72


## Constitutional Provisions

U.S. CONST. amend. IV ........................................................................ 47

U.S. CONST. amend. VI......................................................................... 51

U.S. CONST., amend. VIII ..................................................................... 82


## Statutes

18 U.S.C. §2422..................................................................... 21, 70

18 U.S.C. §3231 .......................................................................... 18

18 U.S.C. §3553......................................................................... 75

21 U.S.C. §841............................................................................ 20, 61

21 U.S.C. §856............................................................................ 21

28 U.S.C. §1291........................................................................... 18


## Rules

FED.R.APP.P. 4 ........................................................................... 18

FED.R.CRIM.P. 29(a) ..................................................................... 61

FED.R.EVID. 403(b)....................................................................... 19

FED.R.EVID. 404(b)....................................................................... 18, 19


## Other Authorities

Joaquín Vélez Navarro, *The Creation of Evil: The Role of the Law in
  Shaping Beliefs on Drug Harm and Addiction,*
  49 OHIO N.U. L.REV. 115, 173 (2022). ...................................... 17

## INTRODUCTION

This case concerns the prosecution of Defendant Edward Buck, a homosexual man who participated in the Los Angeles "party-and-play" sub-culture – which means "to engage in recreational drug use and have sex." *Godinez v. Paramo*, 2021 WL 7543605, at *12 (C.D.Cal. Sept.22,2021).[1]

Despite the consensual (albeit illicit) nature of this practice – and Mr. Buck maintained a defense that argued all activities in this case were consensual – two men – Gemmel Moore and Timothy Dean – were separately found dead in his apartment – one in 2017, and the other in 2019. The Government brought charges against Mr. Buck for these deaths and for alleged crimes against other individuals, including Jermaine Gagnon and Dane Brown.

Because of the graphic nature of the sexual activities involved, and because of racial allegations – i.e., Mr. Moore and Mr. Dean were African-American, the Government pursued Mr. Buck vigorously after an initial delay. In doing so, the Government violated Mr. Buck's Fourth Amendment rights,

---

[1] "[C]onsumption of party and play drugs can provide benefits to people because they caused an increase in HIV-positive people's feelings of wellbeing (people who are usually subject to stigma for living with this virus). In sum, using party and play drugs may provide wellbeing benefits in certain social contexts." Joaquín Vélez Navarro, *The Creation of Evil: The Role of the Law in Shaping Beliefs on Drug Harm and Addiction*, 49 OHIO N.U. L.REV. 115, 173 (2022).

violated his right to confront the police officer who claimed to find drugs in his apartment "in plain view," introduced "prior bad act" evidence that should have been excluded by Rule 404(b), and made improper arguments during closing argument. Additionally, the district court affirmed Mr. Buck's convictions without sufficient evidence to sustain the charges.

Any of these errors individually would be sufficient to warrant a new trial. However, the cumulative effect of these and other errors also entitle Mr. Buck to a new trial.

## JURISDICTION

Substantively, the district court had jurisdiction to resolve this indictment pursuant to 18 U.S.C. §3231. This Court has jurisdiction to resolve this appeal of Mr. Buck's April 14, 2022 final judgment of conviction [Vol.1-ER-0047] and June 8, 2022 second amended sentence [Vol.10-ER-2100] pursuant to 28 U.S.C. §1291.

Procedurally, this Court has jurisdiction because Mr. Buck's Notices of Appeal were timely filed. Mr. Buck's first notice [Vol.10-ER-2099] was filed on April 26, 2022, and his second notice [Vol.10-ER-2100] was filed on June 15, 2022. See FRAP 4(a).

This Court consolidated these appeals on June 22, 2022.

## ISSUES

1.      The 2017 warrantless search of Mr. Buck's apartment discovered drugs and paraphernalia, which are central to all these charges. Did that search violate the Fourth Amendment?

2.      The district court prevented Mr. Buck from confronting Detective Barraza regarding her "plain view" discovery during that search. Did that restriction violate the Sixth Amendment?

3.      The district court admitted witness testimony describing other party-and-play sessions with Mr. Buck, often with lurid details. Did this "other act" evidence violate either Rule 404(b) or 403(b) or both?

4.      The Government claimed – without evidence, as the court acknowledged – that the alleged victims in this case were only a "sample" of the victims of Mr. Buck's crimes. Was Jury Instruction 13 enough to cure this prejudicial error?

5.      The district court denied Mr. Buck's Rule 29 motion for acquittal. Was there sufficient evidence to justify criminal liability:

     a.      for being the cause of Mr. Moore and Mr. Dean deaths?

     b.      of maintain his primary residence as a "drug house"; and

     c.      for inducing Mr. Moore and Mr. Gagnon into interstate prostitution?

6.      The court allowed multiple "other act" witnesses to testify about

lurid sexual details, unsubstantiated (and uncharged) claims of violence, and unsubstantiated claim of racial animus by Mr. Buck, all of which were vastly more unfairly prejudicial than probative. Does the cumulative effect of these errors require a new trial?

7.      The court sentenced 67-year-old Mr. Buck to 30 years imprisonment, despite overwhelming evidence supporting mitigation. Was this sentence excessive?

8.      The court imposed a fine of $200,000 on Mr. Buck, expecting that he would be imprisoned for the next 30 years. Was this fine excessive?

## PROCEDURE

### I.      The charges

The First Superseding Indictment ("Indictment") alleged that Edward Buck had committed the following offenses:

- Count 1: distribution of a controlled substance resulting in the death of Gemmel Moore, in violation of 21 U.S.C. §841;

- Count 2: same – resulting in the death of Timothy Dean;

- Count 3: distribution of a controlled substance to C.S. [Carlos Sinclair], in
violation of 21 U.S.C. §841;

- Count 4: same – to J.G [Jermaine Gagnon];

- Count 5: same - to C.H. [Cody Hoffman];

- Count 6: same – to D.B. [Dane Brown];

- Count 7: maintaining a drug house, in violation of 21 U.S.C. §856;

- Count 8: coercion and enticement of Gemmel Moore (interstate prostitution), in violation of 18 U.S.C §2422; and

- Count 9: same – of Jermaine Gagnon.

[Vol.2-ER-0488.]

## II.    The pre-trial rulings

Both parties moved in limine for the admission and preclusion of evidence. [Vol.1-ER-0223.] Regarding the Government's motions, the district court:

- granted in part (and reserved judgment on) Motion #1 (excluding criminal history of alleged victims) [ECF#48]; and

- granted #2 (admission of percipient witness testimony for "other act" evidence against Mr. Buck) [ECF#50].

[Vol.1-ER-0248.] As for Mr. Buck's motions, the court:

- granted in part (and reserved judgment on) Motion #1 (excluding certain statements by Moore's mother) [ECF#51];

- granted Motion #2 (excluding statements by Moore's aunt) [ECF#52];

- granted #3 (statement by Moore's grandmother) [ECF#53];

- denied Motion #4 (to preclude evidence of a text message and video attachment) [ECF#55],

20

- denied #5 ("broad objection to any and all other acts evidence") [ECF#56],

- denied #6 (to exclude from evidence several racially inflammatory statements allegedly made by Mr. Buck) [ECF#57],

- denied #7 (to admit DNA evidence found on drug paraphernalia discovered on a ledge attached to the exterior of the apartment building) [ECF#58],

and finally,

- granted Mr. Buck's unopposed Motion #8 (to exclude Moore's statements included in his journal or diary) [ECF#71] in full.

[Vol.1-ER-0248.]

## III.  The trial

Mr. Buck's trial lasted 9 days. The Government produced 43 witnesses [ECF#151]. After the Government's presentation, the court reserved judgment on Mr. Buck's motion for acquittal. [Vol.9-ER-1868-1871.]

Mr. Buck called one witness, a medical expert who testified that methamphetamine overdose did not cause either Mr. Moore's or Mr. Dean's death. [Vol.2-ER-0414-0473.]

The jury deliberated for less than a day and found Mr. Buck guilty on all counts and answered each of the special verdict questions in the affirmative. [Vol.10-ER-2092-2095.] The court polled the jury and confirmed the verdict. [Vol.10-ER-2095-2096.] The court then set a briefing schedule

for the Rule 29 motion. [Vol.10-ER-2096-2097.]

On April 14, 2022, the district court ordered that Mr. Buck be imprisoned for a term of 360 months. [Vol.1-ER-0047.] On June 8, 2022, the district court amended Mr. Buck's sentence and conviction to add restitution charges and fines. [Vol.1-ER-0009.]

## IV.    Motion for acquittal

Post-conviction, Mr. Buck moved a judgment of acquittal, claiming the Government failed to prove Mr. Buck:

(1) was the cause either Mr. Moore or Mr. Dean's death;

(2) distributed controlled substances;

(3) maintained a drug house; or

(4) induced either Mr. Moore or Mr. Gagnon into prostitution.

[ECF#178.] The district court affirmed the judgment. [Vol.1-ER-0124.]

### FACTS

## I.    The facts leading to the charges

### A.    The death of Gemmell Moore

#### 1.    The discovery of Mr. Moore's body

Paramedics responded to a 911 call for emergency medical assistance at Mr. Buck's apartment, at approximately 6:00 p.m., on July 27, 2017. [Vol.4-ER-0855-0856.] When the medics arrived, Mr. Moore was lying on

the floor, not breathing, and without a pulse. [Id.]

Paramedics attempted to resuscitate Mr. Moore, but he was pronounced dead after about 20 minutes. [Vol.4-ER-0860-0861.]

**2.    Mr. Moore's pre-existing health conditions and lifestyle**

**a.    Testimony of Mr. Moore's mother Latisha Nixon**

Mr. Moore's mother Latisha Nixon testified that Mr. Moore moved to Los Angeles in 2007 when he was 17; after his move, he stopped attending and did not graduate high school. [Vol.3-ER-0704-0705,0715.] By March 2017 – a few months before Mr. Moore died - his health had visibly deteriorated. [Id.,0725-0726.] Mr. Moore looked "thin," "like he was living a hard life," and he "suffered from seizures." [Id.]

Ms. Nixon testified that, based on her experience in the medical field, Mr. Moore appeared as if he possibly had AIDS. [Id.,0727.] Post-mortem examination confirmed that Mr. Moore was at least HIV-positive. [Vol.9-ER-1884-1895.]

**b.    Testimony of pathologist Dr. Kevin Young**

The Government relied on the testimony of Dr. Kevin Young, a deputy medical examiner in the Los Angeles Department of Coroner who conducted Mr. Moore's autopsy [Vol.2-ER-0301,0304], to establish Mr. Moore's cause

of death. Dr. Young:

- tested Mr. Moore's blood for methamphetamine and found 4.4 micrograms/mL ("μg/mL") in the heart blood and 3.9 μg/mL in the femoral blood, characterizing this concentration as "large" and opined that these concentrations could potentially cause death [id.,0307-08]; and

- observed pulmonary edema, a condition where the lungs fill with fluid and attributed Mr. Moore's edema to the dying process [id.,0307.].

Dr. Young concluded that methamphetamine overdose caused Mr. Moore's

death. [Id.,0308.] On cross-examination, however, Dr. Young conceded:

- the concentration of methamphetamine in Mr. Moore's blood was only potentially fatal - it would not cause death in all cases [id.,0310]; and

- he did not investigate whether Mr. Moore's HIV had progressed to AIDS, which he acknowledged can cause lung infections leading to fatal pulmonary edema.

- He further acknowledged he does not know much about diagnosing AIDS or its complications, as pathologists do not deal with live patients.

[Id.,0314-0315.]

### c.    Testimony of toxicologist Dr. Shawn Carstairs

The Government also called Dr. Shaun Carstairs – an emergency room

physician and toxicologist. [Vol.2-ER-0327.] Relying on the measurements

taken from Mr. Moore's heart and femoral blood, Dr. Carstairs characterized

the concentration of methamphetamine in Mr. Moore's blood as "potentially

fatal." [Id.] Hower, Dr. Carstairs admitted:

- a toxicologist specializes in treating living people for poisonings or

overdoses, and thus, he has never performed an autopsy [id.,0328,0353]; and he

- also conceded that HIV/AIDS is associated with lung infections, which causes fatal pulmonary edema. [Id.,0341-42.]

[See Vol.5-ER, generally.]

### d. Testimony of defense forensic pathologist Dr. Marvin Pietruszka

The defense called Dr. Marvin Pietruszka, a forensic pathologist who is also a board-certified forensic toxicologist. [Vol.2-ER-0414-15.] Dr. Pietruszka identified HIV and AIDS as the true cause of death.

Based on his examination of microscopic findings in Mr. Moore's lungs and other autopsy records,  Dr. Pietruszka concluded Mr. Moore not only had HIV, but was suffering from AIDS [Vol.2-ER-0428];

- Mr. Moore's AIDS had caused pulmonary edema, a condition in which the lungs fill up with fluid. [id.,0418] – which does not occur with methamphetamine overdoses [id.,0429];

- Mr. Moore's pulmonary edema was extensive with each lung filled up with approximately one liter of fluid [id.,0419].

- The edema left little room for blood-oxygenation, diminishing the supply of oxygen to Mr. Moore's heart, which led to cardiorespiratory failure and death. [Id.]

Dr. Pietruszka concluded that "there is no diagnosis" other than AIDS that could have caused Mr. Moore's death. [Id.,0420-0429.]

/ / /

**B.     The death of Timothy Dean**

**1.     The discovery of Timothy Dean's body**

Paramedics responded to another emergency call for aid from Mr. Buck at his apartment on January 7, 2019. [Vol.4-ER-0860-0861.] When first-responders entered, they observed Mr. Dean lying on an air mattress not breathing and without a pulse. [Id.,0861.]

The paramedics attempted to resuscitate Mr. Dean but after 20 minutes they were unsuccessful, and a consulting physician later pronounced him dead. [Id.,0863.]

**2.     Mr. Dean's pre-existing health conditions and lifestyle**

**a.     Testimony of pathologist Dr. Matthew Miller**

The Government called Dr. Matthew Miller, a forensic pathologist who conducted Mr. Dean's autopsy. [Vol.2-ER-0375-0379.] Dr. Miller opined that Mr. Dean had died primarily from a combination of methamphetamine and ethanol toxicity although coronary artery disease contributed to Mr. Dean's death. [Id.,0384.]

However, Dr. Miller acknowledged that Mr. Dean had severe coronary atherosclerosis, so severe, that it would, alone, have been sufficient to cause Mr. Dean's death. [Id.,0385.]

- Of the three coronary arteries supplying Mr. Dean's heart with oxygen, one was 10-20% blocked, one 30-60% blocked, and the last 70-95%

26

blocked. [Id.]

- Mr. Dean's coronary artery blockages created a high risk of a fatal heart-attack or arrhythmia [id.,0382,0385];

- Moreover, the enlargement of Mr. Dean's heart and the thickening of his heart muscle compounded his risk of a fatal cardiac event [id.,0396];

- Dr. Miller also observed significant pulmonary edema in Mr. Dean' lungs, which he attributed to heart failure in the minutes or hours before Mr. Dean's death. [Id.,0396-97.]

Dr. Miller testified that Mr. Dean had severe coronary atherosclerosis, so severe, that it would, alone, have been sufficient to cause Mr. Dean's death. [Id.,0385.]

### b.    Testimony of toxicologist Dr. Shawn Carstairs

Dr. Carstairs testified that Mr. Dean's BAC of approximately 0.13 is typically non-fatal but the combination of alcohol and his coronary artery disease could be fatal. [Vol.2-ER-0367-0368.]

### c.    Testimony of defense forensic pathologist Dr. Marvin Pietruszka

Dr. Pietruszka determined, based on Mr. Dean's autopsy, that Mr. Dean died from severe heart disease and alcohol toxicity and that methamphetamine had a minimal effect, if any, on Mr. Dean's death. [Vol.9-ER-1902-1903.]

///

///

///

Bates 029

### C.    The other persons named in the indictment.

#### 1.    Carlos Sinclair

Carlos Sinclair. is a former crystal methamphetamine addict, who was homeless at the time he met Mr. Buck. [Vol.3-ER-0538.] They used methamphetamine together. [Id.,0547] Mr. Sinclair continued to visit Mr. Buck's apartment to use methamphetamine and GHB until October 2018. [Id.,0552.]

Sometimes Mr. Buck would pay Mr. Sinclair to do household chores, such as shampooing carpets or cleaning windows, [id.,0562,0608.] with Mr. Buck allegedly paying $200 per visit. [Id.,0539-0541.] Mr. Buck also bought gifts to help Mr. Sinclair survive while he was homeless, such as: a laptop, a tent, and a portable generator. [Id.,0564.] Although he claimed he was sometimes uncomfortable with what occurred at Mr. Buck's apartment, Mr. Sinclair nonetheless returned to Mr. Buck's apartment 31 times. [TR.Exh.70,151.]

#### 2.    Jermaine Gagnon

Jermaine Gagnon is a crystal-meth addict who has been convicted of burglary and possession of stolen property [Vol.4-ER-0803-0804] and suffers from paranoid schizophrenia. [Id.,0860.]

Before testifying Mr. Gagnon gave paid statements about Mr. Buck to

the media twice: The Daily Mail, a tabloid newspaper paid Mr. Gagnon $500

for a statement; [id.,0840] after which, a film production company paid Mr.

Gagnon $5,000 for his exclusive story for a documentary on Mr. Buck's life.

[Id.,0841-0842.] Mr. Gagnon will make additional money if the production

company completes the documentary film. [Id.,0843.]

At the time Mr. Gagnon knew Mr. Buck, Mr. Gagnon was working as

a male prostitute in Los Angeles. [Id.,0804,0846.] Mr. Gagnon met Mr. Buck

on the gay social media application Adam4Adam.com. [Id.,0806.] Mr.

Gagnon reached out to Mr. Buck to party-and-play "because I needed money,

and I liked - - I wanted to get high." [Id.]

Mr. Gagnon testified that he first met Mr. Buck in March 2018 and

engaged in party-and-play sessions. [Id.,0851.] During these sessions, both

Mr. Buck and Mr. Gagnon would either smoke or inject methamphetamine,

for which Mr. Buck allegedly paid Mr. Gagnon. [Id.,0806-0824.]

In May 2018, Mr. Gagnon moved back to Minnesota but remained in

touch with Mr. Buck. [Id.,0828.] A few months later, Mr. Gagnon asked Mr.

Buck to pay for a plane ticket to Florida, [id.,0829.] which Mr. Buck allegedly

agreed to if Mr. Gagnon visited Mr. Buck in California. [Id.,0830.] Mr. Buck

bought Mr. Gagnon a plane ticket to Los Angeles and arranged for an Uber

ride to his  apartment. [Id.,0830-0831.] Mr. Gagnon testified that at Mr.

Bates 031

Buck's apartment, he used methamphetamine with Mr. Buck, but he did not testify to any sexual contact. [Id.,0832-0833.]

### 3.   Cody Hoffman

Thomas Cody Hoffman ("Mr. Hoffman") is a current crystal-meth addict. [Vol.7-ER-1533.] When Mr. Hoffman knew Mr. Buck, he was a male prostitute; he met Mr. Buck on Adam4Adam.com. [Id.,1534.] Mr. Hoffman claimed he met Mr. Buck on several occasions to party-and-play; during these sessions they smoked and injected methamphetamine and took Klonopin. [Id., 1534-1572.] Mr. Buck allegedly would sometimes pay for these sessions. [Id.]

### 4.   Dane Brown

Dane Brown is a current crystal-methamphetamine addict. [Vol.8-ER-1756.] Mr. Brown met Mr. Buck through Adam4Adam [id.,1757] and allegedly met a number of times for party-and-play sessions. [Id.,1756-1811.] During their relationship, Mr. Buck allowed Mr. Brown, who was homeless at the time, to stay at his apartment for three months. [Id.,1781-82.]

During their sessions, Mr. Brown testified that he injected ("slammed") meth. [Id.,1758.] On one occasion, after ingesting methamphetamine, Mr. Brown visited urgent care because he felt lethargic, and his heart was racing. [Id.,1793-94.] The urgent-care doctor did not diagnose him as having an overdose and did not admit him to the hospital. [Vol.8-ER-1797.]

## III.   The motion to suppress

### A.   The 2017 search of Mr. Buck's apartment

On July 27, 2017 Los Angeles Sheriff's Deputies responded to a medical emergency call at 1234 North Laurel Avenue, Apartment 17. Sheriff's investigators were not called out because the incident was not deemed to be suspicious. While at the scene deputies, lifted a mattress to search for drugs and drug paraphernalia. [Vol.1-ER-0214.]

Deputies also searched inside the drawers in a large red rolling toolbox located in the living room, by the front door:



SUBJECT TO PROTECTIVE ORDER

[Vol.2-ER-0484.] As the court summarized:

> Accordingly, due to the gaps between the drawers and the drawers' being slightly open, Barraza reports that she could see some of the contents of the first, second and third drawers in plain

view. … In the second drawer, Barraza "saw a small plastic baggie containing a crystal-like substance resembling methamphetamine," and in the third drawer she "saw what appeared to be a bulbous-end pipe." … In the hearing, Barraza specified that the crystalline substance and the pipe were visible because they were at the front end of the drawers. Barraza did not collect this evidence, but rather notified the coroner investigator of its presence when he arrived.

[Vol.1-ER-0215.]

###   B.   The 2019 search outside Mr. Buck's apartment.

On January 7, 2019, Los Angeles County Sheriff's Deputy Rose responded to the above referenced location regarding a "see the woman" call. When he arrived two women greeted him. The women told Deputy Rose that there was a suspicious package directly under the window to unit #17. They were unable to provide any information as to when the package was left or who left it. [Vol.1-ER-215.]



[Vol.2-ER-0485.] Deputy Rose contacted the fire department to bring a ladder

and retrieve the package:



[Vol.2-ER-0487.]

Once retrieved, Deputy Rose took possession of it, transported it to the

West Hollywood Station, and gave it to Deputy Oganyan. According to the

deputies, the package contained syringes and glass pipes that appeared to have

burn marks at the bottom. Later testing suggested DNA residue from both Mr.

Buck and Mr. Moore was found on the pipes and paraphernalia. [Vol.1-ER-

0216.]

**IV.    The denial of confrontation of Detective Barraza**

Because the district court had conducted and denied Mr. Buck's motion

to suppress the drugs and material found during the 2017 search, the court

preceded the trial examination of Detective Barraza with a sidebar regarding

the proper scope of questioning. The court stated its intent to prevent "the

defense [from] relitigat[ing] the motion to suppress" but also to give the jury

"limiting instruction to explain why the questions that are gonna be asked are

asked." [Vol.4-ER-0792:ln.22-23;0793:ln.09-10.]

Defense counsel stated his intent to question the credibility of Deputy Barraza as to the facts or as to how she came to this plain view explanation "a year later," referring to the two different declarations and reports that memorialized Deputy Barazza's claim that the drugs in the toolbox were plainly within her sight. [Id.,0793:ln.18-23.] The court informed defense counsel that questioning would not be permitted, because the court believed defense counsel was misdescribing the time discrepancy between the initial and supplemental police reports. [Id.,0793-95.] The district court then stated:

> And I'm beginning to think that there is absolutely no reason that we should get into how she found the drugs. Whether they were at plain view or not, and whether she wrote a report or whatever else, that's all part of the record that we've been through together through those many hours, and that is something the Court of Appeals is gonna have to decide at the end of the day.

[Vol.4-ER-0796.]

Defense counsel maintained that the discrepancy nonetheless was relevant to Deputy Barraza's credibility. [Id:ln.08-23.] The district court continued to disagree:

> First of all, she didn't write any report at the outset. I believe Mr. Carlin said that he -- that she had collected evidence at the request of the coroner. Then the second thing that happened was Carlin spoke to her about what happened, and then he asked her to write something. What she wrote was certainly -- it was more fulsome but not

34

inconsistent with what she had written. I've ruled on all those things. I have, you know, whether right or wrong, I've taken a position regarding what I think the evidence is and why the motion to suppress fails. I am not going to go back into it in this trial because (a) it's beside the point, and (b) we are going to confuse the jury, and we're not here to confuse the jury. We're here to at least try to have a careful presentation of evidence.

[Vol.4-ER-0798.]

## V.   The motions in limine

### A.   The "other act" evidence admitted over objection

Pre-trial, the court concluded the Government's proffered percipient witnesses to Mr. Buck's participation in "party-and-play sessions" between 2015 and the summer of 2019 [Vol.1-ER-0234] was permissible – as well as testimony from:

- a witness who claimed he previously had seen the two victims Dean – and more --  on other occasions at Mr. Buck's apartment prior to their overdoses;

- a second witness, who claimed at trial Mr. Buck previously had forced him to ingest tranquilizing drugs without that his knowledge;

- a third witness, who claimed at trial at each party-and-play session he attended, Mr. Buck provided him with drugs including methamphetamine [RT07-21-2021,pp.66-100.]

- a fourth witness (Arthur Stokes), who claimed at trial he also attended several party-and-play sessions and that Mr. Buck had paid him to travel from Las Vegas to Los Angeles for the sessions. [RT07-14-2021,pp.122-50.]

[Vol.1-ER-0234.] The Government claimed this evidence was relevant to the

35

charge for distribution of drugs. [Id.,0235.] The court considered the four

404(b) factors ultimately included that the proffer evidence:

> demonstrates that the defendant intended and had the capacity to
> distribute drugs to participate in party[-]and[-]play sessions …
> [and that] the prejudicial effect did not substantially outweigh the
> probative value because its probative value was high.

[Vol.1-ER-0235-0246.] The court, however, conditioned this admission

subject to the submission of an appropriate limiting instruction. [Id., 0237.]

The court rejected Mr. Buck's claim the Government's pre-trial notices

were insufficient [id.,0240], finding them "adequate" and relevant because

"the purpose of this testimony is to establish Defendant's course of conduct

and hosting party-and-play sessions … ." [Vol.1-ER-0242.]

## B.  The motion to preclude the racial epithets

The ruling on Mr. Buck's MIL#6 [ECF#57] demonstrates the sheer

volume of irrelevant racial epithets the Government sought to introduce:

- The ruling analyzing the exhibits to the Government's response
  [ECF#78] details no fewer than 7 different occurrence of "n-word," as
  well as several alleged incidents of describing the sexual features and
  prowess of African-Americans; and

- The source for these (and other racially charged) epithets were at least
  5 different witnesses, as well as text messages to unidentified people
  and from police reports.

[Vol.1-ER-0244-0246.]

The court believed the racial animus could be relevant to motive,

comparing this case to a case involving a cross-burning skinhead. [Id.,0244,

citing *United States v. Skillman*, 922 F.2d 1370, 1374 (9th Cir.1990).]

However, the court clearly stated:

> the Court will not permit the use of the "N" word. The Court believes that the language contained in police reports and otherwise should be sanitized. The Court suggests that, in lieu of the specifically offensive language, the government substitute "[pejorative term for an African American]." … To the extent defendant argues admission of this evidence will unduly consume time, the Court reserves judgment on this argument until the time of trial.

[Vol.1-ER-0244.]

## VI.    The Government's closing argument

After the Government's closing [Vol.9-ER-1972-2010], the court

considered Mr. Buck's objection that the Government had asserted that Mr.

Buck had "many more victims" [Id.,2010:ln.24.] The court stated its belief

that the "other act" limiting instruction would be sufficiently curative.

[Id.,2011:ln.08-09.] Counsel nonetheless asked for an additional instruction

[Id.,:ln.10-17.] The court initially declined, fearing an additional instruction

would be a "comment on the arguments." [Vol.9-ER-2012:ln.07-13,14.]

After  Mr.  Buck's  argument  [Vol.9-ER-2012-2046],  and  the

Government's [Id.,2047-2062], counsel renewed the objection. [Id.,2067.]

The Government conceded that it had argued that "the jury had only heard

from a small sample of victims in this case" [Id.,2067:ln.23-24], which the

37

Government claimed was based on "text messages and videos of other potential victims." [Id.,2068:ln.01-02.] The court also acknowledged that the jury was unaware of that source of evidence. [Id.:ln.04-05.]

Counsel maintained that the implication was inflammatory and was not sufficiently addressed by any instruction. [Vol.9-ER-2062-63.] The court instructed the parties to confer and provide an instruction that addressed the issue if they could agree. [Id.,2069:ln.08-17.]

On the next trial day, defense council offered the following curative instruction:

> you heard from the government stating that you heard evidence from just a small sample of the victims in this case. The government presented no evidence that the evidence presented in this case represents the small sample of all the victims. You must just disregard government counsel's statement in your deliberations.

[Vol.10-ER-2076:ln.15-20.] The government objected [id.:ln.20-23.] The court concluded that:

> the most I am prepared to do is a separate instruction that reiterates what is contained in number 6 without reference to any argument made by either side because I do not think it's appropriate to start instructing the jury based on specific argument but the government.

[Vol.10-ER-2082:ln.19-24.] The court rejected counsel's argument regarding prejudice [Id.,2083:ln.01-07] and stated its intention to simply reiterate instruction number six orally immediately before deliberation. [Id.:ln.08-24].

38

However, the court ultimately instructed the Government to draft a written instruction that stated as follows:

> statements objections and arguments by the lawyers are not evidence. The lawyers are not witnesses … … if the facts as you remember them differ from the way the lawyer state them, your memory of them controls.

[Vol.10-ER-2089:ln.15-19.] This instruction was included in the jury's set of written instructions. [Vol.1-ER-0160.]

## VII. Rule 29 motion

After considering the parties' Rule 29 papers [ECF##178,181], the court rejected all arguments and affirmed the judgment. [Vol.1-ER-0124.] Specifically, the court found:

- the Government "adduced significant evidence … that defendant distributed methamphetamine" to each of the 6 people named in the First Superseding Indictment, chiefly citing the testimony of the percipient witnesses [id.,0127];

- "adequate" evidence existed that "defendant distributed methamphetamine to Moore and Dean as alleged in Counts One and Two," finding a jury could conclude that Moore's airline flight meant he could not have been traveling with drugs, and the witness who claimed he sold Mr. Buck drugs and the fact that "following Dean's death, drug paraphernalia was found in defendant's apartment, but not in Dean's effects." [id.,0127-28];

- sufficient evidence existed to conclude Mr. Buck was responsible for Moore's and Dean's death, noting that whether Moore in fact had AIDS (rather than simply being HIV+) was unclear, and testimony that Dean's cardiovascular condition was not fatal, whereas the Government

presented evidence both men had "fatal levels" of methamphetamine in their blood [id.,0129-30];

- Mr. Buck's argument that his primary residence could not satisfy a 21 U.S.C. § 856(a)(1) conviction failed as a matter of law, citing *United States v. Shetler*, 665 F.3d 1150, 1162 (9th Cir.2011) [id.,0131], and that

- no independent motivation by either Moore or Gagnon to travel to Los Angeles, nor the fact that prostitution might not actually have occurred, negated an inducement conviction pursuant to 18 U.S.C. § 2422(a), citing *United States v. Rashkovski*, 301 F.3d 1133, 1136–37 (9th Cir.2002) [id.pp.0132-33.]

[Vol.1-ER-124.]

## VII.   Post-conviction

### A.   Sentence

The district court acknowledged that the mandatory minimum sentence for Counts 1 and 2 was twenty (20) years imprisonment. [Vol.1-ER-0069:ln.03-04.] The PSR report recommended no more than twenty-five (25) years. [ECF#219, p.7.]

The court further acknowledged Mr. Buck's childhood sexual abuse by both his father and the clergy, and despite this sexual trauma in his upbringing, Mr. Buck managed to become a productive member of society who actively participated in a number of charities, including charities supporting people suffering from AIDS and LGBTQ+ causes. [Vol.1-ER-0069:ln.05-21. See also 0081-0087.] The district court further acknowledged Mr. Buck's age,

poor health, and the effect of a lengthy prison sentence. [Id.,0086-0087.]

Nonetheless, the district court found sentencing enhancements that resulted in a sentence of 360 months, or thirty (30) years [Vol.1-ER-0047], meaning that Mr. Buck likely would not be released until he was well into his 90s. [Vol.1-ER-0087:ln.18-19.]

## B.    Restitution and fine

On June 3, 2021 the court held a restitution hearing. [Vol.1-ER-0010.] The court ordered the following restitution awards to the following people in the following amounts:

- $1,000 to Joanne Campbell for funeral costs [Vol.1-ER-0016:ln.04-07];

- $2,950.68 to GW and AH for funeral and services costs for Timothy Dean [id.,0015:ln.13-16];

- $11,648.47 to Leticia Nixon the mother of Jamel Moore [id.:ln.17-20];

- $480.00 to Dane Brown based on lost wages due to participation in the trial [id.:ln.17-20];

- $8,323.20 to the California victim compensation board [id.,0016:ln.03-08]; and

- $378.40 to Jermaine Gagnon [Id.:ln.09-12].

The total amount of restitution ordered was $47,271.25 [Vol.1-ER-0016:ln.9-20.] Finally, the court imposed a fine of $200,000 to be paid immediately, rejecting a stay of restitution pending appeal. [Vol.1-ER-0044:ln.18-23.]

## SUMMARY

In a case with a high-profile defendant accused of sensational crimes, the Government sought to overwhelm the jury rather than focus strictly on the evidence, which involved a lurid and risky (but consensual) sub-culture. The Government did not have a warrant or exception to the Fourth Amendment for the drugs found in Mr. Buck's apartment in 2017, and the district court exacerbated this error by preventing Mr. Buck from confronting Detective Barraza regarding the search.

The Government introduced mountains of "other act" evidence of the party-and-play subculture – in the form of statements and videos from not only the alleged victims, but also from several other additional sources, including the most lurid sexual details and unsubstantiated charges of violence and racial epithets by Mr. Buck, which were not the basis for any charge in the Indictment. This evidence was duplicative, irrelevant, and unfairly prejudicial.

The Government compounded this error by erroneously asserting that the victims who testified at trial were but "a sample" of Mr. Buck's "victims." The district court's curative instruction was insufficient to cure the prejudice.

The district court should have recognized any of these errors and should have granted portions of Mr. Buck's Rule 29 motion for acquittal. The medical

evidence that methamphetamine that Mr. Buck allegedly injected into Mr. Moore and Mr. Dean was the "but for" cause of their deaths is unsubstantial, as compared to the pre-existing conditions that most likely explains Mr. Moore's (AIDS/pulmonary edema) and Mr. Dean (alcohol poisoning leading to heart attack) death. If any of these errors is insufficient standing alone to permit a new trial, the cumulative effect nonetheless warrants reversal.

Finally, the 30-year sentence imposed on 67-year-old Mr. Buck was unnecessary and effectively a life sentence, and more importantly, ignores a mountain of mitigating evidence that the district court considered (albeit too briefly). Furthermore, the $200,000 fine – in light of the effective life-sentence – was excessive and did not reflect the nature (<u>mens rea</u>) of these crimes.

For all these reasons, Mr. Buck respectfully requests that this Court reverse his conviction and sentence and order a new trial of this matter.

## ARGUMENT

**I.**     **The trial court violated Mr. Buck's Fourth Amendment rights by admitting the evidence of the illicit drugs in the toolbox in Mr. Buck's apartment.**

This case involved two searches that resulted in the discovery of illicit drugs, with each search connected to one of the two deaths in this case. The first search occurred on July 27, 2017, following the death of Mr. Moore, and the second occurred on January 7, 2019, following the death of Mr. Dean.

The Government justified the 2017 warrantless search pursuant to the exigent-circumstances and plain-view legal doctrines. The Government had two warrants for the 2019 search: an initial warrant to search Mr. Buck's apartment, and a second to open the package found outside under Mr. Buck's apartment's window. Mr. Buck is not challenging the 2019 search on appeal.

The district court agreed with both arguments and denied Mr. Buck's evidence to suppress this evidence. The district court's legal errors require a new trial.

## A.    Review

A warrantless entry into a residence is reviewed de novo.  See *United States v. Iwai*, 930 F.3d 1141, 1144 (9th Cir.2019); *United States v. Huguez-Ibarra*, 954 F.2d 546, 551 (9th Cir.1992). Although "[t]he ultimate issue of whether exigent circumstances justify a warrantless entry and/or search" is reviewed de novo, the district court's findings of fact are reviewed for clear error. *Iwai*, 930 F.3d at 1144 (quoting *United States v. Wilson*, 865 F.2d 215, 216 (9th Cir.1989), and citing *United States v. Washington*, 490 F.3d 765, 769 (9th Cir.2007)). Furthermore, with respect to plain-view searches, this court reviews the district court's application of established facts to legal standards de novo. See, e.g., *United States v. Hudson*, 100 F.3d 1409, 1418 (9th Cir.1996).

**B.      The circumstances of the case do not permit the Government to justify the 2017 warrantless search by either the emergency or exigent circumstances exception to the warrant requirement of the Fourth Amendment.**

The 2017 search occurred within Mr. Buck's apartment. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. CONST. amend. IV, quoted in *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir.2009). "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. Martinez*, 406 F.3d 1160, 1163 (9th Cir.2005) (internal quotation marks omitted) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980) ).

**1.      Emergency**

This court has clearly held that a police officer may not enter a home to investigate a medical emergency or other immediate risk to life or limb unless he has "reasonable grounds" to believe an emergency is at hand and that his immediate attention is required. See, e.g., *United States v. Cervantes*, 219 F.3d 882 (9th Cir.2000); *United States v. Snipe*, 515 F.3d 947, 951 (9th Cir.2008).

This court must "judge whether or not the emergency exception applies in any given situation based on the totality of the circumstances, and, as with other exceptions to the warrant requirement, the Government bears the burden of demonstrating that the search at issue meets these parameters." *United*

45

*States v. Stafford*, 416 F.3d 1068, 1074 (9th Cir.2005).

The Government must demonstrate an "objectively reasonable basis" that the emergency exception applies. *Hopkins*, 573 F.3d at 764. The *Hopkins* court noted that not all claims of "medical emergency" create an emergency for the police: for example, the belief (and confirming medical evidence) that the subject of the 911 call is suffering from a diabetic coma does not create sufficient probable cause to justify a warrantless search:

> the mere suggestion that someone has a smell resembling alcohol on his breath and appears slightly intoxicated does not create "reasonable grounds" to suspect a diabetic emergency sufficient to justify warrantless entry into a home. If it did, then, as the officers acknowledged at oral argument, any time the police receive information from a layperson that someone inside a home has the appearance of a person who has consumed alcohol the police will be authorized to enter that home without a warrant. This result would expand the "narrow[,] ... <u>rigorously guarded</u> <u>exception</u>[ ] to th[e] warrant requirement" beyond all recognition, and simply cannot be the law.

*Id.* at 765 (emphasis added) (quoting *Stafford*, 416 F.3d at 1073).

Detective Barraza's original declaration did not demonstrate a medical basis that a crime had been committed, justifying a warrantless search:

- although deputies arrived "about the same time" as the medics, "[w]hen they arrived, an assisting unit was conducting chest compressions" on Mr. Moore. [ECF#72:p.08:ln.04-12.] The

- "[t]he paramedics did not see any injuries on Moore's body and did not deem his death suspicious." [Id.]

- although Mr. Buck told deputies Mr. Moore had used drugs, he said Mr.

46

Moore had done so hours before arriving. [ECF#72 & 72-3, generally.]
[Vol.1-ER-0214-0215.]

> **2.     The exigent-circumstances exception does not apply, because the first responders did not have either probable cause to search or a reasonable worry that the evidence would be destroyed.**

"[W]hen the government relies on the exigent circumstances exception, it ... must satisfy two requirements: first, the government must prove that the officer had probable cause to search the house; and second, the government must prove that exigent circumstances justified the warrantless intrusion." *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir.2001) (en banc). "Exigent circumstances" can include "the destruction of relevant evidence." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir.1984) (en banc).

Finding a person who is lying on his back, not breathing and without a pulse, does not create probable cause. Natural causes are just as likely an explanation -- the person simply could have suffered a heart attack or ischemic event. Nor was there a realistic threat of the destruction of the drugs: 1) the drugs had an elaborate storage place, 2) Mr. Buck was secured and cooperative, and 3) there is no suggestion he made furtive movements towards the drugs to destroy them.

The 2017 search had no exception to the warrant requirement justifying police presence in Mr. Buck's apartment.

### 3.    Plain view

The Government next claims that (1) the weapon was in "plain view" and (2) "its incriminating character [was] immediately apparent." *Horton*, 496 U.S. at 136–37; see also *Stafford*, 416 F.3d at 1076 ("To fall within the plain view exception, two requirements must be met: the officers must be lawfully searching the area where the evidence is found and the incriminatory nature of the evidence must be immediately apparent.")

Sheriff deputies were not lawfully searching the area, given that there was no probable cause that a crime had occurred. But more importantly, the record leaves serious questions as to whether Detective Barraza could "immediately" see the drug paraphernalia in the toolbox. In limine, the court heard the following evidence:

- Detective Barraza 2 declarations regarding the search, with only the later one stating the drawer had been sufficiently open to see the drugs plainly;

- Mr. Buck's declaration and testimony that he always kept the drawers closed and describing the weight of drawers – which didn't really allow to be ajar as Detective Barraza suggested; and

- descriptions of the toolchest – by itself, by its appearance – is in no way suggestive of criminal activity.

[Vol.1-ER-0214-0215;0249-0297.]

This evidence should have been sufficient to conclude the drugs were

not in plain view. However, this error was compounded by the district court's

denial of the opportunity to cross-examine Detective Barraza challenging her

credibility. [See next section, supra.]

Because the drugs and paraphernalia found during the 2017 search were

found in Mr. Buck's apartment without a warrant, the court erred by failing to

suppress this evidence.

**II.    The trial court violated Mr. Buck's Sixth Amendment rights by preventing Mr. Buck from confronting the officer who found the illicit drugs in the toolbox in Mr. Buck's apartment.**

**A.    Review**

This court reviews Confrontation Clause-based challenges to a district

court's limitations on cross-examination de novo, although "[a] challenge to

a trial court's restrictions on the manner or scope of cross-examination on

non-constitutional grounds" is reviewed for an abuse of discretion. *United*

*States v. Singh*, 995 F.3d 1069, 1080 (9th Cir.2021), cert. den., 142 S. Ct. 1422

(2022) (citing and quoting *United States v. Larson*, 495 F.3d 1094, 1101 (9th

Cir.2007)).

**B.    The district court should have allowed Mr. Buck to question Detective Barraza's credibility regarding the search.**

The Confrontation Clause secures a defendant's right "to be confronted

with the witnesses against him." U.S. CONST. amend. VI. The Clause also

49

Bates 051

guarantees "the right of effective cross-examination." *Larson*, 495 F.3d at

1102. However, the right to cross-examine is subject to very well-established

limitations that permeate the Federal Rules of Evidence.

> [T]rial judges retain wide latitude insofar as the Confrontation
> Clause is concerned to impose reasonable limits on such cross-
> examination based on concerns about ... harassment, prejudice,
> confusion of the issues... or interrogation that is... only
> marginally relevant.

*Larson*, 495 F.3d at 1102 (quoted in *Singh*, 995 F.3d at 1080).

> *United States v. Mikhel*, 889 F.3d 1003, 1048 (9th Cir. 2018), is the test

for when restrictions on cross-examination become sufficiently extensive to

raise Confrontation Clause concerns that may undermine the fairness of a trial.

> Under *Mikhel*, the inquiry is "(1) whether the excluded evidence
> was relevant; (2) whether there were other legitimate interests
> outweighing the defendant's interest in presenting the evidence;
> and (3) whether the exclusion of evidence left the jury with
> sufficient information to assess the witness's credibility."

*Singh*, 995 F.3d at 1080 (quoting *Mikhel* and citing *Larson*, 495 F.3d at 1103).

Counsel could not have been clearer that Mr. Buck sought to challenge

Detective Barraza's credibility regarding whether the toolbox drawer was

sufficiently ajar to have made viewing the drugs and paraphernalia obvious to

plain view:

> It was my intent, and I understood exactly what the
> Court's ruling was, that I could go into the credibility of
> Deputy Barraza as to the facts or as to how she came to
> this

50

plain view explanation a year later, but I understand we're not litigating what that means in terms of a valid search or not.

[Vol.4-ER-0793.] Counsel continued:

it still goes to her credibility that she never mentioned this to anybody until Detective Carlin and she communicated about this after the DA said they weren't gonna file.

So it still goes to her credibility as to why, particularly, particularly when you see the government's exhibits where you have a tool chest that is a photograph of, and the drawers appear to be slightly ajar, and you can't see what's in there. And so there's a credibility issue there.

There's a credibility issue regarding the fact that none of the evidence that was allegedly found in these drawers was preserved, at least not the drug evidence was preserved in the state that it was allegedly found. So it all boils down to her credibility. All of this is based on her credibility, Your Honor.

[Id.,0796.] Counsel specifically argued that the court's ruling would preclude

his ability to confront this crucial witnesses' testimony that was the basis for

the seizure of the drugs following Mr. Moore's passing:

We are blocked from challenging her credibility and -- because -- because in -- in trying to, uh, cross-examine the witness, it might come out that she wrote a report a year -- a year after the incident explaining where she found where she actually found these items.

[Vol.4-ER-0804.]

The court contested the notion that the detective's credibility was a

proper question for the jury's consideration and repeated stated that because

of the limine ruling, this was not a matter for appellate review. The court

suggested counsel had surprised the court with this potential line of

questioning:

> THE COURT: No, you aren't. In the previous
> hearings, there was never, never, never, uh, a claim by the
> defense that she hadn't found it. The attack was how she had
> found it and the fact that it was not in plain view versus
> being in plain view. There has never been a suggestion in
> this case that she didn't find the evidence. The question
> is --
> MR. CREARY: I would disagree, Your Honor.

[Id.,0806.]

Counsel then stated he was not "aware that we'd be required to either

challenge whether she found it or not prior to trial. [id.,0807:ln.01-03.] The

court concluded that "the time for motions to suppress has long pas[sed]."

[Id.:ln.14-15.]

III.   **The trial court violated Federal Rule of Evidence 404(b) by
admitting improper evidence of other bad acts.**

A.   **Review**

This court reviews whether evidence is other act evidence within the

meaning of Fed. R. Evid. 404(b) de novo, but the admission of this evidence

for abuse of discretion.  See *United States v. Carpenter*, 923 F.3d 1172, 1180–

81 (9th Cir.2019); *United States v. Hill*, 953 F.2d 452, 455 (9th Cir.1991).

"Where a district court errs in admitting other act evidence, … review [is] for

harmless error." *Carpenter*, 923 F.3d at 1181.

### B.    Standard

The Government has the burden to show that 1) "other act" evidence is admissible under one of the exceptions to Rule 404(b), and 2) the proffered evidence is "more probative than … prejudicial to the defendant." *United States v. Holiday*, 998 F.3d 888, 895 (9th Cir.2021) (citing *United States v. Sims*, 617 F.2d 1371, 1378 (9th Cir.1980) (quoting *United States v. Hernandez-Miranda*, 601 F.2d 1104, 1108 (9th Cir.1979)). Furthermore, the court should ensure that

> (1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged.

*United States v. Bailey*, 696 F.3d 794, 799 (9th Cir.2012) (citation omitted).

> [S]uch evidence is never admissible unless it is "necessary" to establish a material fact such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

*United States v. Shelton*, 628 F.2d 54, 56 (D.C. Cir.180) (emphasis added) (footnote omitted).

Federal courts have recognized that there are "unique dangers of unfair prejudice associated with evidence of other bad acts," *United States v. Lavalle*, 751 F.2d 1266, 1275 (D.C. Cir.1985), and that such evidence creates

"enormous danger of prejudice to the defendant" because "juries are prone to draw illogical and incorrect inferences from such evidence," *Shelton*, 628 F.2d at 56.

    **C.**    **The "other act" evidence of additional party-and-play participants, the alleged threats of violence, and the alleged racial statements were unnecessary, duplicative, and prejudicial.**

First, the additional "party-and-play" witnesses were duplicative. This case already included 6 named defendants, 4 of whom testified to their own experiences. The idea that a "pattern or practice" needed to be established beyond the descriptions provided by Sinclair, Hoffman, Gagnon, and Brown is simply overkill. A defendant has a difficult time overcoming a seemingly never-ending avalanche of evidence, especially for charges that have not been filed.

An example of the overkill of the "other act" emphasis (and the Government's emphasis on the salacious aspect of the case) can be found in the sheer amount of video evidence introduced. Through the testimony of Detective Carlin and Sergeant Cardella and Allen Gates, the Government inundated the jury with images of "other act" evidence:

- pictures and video from witness Markellis Jefferson, showing him smoking and discussing "slams" with Mr. Buck [Vol.5-ER-0992-0997];[2]

---

[2] See Tr.Exh.79.19,79.2,79.21,79.33,79.35,79.38.

- a video clip of witness Daniel Lyons smoking drugs [Vol.5-ER-0990];[3]

- a video clip of Charles Daniel Moore smoking drugs through a gas mask [id.,0995];[4]

- a video clip of Darrell Edwards in Mr. Buck's Apartment [id.,1007],[5] and still

- several other unidentified men (and sometimes Mr. Buck), showing men smoking drugs, sometimes with Mr. Buck allegedly instructing how to smoke drugs, and at least one showing a man injecting drugs [id.,0993-09961043-1045.][6]

[See Vol.5, generally.] This is in addition to video from two of the alleged victims:

- screenshots from 10 separate video clips of Mr. Moore and Mr. Moore and Mr. Buck, some of which included the men smoking [Vol.5-ER-09700-0974];[7]

- two videos from Jermaine Gagnon [Vol.6-ER-1188.][8]

[See Vol.5,Vol.6, generally.]

-----

[3] See Tr.Exh.79.32.

[4] See Tr.Exh.79.28.

[5] See Tr.Exh.79.22.

[6] See Tr.Exh.79.23,79.25,79.26,79.27,79.29,79.36,79.37,79.4.

[7] See Tr.Exh.79.4,79.5,79.7,79.8,79.9,79.12,79.13,79.14,79.16,79.17.

[8] See Tr.Exh.115,115.1.

Second, the additional "party-and-play" witnesses (and even some of the alleged victims) introduced "other act" evidence not relevant or charged by the Indictment:

- Mr. Sinclair claimed Mr. Buck liked to set Sinclair's genitals on fire [Vol.3-ER-0100];

- Mr. Gagnon claimed Mr. Buck threatened him with a chainsaw [Vol.7-ER-01564]; and

- the parties stipulated that Mr. Hoffman would have testified Mr. Buck had a fog machine in his apartment. [ECF#165.]

The Indictment does not include any assault or terroristic crimes to which these allegations were relevant; if so, the Government should have added these charges. They do not address the distribution, the "drug premises," or even the inducement charge. [Vol.2-ER-0488.]

**D.    The "racial animus" evidence of was unnecessary, duplicative, and prejudicial.**

Additionally, all the Government's efforts to introduce racial animus in this case were completely unnecessary. The Government placed heavy emphasis on these alleged statements:

- Daniel Lyons, one of the "other act" witnesses, stated that Mr. Buck referred to him using the n-word. [Vol.6-ER-1116:ln.16-18.]

- The Government played a video – Exhibit 79.22 – that although "sanitized," was introduced solely for the purpose to demonstrate a racial animus [Vol.5-ER-0997-0998];

The Government claimed that this evidence was relevant to motive, but the motive in these cases was supposed to be sexual, not racial. This is not, as the district court analyzed, similar to a cross-burning skinhead. [Vol.1-ER-0244 (citing *Skillman*, 922 F.2d at 1374).]

Because the record is rife with "other act" evidence that is not necessary to prove the stated charges, the court erred in permitting this evidence, especially given the lurid unfairly prejudicial nature of this evidence.

## IV. The trial court violated Mr. Buck's due-process rights by permitting improper argument by the Government.

### A. Review

The district court's decision to allow a jury to consider comments made in closing argument is reviewed for an abuse of discretion. See *United States v. Tucker*, 641 F.3d 1110, 1121 (9th Cir.2011); *United States v. Tam*, 240 F.3d 797, 802 (9th Cir.2001). Any improper comments are subject to harmless error review. See *United States v. Brown*, 327 F.3d 867, 871 (9th Cir.2003).

### B. Impermissibly suggesting Mr. Buck had more victims created an impermissible urge for the jury to "act" by convicting Mr. Buck, thereby depriving him of a fair trial.

Although he did not interrupt the Government's closing, Mr. Buck objected to the Government's statement that the witnesses represented a "sample" of Mr. Buck's alleged victims at the first possible opportunity. The

57

court acknowledged that the Government had no basis for this statement but felt the special Jury Instruction 13 would sanitize the error. Of course, the instruction was general and did not refer to the "sample" comment. [See Facts §VI, infra.]

Improper prosecutorial statements violate due process if they "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoted in *Ford v. Peery*, 999 F.3d 1214, 1224 (9th Cir.2021).

> Prosecutorial misconduct within the meaning of *Darden* does not require improper motive on the part of the prosecutor; it requires only an improper statement. But such misconduct "rises to the level of *Darden* error only if there is a reasonable probability that it rendered the trial fundamentally unfair."

*Perry*, 999 F.3d at 1224 (quoted *Deck v. Jenkins*, 814 F.3d 954, 985 (9th Cir.2016)).

The prejudice to the "sample" quote is the same as any "predator" argument: the Government is appealing to the jury to stop a "monster." Labeling a defendant as a "sexual predator" (which is contrary to the party-and-play subculture):

> ask[s] that the jury speculate 'How many others are there?'" impermissibly shifting the burden " … [c]ertainly a prosecutor should not invite the jury to speculate ...."

*Thomas v Gipson*, 2023 WL 5334425, at *14 (E.D. Cal. Aug. 18, 2023)

(quoting *People v. Yeoman*, 31 Cal.4th 93, 149 (2003)).

## V.    The trial court violated Mr. Buck's due-process rights by affirming his conviction without sufficient evidence of causation.

### A.    Review

A defendant is entitled to a judgment of acquittal if the evidence produced against him is insufficient to sustain a conviction. FED.R.CRIM.P. 29(a); *United States v. Hazeem*, 679 F.2d 770, 772 (9th Cir.1982). A judgment of acquittal should be granted where "there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir.1999); see also *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir.2002) (question is whether, after viewing evidence in light most favorable to prosecution, any rational trier of fact could find essential elements of crime beyond reasonable doubt).

### B.    The Government failed to prove that methamphetamine-overdose is the "but-for cause" of either Mr. Moore's or Mr. Dean's death.

"In *Burrage*, the Supreme Court held that the drugs distributed by a defendant must be an 'independently sufficient cause of the victim's death or serious bodily injury' or a 'but-for cause of the death or injury' to establish liability under 21 U.S.C. §841(b)(1)(C).'" *United States v. Ducasse*, 2019 WL

5058583, at *4 (D. Alaska Oct. 7, 2019) (citing *Burrage*, 571 U.S. at 214).

See also *United States v. Houston*, 406 F.3d 1121, 1124–5 (9th Cir.2005)

(requiring a "but-for" causation standard for the 'death resulting' prong of the

Controlled Substances Act).

### 1.    Gemmel Moore

The competent medical evidence in this case leads to one conclusion,

as expressed by Dr. Marvin Pietruszka: Gemmel Moore died of pulmonary

edema brought upon by complications HIV/AIDS. This is corroborated by

Mr. Moore's mother Latisha Nixon's testimony (who had experience in the

medical field), the last time he was in Texas, Mr. Moore looked like he had

AIDS or cancer and that he'd had seizures. His health was also compromised

by chronic methamphetamine abuse, which could account for how he acquired

the HIV virus.

Dr. Young's testimony on cause of death was not competent on this

point and did not address the factors in the case, as Dr. Marvin Pietruszka

explained:

- Dr. Young erroneously relied on only a heart and femoral blood sample to predict the concentration of methamphetamine in Mr. Moore's before death. [Vol.2-ER-0441]; but

- heart blood is an unreliable indicator of methamphetamine concentration before death, because – on death – heart blood is significantly affected by post-mortem distribution or diffusion of chemicals across tissues that changes the concentration of

methamphetamine in the blood [Vol.2-ER-0441]; and

- although femoral blood is less susceptible to changes in chemical concentrations after death than heart blood, post-mortem distribution also affects measurements in femoral blood unless the sample is corroborated by another blood sample not from the heart (e.g., kidney). [Id.,0427-0428.]

Thus, although the heart and blood samples Dr. Young used are indicators of the presence of methamphetamine in a decedent's blood [id.], because of this post-mortem distribution, Dr. Young's estimates of the methamphetamine level in Mr. Moore's bloodstream were unreliable.

Consequently, any predictions of the toxicity to Mr. Moore, were similarly unreliable. [Vol.2-ER-0427-0328.] Furthermore, as to toxicity, Dr. Young failed to consider the possibility that Mr. Moore's might have consumed the methamphetamine, later found in his blood, before arriving at Mr. Buck's apartment [id.,0420-0425]:

- A person can test positive for methamphetamine up to four days after a person ingests the drug [id.,0423];

- Someone tolerant to methamphetamine, may have a high level of methamphetamine in their blood days after using the drug and experience no negative symptoms [id.];

- Dr. Pietruszka testified that the septum of Mr. Moore's heart was approximately 30% larger than normal – evidence of the damage that his methamphetamine use inflicted on his heart. [Id.,0430.]

Thus, because Mr. Moore was a chronic user of methamphetamine, he might

have consumed the methamphetamine Dr. Young found in Mr. Moore's

system days before he arrived at Mr. Buck's apartment. [Vol.2-ER-0420-

0425.]

Because the Government's evidence was incompetent to prove Mr.

Buck gave Mr. Moore the methamphetamine that the Government believed

was the cause of his death (if the methamphetamine was a sufficient cause by

itself), the court should have acquitted Mr. Buck of Count 1.

### 2.    Timothy Dean

Timothy Dean had multiple health issues, including a bad heart and

pulmonary edema brought on by the ravages of methamphetamine addiction

and alcoholism. The evidence establishes that he died of advanced heart

disease combined with the effects of alcohol intoxication.

Dr. Pietruszka determined, based on Mr. Dean's autopsy, that Mr. Dean

died from severe heart disease and alcohol toxicity and that methamphetamine

had a minimal effect, if any, on Mr. Dean's death. [Vol.2-ER-0436-0437.]

Four factors made Mr. Dean's heart disease particularly deadly.

- First, Mr. Dean's heart weighed 500 grams where a normal heart typically ranges from 350 to 380 – at best 24% enlarged. [Id.,0429.] Enlargement of Mr. Dean's heart, significantly impedes its ability to pump blood effectively, often causing pulmonary edema. [Id.,0431.]

- Second, Mr. Dean had ventricular hypertrophy, a thickening of the heart walls, which further impeded his heart's ability to pump blood effectively. [Id.,0431.]

62

- Third, as Dr. Young noted, one of Mr. Dean's coronary arteries was nearly completely occluded. [Vol.2-ER-0431]

- Fourth, when Dr. Pietruszka conducted microscopic analysis on Mr. Dean's heart he found chronic myocarditis, or inflammation of the heart muscle, likely from a past viral infection of the heart. [Id.,0429-0430.]

As a result of the factors contributing to Mr. Dean's severe heart disease, his heart failed. [Id.,0431.]

- Although Mr. Dean's BAC would typically be survivable in a healthy person, with his severity of heart disease, his BAC carried a significant risk of sudden death. [Id.]

- As Mr. Dean's heart began to fail, it caused pulmonary edema. [Id.,0430.]

- Mr. Dean's autopsy found that he had nearly a liter of fluid in each lung. [Id.]

- Mr. Dean's heart failure and worsening pulmonary edema pushed him into cardiorespiratory arrest, and ultimately caused his death. [Id.]

Importantly, pulmonary edema generally does not occur with methamphetamine overdoses. [Vol.2-ER-0429.]

Dr. Miller conceded that ethanol and heart disease could have killed Mr. Dean without methamphetamine [Vol.2-ER-0385], which not only corroborates Dr. Pietuszka's findings as to cause of death, but also establishes that methamphetamine was not the but for cause.

Further, Dr. Miller believes that Mr. Dean injected himself [id.,0394],

63

and none of the syringes (only one of which was used) found in or around the apartment had Mr. Dean's DNA inside of them. This leads to only one conclusion, that being that Mr. Dean injected himself with methamphetamine before arriving at Mr. Buck's apartment.

Because the Government's evidence was incompetent to prove Mr. Buck gave Mr. Dean the methamphetamine that the Government believed was the cause of his death (if the methamphetamine was a sufficient cause by itself), the court should have acquitted Mr. Buck of Count 2.

**C.    The Government has failed to prove that Mr. Buck rented, leased or maintained his apartment for the purposes of using or distributing methamphetamine.**

Although the district court correctly noted that the fact that a defendant uses a premises as his primary residence does not necessarily negate a conviction under the "drug house" statute, "Congress's primary purpose in enacting § 856(a)(1) was to target those who use their property to profit from drug sales." *Shetler*, 665 F.3d at 1162.

> Particularly where the property in question is the defendant's own home—and is devoted principally to the ordinary activities of residential living—evidence beyond drug manufacture for personal use is necessary to sustain a conviction under § 856(a)(1).7 An individual does not employ his property for a "primary or principal" use of drug activity where he merely grows or manufactures drugs in his own home for his own consumption (and for those who share his residence and its residential purposes). In sum, although the evidence necessary for conviction will therefore generally involve actual commercial

drug transactions, it may in some circumstances be possible for a jury to infer that a defendant's drug activities were a "primary or principal use" of the property where, even if he does not profit financially from such activity, there is evidence that drug activity involving consumption or use by numbers of non-resident individuals occurs in the home.

*Id.* at 1163.

The *Shelter* court affirmed because of sufficient evidence that the defendant manufactured drugs in his home "for a purpose other than consumption by himself and those who shared his home." *Id.* Distributing methamphetamine is not one of the principal uses to which Mr. Buck's apartment was put, despite the testimony of Liam Sacks and Joshua Tedla that they saw constant foot traffic to Mr. Buck's apartment. These two witnesses had never been inside Mr. Buck's apartment, so they do not know what was happening between Buck and his visitors.

The primary purpose for Mr. Buck's apartment was as his home for 20 years. He rented it to live eat and sleep there, those are the things that he did consistently at the residence. The government has failed to prove Count 7 beyond a reasonable doubt.

**D.    The Government has failed to prove that Mr. Buck persuaded, induced and enticed Gemmel Moore or Jermaine Gagnon**

Regarding the inducement charges (Counts 8 and 9), the statute provides in pertinent part:

65

> whoever knowingly persuades, induces, entices, or coerces any
> individual to travel in interstate or foreign commerce ... to engage
> in prostitution ... .

18 U.S.C. §2422(a). The Government did not produce sufficient evidence that

Mr. Buck persuaded, induced, or enticed Mr. Moore or Mr. Gagnon across

state lines.

In §2422(a), the words persuade, induce, and entice retain their plain

and ordinary meanings. *Rashkovski*, 301 F.3d at 1136. Accordingly, persuade

means "to move by argument, entreaty, or expostulation to a belief, position,

or course of action," induce means "to move by persuasion or influence," and

entice means "to attract artfully or adroitly or by arousing hope or desire

tempt." *Id.* (citing the 2002 Merriam-Webster dictionary). In general, to

persuade, induce, or entice a victim, a defendant must have "convinced or

influenced" a person to undergo the journey, or made the possibility more

appealing. *Id.* Crucially, however, the act of persuading, inducing, or enticing

is distinct from the act of transporting. See *United States v. Williams*, 291 F.3d

1180, 1187-88 (9th Cir.2002). Accordingly, the government must not only

prove that transportation occurred, "[it] must prove the additional fact of

coercion, persuasion, or enticement under §2422(a)." *Id.* (emphasis added).

In *Rashkovski*, the defendant engaged in a deliberate campaign to

convince his victims to travel to the United States from Russia for purposes

of prostitution. *Id.* at 1135. The defendant traveled to Russia where he held a series of recruitment meetings during which he made the possibility of coming to the United States more appealing by extolling the benefits of the American prostitution business and describing specific renumeration the victims would receive for their prostitution work. *Id.* Thus, the extent of *Rashkovski* campaign to convince the victims to travel outweighed the victim's generalized desire to move to the United States to escape their circumstances in Russia. *Id.* at 1137.

In *United States v. Zitalpopoca,* 495 Fed.Appx. 833 (9th Cir.2012), however, this Court held that the actions of the alleged victim are probative of whether a defendant persuaded, induced, or coerced the victim. *Id.* at 836. (distinguishing *Rashkovski*). In *Zitalpopoca*, the defendant transported an alleged victim across state lines who ultimately engaged in prostitution, this Court nonetheless found that the evidence was insufficient to sustain the defendant's conviction because the alleged victim had persuaded the defendant to travel "not the other way around." *Id.* Thus, in *Zitalpopoca*, this Court weighed the actions of both the alleged victim and the defendant and concluded that when the evidence shows that the idea of travel originates with a victim, the victim engages in active persuasion of the defendant and a defendant merely facilitated the proposed travel, there is insufficient evidence

to sustain a conviction under §2422(a).

### 1.    Gemmel Moore

In the instant case, Mr. Moore initiated the contact with Mr. Buck and attempted to persuade Mr. Buck to fly him to Los Angeles; Mr. Buck merely assented to Mr. Moore's offer, and then facilitated Mr. Moore's travel. Mr. Buck concedes that he transported Mr. Moore, but the Government failed to adduce the additional evidence at trial of persuasion, inducement, or coercion required to sustain a conviction under §2422(a).

At trial, Detective Carlin testified that Mr. Moore reached out to Mr. Buck saying, "I'm starting to miss L.A.," and accompanied the text with a video of a woman injecting herself with a hypodermic needle – indicating that Mr. Moore wished to go to L.A. to use intravenous drugs. [Vol4.-ER-0916.] Mr. Moore's actions, and Mr. Buck's response, mirror the facts in *Zitalpopoca* for three reasons.

- First, Mr. Moore initiated contact with Mr. Buck and proposed, without prompt from Mr. Buck, the idea of traveling to LA. The idea of travel and drug use, therefore, originated with Mr. Moore not Mr. Buck.

- Second, when Mr. Moore sent a picture of intravenous drug use to Mr. Buck, he attempted to make the possibility of Mr. Buck facilitating his travel more appealing. In other words, he attempted to persuade Mr. Buck to fly him to Los Angeles.

- Third, the government failed to produce any evidence that Mr. Buck offered any incentive beyond a plane ticket and a car trip

from the airport. Mr. Buck, therefore, merely facilitated Mr. Moore's travel, a fact which, by itself, does not qualify as persuasion, inducement, or enticement.

Thus, the idea of travel originated with Mr. Moore, Mr. Moore engaged in active persuasion of Mr. Buck, and Mr. Buck did no more than facilitate the victim's travel.

- Moreover, Mr. Buck's response to Mr. Moore's proposal falls well short of the campaign the defendant in *Rashkovski* waged to convince his victims to come to the United States for the purposes of prostitution.

- Although Mr. Buck responded, "be here now," and "If you lived here, you'd be home now," in context, these remarks merely evince a positive response to Mr. Moore's active attempt at persuasion.

Rashkovski took a series of actions, unprompted by his victims, to make prostitution in the United States seem appealing, and even specified specific compensation that for the victims for engaging in prostitution. By contrast, Mr. Buck sent two text messages directly solicited by Mr. Moore, which indicated only an affirmative response to Mr. Moore's persuasion.

Thus, measured against the defendant in *Rashkovski*'s consistent and substantial effort to influence his victims to travel to engage in prostitution, Mr. Buck's minor indications of assent do not rise to the level of persuasion, inducement, and enticement under §2422(a).

In sum, therefore, there was insufficient evidence to sustain a

conviction under §2422(a).

### 2.    Jermaine Gagnon

The Court gave the standard instruction, without further definition of the specific provisions. In its argument, the government stated that the terms of the statute meant,

> Importantly, it doesn't matter if the person who traveled interstate wanted to do so or, indeed, if it was their idea. What matters is that the defendant did some act to persuade or encourage or entice this individual to actual travel.

[Vol.9-ER-2006.] This Court found in *Zitalpopoca* that this is not a correct statement of law.

Thus, not only did the government incorrectly tell the jury to not evaluate Moore's actions in clearly initiating the contact, it also told the jury not to evaluate the credibility of Gagnon's assertions that Mr. Buck initiated the contact—affirmatively telling the jury that any such finding was irrelevant

## VI.    The trial court's cumulative errors constitute reversible error and entitle Mr. Buck to a new trial.

### A.    Review

In reviewing for cumulative error, the court must review all errors preserved for appeal and all plain errors. Even if a particular error is cured by an instruction, the court should consider any "traces" which may remain.

*United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir.1993) (citing

*United States v. Berry*, 627 F.2d 193, 200, 201 (9th Cir.1980)).

Our cumulative error analysis also considers errors not rising to the

level of plain error. *United States v. Fernandez*, 388 F.3d 1199, 1256-57 (9th

Cir.2004). We affirm if "it is more probable than not that, taken together," the

cumulative effect of the errors "did not materially affect the verdict." *Id.* at

1257.

> **B.**    **The "other act" evidence, the allegation of deviant sexual behavior, the allegation of racial epithets, and the suggestion of other victims in the Government's closing cumulatively constitute reversible error.**

Cumulative error applies when, "although no single trial error

examined in isolation is sufficiently prejudicial to warrant reversal, the

cumulative effect of multiple errors may still prejudice a defendant." *Mancuso*

*v. Olivarez*, 292 F.3d 939, 957 (9th Cir.2002) (quoting *United States v.*

*Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996)).

Specifically in this case, the testimony of the percipient witnesses was

duplicative, excessive, and inflammatory. The Government also never failed

to emphasize both the "deviant" sexual aspects of this case and the alleged

racial motivation, both of which were belied by the often-continuous

relationship Mr. Buck had with these men – much of which should have been

precluded by the unfair prejudice provision of Rule 404 (or Rule 403).

71

The court was aware of the impact of this evidence and expressed

regarding the sexual evidence's

> impact, and I don't mean just for this case, but ongoing
> psychological impact on jurors can be great. And I will not
> say anything at this juncture, but it may well be that we
> offer counseling to them at the conclusion of the case.
>         MS. NORELL: Understood.
>         THE COURT: I haven't decided yet, but I just think
> you have a case to put on, and I understand that, but you
> also, I think, may want to be careful about how aggressively
> you put it on.

[Vol.5-ER-0998-0999:ln.23-09.][9] All of this was identified by defense

counsel in closing argument. [See infra.]

When these errors are combined with the Government's suggestion

during closing that these person were just a "sample" of "all" of Mr. Buck's

"victims," the jury undoubtedly felt compelled to act to prevent a serial

predator. See, e.g., *Thomas v,* 2023 WL 5334425, at *14 (quoting *Yeoman,* 31

Cal.4th at 149).

/ / /

/ / /

---

[9] The court addressed the impact of the "shock factor' of this case, noting that although "counseling for the jury is sometimes provided where the evidence is disturbing, the fact that the evidence was disturbing does not mean that the evidence was unfairly prejudicial." [Vol.1-ER-0130,n.5 (citing *United States v. Jahner*, 72 F.App'x 665, 666 (9th Cir.2003)).]

**VII.  The district court's sentence of 360 months/30 years was substantially unreasonable because it was unduly harsh under the circumstances, and therefore, constitutes an error in judgment.**

Based on the purposes of the Sentencing Guidelines, and Mr. Buck's mitigating circumstances, an effective life sentence was error in this case.

**A.    Review**

The district court's construction of the United States Sentencing Guidelines is reviewed de novo, and its application of the Guidelines to the facts is reviewed for abuse of discretion. *United States v. Harris*, 999 F.3d 1233, 1235 (9th Cir.2021). The district court's factual findings are reviewed for clear error.  See, e.g., *United States v. Halamek*, 5 F.4th 1081, 1087 (9th Cir. 2021); *Harris*, 999 F.3d at 1235.

District courts' sentencing decisions are entitled to deference. See *United States v. Martinez-Lopez*, 864 F.3d 1034, 1043 (9th Cir.2017) (en banc).  Sentences are reviewed for reasonableness, and only a procedurally erroneous or substantively unreasonable sentence is set aside. See, e.g., *United States v. Cruz-Mendez*, 811 F.3d 1172, 1175 (9th Cir. 2016).

**B.    The district court's sentence of three-hundred sixty months (360) / thirty (30) years was unnecessary to accomplish the purposes of 18 U.S.C. § 3553(a).**

18 U.S.C. §3553(a) recommends that the court consider the need for the sentence imposed to provide just punishment for the offense. See *United*

73

*States v. Henry*, 1 F.4th 1315, 1322 (11th Cir.2021), cert. den., 142 S. Ct. 814 (2022) ("under *Gall*, not only are the Guidelines advisory—it is error to treat them as mandatory. … Determining an accurate Guidelines recommendation is 'the starting point and the initial benchmark.'") (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

In determining whether a punishment is "just," a number of factors need to be considered. A "just" punishment is punishment that "fits the crime." *Simon v. United States*, 361 F.Supp.2d 35, 43 (E.D.N.Y. 2005). The punishment should not be unreasonably harsh under all of the circumstances of the case. See *United States v. Wilson*, 350 F.Supp.2d 910 (D. Utah 2005) (citing S. REP. NO. 98-225, at 75-76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3258–59).

### 1. A sentence of 360 months/30 years was not necessary to punish the nature of this offense.

As discussed above, Mr. Buck has been entirely forthcoming about the many underlying mental, physical, and substance abuse issues that led to his involvement in the instant offense. Thus, Mr. Buck has demonstrated his commitment to rehabilitation by taking concrete steps to address the underlying issues that led to his participation in the instant offense.

The Sentencing Guidelines ask the district court "what [would be] a 'sufficient but not greater than necessary sentence'" under the circumstances.

*United States v. Shouse*, 755 F.3d 1104, 1108 (9th Cir.2014) (quoting 18

U.S.C. §3553(a)). "[N]ecessary" is the "operative word." *United States v.*

*Adelson,* 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006). As Mr. Buck's attorney

explained during the sentencing hearing,

> Sometimes in this building we lose sight of what a sentence
> means. 30 years for two sad, tragic but nevertheless accidental,
> deaths with no intent to kill is way overboard, your Honor, and I
> would ask the Court to please reconsider and give him closer to
> the mandatory minimum that would reflect, A, a substantial
> sentence, far greater than anything that he would ever get across
> the street in a State Court; and, two, it's a horrendous punishment.
> Going to prison for 20 years is not a treat. It's not a favor. It's a
> life sentence almost, no matter what.

[Vol.1-ER-0114-0115.]

Accordingly, there was no need for a custodial sentence as high as the

one recommended by Probation, which would amount to the functional

equivalent of a life sentence. Instead, the Court should have imposed a lower

custodial sentence with a focus on rehabilitation and treatment for these

underlying issues.

### 2. A sentence of 360 months / 30 years was not necessary to protect the public.

Another factor to consider in determining the need for the sentence

imposed is whether or to what extent society needs to be protected from the

defendant. Further, in determining whether the length of the sentence is

adequate to protect the public from further crimes of the defendant, it is also

relevant to determine a defendant's likelihood of recidivism.

Here, Mr. Buck is already an elderly man in ill health. Thus, even a lower-end custodial sentence, with a focus on rehabilitation, will ensure that any concern about public safety is adequately alleviated. However, to the extent that any concerns remain, the Court may also impose a lengthier term of supervised release with appropriate conditions to further mitigate any concerns with protecting the public.

C.    **The district court should have mitigated Mr. Buck's sentence.**

The United States Supreme Court has instructed that evidence about a defendant's background and character is relevant

> because of the belief, long held by this society, "that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), abrogated on other grounds by *Atkins v. Virginia*, 536 U.S. 304 (2002). As one court noted,

> Surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.

*Adelson,* 441 F.Supp.2d at 515.

Here, Mr. Buck's history and characteristics are highly mitigating, as

76

set forth in Mr. Buck's Sentencing Memorandum and attached exhibits. Mr.

Buck presented the following undisputed evidence to the district court for its

consideration:

- a volatile and dysfunctional childhood household;

- undiagnosed mental health and substance abuse issues prevalent on his
  father's side of the family (alcoholism, verbal and physical abuse);

- sexual abuse of Mr. Buck by his father at age eleven (11), nearly every
  other day for the better part of two years;

- use of shame by Mr. Buck's father, compelling Mr. Buck to participate
  in religion, where Mr. Buck was then sexually abused by various clergy
  members;

[ECF#236.]

Despite these unimaginably difficult circumstances, Mr. Buck

demonstrated resilience and his ability to participate as a productive member

of society, as demonstrated by:

- his graduation from high school, and college;

- he began a successful modeling and acting career;

- through various business ventures. Mr. Buck had earned enough money
  by the age of 32 to "retire" from business;

- nonetheless, he worked in the field of animal rights activism, LGBTQ
  causes, and AIDs advocacy – all of which was well-noted.

[Id.]

Yet, in his mid-forties, Mr. Buck was prescribed amphetamines to deal

Bates 079

with severe chronic physical and cognitive issues. This began decades of dependence on first prescription amphetamines and then, oral and intravenous methamphetamine. This severe narcotic addiction, for which Mr. Buck never sought professional help, was a major factor in his eventual involvement in the instant offense.

Thus, Mr. Buck's history and characteristics are highly mitigating because they help to explain and contextualize his later self-destructive and risky behaviors. Indeed, Mr. Buck's history and characteristics show an individual subjected to unusually horrific amounts of early childhood trauma, and persistent abuse, compounded by physical, mental health, and substance abuse issues.

This history is notable, therefore, because it shows that despite facing inconceivable amounts of abuse and pain from a very early age and from some of the most trusted adults around him, Mr. Buck made a conscious effort to escape from that abusive environment and to contribute positively to society. Indeed, for years, he worked to contribute to important causes through his philanthropic work and activism. However, Mr. Buck's undiagnosed and untreated mental health and substance abuse issues eventually caused him to spiral into highly risky and self-destructive patterns of behavior.

Notably, since his arrest, Mr. Buck has been highly forthcoming about

Bates 080

his mental, physical, and substance abuse issues and has expressed an unqualified desire to obtain help and rehabilitation for these issues. Thus, there is no reason to believe that these issues cannot be redressed and solved with appropriate rehabilitative care and treatment.

Thus, the Court should consider imposing an appropriate custodial sentence that allows Mr. Buck to obtain the mental health and substance abuse counseling he needs and allows him to eventually reintegrate into society. In this case, even the sentence recommended by Probation would be unduly punitive as it would amount to the functional equivalent of a life sentence for a man of Mr. Buck's age. Thus, the Court should have imposed a custodial sentence below the guideline recommendation – such as a sentence closer to the minimum 20 years.

**VIII.  The fine imposed was excessive and arbitrary, violating Mr. Buck's Eight Amendment rights.**

**A.     Review**

This court reviews the decision to impose a fine and its amount for reasonableness, and a finding the defendant is able to pay for clear error. *United States v. Orlando*, 553 F.3d 1235, 1240 (9th Cir.2009).

**B.     Given Mr. Buck's effective life sentence and inability to ever earn more money, the amount of the fine imposed is excessive**

"The Excessive Fines Clause limits the government's power to extract

payments, whether in cash or in kind, as punishment for some offense."
*Alexander v. United States*, 509 U.S. 544, 558 (1993) (citing *Austin v. United States*, 509 U.S. 602, 609–610 (1993)); see also U.S. CONST., amend. VIII.

"A fine is unconstitutionally excessive if (1) the payment to the government constitutes punishment for an offense, and (2) the payment is grossly disproportionate to the gravity of the defendant's offense." *United States v. Mackby*, 261 F.3d 821, 830 (9th Cir.2001) (citing *United States v. Bajakajian*, 524 U.S. 321, 327-28 (1998)).

As for the fine, the Government suggested that 1) the maximum statutory fines for these offenses would be $9 million for these offenses, 2) the Government found financial records in Mr. Buck's apartment suggesting he had as much as $3.4 million in assets, and 3) Probation had recommended a fine in this case of a million dollars. [Vol.1-ER-0026:ln.10-25.] The Government requested a fine of $400,000. [Id.,0029:ln.02-18.]

The parties disputed the full extent of Mr. Buck's assets. Defense counsel explained that Mr. Buck had difficulty even gathering records while incarcerated from the various financial institutions his various financial institutions. [Id.,0029-0033.] Mr. Buck's counsel recounted his liabilities, namely:

1)      a tax debt of approximately $300,000;

2)    a debt to his mother for at least a million dollars as reimbursement for attorney's fees; and

3)    $800,000 already paid to prior defense counsel.

[Id.] Mr. Buck's counsel argued a fine of $400,000 was "excessive and arbitrary" [Vol.1-ER-0029:ln.25] and argued "no fine is either necessary or could at rationally meet a justification in this case." [Vol.1-ER-0035:ln.5-06.] The district court concluded a fine of $400,000 was "excessive given the goals that we're trying to address." [Vol.1-ER-0020:ln.05-06.]

The court considered a range of between $100,000 and $250,000 [Vol.1-ER-0038:ln.21-22] and imposed a fine of $200,000 to be paid immediately, rejecting a stay of restitution pending appeal. [Vol.1-ER-0044:ln.18-23.]

Although a court may enter without conclusive evidence of a defendant's ability to pay, the court seem unbothered that this fine was being imposed on a man was effectively being sentenced to life imprisonment and thus would have no way of earning fund in the future. The Government suggested that Mr. Buck might receive money from his mother, but she should not bear a financial penalty for actions that had nothing do with her.

**C.    The fine should more closely reflect the nature of the case.**

This court generally consider these four factors to determine whether a penalty is grossly disproportional:

(1) the nature and extent of the underlying offense; (2) whether the underlying offense related to other illegal activities; (3) whether other penalties may be imposed for the offense; and (4) the extent of the harm caused by the offense.

*Sec. & Exch. Comm'n v. Murphy*, 50 F.4th 832, 849–50 (9th Cir.2022) (citing

*Pimentel v. City of Los Angeles*, 974 F.3d 917, 921 (9th Cir.2020)).

The balance of evidence – given the existing relationship Mr. Buck had with these men, and the nature of the party-and-play culture – strongly suggests that the deaths of Mr. Moore and Mr. Dean were at worst "accidental" but not wanton or willful crimes.

## CONCLUSION

For all these reasons, Mr. Buck respectfully requests that this Court reverse his conviction and sentence and order a new trial of this matter.

RESPECTFULLY SUBMITTED this 25th   day of August, 2023.

MICHAEL P. DENEA PLC

By_____
        Michael P. Denea
        Kevin R. Myer

        3200 North Central Avenue, Suite 1500
        Phoenix, Arizona 85012

        *Attorneys for Defendant Edward Buck*

Bates 084

## COMPLIANCE

Pursuant to FRAP 32(A)(7)(C) and Ninth Circuit Rule 32-1, I certify that the attached Answering Brief is proportionately spaced, has a 14-point typeface (Times New Roman), and contains __13,682___ words.

_____

## **SERVICE**

I hereby certify that on the 20th day of July 2023, I electronically filed this

Supplement to Motion for Extension of Time for Filing Opening Brief with

the Ninth Circuit Court of Appeals, using the appellate CM/ECF System for the

filing and transmittal of a Notice of Electronic Filing to

Chelsea Norell,

Lindsay Bailey,

Assistant United States Attorneys

*Counsel for Appellee*

I certify that all participants in the case are registered CM/ECF users, and

that service will be accomplished through the appellate CM/ECF system.

:

_____

## STATEMENT OF RELATED CASES

This case is related to the following cases presently pending in the

Ninth Circuit pursuant to Circuit Rule 28-2.6:

None (consolidated)

| Date | Time | Title | Source | Affiliation | Market | Market Rank | Calc Publicity Value | Ratings Estimate | Item Type | Folder |
|---|---|---|---|---|---|---|---|---|---|---|
| Mar 27 2021 | 12:04 AM PT | A Judge's Ruling Against Ed Buck Calls Into Question Jackie Lacey's Handling of the Case | LA Magazine | | Los Angeles, CA | 2 | $975 | 279179 | Web | Ch. 3 Internet |
| Mar 26 2021 | 2:22 PM PT | Judge undercuts former L.A. County DA Jackie Lacey's initial decision not to charge Ed Buck in fatal | KTLA-TV [CW 5] | | Los Angeles, CA | 2 | $3,903 | 1476189 | Web | Ch. 3 Internet |
| Mar 26 2021 | 1:02 PM PT | Judge undercuts ex-D.A. Jackie Lacey's initial decision not to charge Ed Buck in fatal overdose | Los Angeles Times | | Los Angeles, CA | 2 | $7,164 | 7544455 | Web | Ch. 3 Internet |
| Mar 26 2021 | 3:09 AM PT | Judge Denies Defense Request in Ed Buck Trial | KNBC-TV [NBC 4] | | Los Angeles, CA | 2 | $1,668 | 611785 | Web | Ch. 3 Internet |
| Mar 26 2021 | 3:00 AM ET | Judge undercuts ex-D.A. Jackie Lacey's initial dec | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Mar 25 2021 | 5:30 PM PT | NBC 4 News at 5:30 PM | KNBC | NBC | Los Angeles, CA | 2 | $10,360 | 101650 | Television | Ch. 3 Broadcast |
| Mar 24 2021 | 9:47 PM PT | Ed Buck Judge Denies Motion to Suppress Evidence from WeHo Apartment | My News LA | | Los Angeles, CA | 2 | $405 | 43484 | Web | Ch. 3 Internet |
| Mar 12 2021 | 9:12 PM PT | Buck's attorneys challenge witness | Wave Newspapers | | Los Angeles, CA | 2 | $27 | 146 | Web | Ch. 3 Internet |
| Mar 9 2021 | 7:00 AM PT | KFI 640am - Bill Handel | KFI-AM | | Los Angeles, CA | 2 | $2,645 | 101100 | Radio | Ch. 3 Broadcast |
| Mar 4 2021 | 3:50 PM PT | Articles | L.A. Watts Times | | Los Angeles, CA | 2 | $78 | 1441 | Web | Ch. 3 Internet |
| Mar 3 2021 | 12:45 AM PT | Defense Assails Deputy's Statements in Ed Buck Case | My News LA | | Los Angeles, CA | 2 | $405 | 43484 | Web | Ch. 3 Internet |
| Jan 21 2021 | 11:50 PM PT | April federal trial date scheduled for Ed Buck | Wave Newspapers | | Los Angeles, CA | 2 | $48 | 166 | Web | Ch. 3 Internet |
| Jan 16 2021 | 1:20 PM PT | Ed Buck's Trial Has Been Postponed Again, and Further Delay Could Follow | LA Magazine | | Los Angeles, CA | 2 | $1,125 | 392107 | Web | Ch. 3 Internet |
| Jan 15 2021 | 5:00 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $6,749 | 26900 | Radio | Ch. 3 Broadcast |
| Jan 15 2021 | 6:30 AM PT | Spectrum News 1 06:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 14 2021 | 6:30 PM PT | LA Judge approves April trial date for Ed Buck in federal case | Our Weekly | | Los Angeles, CA | 2 | $117 | 3527 | Web | Ch. 3 Internet |
| Jan 14 2021 | 4:44 PM PT | L.A. Judge Approves April Trial Date for Ed Buck in Federal Case | My News LA | | Los Angeles, CA | 2 | $393 | 39044 | Web | Ch. 3 Internet |
| Jan 14 2021 | 2:00 PM PT | KFI 640am - John and Ken | KFI-AM | | Los Angeles, CA | 2 | $9,973 | 68900 | Radio | Ch. 3 Broadcast |
| Jan 5 2021 | 4:19 AM PT | Nicola Hanna, U.S. attorney in Los Angeles, to step down | Los Angeles Times | | Los Angeles, CA | 2 | $7,617 | 8700635 | Web | Ch. 3 Internet |
| Jan 5 2021 | 3:26 AM PT | United States Attorney Nick Hanna Resigns | Canyon News | | Los Angeles, CA | 2 | $324 | 18647 | Web | Ch. 3 Internet |
| Jan 4 2021 | 11:43 PM PT | Nick Hanna, U.S. Attorney in L.A., to Step Down | My News LA | | Los Angeles, CA | 2 | $393 | 39044 | Web | Ch. 3 Internet |
| Jan 4 2021 | 6:00 PM ET | Nicola Hanna, U.S. attorney in Los Angeles, to ste | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Dec 10 2020 | 8:08 AM PT | Ed Buck is in Jail and Now the Culture Vultures are Circling | Los Angeles Sentinel | | Los Angeles, CA | 2 | $354 | 24858 | Web | Ch. 3 Internet |
| Dec 8 2020 | 4:37 AM PT | Ed Buck Is in Jail and Now the Culture Vultures Are Circling | City Watch | | Los Angeles, CA | 2 | $474 | 26094 | Web | Ch. 3 Internet |
| Dec 8 2020 | 4:37 AM PT | Will Georgia Save the GOP? | City Watch | | Los Angeles, CA | 2 | $474 | 26094 | Web | Ch. 3 Internet |
| Dec 7 2020 | 4:00 PM CT | L.A. County's new DA will review even more cases o | Daily News | | Louisiana | 51 | $0 | 0 | Print | Ch. 3 Print |
| Dec 2 2020 | 3:36 PM PT | An infant dies, a millionaire doctor calls 911, and a tale emerges of drugs, love and suspected crim | Los Angeles Times | | Los Angeles, CA | 2 | $7,617 | 8700635 | Web | Ch. 3 Internet |
| Dec 2 2020 | 6:00 AM ET | An infant dies, a millionaire doctor calls 911, an | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Oct 23 2020 | 8:43 PM PT | DA Jackie Lacey Says Experience as Trial Lawyer Makes Her the Better Candidate | Spectrum News 1 | | Los Angeles, CA | 2 | $1,071 | 349919 | Web | Ch. 3 Internet |
| Oct 22 2020 | 10:19 PM PT | Three races have South L.A. voters taking sides | Wave Newspapers | | Los Angeles, CA | 2 | $48 | 166 | Web | Ch. 3 Internet |
| Oct 22 2020 | 7:20 AM PT | The great race | Our Weekly | | Los Angeles, CA | 2 | $120 | 3900 | Web | Ch. 3 Internet |
| Oct 15 2020 | 7:27 AM PT | Petition launched to deny bail for Ed Buck | Our Weekly | | Los Angeles, CA | 2 | $120 | 3900 | Web | Ch. 3 Internet |
| Oct 9 2020 | 7:19 AM PT | The great race for D.A. | Our Weekly | | Los Angeles, CA | 2 | $120 | 3900 | Web | Ch. 3 Internet |
| Oct 8 2020 | 12:47 AM PT | DA Candidate George Gascon Says Childhood Shaped His Perspective on Policing | Spectrum News 1 | | Los Angeles, CA | 2 | $1,071 | 349919 | Web | Ch. 3 Internet |
| Oct 1 2020 | 5:48 PM PT | Articles | L.A. Watts Times | | Los Angeles, CA | 2 | $60 | 1307 | Web | Ch. 3 Internet |
| Oct 1 2020 | 7:05 PM PT | Judge Denies Bail for Ed Buck | Los Angeles Sentinel | | Los Angeles, CA | 2 | $357 | 31287 | Web | Ch. 3 Internet |
| Sep 26 2020 | 6:00 AM PT | KNX Morning News with Bob Brill | KNX-AM | | Los Angeles, CA | 2 | $2,410 | 29000 | Radio | Ch. 3 Broadcast |
| Sep 26 2020 | 12:05 AM PT | 1 In 3 California Restaurants Expect To Close Locations, Shut Down Permanently Due To COVID Rules | KCAL-TV [IND 9] | | Los Angeles, CA | 2 | $2,730 | 1160828 | Web | Ch. 3 Internet |
| Sep 25 2020 | 11:11 PM PT | Ed Buck To Remain Jailed After Judge Denies Request For Bail | KCAL-TV [IND 9] | | Los Angeles, CA | 2 | $2,730 | 1160828 | Web | Ch. 3 Internet |
| Sep 25 2020 | 11:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $1,321 | 7700 | Radio | Ch. 3 Broadcast |
| Sep 25 2020 | 10:30 PM PT | KCAL 9 News at 10:30 PM | KCAL | IND | Los Angeles, CA | 2 | $3,360 | 105003 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 10:30 PM PT | CBSN Los Angeles 10:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 9:36 PM PT | Judge denies Ed Buck's bail request | Wave Newspapers | | Los Angeles, CA | 2 | $66 | 1147 | Web | Ch. 3 Internet |
| Sep 25 2020 | 9:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $2,559 | 11300 | Radio | Ch. 3 Broadcast |
| Sep 25 2020 | 7:46 PM PT | LA Judge Denies Pretrial Release for Ed Buck | My News LA | | Los Angeles, CA | 2 | $369 | 44216 | Web | Ch. 3 Internet |
| Sep 25 2020 | 7:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $4,893 | 30900 | Radio | Ch. 3 Broadcast |
| Sep 25 2020 | 6:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $11,977 | 53700 | Radio | Ch. 3 Broadcast |
| Sep 25 2020 | 5:00 PM PT | FOX 11 News at 5:00 | KTTV | FOX | Los Angeles, CA | 2 | $240 | 31160 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 4:30 PM PT | CBSN Los Angeles 04:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 4:30 PM PT | KCAL 9 News at 4:30 PM | KCAL | IND | Los Angeles, CA | 2 | $2,870 | 36622 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 4:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $12,284 | 74600 | Radio | Ch. 3 Broadcast |
| Sep 25 2020 | 3:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $11,618 | 71200 | Radio | Ch. 3 Broadcast |
| Sep 25 2020 | 3:00 PM PT | Eyewitness News 3:00 PM | KABC | ABC | Los Angeles, CA | 2 | $1,235 | 108367 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 12:30 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $360 | 19024 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 12:00 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $800 | 20946 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 12:00 PM PT | KNX Morning News with Chris Sedens and Linda Nunez | KNX-AM | | Los Angeles, CA | 2 | $10,388 | 54000 | Radio | Ch. 3 Broadcast |
| Sep 25 2020 | 11:30 AM PT | KTLA 5 Morning News at 11:30 AM | KTLA | CW | Los Angeles, CA | 2 | $4,620 | 135634 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 11:00 AM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | 2 | $7,152 | 57400 | Radio | Ch. 3 Broadcast |

| Date | Time | Title | Outlet | Network | Location | | Value | Reach | Type | |
|---|---|---|---|---|---|---|---|---|---|---|
| Sep 25 2020 | 11:00 AM PT | KTLA 5 Morning News at 11:00 AM | KTLA | CW | Los Angeles, CA | 2 | $420 | 137886 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 11:00 AM PT | Eyewitness News 11:00 AM | KABC | ABC | Los Angeles, CA | 2 | $6,160 | 113120 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 8:57 AM PT | Ed Buck to Ask LA Judge for Pretrial Release Due to Pandemic | KNBC-TV [NBC 4] | | Los Angeles, CA | 2 | $1,899 | 806387 | Web | Ch. 3 Internet |
| Sep 25 2020 | 6:00 PM PT | Eyewitness News at 6:00 AM | KABC | ABC | Los Angeles, CA | 2 | $12,320 | 79592 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 6:00 AM PT | FOX 11 Morning News at 6:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $2,760 | 34694 | Television | Ch. 3 Broadcast |
| Sep 25 2020 | 4:30 AM PT | Eyewitness News at 4:30 AM | KABC | ABC | Los Angeles, CA | 2 | $1,820 | 32518 | Television | Ch. 3 Broadcast |
| Sep 24 2020 | 9:27 PM PT | Victims' families angry over Ed Buck bail request | Wave Newspapers | | Los Angeles, CA | 2 | $66 | 1147 | Web | Ch. 3 Internet |
| Sep 18 2020 | 3:05 PM PT | Morning Brief: A Deep Dive into the Ed Buck Case | LA Magazine | | Los Angeles, CA | 2 | $1,020 | 259998 | Web | Ch. 3 Internet |
| Sep 17 2020 | 5:30 PM PT | Eyewitness News at 5:30 PM | KABC | ABC | Los Angeles, CA | 2 | $9,240 | 204247 | Television | Ch. 3 Broadcast |
| Sep 17 2020 | 5:00 PM PT | Eyewitness News at 5:00 PM | KABC | ABC | Los Angeles, CA | 2 | $9,030 | 196321 | Television | Ch. 3 Broadcast |
| Sep 17 2020 | 7:04 AM PT | Petition Urges Judge to Deny Bail to Democratic Donor Ed Buck in Deaths of Black Gay Men | Los Angeles Sentinel | | Los Angeles, CA | 2 | $369 | 31287 | Web | Ch. 3 Internet |
| Sep 10 2020 | 7:03 PM PT | Buck seeks bail hearing while pleading not guilty to new charges | Wave Newspapers | | Los Angeles, CA | 2 | $66 | 1147 | Web | Ch. 3 Internet |
| Sep 5 2020 | 11:30 AM PT | Spectrum News 1 11:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 5 2020 | 9:00 AM PT | Spectrum News 1 09:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 4 2020 | 8:23 PM PT | Ed Buck pleads not guilty to charges in updated indictment | KTTV-TV [FOX 11] / K( | | Los Angeles, CA | 2 | $1,911 | 533427 | Web | Ch. 3 Internet |
| Sep 4 2020 | 7:45 PM PT | Ed Buck Pleads Not Guilty to Charges in Updated Indictment | My News LA | | Los Angeles, CA | 2 | $369 | 44216 | Web | Ch. 3 Internet |
| Sep 4 2020 | 5:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $14,141 | 62500 | Radio | Ch. 3 Broadcast |
| Sep 4 2020 | 11:01 AM PT | KNX Morning News with Chris Sedens and Linda Nunez | KNX-AM | | Los Angeles, CA | 2 | $13,854 | 50300 | Radio | Ch. 3 Broadcast |
| Sep 4 2020 | 10:00 AM PT | KNX Morning News with Chris Sedens and Linda Nunez | KNX-AM | | Los Angeles, CA | 2 | $7,414 | 43800 | Radio | Ch. 3 Broadcast |
| Sep 4 2020 | 7:00 AM PT | Good Day L.A. at 7:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $2,320 | 42725 | Television | Ch. 3 Broadcast |
| Sep 4 2020 | 6:00 AM PT | FOX 11 Morning News at 6:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $3,480 | 34694 | Television | Ch. 3 Broadcast |
| Sep 1 2020 | 11:00 AM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | 2 | $6,968 | 58800 | Radio | Ch. 3 Broadcast |
| Aug 31 2020 | 8:52 PM PT | Political Donor and Activist Ed Buck Requests Release Ahead of Criminal Trial | KNBC-TV [NBC 4] | | Los Angeles, CA | 2 | $1,830 | 790479 | Web | Ch. 3 Internet |
| Aug 31 2020 | 6:00 PM PT | NBC 4 News at 6:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $5,200 | 144628 | Television | Ch. 3 Broadcast |
| Aug 21 2020 | 3:02 PM PT | Ed Buck Going to Trial in January for Allegedly Distributing Drugs, Enticing Prostitution | Spectrum News 1 | | Los Angeles, CA | 2 | $912 | 235706 | Web | Ch. 3 Internet |
| Aug 17 2020 | 12:00 AM PT | Spectrum News 1 12:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 16 2020 | 8:00 PM PT | Spectrum News 1 08:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 16 2020 | 10:00 PM PT | Spectrum News 1 10:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 16 2020 | 5:00 AM PT | Spectrum News 1 05:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 16 2020 | 12:00 AM PT | Spectrum News 1 12:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 15 2020 | 8:00 PM PT | Spectrum News 1 08:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 15 2020 | 10:00 PM PT | Spectrum News 1 10:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 15 2020 | 5:00 PM PT | Spectrum News 1 05:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 15 2020 | 3:00 PM PT | Spectrum News 1 03:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 14 2020 | 11:00 PM PT | Spectrum News 1 11:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 14 2020 | 8:00 PM PT | Spectrum News 1 08:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Aug 6 2020 | 3:01 PM PT | Morning Brief: New Charges Against Accused Drug House Operator Ed Buck | LA Magazine | | Los Angeles, CA | 2 | $1,095 | 331734 | Web | Ch. 3 Internet |
| Aug 5 2020 | 6:38 PM PT | Danielle Gersh's Weather Forecast (Aug. 5) | KCAL-TV [IND 9] | | Los Angeles, CA | 2 | $2,640 | 1160828 | Web | Ch. 3 Internet |
| Aug 5 2020 | 12:33 PM PT | Newsletter: What you need to know about Karen Bass | Los Angeles Times | | Los Angeles, CA | 2 | $7,716 | 8969326 | Web | Ch. 3 Internet |
| Aug 5 2020 | 11:00 AM PT | Eyewitness News 11:00 AM | KABC | ABC | Los Angeles, CA | 2 | $1,320 | 107504 | Television | Ch. 3 Broadcast |
| Aug 5 2020 | 7:43 AM PT | Democratic donor Ed Buck hit with four more felony charges | Los Angeles Daily New | | Los Angeles, CA | 2 | $1,269 | 290776 | Web | Ch. 3 Internet |
| Aug 5 2020 | 6:30 AM PT | Eyewitness News at 6:30 AM | KABC | ABC | Los Angeles, CA | 2 | $4,320 | 86243 | Television | Ch. 3 Broadcast |
| Aug 5 2020 | 6:20 AM PT | New Charges Allege Ed Buck Enticed 2 Men To LA Area To Engage In Prostitution | KCAL-TV [IND 9] | | Los Angeles, CA | 2 | $2,640 | 1160828 | Web | Ch. 3 Internet |
| Aug 5 2020 | 4:57 AM PT | Grand Jury Charges Ed Buck with Four Additional Felonies, Including that He Enticed Victims to Trave | Los Angeles Sentinel | | Los Angeles, CA | 2 | $366 | 29181 | Web | Ch. 3 Internet |
| Aug 5 2020 | 4:31 AM PT | Statement on Federal Grand Jury Indictments Charging Ed Buck with Four Additional Felonies | Los Angeles Sentinel | | Los Angeles, CA | 2 | $366 | 29181 | Web | Ch. 3 Internet |
| Aug 5 2020 | 1:26 AM PT | Feds add more charges against Ed Buck, including drug distribution and enticing prostitution | Los Angeles Times | | Los Angeles, CA | 2 | $7,716 | 8969326 | Web | Ch. 3 Internet |
| Aug 5 2020 | 1:05 AM PT | Democratic donor Ed Buck facing four additional felonies | KTTV-TV [FOX 11] / K( | | Los Angeles, CA | 2 | $1,887 | 490578 | Web | Ch. 3 Internet |
| Aug 5 2020 | 1:02 AM PT | Ed Buck faces new charges of enticing victims into prostitution, including man who died at his WeHo | KTLA-TV [CW 5] | | Los Angeles, CA | 2 | $3,897 | 1284378 | Web | Ch. 3 Internet |
| Aug 5 2020 | 1:00 AM PT | Democratic Donor Ed Buck Charged With Four Additional Felonies | KNBC-TV [NBC 4] | | Los Angeles, CA | 2 | $1,830 | 790479 | Web | Ch. 3 Internet |
| Aug 5 2020 | 12:46 AM PT | Grand Jury Charges Democratic Donor Ed Buck with Four Additional Felonies | My News LA | | Los Angeles, CA | 2 | $357 | 44216 | Web | Ch. 3 Internet |
| Aug 5 2020 | 12:23 AM PT | Ed Buck charged with 4 additional felonies, alleging he enticed victims to engage in prostitution | KTTV-TV [FOX 11] / K( | | Los Angeles, CA | 2 | $1,887 | 490578 | Web | Ch. 3 Internet |
| Aug 5 2020 | 12:15 AM PT | New Charges Allege Ed Buck Enticed 26-Year-Old Man To Travel To LA Area To Engage In Prostitution Be | KCAL-TV [IND 9] | | Los Angeles, CA | 2 | $2,640 | 1160828 | Web | Ch. 3 Internet |
| Aug 4 2020 | 4:00 PM ET | Feds add more charges against Ed Buck, including d | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Jul 10 2020 | 6:55 PM ET | Jackie Lacy, L.A.'s first Black district attorney, faces unlikely opposition from Black Lives Matter | KTLA-TV [CW 5] | | Los Angeles, CA | 2 | $3,897 | 1284378 | Web | Ch. 3 Internet |
| Jun 21 2020 | 4:00 AM ET | How two Black women in L.A. helped build Black Liv | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Mar 7 2020 | 4:00 AM ET | Lopez: Readers weren't happy with what I had to sa | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Mar 3 2020 | 7:00 AM ET | CBS This Morning (East) | CBS | | National | 0 | $59,800 | 3209366 | Television | Ch. 3 Broadcast |
| Mar 2 2020 | 1:30 PM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | 2 | $10,744 | 50200 | Radio | Ch. 3 Broadcast |
| Mar 1 2020 | 3:00 AM ET | Jackie Lacey grew up in South L.A. But in a tough | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |

| Date | Time | Program | Station | Network | Location | Val | Cost | Impressions | Type | Channel |
|---|---|---|---|---|---|---|---|---|---|---|
| Feb 26 2020 | 12:00 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $680 | 55432 | Television | Ch. 3 Broadcast |
| Feb 26 2020 | 1:00 AM PT | FOX 11 Ten O'clock News (Rebroadcast) | KTTV | FOX | Los Angeles, CA | 2 | $120 | 17843 | Television | Ch. 3 Broadcast |
| Feb 25 2020 | 10:00 PM PT | FOX 11 Ten O'clock News | KTTV | FOX | Los Angeles, CA | 2 | $1,950 | 72623 | Television | Ch. 3 Broadcast |
| Feb 19 2020 | 7:00 PM ET | Why I am Running for Elected Office and Why You Sh | Los Angeles Sen | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Feb 18 2020 | 3:00 AM ET | How Jackie Lacey's and George Gascn's time in offi | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Feb 17 2020 | 5:30 PM PT | CBSN Los Angeles 05:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Feb 17 2020 | 5:30 PM PT | CBS 2 News at 5:30 PM | KCBS | CBS | Los Angeles, CA | 2 | $1,700 | 111685 | Television | Ch. 3 Broadcast |
| Feb 13 2020 | 10:00 AM ET | In West Hollywood, a town hall confronts meth-fuel | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Feb 5 2020 | 10:00 PM PT | KCAL 9 News at 10:00 PM | KCAL | IND | Los Angeles, CA | 2 | $3,240 | 148769 | Television | Ch. 3 Broadcast |
| Feb 5 2020 | 10:00 PM PT | CBSN Los Angeles 10:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 30 2020 | 2:00 AM ET | Candidates for L.A. County district attorney trade | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Jan 17 2020 | 3:30 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $6,997 | 23200 | Radio | Ch. 3 Broadcast |
| Jan 17 2020 | 8:30 AM PT | 89.9 NPR - Morning Edition | KCRW-FM | NPR | Los Angeles, CA | 2 | $12,099 | 36900 | Radio | Ch. 3 Broadcast |
| Jan 17 2020 | 2:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $914 | 2200 | Radio | Ch. 3 Broadcast |
| Jan 15 2020 | 7:00 PM ET | Second Wrongful Death Lawsuit Filed Against Democr | Los Angeles Sen | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Jan 13 2020 | 11:00 AM PT | NBC 4 News at 11:00 AM | KNBC | NBC | Los Angeles, CA | 2 | $1,820 | 39957 | Television | Ch. 3 Broadcast |
| Jan 13 2020 | 6:30 AM PT | Today in L.A. at 6:30 AM | KNBC | NBC | Los Angeles, CA | 2 | $2,210 | 45941 | Television | Ch. 3 Broadcast |
| Jan 10 2020 | 6:00 PM ET | One America News 6pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 10 2020 | 4:00 PM ET | One America News 4pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 10 2020 | 3:00 PM ET | One America News 3pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 10 2020 | 2:00 PM ET | One America News 2pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 10 2020 | 1:00 PM ET | One American News 1pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 10 2020 | 10:00 AM ET | One America News 10am | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 10 2020 | 8:00 AM ET | One America News 8am | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 10 2020 | 6:00 AM ET | One America News 6am | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 9 2020 | 7:30 AM PT | 89.9 NPR - Morning Edition | KCRW-FM | NPR | Los Angeles, CA | 2 | $4,189 | 24300 | Radio | Ch. 3 Broadcast |
| Jan 9 2020 | 6:30 AM PT | KFI 640am - Bill Handel | KFI-AM | | Los Angeles, CA | 2 | $18,515 | 104600 | Radio | Ch. 3 Broadcast |
| Jan 9 2020 | 4:30 AM PT | Today in L.A. at 4:30 AM | KNBC | NBC | Los Angeles, CA | 2 | $480 | 19759 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 11:00 PM PT | NBC 4 News at 11:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $5,940 | 139448 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 5:30 PM PT | NBC 4 News at 5:30 PM | KNBC | NBC | Los Angeles, CA | 2 | $11,340 | 127887 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 12:30 PM PT | KCAL 9 News at Noon | KCAL | IND | Los Angeles, CA | 2 | $3,990 | 60070 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 12:30 PM PT | CBSN Los Angeles 12:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 12:00 PM ET | On the anniversary of Timothy Dean's death, his fa | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Jan 8 2020 | 7:00 PM PT | CBSN Los Angeles 07:00 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 5:30 PM PT | Eyewitness News at 5:00 AM | KABC | ABC | Los Angeles, CA | 2 | $3,800 | 76976 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 4:30 AM PT | CBS 2 News at 4:30 AM | KCBS | CBS | Los Angeles, CA | 2 | $1,140 | 13110 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 4:30 AM PT | KTLA 5 Morning News at 4:00 AM | KTLA | CW | Los Angeles, CA | 2 | $3,300 | 45549 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 4:30 AM PT | CBSN Los Angeles 04:30 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 4:00 AM PT | Today in L.A. at 4:00 AM | KNBC | NBC | Los Angeles, CA | 2 | $420 | 18961 | Television | Ch. 3 Broadcast |
| Jan 8 2020 | 12:00 AM PT | Eyewitness News on KDOC-TV at 12:00 AM | KDOC | IND | Los Angeles, CA | 2 | $5,675 | 20804 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 11:00 PM PT | NBC 4 News at 11:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $5,720 | 139448 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 11:00 PM PT | Eyewitness News at 11:00 PM | KABC | ABC | Los Angeles, CA | 2 | $17,550 | 178289 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 11:00 PM PT | KTLA 5 News at 11:00 PM | KTLA | CW | Los Angeles, CA | 2 | $26,100 | 97522 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 10:00 PM PT | KCAL 9 News at 10:00 PM | KCAL | IND | Los Angeles, CA | 2 | $10,200 | 149272 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 10:00 PM PT | CBSN Los Angeles 10:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 10:00 PM PT | KTLA 5 News at 10:00 PM | KTLA | CW | Los Angeles, CA | 2 | $32,850 | 149837 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 7:30 PM PT | Eyewitness News on KDOC-TV at 7:30 PM | KDOC | IND | Los Angeles, CA | 2 | $3,667 | 29130 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 6:30 PM PT | KTLA 5 News at 6:30 PM | KTLA | CW | Los Angeles, CA | 2 | $17,100 | 79002 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 6:00 PM PT | KTLA 5 News at 6:00 PM | KTLA | CW | Los Angeles, CA | 2 | $31,050 | 78657 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 5:00 PM PT | NBC 4 News at 5:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $2,380 | 132702 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 3:30 PM PT | KTLA 5 News at 3:30 PM | KTLA | CW | Los Angeles, CA | 2 | $12,600 | 69454 | Television | Ch. 3 Broadcast |
| Jan 7 2020 | 1:00 PM PT | KTLA 5 News at 1:00 PM | KTLA | CW | Los Angeles, CA | 2 | $3,920 | 93386 | Television | Ch. 3 Broadcast |
| Dec 31 2019 | 4:00 AM PT | FOX 11 Morning News at 4:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $260 | 4616 | Television | Ch. 3 Broadcast |
| Dec 31 2019 | 1:00 AM PT | FOX 11 Ten O'clock News (Rebroadcast) | KTTV | FOX | Los Angeles, CA | 2 | $310 | 20858 | Television | Ch. 3 Broadcast |
| Dec 25 2019 | 7:00 PM ET | Black Inspirations of 2019 | Los Angeles Sen | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Dec 25 2019 | 7:00 PM ET | Top Local stories of 2019 | Los Angeles Sen | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Dec 19 2019 | 3:30 PM PT | KFI 640am - John and Ken | KFI-AM | | Los Angeles, CA | 2 | $36,046 | 83900 | Radio | Ch. 3 Broadcast |
| Dec 19 2019 | 3:00 PM ET | One America News 3pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Dec 19 2019 | 2:00 PM ET | One America News 2pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |

Bates 090

| Date | Time | Program | Outlet | Affiliate | Market | Count | Cost | Audience | Medium | Channel |
|---|---|---|---|---|---|---|---|---|---|---|
| Dec 19 2019 | 1:00 PM ET | One American News 1pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Dec 19 2019 | 12:30 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $920 | 51832 | Television | Ch. 3 Broadcast |
| Dec 19 2019 | 12:00 PM ET | One America News 12pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Dec 19 2019 | 11:00 AM ET | One America News 11am | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Dec 19 2019 | 10:30 AM PT | KTLA 5 Morning News at 10:00 AM | KTLA | CW | Los Angeles, CA | 2 | $5,740 | 177855 | Television | Ch. 3 Broadcast |
| Dec 19 2019 | 7:00 AM PT | 89.9 NPR - Morning Edition | KCRW-FM | NPR | Los Angeles, CA | 2 | $16,560 | 23400 | Radio | Ch. 3 Broadcast |
| Dec 19 2019 | 5:00 AM PT | Eyewitness News at 5:00 AM | KABC | ABC | Los Angeles, CA | 2 | $9,310 | 55501 | Television | Ch. 3 Broadcast |
| Dec 18 2019 | 3:00 PM PT | Eyewitness News 3:00 PM | KABC | ABC | Los Angeles, CA | 2 | $6,080 | 126706 | Television | Ch. 3 Broadcast |
| Dec 18 2019 | 3:00 PM ET | Christopher Darden, former O.J. prosecutor, defend | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Dec 14 2019 | 9:30 AM CT | TruTV 09:30 AM | TRUTV | | National | 0 | $6,239 | 74355 | Television | Ch. 3 Broadcast |
| Dec 9 2019 | 3:00 PM PT | KTLA 5 News at 3:00 PM | KTLA | CW | Los Angeles, CA | 2 | $7,650 | 70166 | Television | Ch. 3 Broadcast |
| Nov 17 2019 | 10:00 PM CT | Spectrum News 1 10:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Nov 17 2019 | 10:00 AM CT | Spectrum News 1 10:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Nov 17 2019 | 10:00 PM CT | Spectrum News 1 10:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Nov 16 2019 | 10:00 AM CT | Spectrum News 1 10:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Nov 16 2019 | 10:00 PM CT | Spectrum News 1 10:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Nov 16 2019 | 5:00 AM CT | Spectrum News 1 05:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Nov 16 2019 | 2:00 AM CT | Spectrum News 1 02:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Nov 16 2019 | 8:30 PM CT | Spectrum News 1 08:30 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Nov 15 2019 | 8:00 PM CT | Spectrum News 1 08:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Nov 15 2019 | 4:30 AM CT | Spectrum News 1 04:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Nov 15 2019 | 11:00 PM PT | CBS 2 News at 11:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $8,200 | 153201 | Television | Ch. 3 Broadcast |
| Nov 14 2019 | 10:00 PM PT | KCAL 9 News at 10:00 PM | KCAL | IND | Los Angeles, CA | 2 | $3,000 | 171646 | Television | Ch. 3 Broadcast |
| Oct 29 2019 | 3:00 PM ET | D.A. Jackie Lacey faults errors by Sheriff's Depar | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Oct 29 2019 | 4:00 PM CT | The Five | FOXNEWS | | National | 0 | $70,713 | 1422297 | Television | Ch. 3 Broadcast |
| Oct 29 2019 | 6:00 AM CT | Comedy Central 06:00 AM | Comedy Central | | National | 2 | $12,567 | 139499 | Television | Ch. 3 Broadcast |
| Oct 28 2019 | 7:30 AM CT | KFI 640am - Bill Handel | KFI-AM | | Los Angeles, CA | 2 | $6,682 | 117300 | Radio | Ch. 3 Broadcast |
| Oct 25 2019 | 11:00 AM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | 2 | $23,473 | 62500 | Radio | Ch. 3 Broadcast |
| Oct 18 2019 | 11:00 AM PT | Eyewitness News 11:00 AM | KABC | ABC | Los Angeles, CA | 2 | $5,610 | 133434 | Television | Ch. 3 Broadcast |
| Oct 17 2019 | 8:00 AM PT | KFI 640am - Bill Handel | KFI-AM | | Los Angeles, CA | 2 | $13,438 | 99200 | Radio | Ch. 3 Broadcast |
| Oct 17 2019 | 4:00 AM ET | Ed Buck was known for his abrasive behavior. But p | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Oct 17 2019 | 6:00 PM ET | L.A. District Attorney Jackie Lacey Failed the Vic | Los Angeles Sen | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Oct 17 2019 | 9:00 PM PT | TalkRadio 790am - Best Of KABC | KABC-AM | | Los Angeles, CA | 2 | $1,084 | 1500 | Radio | Ch. 3 Broadcast |
| Oct 17 2019 | 9:30 PM CT | Primetime Programming | NBC | | National | 0 | $166,867 | 0 | Television | Ch. 3 Broadcast |
| Oct 16 2019 | 9:00 PM CT | Primetime Programming | NBC | | National | 0 | $266,988 | 0 | Television | Ch. 3 Broadcast |
| Oct 14 2019 | 8:30 PM CT | Primetime Programming | NBC | | National | 0 | $186,891 | 0 | Television | Ch. 3 Broadcast |
| Oct 11 2019 | 2:00 PM CT | C-SPAN2 02:00 PM | CSPAN2 | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 11 2019 | 6:30 AM PT | 89.9 NPR - Morning Edition | KCRW-FM | NPR | Los Angeles, CA | 2 | $2,551 | 17100 | Radio | Ch. 3 Broadcast |
| Oct 11 2019 | 8:30 PM PT | KCAL 9 News at 8:30 PM | KCAL | IND | Los Angeles, CA | 2 | $1,680 | 128341 | Television | Ch. 3 Broadcast |
| Oct 11 2019 | 8:30 PM CT | CBSN Los Angeles 08:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 11 2019 | 7:00 PM PT | Eyewitness News on KDOC-TV at 7:00 PM | KDOC | IND | Los Angeles, CA | 2 | $2,820 | 31854 | Television | Ch. 3 Broadcast |
| Oct 11 2019 | 6:00 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $6,426 | 38700 | Radio | Ch. 3 Broadcast |
| Oct 10 2019 | 5:30 PM PT | NBC 4 News at 5:30 PM | KNBC | NBC | Los Angeles, CA | 2 | $1,260 | 110015 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 4:30 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $20,711 | 37000 | Radio | Ch. 3 Broadcast |
| Oct 10 2019 | 3:00 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $3,690 | 24000 | Radio | Ch. 3 Broadcast |
| Oct 10 2019 | 1:30 PM PT | KTLA 5 News at 1:30 PM | KTLA | CW | Los Angeles, CA | 2 | $24,780 | 114535 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 1:00 PM CT | Spectrum News 1 01:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 1:00 PM CT | CBSN Los Angeles 01:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 12:30 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $880 | 45900 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 12:00 PM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | 2 | $18,682 | 64900 | Radio | Ch. 3 Broadcast |
| Oct 10 2019 | 12:00 PM CT | CBSN Los Angeles 12:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 12:00 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $3,640 | 44318 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 12:00 PM PT | KCAL 9 News at Noon | KCAL | IND | Los Angeles, CA | 2 | $2,170 | 62642 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 11:00 AM PT | KTLA 5 Morning News at 11:00 AM | KTLA | CW | Los Angeles, CA | 2 | $34,720 | 134563 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 11:00 AM PT | CBS 2 News at 11:00 AM | KCBS | CBS | Los Angeles, CA | 2 | $2,125 | 115725 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 11:00 AM PT | Eyewitness News 11:00 AM | KABC | ABC | Los Angeles, CA | 2 | $2,530 | 133434 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 11:00 AM CT | CBSN Los Angeles 11:00 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 11:00 AM PT | NBC 4 News at 11:00 AM | KNBC | NBC | Los Angeles, CA | 2 | $2,100 | 38862 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 9:30 AM PT | Good Day L.A. at 9:30 AM | KTTV | FOX | Los Angeles, CA | 2 | $3,720 | 47897 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 9:00 AM PT | Good Day L.A. at 9:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $660 | 51317 | Television | Ch. 3 Broadcast |

| Date | Time | Program | Station | Network | Market | | Spend | Audience | Type | |
|---|---|---|---|---|---|---|---|---|---|---|
| Oct 10 2019 | 7:00 AM CT | CBSN Los Angeles 07:00 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 7:00 AM PT | Good Morning America (West Coast) | ABC | | National | 0 | $99,330 | 3805513 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 6:30 AM CT | CBSN Los Angeles 06:30 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 6:30 AM PT | EYEWITNESS NEWS AT 6:30 AM | KABC | ABC | Los Angeles, CA | 2 | $4,000 | 115189 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 6:30 AM PT | CBS 2 News at 6:30 AM | KCBS | CBS | Los Angeles, CA | 2 | $1,320 | 27218 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 6:00 AM PT | Southern California Public Radio - Morning Edition | KPCC-FM | NPR | Los Angeles, CA | 2 | $4,720 | 26000 | Radio | Ch. 3 Broadcast |
| Oct 10 2019 | 6:00 AM PT | Today in L.A. at 6:00 AM | KNBC | NBC | Los Angeles, CA | 2 | $3,400 | 42234 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 5:30 AM PT | FOX 11 Morning News at 5:30 AM | KTTV | FOX | Los Angeles, CA | 2 | $1,400 | 54386 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 5:30 AM PT | Eyewitness News at 5:30 AM | KABC | ABC | Los Angeles, CA | 2 | $6,840 | 72533 | Television | Ch. 3 Broadcast |
| Oct 10 2019 | 5:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $7,100 | 53000 | Radio | Ch. 3 Broadcast |
| Oct 10 2019 | 4:30 AM PT | Eyewitness News at 4:30 AM | KABC | ABC | Los Angeles, CA | 2 | $3,570 | 51098 | Television | Ch. 3 Broadcast |
| Oct 6 2019 | 11:00 PM CT | Spectrum News 1 11:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 6 2019 | 10:30 PM CT | Spectrum News 1 10:30 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 6 2019 | 1:00 PM CT | Spectrum News 1 01:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 6 2019 | 10:30 AM CT | Spectrum News 1 10:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 6 2019 | 5:00 AM CT | Spectrum News 1 05:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 5 2019 | 10:30 PM CT | Spectrum News 1 10:30 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 5 2019 | 9:00 PM CT | Spectrum News 1 09:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 5 2019 | 10:30 AM CT | Spectrum News 1 10:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 5 2019 | 9:00 AM CT | Spectrum News 1 09:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 5 2019 | 5:30 AM CT | Spectrum News 1 05:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 5 2019 | 4:00 AM CT | Spectrum News 1 04:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 4 2019 | 9:01 AM PT | KNX Morning News with Dick Helton and Vicky Moore | KNX-AM | | Los Angeles, CA | 2 | $8,465 | 52900 | Radio | Ch. 3 Broadcast |
| Oct 4 2019 | 9:00 AM CT | Spectrum News 1 09:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 4 2019 | 7:01 AM PT | KNX Morning News with Dick Helton and Vicky Moore | KNX-AM | | Los Angeles, CA | 2 | $19,994 | 59300 | Radio | Ch. 3 Broadcast |
| Oct 4 2019 | 6:00 AM CT | Spectrum News 1 06:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 4 2019 | 5:01 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $19,114 | 43300 | Radio | Ch. 3 Broadcast |
| Oct 4 2019 | 4:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $3,106 | 15400 | Radio | Ch. 3 Broadcast |
| Oct 4 2019 | 2:30 AM CT | Spectrum News 1 02:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 4 2019 | 2:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $611 | 3100 | Radio | Ch. 3 Broadcast |
| Oct 4 2019 | 12:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $2,473 | 8000 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 11:30 PM CT | Spectrum News 1 11:30 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 11:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $2,946 | 8900 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 10:02 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $7,974 | 14600 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 9:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $4,003 | 19600 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 8:30 PM CT | Spectrum News 1 08:30 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 7:01 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $8,018 | 32400 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 6:01 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $6,585 | 52800 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 6:00 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $27,608 | 38700 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 6:00 PM PT | NBC 4 News at 6:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $11,600 | 105102 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 5:01 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $13,433 | 65600 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 5:00 PM PT | NBC 4 News at 5:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $8,260 | 128641 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 4:30 PM PT | NBC 4 News at 4:30 PM | KNBC | NBC | Los Angeles, CA | 2 | $2,400 | 112656 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 3:00 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $7,084 | 24000 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 1:30 PM CT | CBSN Los Angeles 01:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 9:30 AM PT | KFI 640am - Bill Handel | KFI-AM | | Los Angeles, CA | 2 | $13,739 | 67100 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 9:30 AM PT | KTLA 5 Morning News at 9:30 AM | KTLA | CW | Los Angeles, CA | 2 | $4,620 | 191591 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 8:55 AM PT | NBC 4 Cut-in at 08:55 AM | KNBC | NBC | Los Angeles, CA | 2 | $2,040 | 86841 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 8:30 AM PT | 89.9 NPR - Morning Edition | KCRW-FM | NPR | Los Angeles, CA | 2 | $4,406 | 39800 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 8:00 AM PT | 89.9 NPR - Morning Edition | KCRW-FM | NPR | Los Angeles, CA | 2 | $15,373 | 36300 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 8:00 AM PT | Good Day L.A. at 8:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $1,840 | 66434 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 7:30 AM CT | Spectrum News 1 07:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 7:00 AM PT | KTLA 5 Morning News at 7:00 AM | KTLA | CW | Los Angeles, CA | 2 | $11,900 | 232534 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 6:30 AM PT | FOX 11 Morning News at 6:30 AM | KTTV | FOX | Los Angeles, CA | 2 | $5,160 | 54997 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 6:00 AM PT | Today in L.A. at 6:00 AM | KNBC | NBC | Los Angeles, CA | 2 | $3,400 | 42234 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 6:00 AM PT | 89.9 NPR - Morning Edition | KCRW-FM | NPR | Los Angeles, CA | 2 | $3,353 | 13500 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 5:30 AM CT | Spectrum News 1 05:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 5:30 AM PT | FOX 11 Morning News at 5:30 AM | KTTV | FOX | Los Angeles, CA | 2 | $150 | 54386 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 5:00 AM PT | CBS 2 News at 5:00 AM | KCBS | CBS | Los Angeles, CA | 2 | $1,480 | 12216 | Television | Ch. 3 Broadcast |

| Date | Time | Program | Outlet | Network | Market | | Value | Audience | Type | Channel |
|---|---|---|---|---|---|---|---|---|---|---|
| Oct 3 2019 | 5:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $9,547 | 53000 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 4:30 AM PT | CBS 2 News at 4:30 AM | KCBS | CBS | Los Angeles, CA | 2 | $435 | 12364 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 4:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $4,155 | 13800 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 4:00 AM PT | FOX 11 Morning News at 4:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $200 | 6997 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 4:00 AM PT | KTLA 5 Morning News at 4:00 AM | KTLA | CW | Los Angeles, CA | 2 | $6,225 | 26115 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 4:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $6,386 | 22700 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 2:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $666 | 2400 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 1:00 AM PT | FOX 11 Ten O'clock News (Rebroadcast) | KTTV | FOX | Los Angeles, CA | 2 | $410 | 26531 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 12:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $975 | 3500 | Radio | Ch. 3 Broadcast |
| Oct 3 2019 | 12:00 AM PT | Eyewitness News on KDOC-TV at 12:00 AM | KDOC | IND | Los Angeles, CA | 2 | $4,183 | 20164 | Television | Ch. 3 Broadcast |
| Oct 3 2019 | 12:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $1,506 | 3900 | Radio | Ch. 3 Broadcast |
| Oct 2 2019 | 11:00 PM PT | Eyewitness News at 11:00 PM | KABC | ABC | Los Angeles, CA | 2 | $11,250 | 166826 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 11:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $2,305 | 10900 | Radio | Ch. 3 Broadcast |
| Oct 2 2019 | 11:00 PM PT | NBC 4 News at 11:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $3,520 | 137879 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 11:00 PM PT | CBS 2 News at 11:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $11,000 | 119989 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 11:00 PM CT | CBSN Los Angeles 11:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 10:02 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $2,399 | 10500 | Radio | Ch. 3 Broadcast |
| Oct 2 2019 | 10:00 PM PT | FOX 11 Ten O'clock News | KTTV | FOX | Los Angeles, CA | 2 | $6,450 | 68991 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 10:00 PM PT | KCAL 9 News at 10:00 PM | KCAL | IND | Los Angeles, CA | 2 | $10,200 | 141201 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 10:00 PM CT | CBSN Los Angeles 10:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 10:00 PM PT | KTLA 5 News at 10:00 PM | KTLA | CW | Los Angeles, CA | 2 | $80,100 | 156702 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 9:00 PM PT | TalkRadio 790am - Best Of KABC | KABC-AM | | Los Angeles, CA | 2 | $298 | 2100 | Radio | Ch. 3 Broadcast |
| Oct 2 2019 | 9:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $6,718 | 15400 | Radio | Ch. 3 Broadcast |
| Oct 2 2019 | 8:00 PM PT | KCAL 9 News at 8:00 PM | KCAL | IND | Los Angeles, CA | 2 | $4,320 | 113523 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 8:00 PM CT | CBSN Los Angeles 08:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 7:01 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $9,548 | 40300 | Radio | Ch. 3 Broadcast |
| Oct 2 2019 | 7:00 PM PT | Eyewitness News on KDOC-TV at 7:00 PM | KDOC | IND | Los Angeles, CA | 2 | $1,802 | 36832 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 6:00 PM PT | NBC 4 News at 6:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $3,200 | 125462 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 6:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $25,146 | 59400 | Radio | Ch. 3 Broadcast |
| Oct 2 2019 | 6:00 PM CT | CBSN Los Angeles 06:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 6:00 PM PT | CBS 2 News at 6:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $7,225 | 63160 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 6:00 PM ET | LaTisha Nixon: 'I Want Ed Buck to Know I'm Never G | Los Angeles Sen | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Oct 2 2019 | 5:00 PM PT | CBS 2 News at 5:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $6,120 | 75786 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 5:00 PM PT | NBC 4 News at 5:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $2,520 | 115312 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 5:00 PM PT | FOX 11 News at 5:00 PM | KTTV | FOX | Los Angeles, CA | 2 | $800 | 46643 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 5:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $21,811 | 58800 | Radio | Ch. 3 Broadcast |
| Oct 2 2019 | 4:30 PM CT | CBSN Los Angeles 04:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 4:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $22,767 | 71500 | Radio | Ch. 3 Broadcast |
| Oct 2 2019 | 3:58 PM PT | NBC 4 News at 4:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $5,880 | 93139 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 3:30 PM PT | KTLA 5 News at 3:30 PM | KTLA | CW | Los Angeles, CA | 2 | $14,400 | 69698 | Television | Ch. 3 Broadcast |
| Oct 2 2019 | 11:00 AM PT | Eyewitness News 11:00 AM | KABC | ABC | Los Angeles, CA | 2 | $5,940 | 113992 | Television | Ch. 3 Broadcast |
| Oct 1 2019 | 6:00 AM PT | KFI 640am - Bill Handel | KFI-AM | | Los Angeles, CA | 2 | $9,651 | 60900 | Radio | Ch. 3 Broadcast |
| Oct 1 2019 | 4:00 AM CT | Spectrum News 1 04:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 30 2019 | 10:00 PM CT | Spectrum News 1 10:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 30 2019 | 7:00 PM CT | Spectrum News 1 07:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 30 2019 | 7:00 AM ET | Newsletter: L.A. rabbis navigate politics from the | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 29 2019 | 10:00 PM ET | Por qu tom dos aos arrestar al donante demcrata Ed | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 29 2019 | 4:00 PM PT | KNX Afternoon News with Rob Archer | KNX-AM | | Los Angeles, CA | 2 | $1,161 | 32000 | Radio | Ch. 3 Broadcast |
| Sep 29 2019 | 2:00 PM PT | KNX Afternoon News with Rob Archer | KNX-AM | | Los Angeles, CA | 2 | $1,008 | 28400 | Radio | Ch. 3 Broadcast |
| Sep 29 2019 | 12:00 PM PT | KNX Afternoon News with Rob Archer | KNX-AM | | Los Angeles, CA | 2 | $963 | 43900 | Radio | Ch. 3 Broadcast |
| Sep 29 2019 | 6:00 AM ET | It took two years to arrest Democratic donor Ed Bu | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 29 2019 | 4:00 AM ET | Why did it take so long to arrest Democratic donor | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 28 2019 | 10:00 AM ET | One America News 10am | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 28 2019 | 9:00 AM ET | One America News 9am | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 10:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $5,928 | 15800 | Radio | Ch. 3 Broadcast |
| Sep 26 2019 | 10:00 PM PT | KTLA 5 News at 10:00 PM | KTLA | CW | Los Angeles, CA | 2 | $58,500 | 156702 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 8:30 PM PT | KFI 640am - Tim Conway Jr | KFI-AM | | Los Angeles, CA | 2 | $3,545 | 19700 | Radio | Ch. 3 Broadcast |
| Sep 26 2019 | 7:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $2,639 | 32400 | Radio | Ch. 3 Broadcast |
| Sep 26 2019 | 6:00 PM PT | NBC 4 News at 6:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $2,600 | 125462 | Television | Ch. 3 Broadcast |

Bates 093

| Date | Time | Program | Station | Network | City | Count | Value | Impressions | Medium | Type |
|---|---|---|---|---|---|---|---|---|---|---|
| Sep 26 2019 | 6:00 PM PT | Eyewitness News at 6:00 PM | KABC | ABC | Los Angeles, CA | 2 | $11,100 | 218617 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 6:00 PM PT | KTLA 5 News at 6:00 PM | KTLA | CW | Los Angeles, CA | 2 | $67,500 | 61243 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 6:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $10,494 | 62000 | Radio | Ch. 3 Broadcast |
| Sep 26 2019 | 5:01 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $8,128 | 67700 | Radio | Ch. 3 Broadcast |
| Sep 26 2019 | 5:00 PM PT | NBC 4 News at 5:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $12,040 | 115312 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 4:30 PM PT | KCAL 9 News at 4:30 PM | KCAL | IND | Los Angeles, CA | 2 | $2,520 | 36862 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 3:58 PM PT | NBC 4 News at 4:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $1,560 | 93139 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 3:00 PM PT | KTLA 5 News at 3:00 PM | KTLA | CW | Los Angeles, CA | 2 | $46,800 | 62813 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 12:00 PM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | 2 | $35,664 | 64900 | Radio | Ch. 3 Broadcast |
| Sep 26 2019 | 12:00 PM PT | KCAL 9 News at Noon | KCAL | IND | Los Angeles, CA | 2 | $2,310 | 68390 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 12:00 PM CT | CBSN Los Angeles 12:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 11:00 AM PT | Eyewitness News 11:00 AM | KABC | ABC | Los Angeles, CA | 2 | $5,720 | 113992 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 9:00 AM PT | KFI 640am - Bill Handel | KFI-AM | | Los Angeles, CA | 2 | $17,935 | 73300 | Radio | Ch. 3 Broadcast |
| Sep 26 2019 | 8:00 AM PT | Good Day L.A. at 8:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $560 | 51873 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 7:00 AM CT | CBSN Los Angeles 07:00 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 5:30 AM PT | FOX 11 Morning News at 5:30 AM | KTTV | FOX | Los Angeles, CA | 2 | $600 | 31752 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 5:00 AM PT | KFI 640am - Wake Up Call | KFI-AM | | Los Angeles, CA | 2 | $16,461 | 34500 | Radio | Ch. 3 Broadcast |
| Sep 26 2019 | 4:30 AM PT | Eyewitness News at 4:30 AM | KABC | ABC | Los Angeles, CA | 2 | $6,020 | 38578 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 4:00 AM PT | FOX 11 Morning News at 4:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $120 | 5392 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 1:30 AM PT | FOX 11 Ten O'clock News (Rebroadcast) | KTTV | FOX | Los Angeles, CA | 2 | $350 | 19183 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 1:00 AM PT | FOX 11 Ten O'clock News (Rebroadcast) | KTTV | FOX | Los Angeles, CA | 2 | $120 | 20683 | Television | Ch. 3 Broadcast |
| Sep 26 2019 | 12:00 AM PT | Eyewitness News on KDOC-TV at 12:00 AM | KDOC | IND | Los Angeles, CA | 2 | $5,085 | 24256 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 11:00 PM PT | Eyewitness News at 11:00 PM | KABC | ABC | Los Angeles, CA | 2 | $11,400 | 166826 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 10:30 PM PT | FOX 11 Ten O'clock News | KTTV | FOX | Los Angeles, CA | 2 | $5,250 | 55951 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 10:00 PM PT | KTLA 5 News at 10:00 PM | KTLA | CW | Los Angeles, CA | 2 | $31,500 | 156702 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 10:00 PM PT | FOX 11 Ten O'clock News | KTTV | FOX | Los Angeles, CA | 2 | $1,350 | 68991 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 10:00 PM CT | CBSN Los Angeles 10:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 10:00 PM PT | KCAL 9 News at 10:00 PM | KCAL | IND | Los Angeles, CA | 2 | $12,360 | 141201 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 8:30 PM PT | KCAL 9 News at 8:30 PM | KCAL | IND | Los Angeles, CA | 2 | $10,080 | 95599 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 8:30 PM CT | CBSN Los Angeles 08:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 7:30 PM PT | Eyewitness News on KDOC-TV at 7:30 PM | KDOC | IND | Los Angeles, CA | 2 | $14,589 | 34589 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 7:00 PM PT | Eyewitness News on KDOC-TV at 7:00 PM | KDOC | IND | Los Angeles, CA | 2 | $1,630 | 36832 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 6:30 PM PT | KTLA 5 News at 6:30 PM | KTLA | CW | Los Angeles, CA | 2 | $28,350 | 61224 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 6:00 PM PT | Eyewitness News at 6:00 PM | KABC | ABC | Los Angeles, CA | 2 | $39,600 | 218617 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 6:00 PM PT | KTLA 5 News at 6:00 PM | KTLA | CW | Los Angeles, CA | 2 | $67,500 | 61243 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 6:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $13,652 | 46200 | Radio | Ch. 3 Broadcast |
| Sep 25 2019 | 5:30 PM PT | Eyewitness News at 5:30 PM | KABC | ABC | Los Angeles, CA | 2 | $2,940 | 189912 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 5:01 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $16,643 | 66300 | Radio | Ch. 3 Broadcast |
| Sep 25 2019 | 5:00 PM PT | CBS 2 News at 5:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $7,140 | 75786 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 5:00 PM CT | CBSN Los Angeles 05:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 5:00 PM PT | Eyewitness News at 5:00 PM | KABC | ABC | Los Angeles, CA | 2 | $10,080 | 184895 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 5:00 PM PT | FOX 11 News at 5:00 PM | KTTV | FOX | Los Angeles, CA | 2 | $1,280 | 46643 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 4:00 PM CT | CBSN Los Angeles 04:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 4:00 PM PT | Eyewitness News at 4:00 PM | KABC | ABC | Los Angeles, CA | 2 | $7,650 | 136835 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 4:00 PM PT | KCAL 9 News at 4:00 PM | KCAL | IND | Los Angeles, CA | 2 | $2,870 | 36612 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 3:01 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $6,198 | 56700 | Radio | Ch. 3 Broadcast |
| Sep 25 2019 | 3:00 PM PT | Eyewitness News 3:00 PM | KABC | ABC | Los Angeles, CA | 2 | $4,180 | 95333 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 3:00 PM PT | KTLA 5 News at 3:00 PM | KTLA | CW | Los Angeles, CA | 2 | $82,350 | 62813 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 1:00 PM PT | KTLA 5 News at 1:00 PM | KTLA | CW | Los Angeles, CA | 2 | $7,840 | 88849 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 1:00 PM CT | CBSN Los Angeles 01:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 11:00 AM PT | KNX Morning News with Chris Sedens and Linda Nunez | KNX-AM | | Los Angeles, CA | 2 | $19,580 | 50500 | Radio | Ch. 3 Broadcast |
| Sep 25 2019 | 8:00 AM PT | Good Day L.A. at 8:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $800 | 51873 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 6:30 AM PT | Eyewitness News at 6:30 AM | KABC | ABC | Los Angeles, CA | 2 | $8,480 | 75869 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 6:30 AM PT | KFI 640am - Bill Handel | KFI-AM | | Los Angeles, CA | 2 | $14,665 | 94300 | Radio | Ch. 3 Broadcast |
| Sep 25 2019 | 6:00 AM PT | KTLA 5 Morning News at 6:00 AM | KTLA | CW | Los Angeles, CA | 2 | $6,000 | 100321 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 6:00 AM ET | Why all 7 freshmen Democrats from the state's 'pur | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 25 2019 | 6:00 AM ET | Man credited with aiding arrest of Democratic dono | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 25 2019 | 5:30 AM PT | Eyewitness News at 5:30 AM | KABC | ABC | Los Angeles, CA | 2 | $3,420 | 50567 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 5:30 AM PT | KTLA 5 Morning News at 5:30 AM | KTLA | CW | Los Angeles, CA | 2 | $2,550 | 76274 | Television | Ch. 3 Broadcast |

| Date | Time | Program | Station | Network | Market | | Value | Audience | Type | Medium |
|---|---|---|---|---|---|---|---|---|---|---|
| Sep 25 2019 | 5:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $10,513 | 50200 | Radio | Ch. 3 Broadcast |
| Sep 25 2019 | 4:30 AM PT | FOX 11 Morning News at 4:30 AM | KTTV | FOX | Los Angeles, CA | 2 | $120 | 10459 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 4:30 AM PT | Eyewitness News at 4:30 AM | KABC | ABC | Los Angeles, CA | 2 | $2,100 | 38578 | Television | Ch. 3 Broadcast |
| Sep 25 2019 | 4:00 AM PT | KTLA 5 Morning News at 4:00 AM | KTLA | CW | Los Angeles, CA | 2 | $10,050 | 17935 | Television | Ch. 3 Broadcast |
| Sep 24 2019 | 11:00 PM PT | KTLA 5 News at 11:00 PM | KTLA | CW | Los Angeles, CA | 2 | $68,850 | 84776 | Television | Ch. 3 Broadcast |
| Sep 24 2019 | 10:45 PM PT | KTLA 5 Sports Final | KTLA | CW | Los Angeles, CA | 2 | $11,700 | 121644 | Television | Ch. 3 Broadcast |
| Sep 24 2019 | 10:00 PM PT | KTLA 5 News at 10:00 PM | KTLA | CW | Los Angeles, CA | 2 | $80,100 | 156702 | Television | Ch. 3 Broadcast |
| Sep 24 2019 | 4:30 PM PT | NBC 4 News at 4:30 PM | KNBC | NBC | Los Angeles, CA | 2 | $2,040 | 95385 | Television | Ch. 3 Broadcast |
| Sep 24 2019 | 11:30 AM CT | Home & Family (Rebroadcast) | HALL | | National | 0 | $7,159 | 357601 | Television | Ch. 3 Broadcast |
| Sep 24 2019 | 11:00 AM PT | NBC 4 News at 11:00 AM | KNBC | NBC | Los Angeles, CA | 2 | $1,750 | 25383 | Television | Ch. 3 Broadcast |
| Sep 24 2019 | 6:00 AM PT | Today in L.A. at 6:00 AM | KNBC | NBC | Los Angeles, CA | 2 | $4,420 | 32811 | Television | Ch. 3 Broadcast |
| Sep 24 2019 | 5:30 AM PT | Today in L.A. at 5:30 AM | KNBC | NBC | Los Angeles, CA | 2 | $660 | 25597 | Television | Ch. 3 Broadcast |
| Sep 23 2019 | 2:30 PM PT | KFI 640am - John and Ken | KFI-AM | | Los Angeles, CA | 2 | $45,538 | 72000 | Radio | Ch. 3 Broadcast |
| Sep 22 2019 | 1:30 AM CT | Spectrum News 1 01:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 22 2019 | 1:00 AM CT | General Programming | FOXNEWS | | National | 0 | $18,150 | 510105 | Television | Ch. 3 Broadcast |
| Sep 21 2019 | 11:30 PM PT | SoCal Week in Review | KCBS | CBS | Los Angeles, CA | 2 | $9,945 | 61106 | Television | Ch. 3 Broadcast |
| Sep 21 2019 | 10:00 PM CT | Watters' World | FOXNEWS | | National | 0 | $51,680 | 964397 | Television | Ch. 3 Broadcast |
| Sep 21 2019 | 7:00 PM CT | Watters' World | FOXNEWS | | National | 0 | $62,700 | 1472055 | Television | Ch. 3 Broadcast |
| Sep 21 2019 | 5:30 PM CT | Spectrum News 1 05:30 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 21 2019 | 3:00 AM ET | Newsletter: Essential California Week in Review: T | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 20 2019 | 4:30 PM PT | KFI 640am - John and Ken | KFI-AM | | Los Angeles, CA | 2 | $16,012 | 65400 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 3:30 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $5,534 | 23200 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 1:00 PM CT | CBSN Los Angeles 01:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 12:30 PM CT | CBSN Los Angeles 12:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 12:30 PM PT | KCAL 9 News at Noon | KCAL | IND | Los Angeles, CA | 2 | $1,120 | 57570 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 12:00 PM CT | Outnumbered Overtime | FOXNEWS | | National | 0 | $60,280 | 1138375 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 12:00 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $1,760 | 33256 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 11:30 AM CT | Spectrum News 1 11:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 11:00 AM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | 2 | $24,030 | 64500 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 11:00 AM ET | Homeless men called Democratic donor Ed Buck 'Dr. | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 20 2019 | 10:00 AM CT | Spectrum News 1 10:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 9:01 AM PT | KNX Morning News with Dick Helton and Vicky Moore | KNX-AM | | Los Angeles, CA | 2 | $8,976 | 53000 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 9:00 AM CT | America's Newsroom with Bill Hemmer and Sandra Smi | FOXNEWS | | National | 0 | $58,642 | 1529216 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 8:30 AM CT | Spectrum News 1 08:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 8:00 AM CT | America's Newsroom with Bill Hemmer and Sandra Smi | FOXNEWS | | National | 0 | $9,684 | 1632119 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 7:00 AM PT | Good Day L.A. at 7:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $2,560 | 51863 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 7:00 AM CT | CBSN Los Angeles 07:00 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 6:30 AM PT | Eyewitness News at 6:30 AM | KABC | ABC | Los Angeles, CA | 2 | $3,200 | 75869 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 6:00 AM PT | Eyewitness News at 6:00 AM | KABC | ABC | Los Angeles, CA | 2 | $14,400 | 59506 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 6:00 AM PT | KTLA 5 Morning News at 6:00 AM | KTLA | CW | Los Angeles, CA | 2 | $6,250 | 100321 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 6:00 AM PT | KFI 640am - Bill Handel | KFI-AM | | Los Angeles, CA | 2 | $27,450 | 73100 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 6:00 AM PT | KNX Morning News with Dick Helton and Vicky Moore | KNX-AM | | Los Angeles, CA | 2 | $6,595 | 59500 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 5:30 AM PT | 89.9 NPR - Morning Edition | KCRW-FM | NPR | Los Angeles, CA | 2 | $2,722 | 9200 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 5:30 AM CT | CBSN Los Angeles 05:30 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 5:30 AM CT | Spectrum News 1 05:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 5:30 AM PT | CBS 2 News at 5:30 AM | KCBS | CBS | Los Angeles, CA | 2 | $2,520 | 16453 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 5:00 AM PT | CBS 2 News at 5:00 AM | KCBS | CBS | Los Angeles, CA | 2 | $480 | 12955 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 5:00 AM PT | Eyewitness News at 5:00 AM | KABC | ABC | Los Angeles, CA | 2 | $2,945 | 41330 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 5:00 AM PT | Today in L.A. at 5:00 AM | KNBC | NBC | Los Angeles, CA | 2 | $1,560 | 15051 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 5:00 AM CT | FOX & Friends | FOXNEWS | | National | 0 | $46,512 | 1054587 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 5:00 AM CT | CBSN Los Angeles 05:00 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 5:00 AM PT | FOX 11 Morning News at 5:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $1,950 | 22199 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 5:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $13,453 | 43300 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 4:30 AM PT | CBS 2 News at 4:30 AM | KCBS | CBS | Los Angeles, CA | 2 | $795 | 14655 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 4:30 AM CT | CBSN Los Angeles 04:30 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 4:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $12,605 | 15400 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 4:00 AM PT | KTLA 5 Morning News at 4:00 AM | KTLA | CW | Los Angeles, CA | 2 | $4,200 | 17935 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 4:00 AM PT | Eyewitness News at 4:00 AM | KABC | ABC | Los Angeles, CA | 2 | $2,240 | 34207 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 4:00 AM PT | Today in L.A. at 4:00 AM | KNBC | NBC | Los Angeles, CA | 2 | $640 | 12431 | Television | Ch. 3 Broadcast |

| Date | Time | Program | Station | Network | Location | | Amount | Audience | Type | Medium |
|------|------|---------|---------|---------|----------|---|--------|----------|------|--------|
| Sep 20 2019 | 4:00 AM PT | FOX 11 Morning News at 4:00 AM | KTTV | FOX | Los Angeles, CA | 2 | $440 | 5392 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 3:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $1,580 | 3100 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 3:00 AM ET | Newsletter: Why are so many women dying in L.A. Co | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 20 2019 | 2:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $1,023 | 2200 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 1:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $1,236 | 3900 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 1:00 AM PT | FOX 11 Ten O'clock News (Rebroadcast) | KTTV | FOX | Los Angeles, CA | 2 | $170 | 20683 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 12:30 AM CT | General Programming | FOXNEWS | | National | 0 | $19,800 | 592231 | Television | Ch. 3 Broadcast |
| Sep 20 2019 | 12:00 AM PT | KNX Nightly News | KNX-AM | | Los Angeles, CA | 2 | $6,180 | 8000 | Radio | Ch. 3 Broadcast |
| Sep 20 2019 | 12:00 AM PT | Eyewitness News on KDOC-TV at 12:00 AM | KDOC | IND | Los Angeles, CA | 2 | $5,312 | 24256 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 11:00 PM PT | Eyewitness News at 11:00 PM | KABC | ABC | Los Angeles, CA | 2 | $11,700 | 166826 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 11:00 PM PT | KTLA 5 News at 11:00 PM | KTLA | CW | Los Angeles, CA | 2 | $109,350 | 84776 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 11:00 PM PT | NBC 4 News at 11:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $5,500 | 137879 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 11:00 PM PT | CBS 2 News at 11:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $13,800 | 119989 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 11:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $3,316 | 8900 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 11:00 PM CT | CBSN Los Angeles 11:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 11:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $2,904 | 8000 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 10:45 PM PT | KTLA 5 Sports Final | KTLA | CW | Los Angeles, CA | 2 | $22,500 | 121644 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 10:30 PM PT | KCAL 9 News at 10:30 PM | KCAL | IND | Los Angeles, CA | 2 | $9,360 | 112338 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 10:30 PM CT | CNN Tonight With Don Lemon | CNN | | National | 0 | $77,350 | 581862 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 10:30 PM CT | CBSN Los Angeles 10:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 10:02 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $12,508 | 14600 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 10:00 PM CT | CNN Tonight With Don Lemon | CNN | | National | 0 | $7,700 | 681239 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 10:00 PM CT | CBSN Los Angeles 10:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 10:00 PM PT | FOX 11 Ten O'clock News | KTTV | FOX | Los Angeles, CA | 2 | $2,400 | 68991 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 10:00 PM PT | KCAL 9 News at 10:00 PM | KCAL | IND | Los Angeles, CA | 2 | $13,800 | 141201 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 10:00 PM PT | KTLA 5 News at 10:00 PM | KTLA | CW | Los Angeles, CA | 2 | $39,150 | 156702 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 9:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $15,685 | 19500 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 9:00 PM PT | KCAL 9 News at 9:00 PM | KCAL | IND | Los Angeles, CA | 2 | $1,680 | 153979 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 9:00 PM AZ | Free Speech TV | Free Speech TV | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 9:00 PM CT | CBSN Los Angeles 09:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 8:00 PM CT | Hannity | FOXNEWS | | National | 0 | $151,029 | 3220159 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 8:00 PM PT | KCAL 9 News at 8:00 PM | KCAL | IND | Los Angeles, CA | 2 | $16,920 | 113523 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 8:00 PM CT | CBSN Los Angeles 08:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 7:30 PM CT | CBSN Los Angeles 07:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 7:00 PM PT | KFI 640am - Tim Conway Jr | KFI-AM | | Los Angeles, CA | 2 | $6,281 | 35800 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 7:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $27,280 | 43100 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 7:00 PM PT | Eyewitness News on KDOC-TV at 7:00 PM | KDOC | IND | Los Angeles, CA | 2 | $5,406 | 36832 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 7:00 PM PT | TalkRadio 790am - NBC 4 News | KABC-AM | | Los Angeles, CA | 2 | $1,287 | 4300 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 6:30 PM PT | KTLA 5 News at 6:30 PM | KTLA | CW | Los Angeles, CA | 2 | $48,150 | 61224 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 6:30 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $13,042 | 31400 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 6:00 PM CT | CBSN Los Angeles 06:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 6:00 PM PT | Eyewitness News at 6:00 PM | KABC | ABC | Los Angeles, CA | 2 | $27,900 | 218617 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 6:00 PM ET | One America News 6pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 6:00 PM PT | CBS 2 News at 6:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $5,780 | 63160 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 6:00 PM PT | KTLA 5 News at 6:00 PM | KTLA | CW | Los Angeles, CA | 2 | $58,050 | 61243 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 6:00 PM PT | NBC 4 News at 6:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $8,800 | 125462 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 6:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $25,663 | 62000 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 5:30 PM PT | Eyewitness News at 5:30 PM | KABC | ABC | Los Angeles, CA | 2 | $9,240 | 189912 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 5:30 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $15,200 | 41300 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 5:00 PM PT | Eyewitness News at 5:00 PM | KABC | ABC | Los Angeles, CA | 2 | $19,530 | 184895 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 5:00 PM CT | Special Report with Bret Baier | FOXNEWS | | National | 0 | $42,777 | 1538458 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 5:00 PM PT | NBC 4 News at 5:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $8,960 | 115312 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 5:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $23,340 | 67700 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 5:00 PM CT | CBSN Los Angeles 05:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 5:00 PM PT | CBS 2 News at 5:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $3,995 | 75786 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 4:30 PM PT | Eyewitness News at 4:30 PM | KABC | ABC | Los Angeles, CA | 2 | $3,400 | 125251 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 4:00 PM PT | KCAL 9 News at 4:00 PM | KCAL | IND | Los Angeles, CA | 2 | $6,720 | 36612 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 4:00 PM CT | CBSN Los Angeles 04:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 4:00 PM PT | Eyewitness News at 4:00 PM | KABC | ABC | Los Angeles, CA | 2 | $15,640 | 136835 | Television | Ch. 3 Broadcast |

| Date | Time | Program | Outlet | Network | Location | # | $ | Audience | Type | Source |
|---|---|---|---|---|---|---|---|---|---|---|
| Sep 19 2019 | 4:00 PM ET | One America News 4pm | One America News Net | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 4:00 PM PT | KFI 640am - John and Ken | KFI-AM | | Los Angeles, CA | 2 | $42,331 | 70900 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 3:58 PM PT | NBC 4 News at 4:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $5,400 | 93139 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 3:30 PT | ABC World News Tonight (West Coast) | ABC | | National | 0 | $133,650 | 7974405 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 3:30 PM PT | KTLA 5 News at 3:30 PM | KTLA | CW | Los Angeles, CA | 2 | $13,500 | 69698 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 3:30 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $9,849 | 30500 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 3:00 PM PT | Eyewitness News 3:00 PM | KABC | ABC | Los Angeles, CA | 2 | $8,075 | 95333 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 3:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $65,540 | 64100 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 3:00 PM PT | KTLA 5 News at 3:00 PM | KTLA | CW | Los Angeles, CA | 2 | $67,050 | 62813 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 2:30 PM PT | KFI 640am - John and Ken | KFI-AM | | Los Angeles, CA | 2 | $75,794 | 82900 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 2:00 PM AZ | Free Speech TV | Free Speech TV | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 2:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $71,856 | 49000 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 2:00 PM PT | KFI 640am - John and Ken | KFI-AM | | Los Angeles, CA | 2 | $98,250 | 68900 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 1:30 PM CT | CBSN Los Angeles 01:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 1:30 PM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | 2 | $2,906 | 65100 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 1:01 PM PT | KNX In Depth with Chris Sedens and Charles Feldman | KNX-AM | | Los Angeles, CA | 2 | $13,135 | 60100 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 1:00 PM PT | KTLA 5 News at 1:00 PM | KTLA | CW | Los Angeles, CA | 2 | $33,600 | 88849 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 1:00 PM CT | CBSN Los Angeles 01:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 12:30 PM CT | CBSN Los Angeles 12:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 12:30 PM CT | On the Story With Erica Hill | HLN | CNN | National | 0 | $1,500 | 122869 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 12:30 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $640 | 33227 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 12:00 PM PT | KNX Morning News with Chris Sedens and Linda Nunez | KNX-AM | | Los Angeles, CA | 2 | $17,064 | 51300 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 12:00 PM CT | CBSN Los Angeles 12:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 12:00 PM PT | KCAL 9 News at Noon | KCAL | IND | Los Angeles, CA | 2 | $15,190 | 68390 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 12:00 PM PT | KNX Morning News with Chris Sedens and Linda Nunez | KNX-AM | | Los Angeles, CA | 2 | $9,887 | 60000 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 11:30 AM CT | CBSN Los Angeles 11:30 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 11:30 AM CT | Spectrum News 1 11:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 11:01 AM PT | KNX Morning News with Chris Sedens and Linda Nunez | KNX-AM | | Los Angeles, CA | 2 | $22,264 | 42700 | Radio | Ch. 3 Broadcast |
| Sep 19 2019 | 11:00 AM PT | Eyewitness News 11:00 AM | KABC | ABC | Los Angeles, CA | 2 | $11,110 | 113992 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 11:00 AM ET | Democratic donor Ed Buck charged in 2017 overdose | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 19 2019 | 6:00 AM PT | KTLA 5 Morning News at 6:00 AM | KTLA | CW | Los Angeles, CA | 2 | $39,250 | 100321 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 5:00 AM PT | KTLA 5 Morning News at 5:00 AM | KTLA | CW | Los Angeles, CA | 2 | $15,555 | 71001 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 4:00 AM PT | KTLA 5 Morning News at 4:00 AM | KTLA | CW | Los Angeles, CA | 2 | $10,650 | 17935 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 3:00 AM ET | Newsletter: Power, money, race and injustice in We | Los Angeles Tim | | USA | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 19 2019 | 1:00 AM PT | FOX 11 Ten O'clock News (Rebroadcast) | KTTV | FOX | Los Angeles, CA | 2 | $600 | 20683 | Television | Ch. 3 Broadcast |
| Sep 19 2019 | 12:30 AM CT | Spectrum News 1 12:30 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 PM CT | Tucker Carlson Tonight | FOXNEWS | | National | 0 | $10,340 | 1064951 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $3,424 | 10400 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 PM CT | CBSN Los Angeles 11:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 PM PT | CBS 2 News at 11:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $1,600 | 119989 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 PM PT | KTLA 5 News at 11:00 PM | KTLA | CW | Los Angeles, CA | 2 | $96,750 | 84776 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 10:02 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $3,509 | 10500 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 10:00 PM PT | KCAL 9 News at 10:00 PM | KCAL | IND | Los Angeles, CA | 2 | $9,000 | 141201 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 10:00 PM PT | FOX 11 Ten O'clock News | KTTV | FOX | Los Angeles, CA | 2 | $9,600 | 68991 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 10:00 PM CT | CBSN Los Angeles 10:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 10:00 PM PT | KTLA 5 News at 10:00 PM | KTLA | CW | Los Angeles, CA | 2 | $89,550 | 156702 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 9:30 PM CT | Spectrum News 1 09:30 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 9:00 PM CT | The Ingraham Angle | FOXNEWS | | National | 0 | $359,676 | 2059806 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 9:00 PM PT | KFI 640am - Tim Conway Jr | KFI-AM | | Los Angeles, CA | 2 | $5,051 | 19000 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 9:00 PM CT | The Ingraham Angle | FOXNEWS | | National | 0 | $139,680 | 2059806 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 PM PT | TalkRadio 790am - Best Of KABC | KABC-AM | | Los Angeles, CA | 2 | $1,014 | 3400 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 PM CT | CBSN Los Angeles 08:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 PM PT | KCAL 9 News at 8:00 PM | KCAL | IND | Los Angeles, CA | 2 | $14,760 | 113523 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $3,056 | 18900 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 7:30 PM CT | CBSN Los Angeles 07:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 PM CT | NBC News Now 07:00 PM | NBC News Now | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 PM CT | Tucker Carlson Tonight | FOXNEWS | | National | 0 | $313,407 | 3099948 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $5,343 | 34400 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 PM PT | Eyewitness News on KDOC-TV at 7:00 PM | KDOC | IND | Los Angeles, CA | 2 | $2,402 | 36832 | Television | Ch. 3 Broadcast |

| Date | Time | Program | Station | Network | Market | | Cost | Audience | Type | Source |
|---|---|---|---|---|---|---|---|---|---|---|
| Sep 18 2019 | 6:30 PM PT | KTLA 5 News at 6:30 PM | KTLA | CW | Los Angeles, CA | 2 | $21,150 | 61224 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 PM PT | CBS 2 News at 6:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $6,545 | 63160 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 PM CT | CBSN Los Angeles 06:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 PM PT | KTLA 5 News at 6:00 PM | KTLA | CW | Los Angeles, CA | 2 | $98,100 | 61243 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $17,136 | 46200 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 PM PT | Eyewitness News at 6:00 PM | KABC | ABC | Los Angeles, CA | 2 | $8,400 | 218617 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 5:30 PM CT | Spectrum News 1 05:30 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 5:30 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $5,713 | 34400 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 5:00 PM PT | CBS 2 News at 5:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $2,380 | 75786 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 5:00 PM PT | NBC 4 News at 5:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $4,480 | 115312 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 5:00 PM PT | Eyewitness News at 5:00 PM | KABC | ABC | Los Angeles, CA | 2 | $17,850 | 184895 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 5:00 PM CT | CBSN Los Angeles 05:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 5:00 PM PT | FOX 11 News at 5:00 PM | KTTV | FOX | Los Angeles, CA | 2 | $2,720 | 46643 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 5:00 PM PT | KFI 640am - John and Ken | KFI-AM | | Los Angeles, CA | 2 | $50,336 | 62900 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 4:30 PM PT | Eyewitness News at 4:30 PM | KABC | ABC | Los Angeles, CA | 2 | $4,250 | 125251 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 4:30 PM CT | Spectrum News 1 04:30 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 4:30 PM CT | NBC News Now 04:30 PM | NBC News Now | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 4:00 PM CT | Spectrum News 1 04:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 4:00 PM PT | Eyewitness News at 4:00 PM | KABC | ABC | Los Angeles, CA | 2 | $29,750 | 136835 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 4:00 PM CT | CBSN Los Angeles 04:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 4:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $19,818 | 71500 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 4:00 PM CT | NBC News Now 04:00 PM | NBC News Now | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 4:00 PM PT | KCAL 9 News at 4:00 PM | KCAL | IND | Los Angeles, CA | 2 | $10,710 | 36612 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 3:58 PM PT | NBC 4 News at 4:00 PM | KNBC | NBC | Los Angeles, CA | 2 | $3,480 | 93139 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 3:30 PM PT | KTLA 5 News at 3:30 PM | KTLA | CW | Los Angeles, CA | 2 | $116,100 | 69698 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 3:00 PM PT | Eyewitness News 3:00 PM | KABC | ABC | Los Angeles, CA | 2 | $10,830 | 95333 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 3:00 PM PT | KTLA 5 News at 3:00 PM | KTLA | CW | Los Angeles, CA | 2 | $60,750 | 62813 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 3:00 PM PT | 89.9 NPR - All Things Considered | KCRW-FM | NPR | Los Angeles, CA | 2 | $4,200 | 24400 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 3:00 PM CT | Spectrum News 1 03:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 2:30 PM PT | CNN Newsroom With Brooke Baldwin | CNN | | National | 0 | $31,680 | 624144 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 2:30 PM PT | General Hospital | ABC | | National | 0 | $4,000 | 461864 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 2:00 PM PT | NBC News Now 02:00 PM | NBC News Now | | National | 0 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 2:00 PM PT | KNX Afternoon News with Mike Simpson and Diane Tho | KNX-AM | | Los Angeles, CA | 2 | $20,012 | 72600 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 2:00 PM CT | Spectrum News 1 02:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 2:00 PM PT | KFI 640am - John and Ken | KFI-AM | | Los Angeles, CA | 2 | $36,419 | 69400 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 1:30 PM PT | CBSN Los Angeles 01:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 1:01 PM PT | KNX In Depth with Chris Sedens and Charles Feldman | KNX-AM | | Los Angeles, CA | 2 | $9,734 | 51000 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 1:00 PM PT | Spectrum News 1 01:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 1:00 PM CT | CBSN Los Angeles 01:00 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 12:30 PM CT | CBSN Los Angeles 12:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 12:30 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $1,000 | 33227 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 12:30 PM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | 2 | $1,844 | 59900 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 12:00 PM CT | Spectrum News 1 12:00 PM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 12:00 PM PT | Noticiero Univision - Edicion Digital (West Coast) | UNIVISION | UNIVISION | National | 0 | $77,851 | 524956 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 12:00 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $1,320 | 33256 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 12:00 PM CT | Outnumbered Overtime | FOXNEWS | | National | 0 | $95,040 | 1138375 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:30 AM CT | Michaela | HLN | CNN | National | 0 | $1,500 | 130681 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:30 AM PT | California Live | KNBC | NBC | Los Angeles, CA | 2 | $770 | 27391 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:30 AM PT | Eyewitness News 11:00 AM | KABC | ABC | Los Angeles, CA | 2 | $1,870 | 96898 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:01 AM PT | TalkRadio 790am - Tilden @ 10 | KABC-AM | | Los Angeles, CA | 2 | $5,476 | 18100 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 11:01 AM PT | KNX Morning News with Chris Sedens and Linda Nunez | KNX-AM | | Los Angeles, CA | 2 | $6,061 | 50500 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 AM PT | NBC 4 News at 11:00 AM | KNBC | NBC | Los Angeles, CA | 2 | $6,580 | 25383 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 AM CT | Noticiero Univision - Edicion Digital | UNIVISION | UNIVISION | National | 0 | $72,718 | 797747 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 AM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | 2 | $36,785 | 68300 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 AM PT | Eyewitness News 11:00 AM | KABC | ABC | Los Angeles, CA | 2 | $10,560 | 113992 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 AM CT | Outnumbered | FOXNEWS | | National | 0 | $121,440 | 1271573 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 AM PT | Spectrum News 1 11:00 AM | Spectrum News | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 AM PT | KTLA 5 Morning News at 11:00 AM | KTLA | CW | Los Angeles, CA | 2 | $26,740 | 92056 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 AM CT | CBSN Los Angeles 11:00 AM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |

Bates 098

| Date | Time | Program | Outlet | Network | Market | Value | Count | Reach | Medium | Category |
|---|---|---|---|---|---|---|---|---|---|---|
| Sep 18 2019 | 11:00 AM PT | CBS 2 News at 11:00 AM | KCBS | CBS | Los Angeles, CA | $1,530 | 2 | 71642 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 11:00 AM ET | Democratic donor Ed Buck used 'position of power' | Los Angeles Tim | | USA | $0 | 0 | 0 | Print | Ch. 3 Print |
| Sep 18 2019 | 10:30 AM CT | Yahoo Finance 10:30 AM | Yahoo Finance | | National | $0 | 0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 10:00 AM AZ | RT America | Russian TV | | National | $0 | 0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 10:00 AM PT | KNX Morning News with Chris Sedens and Linda Nunez | KNX-AM | | Los Angeles, CA | $19,162 | 2 | 47500 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 10:00 AM PT | KTLA 5 Morning News at 10:00 AM | KTLA | CW | Los Angeles, CA | $24,500 | 2 | 136207 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 10:00 AM ET | One America News 10am | One America News Net | | National | $0 | 0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 10:00 AM PT | KFI 640am - Gary and Shannon | KFI-AM | | Los Angeles, CA | $47,627 | 2 | 63000 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 9:30 AM PT | KTLA 5 Morning News at 9:30 AM | KTLA | CW | Los Angeles, CA | $3,220 | 2 | 147423 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 9:01 AM PT | Southern California Public Radio - Take Two | KPCC-FM | NPR | Los Angeles, CA | $6,496 | 2 | 25300 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 9:00 AM ET | One America News 9am | One America News Net | | National | $0 | 0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 9:00 AM PT | America's Newsroom with Bill Hemmer and Sandra Smi | FOXNEWS | FOX | National | $145,798 | 2 | 1529216 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 9:00 AM PT | Good Day L.A. at 9:00 AM | KTTV | | Los Angeles, CA | $360 | 2 | 36862 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 9:00 AM CT | Spectrum News 1 09:00 AM | Spectrum News | | Los Angeles, CA | $0 | 0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 9:00 AM PT | KTLA 5 Morning News at 9:00 AM | KTLA | CW | Los Angeles, CA | $20,300 | 2 | 156681 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:55 AM PT | CBS 2 News Cut-in at 08:55 AM | KCBS | CBS | Los Angeles, CA | $1,200 | 2 | 41331 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:30 AM PT | Good Day L.A. at 8:30 AM | KTTV | FOX | Los Angeles, CA | $2,640 | 2 | 40772 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:30 AM PT | CBS This Morning (West Coast) | CBS | CBS | National | $46,800 | 2 | 2642685 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:30 AM CT | Spectrum News 1 08:30 AM | Spectrum News | | Los Angeles, CA | $0 | 0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:30 AM PT | KTLA 5 Morning News at 8:30 AM | KTLA | CW | Los Angeles, CA | $8,050 | 2 | 163368 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 AM CT | Morning Express With Robin Meade | HLN | CNN | National | $2,868 | 0 | 222501 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 AM PT | Good Day L.A. at 8:00 AM | KTTV | FOX | Los Angeles, CA | $480 | 2 | 51873 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 AM CT | America's Newsroom with Bill Hemmer and Sandra Smi | FOXNEWS | | National | $13,450 | 0 | 1632119 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 AM CT | America's Newsroom with Bill Hemmer and Sandra Smi | FOXNEWS | | National | $27,976 | 0 | 1632119 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 AM PT | KTLA 5 Morning News at 8:00 AM | KTLA | CW | Los Angeles, CA | $70,000 | 2 | 174992 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 AM PT | Un nuevo dia (West Coast) | TELEMUNDO | TELEMUN | National | $10,620 | 0 | 189761 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 AM PT | 89.9 NPR - Morning Edition | KCRW-FM | NPR | Los Angeles, CA | $8,731 | 2 | 38100 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 8:00 AM ET | One America News 8am | One America News Net | | National | $0 | 0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:55 AM PT | NBC 4 Cut-in at 07:55 AM | KNBC | NBC | Los Angeles, CA | $7,480 | 2 | 77311 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:30 AM PT | Today (West Coast) | NBC | NBC | National | $293,346 | 0 | 3486715 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:30 AM PT | Spectrum News 1 07:30 AM | Spectrum News | | Los Angeles, CA | $0 | 2 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:25 AM PT | CBS 2 News Cut-in at 07:25 AM | KCBS | CBS | Los Angeles, CA | $4,740 | 2 | 41352 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:02 AM PT | TalkRadio 790am - McIntyre In The Morning | KABC-AM | | Los Angeles, CA | $8,628 | 0 | 12500 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 AM CT | CBS This Morning (Central) | CBS | CBS | National | $89,700 | 0 | 2895660 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 AM CT | Good Morning America (Central) | ABC | ABC | National | $572,330 | 0 | 3878189 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 AM PT | Good Day L.A. at 7:00 AM | KTTV | FOX | Los Angeles, CA | $7,840 | 2 | 51863 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 AM PT | KTLA 5 Morning News at 7:00 AM | KTLA | CW | Los Angeles, CA | $50,400 | 0 | 216522 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 AM ET | Good Morning America (East) | ABC | | National | $614,900 | 0 | 3878189 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 AM ET | Good Morning America (West Coast) | ABC | | National | $671,660 | 0 | 3878189 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 7:00 AM CT | Spectrum News 1 07:00 AM | Spectrum News | | Los Angeles, CA | $0 | 0 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:30 AM PT | FOX 11 Morning News at 6:30 AM | KTTV | FOX | Los Angeles, CA | $10,080 | 2 | 40786 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:30 AM PT | KTLA 5 Morning News at 6:30 AM | KTLA | CW | Los Angeles, CA | $9,500 | 2 | 146927 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:30 AM PT | Today in L.A. at 6:30 AM | KNBC | NBC | Los Angeles, CA | $11,730 | 2 | 44929 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:30 AM PT | Noticiero 52 a las 6:30 AM | KVEA | TELEMUN | Los Angeles, CA | $480 | 2 | 39138 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:30 AM PT | CBS 2 News at 6:30 AM | KCBS | CBS | Los Angeles, CA | $5,340 | 2 | 20337 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:30 AM PT | 89.9 NPR - Morning Edition | KCRW-FM | NPR | Los Angeles, CA | $5,178 | 2 | 17800 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 AM PT | KFI 640am - Bill Handel | KFI-AM | | Los Angeles, CA | $26,807 | 2 | 65200 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 AM PT | CBS 2 News at 6:00 AM | KCBS | CBS | Los Angeles, CA | $3,540 | 2 | 20507 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 AM PT | KTLA 5 Morning News at 6:00 AM | KTLA | CW | Los Angeles, CA | $38,250 | 2 | 100321 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 AM PT | TalkRadio 790am - McIntyre In The Morning | KABC-AM | | Los Angeles, CA | $5,308 | 2 | 10400 | Radio | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 AM PT | Noticiero 52 a las 6:00 AM | KVEA | TELEMUN | Los Angeles, CA | $640 | 2 | 20754 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 6:00 AM PT | Today in L.A. at 6:00 AM | KNBC | NBC | Los Angeles, CA | $17,000 | 2 | 32811 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 5:30 AM CT | Spectrum News 1 05:30 AM | Spectrum News | | Los Angeles, CA | $0 | 2 | 0 | Television | Ch. 3 Broadcast |
| Sep 18 2019 | 3:00 AM ET | Trump brings the battle to California, from homele | Los Angeles Tim | | USA | $0 | 0 | 0 | Print | Ch. 3 Print |
| Sep 17 2019 | 11:00 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | $3,444 | 2 | 9100 | Radio | Ch. 3 Broadcast |
| Sep 17 2019 | 11:00 PM PT | Eyewitness News at 11:00 PM | KABC | ABC | Los Angeles, CA | $43,650 | 2 | 166826 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 11:00 PM PT | KTLA 5 News at 11:00 PM | KTLA | CW | Los Angeles, CA | $92,250 | 2 | 84776 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 11:00 PM CT | CBSN Los Angeles 11:00 PM | CBSN Los Angeles | | Los Angeles, CA | $0 | 0 | 0 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 11:00 PM PT | NBC 4 News at 11:00 PM | KNBC | NBC | Los Angeles, CA | $16,500 | 2 | 137879 | Television | Ch. 3 Broadcast |

Bates 099

| Date | Time | Program | Station | Network | Market | Dur | Value | Audience | Type | Source |
|---|---|---|---|---|---|---|---|---|---|---|
| Sep 17 2019 | 11:00 PM PT | CBS 2 News at 11:00 PM | KCBS | CBS | Los Angeles, CA | 2 | $21,000 | 119989 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 10:30 PM CT | CBSN Los Angeles 10:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 10:02 PM PT | KNX Evening News with Brian Ping | KNX-AM | | Los Angeles, CA | 2 | $3,228 | 10600 | Radio | Ch. 3 Broadcast |
| Sep 17 2019 | 10:00 PM PT | FOX 11 Ten O'clock News | KTTV | FOX | Los Angeles, CA | 2 | $4,950 | 68991 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 10:00 PM PT | KTLA 5 News at 10:00 PM | KTLA | CW | Los Angeles, CA | 2 | $91,350 | 156702 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 10:00 PM PT | KCAL 9 News at 10:00 PM | KCAL | IND | Los Angeles, CA | 2 | $16,680 | 141201 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 10:00 PM ET | Democratic donor Ed Buck arrested and charged with | Los Angeles Tim | USA | | 0 | $0 | 0 | Print | Ch. 3 Print |
| Sep 17 2019 | 9:30 PM CT | CBSN Los Angeles 09:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 9:30 PM PT | KCAL 9 News at 9:30 PM | KCAL | IND | Los Angeles, CA | 2 | $7,560 | 132695 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 9:00 PM PT | TalkRadio 790am - Best Of KABC | KABC-AM | | Los Angeles, CA | 2 | $213 | 900 | Radio | Ch. 3 Broadcast |
| Sep 17 2019 | 9:00 PM PT | KFI 640am - Tim Conway Jr | KFI-AM | | Los Angeles, CA | 2 | $11,245 | 23200 | Radio | Ch. 3 Broadcast |
| Sep 17 2019 | 8:30 PM PT | KCAL 9 News at 8:30 PM | KCAL | IND | Los Angeles, CA | 2 | $6,120 | 95599 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 8:30 PM CT | CBSN Los Angeles 08:30 PM | CBSN Los Angeles | | Los Angeles, CA | 2 | $0 | 0 | Television | Ch. 3 Broadcast |
| Sep 17 2019 | 8:00 PM PT | TalkRadio 790am - Best Of KABC | KABC-AM | | Los Angeles, CA | 2 | $399 | 2500 | Radio | Ch. 3 Broadcast |
| Sep 13 2019 | 12:30 PM PT | FOX 11 News at Noon | KTTV | FOX | Los Angeles, CA | 2 | $1,360 | 33227 | Television | Ch. 3 Broadcast |
| Sep 13 2019 | 5:30 AM PT | FOX 11 Morning News at 5:30 AM | KTTV | FOX | Los Angeles, CA | 2 | $1,300 | 31752 | Television | Ch. 3 Broadcast |